IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECOND AMENDMENT ARMS, et. al.,       )
                                      )
                    Plaintiffs,       )       Civil Case No: 1:10-cv-4257
                                      )
          v.                          )       Hon. Robert M. Dow, Jr.
                                      )       U.S. District Court Judge
CITY OF CHICAGO, et. al.,             )
                                      )       Hon. Sheila M. Finnegan
                    Defendants.       )       U.S. Magistrate Judge

PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO DISMISS COUNTS I, III, AND
VIII-XVIII OF THE SECOND AMENDED COMPLAINT

NOW COME Plaintiffs Second Amendment Arms ("SAA"), R. Joseph Franzese, Robert M. Zieman, Sr., ICarry, and Shaun A. Kranish, and Tony Kole (collectively "Plaintiffs"), by their attorney, Walter P. Maksym, Jr., and submit the following argument and authorities in opposition to Defendants City of Chicago (the "City" or "Chicago"), Mayor Rahm Emanuel (the "Mayor"), Superintendent of Police Garry McCarthy (the "Superintendent"), and Susana Mendoza (the "Clerk") (collectively, "Defendants") Motion to Dismiss Second Amended Complaint (the "Complaint" - Doc. 52), and Memorandum in Support ("Defs' Memo" - Doc. 60.1), stating:

ARGUMENT

THE SALES AND PURCHASE OF FIREARMS AND AMMUNITION HAVE LONG BEEN
FAIRLY IMPLIED AS NECESSARILY INCIDENT TO SECOND AMENDMENT RIGHTS

Before addressing Defendants' argument by responding to their corresponding points, Plaintiffs wish to put matters in prospective by first addressing the obvious - what their Motion is calculated to avoid[1]. SAA, as a duly licensed federally firearms dealer, have asserted injuries

---

[1] Defendants' stubborn, "ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless." *Del Gonzlez-Sevin v. Ford Motor Company*, Appeal No-1665 (Slip. Opin. pp. 4-6, 7th Cir. Nov. 23, 2011, Posner, J.) (with photos).

sufficient to establish standing to challenge the Ordinance that absolutely bans on the sale, transfer, keeping, display, possession of firearms and inability to engage in interstate commerce of firearms. Their claims are actionable because there is, necessarily associate with the core Second Amendment right, the concomitant right to sell, purchase, transfer sale, transfer, keep, display, and possess firearms. In *Andrews v. State,* 50 Tenn. 165, 178, 8 Am. Rep. 8, 13 (1871), in striking down a pistol carrying statute as too restrictive under the Second Amendment, the Tennessee Supreme Court held that "the right to keep arms for this purpose *involves the right to practice their use*.... The right to keep arms *necessarily involves the right to purchase them*, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews* also held that "the right to *keep* them [arms], *with all that is implied fairly as an incident to this right*, is a private individual right, guaranteed to the citizen, not the soldier." (Emphasis supplied) 50 Tenn. at 182. *Andrews* was cited several times in *District of Columbia v. Heller,* 128 S.Ct. 2783, 2806, 2809, 2818 (2008) See also *State v. Tomas*, No. 526776 (Ohio Ct. Com. Pl. Dec. 7, 2010) (declaring a statute unconstitutional, finding, "the State has no compelling interest in prohibiting this particular defendant from possessing firearms in his place of business and home") This especially makes sense with respect to FFLs, like SAA, who's very livelihood is to sell them.

Licenses are essential in the pursuit of a livelihood. In such cases, occupation and the inability to obtain approval for a location whereat use of FFL licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. *Sniadach v. Family Finance Corp.,* 395 U. S. 337 (1969), "the right to hold specific private employment and to follow a chosen profession free from unreasonable government interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene v. McElroy*, 360 U.S. 474, 492 (1959) In *Greene* the federal government revoked the security clearance of the plaintiff. As a result he was fired. After being fired, he could not get a job as an aeronautical engineer, and as the Supreme Court noted, "[F]or all practical purposes that field of endeavor is now closed to him." Id. at 47.

THE SEVENTH CIRCUIT DOOMS THE DEFENDANTS - UNDER *EZELL*, THE SECOND
AMENDMENT NECESSARILY IMPLIES A RIGHT TO LAWFULLY ENGAGE IN THE
<u>BUSINESS OF WEAPONS AND AMMUNITION SALES TO QUALIFIED PERSONS</u>

The Seventh Circuit, recently used essentially the same horse-sense rational employed well over a century ago in *Nunn* and *Andrews,* looked to in *Heller*, to hold that firearm training is protected under the Second Amendment, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that makes it effective" See the Seventh Circuit decided *Ezell v. Chicago,* 651 F.3d 684 (7th Cir. 2011)[2] where the Seventh Circuit allowed gun owners to obtain an injunction against CHICAGO's ban on public firing ranges, holding their Second Amendment challenge had a strong likelihood of success on the merits.

In a lengthy reversal, a unanimous *Ezell* panel explained its methodology for assessing Second Amendment claims, "[t]he question is not whether or how easily CHICAGO residents can comply with the range-training requirement by traveling outside the city; the plaintiffs are not seeking an injunction against the range-training requirement," Judge Sykes wrote for the majority: "The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; *that ranges are present in neighboring jurisdictions has no bearing on this question*." (Emphasis supplied) Making short work of the kind of twisted thinking CHICAGO again hangs its hat in the instant case, the Seventh Circuit (Sykes, J.) rebuked Judge Kendall for the same "…profoundly mistaken assumption" in reasoning that one may measure harm

---

[2] Long before *Ezell*, Georgia, like CHICAGO, sought to totally ban the sale of pistols (excepting the larger pistols) and other weapons. In 1846 the Georgia Supreme Court held such ban unconstitutional under the Second Amendment. *Nunn v. State*, 1 Ga. 243, 251 (1846) Thereafter, the Tennessee Supreme Court stated what was obvious to the Seventh Circuit in *Ezell*; "the right to keep arms for this purpose involves the right to practice their use.... The right to keep arms *necessarily involves the right to purchase them*, to keep them in a state of efficiency for use, *and to purchase and provide ammunition suitable for such arms*, and to keep them in repair." (Emphasis supplied) *Andrews* at p. 1. *Andrews* also held, "the right to keep them [arms], *with all that is implied fairly as an incident to this right*, is a private individual right, guaranteed to the citizen…." (Emphasis supplied) Id. at 182.

to a constitutional right by the extent to which it can be exercised in another jurisdiction. "It's hard to imagine anyone suggesting that CHICAGO may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs," The Court added, "[t]hat sort of argument should be no less unimaginable in the Second Amendment context." … "The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City…"

There can be little doubt the reception the Seventh Circuit would give to CHICAGO's same old "profoundly mistaken assumption" in reasoning that they can totally ban gun dealers "because there are numerous gun stores in the suburbs surrounding CHICAGO." (Defs' Memo p. 14, n. 6) Rather than applying the undue-burden test from abortion cases, the Seventh Circuit stated a standard in *Ezell* more akin to First Amendment cases. It ruled, "We can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context," and then held:

> First, *a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified.* How much more easily depends on the relative severity of the burden and its proximity to the core of the right." (Emphasis supplied)

Not having learned its lesson, CHICAGO again advances the illogical notion that the right to keep handguns at home for self-defense, that they must finally acknowledge exists, somehow justifies their view that firearms and ammunition cannot be sold, purchased or transferred in CHICAGO. It argues there is absolutely no right to sell or transfer firearms in a city of almost three million is, given *Heller, McDonald*, and *Ezell*, nonsensical.

CHICAGO's ban targets to totally curtail and restrict, rather than reasonably regulate the core rights of responsible, law-abiding citizens. This is a "serious encroachment" on Second Amendment rights, unjustified by any strong and legitimate concerns. "Properly regulated firing ranges open to the public should not pose significant threats to public health and safety," Judge Sykes wrote in *Ezell*.

4

The same would be true of gun stores. "On the other side of the scale, the plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the range ban is in effect. The balance of harms favors the plaintiffs." An injunction should also halt other portions of the ordinance that indirectly prevent range training, the court added. These include the prohibition of firearms outside of the home and rules preventing the firing of guns within city limits. In a concurring opinion, Judge Ilana Rovner took aim at the contradictory firing-range training requirement and ban, which she described as "not so much a nod to the importance of live-range training as it was a thumbing of the municipal nose at the Supreme Court." *Ezell* holds firearms training is protected under the Second Amendment, because, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that makes it effective…" Id. It necessarily and logically follows that SAA's ability as a federally licensed FFL to lawfully sell and purchase lawful firearms to eligible, law abiding citizens for protection necessarily implies a corresponding right to sell, acquire and maintain the weapon itself in order proficiency in their use; "the core right wouldn't mean much without" such sales of the instrumentalities makes it effective.

The substantive component of the Due Process Clause protects fundamental liberty interests against infringement by the government, regardless of the procedures provided. *Reno v. Flores*, 507 U.S. 292 (1993); *Collins v. City of Harker Heights*, 503 U.S. 115 (1992) CHICAGO should know of *City of Chicago v. Beretta U.S.A. Corporation*, 213 Ill. 2d 351 (2005) (firearms are clearly lawful products an therefore can be manufactured and sold). It should also be aware of well established law that laws that prohibited engaging in the sale or of a lawful product without a license, to be issued only on proof of public necessity and capacity to meet public demand, effects an invalid regulation of a business not affected with a public interest and a denial of liberty to pursue a lawful calling contrary to the due process clause of the Fourteenth Amendment. *New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) (The right to engage in a common calling is one of the fundamental liberties

guaranteed by the due process clause. The limitation is that set by the due process clause, which, as construed, requires that the regulation shall be not unreasonable, arbitrary, or capricious, and that the means of regulation selected shall have a real, substantial relation to the goal sought to be obtained.)

The business of selling it is primarily private and not so affected with a municipality interest that could constitutionally limit the number of those who may engage in it. 285 U.S. at 273. Such limitations are repugnant to the due process clause of the Fourteenth Amendment. *Id.*, *Ezell*, *supra*. See also *Spinelli v. City of New York*, 579 F.3d 160, 169 (2nd Cir. 2009) a gun shop owner had a protectable interest in her firearms dealer's license that could no be deprived without due process. Id. at 169 Interference with of deprivation of a businessperson's livelihood, as in *Spinelli*, and in the instant case, violates due process. 579 F.3d at 174-76.

A qualified American cannot keep and bear that which he or she cannot acquire, especially through FFLs. In *Heller*, the Supreme Court observed that, the purpose of the Second Amendment was thought "to be 'necessary to the security of a free state.'" Id., 128 S.Ct. at 2800. If CHICAGO and other municipalities are allowed to deny SAA and others the right to do business, that, as here, is designed to totally impair their ability to provide and acquire them, the core Second Amendment rights could be prevented from being exercised.

### CHICAGO FAILS TO IDENTIFY ANY LEGITIMATE, "*EXTREMELY STRONG*" GOVERNMENTAL INTEREST THAT MIGHT WARRANT THEIR SEVERE RESTRICTIONS AND PROHIBITIONS

CHICAGO has taken the untenable and illogical position that any lawful sale, purchase or transfer of firearms can be wiped out of existence by a total ban. Its Ordinance is not a reasonable "regulation" but, rather, the type of rank prohibition recently declared unconstitutional in *Ezell*. Their infringement of SAA's' fundamental right to engage in and pursue, a lawful livelihood triggers "*Ezell* review" because a municipality cannot prevent the expansion of a business that would otherwise comport with existing law. *Dolan v. City of Tigard*, 512 U.S. 374 (1994)

CHICAGO's Ordinance cannot withstand such scrutiny justified by any legitimate,

"*extremely strong*" governmental interest as required by *Ezell*. Here, all Plaintiffs make out not only plausible procedural due process claims, but, additionally, deprivations of their fundamental rights, livelihood, liberty and property. As to Plaintiffs' due process claims, this Court only need determine: whether they have been deprived of a protected liberty interest or property interest; if so, whether the deprivation occurred without due process. *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003) In the instant case plausible claims are alleged that their fundamental rights, livelihoods, liberty and property were deprived without due process.

THE RULE 12 (B)(6) DISMISSAL STANDARD

Though plaintiffs do not disagree with the Rule 12(B)(6) authorities cited by Defendants, the following should also be considered: To avoid dismissal, the "allegations must plausibly suggest … a right to relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (citing *Twombly,* 127 S. Ct. at 1965) In interpreting the effect of *Twombly* and *Iqbal,* the Seventh Circuit has emphasized the Supreme Court's admonition that plausible claims are not the stuff of probabilistic reasoning: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable * * * [And the 'plausibility' requirement] simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations. *Brooks,* 578 F.3d at 581 (quotation marks omitted) (quoting *Twombly,* 550 U.S. at 556) So, a plaintiff need not allege specific facts unless the factual detail is "so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Brooks v. Ross,* 578 F.3d 581 (7th Cir. 2009) (discussing *Iqbal* and *Twombly*) (discussing the Seventh Circuit's interpretation of *Twombly, Iqbal*, *supra*).

According to *Riley v. Villach,* 665 F. Supp. 2d 994 (W.O. Wis. 2009), the Seventh Circuit is proceeding cautiously, as it should. It has continued to emphasize that *Twombly* and *Iqbal* have not changed the fundamentals of pleading, citing to *Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d

599 (7th Cir. 2009) ("Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact."). According to *Riley*, the bottom line seems to be that "the height of the pleading requirement is relative to circumstances." (The plausibility standard has greatest force when special concerns exist about the burden of litigation on the defendant or when the plaintiff's theory seems particularly unlikely. However, in the ordinary case, the burden remains low. So long as the Plaintiff avoids using legal or factual conclusions, any allegations that raise the complaint above sheer speculation should be sufficient.) The Supreme Court rejected the use of a heightened pleading standard to weed out insubstantial civil rights claims in *Leatherman v. Tarrant County*, 507 U.S. 163 (1993) A litigant who invokes the wrong legal theory but pleads the right facts survives a motion to dismiss Rule 12(b)(6) motion. *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1135 (7th Cir. 1992)

### A.  THAT PART OF COUNT I THAT CHALLENGES CHICAGO'S ZONING ORDINANCE SHOULD BE UPHELD IN ITS ENTIRETY

Defendants do not challenge Count I, except to say it fails to identify any provision of CHICAGO's Zoning Ordinance "that would prohibit commercial sales of firearms." (Defs' Memo p. 3) They are incorrect. There is no violation of Rule 8(a)(2) because ¶ 20 of the Complaint contains a short, plane statement,  "the sale of firearms or ammunition" is forbidden as a "home occupation" pursuant to § 17-9-0202-C (11)(q). ... CHICAGO will not issue a zoning permit for any use it deems may violate the penal ordinances of the CITY. When ¶¶ 20 and 48 are read in conjunction with ¶¶ 18 and 19 § 8-20-100 Defendants are placed on notice as to which provision of their Zoning Ordinance they are called upon to defend. Further, there is a firmly entrenched constitutional principle that every citizen is guaranteed the right to engage in any lawful, useful and harmless business or trade, and that it is not within the constitutional authority of the legislature in the exercise of the police power to interfere with that right of the individual where no interest of the public safety, welfare or morals is damaged or threatened. *People ex rel. Barrett* v. *Thillens,* 400 Ill. 224 (1948); *Figura v. Cummins*, 4 Ill. 2d 44 (1954); *Figura v. Cummins*, 4 Ill. 2d 44 (1954) (principal applied to

8

prohibitions of home based businesses). Therefore, Count I should stand in its entirety.

    B.   Plaintiffs' Count III Should Not Be Dismissed - Chicago's Gun and Ammunition Sales Ban Ordinance is Unconstitutional - it Violates the Supremacy Clause By Rendering SAA's Federal License Impotent

In *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824) (State law invalided because it conflicted with a federal licensing law of steamboat operators protected by the terms of their federal license to engage in trade by rendering the federal law impotent in that state])) SAA is protected by federally license and its liberty interest to be a dealer in firearms - licensed and authorized by ATF - with a concomitant and independent constitutional right to engage in interstate commerce and in CHICAGO. The CHICAGO ban has made it possible for local authorities, who are unanswerable to the federal government, to totally defeat SAA's interstate importation and sales of lawful firearm to qualified purchasers by constructing an *de facto* trade barrier. SAA alleges lost sales and business opportunities that are ongoing and real. It is well established that the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs. Inc.,* 471 U.S. 707, 712 (1985) (quoting *Gibbons,* 9 Wheat. 1, 211)

    Preemption will also be implied if state or local law "actually conflicts with federal law." State and federal law directly conflict, "where it is impossible for a private party to comply with both state and federal requirements *or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress*." (Emphasis supplied) *Hillsborough, supra*, *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) Congress put in place a comprehensive scheme to regulate the movement of firearms in commerce. *See United States v. Mobley*, 956 F.2d 450, 453 (3rd Cir. 1992) ("By channeling the sales of firearms through federally licensed dealers, the Act sought to 'insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest.'"). Thus, *the Federal firearms laws are "comprehensive legislation to regulate the interstate market in a fungible commodity." Gonzales v. Raich*, 545 U.S. 1, 22 (2005) Indeed, Congress found that "[o]nly

through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business … dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible." *Id.* at 2114; *see also Scarborough v. United States*, 431 U.S. 563, 572 n.10 (1977)

SAA's' activities - selling firearms, accessories, and ammunition affect interstate commerce. See *United States v. Stewart*, the Ninth Circuit held that "[g]uns … are regulated by a detailed and comprehensive statutory regime *designed to protect individual firearm ownership* while supporting 'Federal, State and local law enforcement officials in their fight against crime and violence.' (Emphasis supplied) 451 F.3d 1071, 1076 (9th Cir. 2006) CHICAGO's Ordinance conflicts with, intensely interferes with and essentially emasculates SAA's FFL. SAA asks this Court for relief because the federal firearms laws are a valid exercise of federal power that, operate to preempt CHICAGO's total prohibitions to the extent that a conflict exists. *Raich*, 545 U.S. at 29 ("state action cannot circumscribe Congress' plenary commerce power"). See also *Ogden, supra*, and *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1039 (9th Cir. 2007) (the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law,"); *U.S. v. Rothacher,* 442 F.Supp.2d 999, 1007 (2006) ("the primacy of the Supremacy Clause … authorizes congressional commerce power to override state law").

Even if the regulations are not comprehensive enough and the federal interest is not dominant enough to pre-empt the entire field of firearms sales regulation, CHICAGO's Ordinance must be invalidated because they conflict with the federal scheme and the pubic interest and defeat and render impotent Congresses' intended normal and protected use of SAA's FFL. Under the above authorities and *Ezell,* SAA has fairly alleged that the prohibitions imposed by the Ordinance are legally impermissible. Given CHICAGO's outright bans, balancing under *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) is unnecessary since it has made no attempt to specify

any valid public interest through less invasive and burdensome methods. Instead, they undermined the federal scheme, public interest and suppressed interstate commerce in lawful products, the availability of which lies at the core of a fundamental right. Moreover, it is clear CHICAGO has failed to even allude to any "*extremely strong* public-interest justification and a close fit between the government's means and its end" banning of a federally licensed livelihood imposed on Plaintiffs by the Ordinance.

### C.  PLAINTIFFS HAVE STANDING TO ASSERT COUNT VIII AND IT STATES A CLAIM

Almost three (3) years before CHICAGO enacted the Ordinance, the Court of Appeals for the D.C. Circuit had held that handguns are "arms" for the purposes of the Second Amendment and struck down sections of a local law that barred D.C. residents from owning handguns, ruling that the law's ban on handgun ownership and requiring all firearms "unloaded and disassembled or bound by a trigger lock" were unconstitutional, holding the requirement amounted to a complete ban on functional firearms and prohibition on use for self-defense: "…like the bar on carrying a pistol within the home, [this prohibition] amounts to a complete prohibition on the lawful use of handguns for self-defense. As such, we hold it unconstitutional." *D.C. v. Parker*, 78 F.3d 370 (D.C. Cir. 2007), *cert. denied*, 128 S. Ct. 2994 (2008), affirmed *D.C. v. Heller,* 554 U.S. 570 (2008) Defendants' broadly written "locked box or container" is a similar severe imposition[3] that is no doubt also infirm. Defendants' Motion reflects nothing more than their dogged determination to delay facing *Ezell*.

---

[3] Defendants grasp for straws reasonable have anticipation at any time any potential visitor (under 18 years), even a burglar, may have a minor(s) with them thus requiring lock. See, e.g., Dickens's *Oliver Twist*, describing Fagan's recruitment and use of orphans such as the "Artful Dodger" and his juvenile minions. Further, as held in *Parker*, gun locks render them useless when need for protection. The Ordinance is fatally flawed not only because of *Parker*, but because it is so broadly drawn. Any CHICAGO gun owner would have to have their weapons locked 24/7/365 out of fear of prosecution and permanent loss of their core rights, whether or not they had minors living with them, to avoid the possibility of prosecution and penalty should any invitee be a minor, or, if adult be accompanied by a minor, not to mention any confrontation of any youthful intruder or trespasser, whether or not they might be intent on committing a felony in or about their home or not. In any event, Mr. Zeiman has five (5) minor children.

11

In *Ezell v. Chicago*, decided July 6, 2011, the Seventh Circuit reversed a district court decision that the post-*McDonald* measures adopted by the CHICAGO were constitutional. CHICAGO's ordinance required firearms training in a shooting range in order to obtain a gun permit, but also banned shooting ranges within the City. CHICAGO argued with a straight face that applicants could obtain their mandatory training at gun ranges in the suburbs – though nowhere in the City. The opinion noted that CHICAGO could not infringe Second Amendment rights on the grounds that they could be exercised elsewhere, any more than it could infringe the right to freedom of speech on the grounds that citizens could speak elsewhere.

    D.    COUNT IX DOES NOT FAIL TO COMPLY WITH
             RULES 8 (A)(2) AND 10 (B), AND TO STATES A CLAIM

    1.    COUNT IX DOES NOT VIOLATE FED. R. CIV. P. 10 (B) & 8 (A)(2)

Defendants argue SAA "…has not brought a separate claim for each provision of the Ordinance it challenges…." (Defs' Memo p. 10) However, Count IX challenges the Ordinance that is comprised of a multitude of infirm sections that are merely its parts. Defendants cite no authority that would require an unending series of separate counts is to challenge a single ordinance on multiple grounds – only the fair notice given here is needed. This Court asked Plaintiffs in open court to amend and simplify the Complaint. They have done so. Pleading separate claims for each section of the Ordinance, as Defendants urge, would accomplish the opposite result and unnecessarily lengthen the Complaint. Further, Defendants' citation of and reliance upon the non-final decision in *Stanard v. Nygren,* __ F.3d __, No. 09-1487, 2011 WL 4346715 (7th Cir. Sept. 19, 2011) is premature and misplaced. See *Stanard v. Nygren,* Appeal No. 9-1487, Petition for Rehearing filed 10/3/11 and Verified Response filed 10/10/11 (7th Cir. 2011) These matters and the *Stanard* appeal are still pending and undetermined thus rendering the 9/19/11 opinion non-final. Moreover, under *Ezell*, the burden shifts to the City to show its Ordinance has "extremely strong

public-interest justification and a close fit between the government's means and its end." Dismissal of SAA's answerable Count IX under Rules 10 and 8 would therefore inappropriate.

2-5. P<small>LAINTIFFS</small> S<small>TATE A</small> C<small>LAIM UNDER THE</small> D<small>ORMANT</small> C<small>OMMERCE</small> C<small>LAUSE</small>

The Dormant Commerce Clause ("DCC") is the judicial concept that the Constitution bars the states from legislating on certain matters that affect interstate commerce, even in the absence of Congressional legislation. It is applied to block states from regulating in a way that materially burdens against interstate commerce. See *Gibbons v. Ogden*, supra; *Cooley v. Board of Wardens*, 53 U.S. 299 (1851) More recent treatments of the concept include *Healy v. The Beer Institute*, 491 U.S. 324 (1989), and *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987)

The DCC involves not federal power to act but the restrictions on state power that are inherent in the Commerce Clause. There is no actual "DCC" found in the Constitution. Rather, the Supreme Court from the Commerce Clause has inferred the restrictions on state action. The DCC requires that laws that impact interstate commerce be subjected to scrutiny under a two-tiered framework: any statute that facially discriminates against out-of-state commerce will fall subject to the *per se* rule, and all other statutes that have an effect on interstate commerce are analyzed under the balancing test set forth in established in *Pike*. See *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003) The second tier of scrutiny governs non-discriminatory state or local laws which, as here, affect interstate commerce. Such laws are subjected to the aforesaid *Pike* balancing test that requires a court to evaluate many different issues relating to the challenged the Ordinance, including the legitimacy of the CHICAGO's (here unarticulated) local public interests, the extent of the burdens imposed on interstate commerce, and the degree to which the they are tailored to promote the governmental interest while having a minimal effect upon such commerce. However, here there is no "legitimate local public interest" that would warrant totally preventing SAA's use of its FFL and engaging in a lawful business – the sale of lawful products.

Numerous Seventh Circuit and Supreme Court decisions consistently state that laws can

either be discriminatory or nondiscriminatory, and that *Pike* balancing comes into play when a law is nondiscriminatory. See *Alliant Energy Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003), *reh'g den.*, 336 F.3d 545 (7th Cir. 2004) ("In determining which tier to apply, the rule of thumb is that essentially any statute that facially discriminates against out-of-state commerce will fall subject to the per se rule, and all other statutes that have an effect on interstate commerce will be analyzed under the *Pike* balancing test.")

Plaintiffs have set forth a valid DCC claim demonstrating that either the local law "discriminates on its face against interstate commerce," *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n,* 545 U.S. 429, 433 (2005); *or* imposes a "burden ... on [interstate] commerce [that] is clearly excessive in relation to the putative local benefits," *Pike, supra,* See also *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) Plaintiffs have shown both. Again, here the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits, since the Ordinance has none. Upon determination that challenged provision affects interstate commerce, this court "*must* then apply either the virtual per se invalidity or the *Pike* balancing test") *Solid Wastes Management Association v. Meyer*, 63 F.3d 652, 657 (7th Cir. 1995)

When considering the purpose of the challenged statute ... it is [the court's] duty to determine the practical effect of the law." *Meyer*, 63 F.3d at 658 Plaintiffs assert the effects of the Ordinance are, in fact, discriminatory; at a minimum, they include the imposition of tangible burdens on interstate commerce. The Ordinance to totally bans the sale of lawful products imported by a federally licensed dealer. It has the practical effect of suppressing the general demand, trade in and availability of perfectly lawful products, and preventing their sale or gift or transfer. If allowed to persist, this would lead to diminished production and exporting from those states and countries from which Plaintiffs would purchase their stock in trade produced in other jurisdictions and would be sold to them through interstate commerce. At this stage in the case, courts are required to accept these

14

allegations as true: the Ordinance burdens interstate commerce by suppressing the interstate trade in a lawful product in the absence of any putative local benefit. Such an economic barrier necessarily burdens interstate commerce. See, e.g., *Proctor & Gamble Co. v. City of Chicago*, 509 F.2d 69, 78 (7th Cir. 1975) ("Though the ordinance may not directly dictate such a result, one effect is that the free flow in commerce of a particular product is disrupted. Such a disruption must be deemed a burden on interstate commerce.")

Outlawing gun dealers is in essence banning not only the necessary instrumentalities that lie at the heart of the exercise of the core Second Amendment right, but also SAA's pursuit of a lawful livelihood, and interstate trade. The Ordinance totally bars the sale of guns and ammunition within the City without regard to their source. So, its ultimate effect is to discriminate between in-state and out-of-state interests. See, e.g., *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S 511, 521-522 (1935) (ban on sale of imported product "will set a barrier to traffic between one state and another as effective as if customs duties ... had been laid upon the thing transported .... [and] are placed by an express prohibition of the Constitution, beyond the power of a state") The burdens of such bans are directly borne by those out-of-state gun manufacturers and distributors who supply lawful products to SAA who now find the markets for its products closed - shut down by a hostile regime. The Ordinance is a ban on interstate trade between foreign gun manufacturers and distributors and domestic retailers, such as SAA, designed to punish lawful conduct in pursuit of a lawful calling. Such a prohibitions have undeniable discriminatory effects that the DCC is intended to forbid.

Preemption applies, only when there is a federal law on point. When there is no existing federal law, the DCC applies to tell us what states may or may not do. The DCC ultimately means that because Congress has been given power over interstate commerce, states cannot discriminate against interstate commerce *nor can they unduly burden interstate commerce, even in the absence of federal legislation regulating the activity.* Any state law which affects interstate commerce must be: (1) rationally related to a legitimate state concern and (2) the burden on interstate commerce must be

outweighed by the benefit to the state's interests. In determining whether the burden is outweighed by the benefits, a court must examine whether the state objective could be achieved by a means less restrictive on interstate commerce. See *United States v. Lopez,* 514 U.S. 549, 579 (1995)

Defendants rely on *National Paint* and *Procter & Gamble.* Those cases upheld the bans on outlaw the sale of particular sub-types of products (banning spray-paints and detergents containing phosphates) otherwise available – not each and every type of a product (i.e., all paints, detergents, handguns and/or ammunition) along with an entire kind of livelihood, such as grocery, hardware or weapons dealers and stores – not a product that must be available in order to exercise a core constitutional right. A claim should not be dismissed at the pleading stage where, as here, it alleges under the DCC that a law places an excessive burden on interstate commerce.

E.   Count X States a "Monell Claim"

Plaintiffs state a separate § 1983 against CHICAGO under *Monell, ("…[r]espondeat superior* liability will not suffice to impose § 1983 liability on a city.") Instead, "it is when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694). *Baskin v. City of Desplaines,* 138 F.3d 701, 704-05 (7th Cir. 1998) (municipal liability can stem from that which comes to have the force of law, i.e. here the City's Ordinance) In *U.S. v. Classic*, 313 U.S. 299 (1941), the Court held that "[m]isuse of power, possessed by virtue of law and made possible only because the wrongdoer is clothed with the authority of … law, is action taken 'under color of' … law." Id. at 326. The *Monell* Claim should not be dismissed.

F.   Count XI Should Not Be Dismissed Because the
     Ordinance Violates the Sherman Antitrust Act

Count XI alleges that the City's Ordinance violates the Sherman Antitrust Act (15 U.S.C. §1) due to its total prohibition of firearms dealers and their businesses – an act made thereunder in combination and conspiracy pursuant to a scheme to restrain trade. Its actions that admittedly "prohibits the sale of firearms in the City" (Defs' Memo p. 14) The City bans commercial trade that reduce lawful competition for antitrust purposes. In matters of mixed state and local concern, a conflict exists if the ordinance forbids what the state or federal law authorizes. See, e.g., *City of Commerce City v. State,* 40 P.3d 1273, 1279, 1284 (Colo. 2002). Plaintiffs' Count XI should stand.

G. COUNT XII COMPLIES WITH RULE 8(A)(2)

Defendants ignore the specific prior common allegations (¶¶ 1 - 44) incorporated by reference via ¶ 92 of Count XIV as if fully set forth therein, as is permitted by Fed. R. Civ. 10(b). See *Wessel v Village of Monee*, Case No. 1:04-cv-03246 Doc. 75 p. 15 (N.D. Ill. June 14, 2010 - Joan B. Gottschall, Judge). KOLE simply seeks restitution of property, the fees he and others, similarly situated, were compelled to and did pay under pain of fines and penalties to obtain a mandatory permit and certificates under the allegedly unconstitutional Ordinance.

 "A State may not impose a charge for the enjoyment of a right granted by the Federal Constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) In *Ross v. City of Geneva*, 71 Ill. 2d 27 (1978) the plaintiff class prosecuted a refund action seeking the return of fees collected, pursuant to an unconstitutional ordinance over a 13-year period. 43 Ill.App.3d 976, 977-78 (1976) The Illinois Supreme Court in *Ross* affirmed the judgment of the appellate court, which had held that the claims were not barred. *Ross*, 43 Ill.App.3d at 985 (rejected applicability of the statute of limitations, noting that plaintiff sought "equitable relief" by, as here, seeking the restitution of funds collected without [lawful] authority over a period of 13 years"). The appellate court held that the statute of limitations did not apply to plaintiff's "equitable claim."

Such claim and relief is appropriate. See *Raintree Homes, Inc. v. Village of Long*

*Grove*, 389 Ill. App. 3d 836, *app'l den.* 233 Ill. 2d 599 (2009) (payer subject to fines or other penalties[4], fees paid to municipality under voided ordinance ordered refunded); *Anne Arundel County v. Halle Development, Inc., et al.,* 971 A.2d 214 (Md. 2009); *Award Homes, Inc. v. Town of Cary*, 698 S.E.2d 404 (NC 2010) (fees paid pursuant to an invalidated ordinance refunded to individual and class members). Accordingly, Count XII should not be dismissed.

H.     ZIEMAN'S COUNT XIII CLAIMS SHOULD NOT BE DISMISSED

Zieman's conviction was a nullity, as were those of others. "An unconstitutional law is void and is no law". An offense so created is not a crime. If the City's Ordinance is void, it inevitably follows that all convictions and benefits gained under it are likewise void. *Bond v. United States*, 64 U. S. __, 131 S.Ct. 2355 (2011) Citizens have right not to be convicted under a constitutionally invalid law. A conviction under such a law is not merely erroneous, but is illegal and void thus requiring restitution of any fine paid. See *Ex Parte Siebold*, 1 U.S. 373 (1879); Ex *Parte Royall*, 117 U.S. 241 (1886) "[A] void judgment … may be attacked at any time or in any court, either directly or collaterally"… even before reversal. *Vallely v Northern Fire & Marine Ins. Co.*, 254 U.S. 348 (1920) (attack may be at any time in the same or any other court, by the parties or by any other person who is affected thereby). See also Accord, *People v Wade*, 116 Ill.2d 1 (1987); *United States v. Wallace*, 280 F.3d 781 (7th Cir. 2002) (A conviction based on an unconstitutional law is void *ab initio*.)

Zieman's claims are not "moot" or time-barred by the normal two-year statute because Plaintiffs' claims are equitable. See *Ross,* supra. On July 2, 2010, the City repealed the handgun ban and enacted the Ordinance. In light of Chicago's *McDonald* defeat, Zieman promptly filed his claim until July 9, 2010. The fact the original handgun ban was no longer in effect at the time Zieman filed his claims renders them still timely. Given *McDonald* and *Ezell*, that ban was

---

[4] The penalty provision of the new Ordinance provides that for failure to obtain a permit, failure to register a weapon or any non-compliance, is that one forever loses the fundamental core right to own a gun. One does not forfeit one's dog or car in CHICAGO for failure to obtain a dog license or city sticker.

clearly invalid when Zieman's firearms were seized and destroyed under it, and remains void *ab initio*. Yet, Defendants say, "[b]efore … *McDonald,* the Second Amendment did not apply to state and local governments." *See District of Columbia v. Heller,* 554 U.S. at 620 n.23. Not quite. Though *McDonald* had profound implications for the *manner in which courts evaluate* the constitutionality of laws prohibiting the possession of firearms, it is "widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *McDonald*, 130 S.Ct. at 3066; *Heller I*, 554 U.S. 570, 592 (2008) These rights are so "deeply rooted in this Nation's history and tradition," (Section 1983 confers no rights of its own but merely provides a cause of action for rights secured via the Constitution or federal law. Wright, Miller & Cooper, *Federal Practice and Procedure* § 3573.2 (2d ed. 2008) 130 S.Ct. at 3023) that they are fundamental to our scheme of ordered liberty. Accordingly, the Court reversed the judgment of the Seventh Circuit and remanded the case for further proceedings in accordance with their decision. *Id.* at 3050.

In *McDonald,* the Supreme Court sounded the death knell for the City's ordinance leaving the lower courts to perform the burial. *Id.* at 3050. After losing *McDonald* in the Supreme Court, and before the case came back down to the trial court so it could enter judgment. However, before the lower courts could do so, to avoid paying the piper's fees, the City rushed to repeal the ban and enacted its new Ordinance on July 2, 2010. *McDonald was* dismissed as "moot." The district court then ruled in the NRA case that there were no "prevailing parties" to recover fees, since the only final judgment was a dismissal. The Seventh Circuit reversed, asking, "By the time [CHICAGO] bowed to the inevitable, plaintiffs had in hand a judgment of the Supreme Court that gave them everything they needed. If a favorable decision of the Supreme Court does not count as "the necessary judicial imprimatur" on the plaintiffs' position (*Buckhannon*, 532 U.S. at 605), what would? The district court's decision is reversed, and the cases are remanded for awards of reasonable attorneys' fees under §1988." *NRA v. City of Chicago*, 646 F.3d 992 (7th Cir. 2011) (Plaintiffs in *McDonald* did better than prevail at the district court level; they received a

favorable decision from the United States Supreme Court.) In any event, the October 12, 2010 Order did not involve Plaintiffs or this case, nor did they have no notice of it.

Thereafter, rather than be a good looser, face responsibility and take their medicine, in what Defendants no doubt thought would be a slick end-run around the Seventh Circuit's pounding and their loss in *Ezell* appeal, on July 6, 2011, the CHICAGO City Council allowed firing ranges to operate in the city, subject to restrictions, by deleting the offending section of the ordinance. One hour before the council changed the law, however, the 7th Circuit granted *Ezell's* earlier request for an injunction with an emergency reversal ruling. *Ezell v. City of Chicago*, Case No. 1:10-cv-05135 Doc. 122, p. 6-7 (Memo Opin. Sept. 28, 2011) As part of what they thought would be a slick move, the City raced to move to dismiss *Ezell* as moot, asserting that the council had given her all the relief she sought. But Ezell claimed that the city's new web of restrictions, as do these Plaintiffs, effectively operates as a new ban and presents additional and different issues. The City fails to advise that their motion to dismiss, is in this respect, identical to its unsuccessful motion to dismiss *Ezell* that was also based on upon the repeal of its doomed original Ordinance and adoption of its new Ordinance *Ezell,* Doc. 122, Memo Opin. pp. 1-6 ("mootness" motion denied). Here, as in *Ezell*, Plaintiffs have not received all of the relief they seek and the new Ordinance severely burdens core rights.

Zieman could not have simply sued before *McDonald.* Had he filed an earlier action challenging the constitutionality of and restitution under the Old Ordinance, he would have no doubt risked the imposition of sanctions under Rule 11, given the Seventh Circuits' precedent in *Quilici v. Village of Morton Grove*, 695 F.2d 261 (7th Cir. 1982) Those, like him, convicted and punished under the old Ordinance were thus then prohibited by precedent from bringing a constitutional challenge and claims for restitution. Therefore, Count XIII should not be dismissed.

I. COUNT XIV DOES NOT VIOLATE RULE 10(B)(6)

Defendants do not maintain the Ordinance is constitutional. Rather, they demand Plaintiffs plead a separate declaratory count for challenged provision of the Ordinance. In so

doing they ignore the specific prior common allegations (¶¶ 1 - 44) incorporated by reference via ¶ 104 of Count XIV as if fully set forth therein, as is permitted by Fed. R. Civ. 10(b). See *Wessel, supra.* Accordingly, Count XIV should not be dismissed.

    J.   SAA IS ENTITLED TO MANDAMUS AS CLAIMED IN COUNT XV

CHICAGO's ban on the sale of arms is not, as it says, "presumptively lawful." (Defs' Memo p. 20) See *Ezell.* Federal courts proclaim, when requiring state officials to pay damages for disobedience to federal law (including constitutional doctrine) and that state actors must follow the federal rules without waiting for litigation. *Alleghany Corp. v. Haase,* 896 F.2d 1046 (7th Cir. 1998) *Mandamus* is an extraordinary remedy used to enforce, as a matter of right, a public officer's performance of his public duties where no exercise of discretion on his part is involved. *Noyola v. Board of Education of the City of Chicago,* 179 Ill. 2d 121, 133 (1997) Under the new Ordinance, the City *de facto* removes all discretion, if any, over lawful gun dealerships under the Old Ordinance. (Comp. Ex. "A") "Where rights secured by the constitution are involved, there can be no rule making or legislation which would abrogate them." *Miranda v. Arizona*, 384 U.S. 436, 491 (1966) "The assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice." *Davis v. Wechsler*, 263 U.S. 22, 24 (1923)

Illinois courts have had no hesitation in using mandamus when constitutional rights are at stake. See, e.g., *Overend v. Guard*, 98 Ill. App.3d 441 (4th Cir. 1981) (holding that mandamus was the appropriate means to compel public officials to comply with constitutional duties); *Crump v. Illinois Prisoner Review Bd.*, 181 Ill. App. 3d 58 (1st Dist. 1989) ("in certain cases, allegations of constitutional violations . . . can state a cause of action for mandamus relief"); *Clayton-El v. Lane*, 203 Ill. App. 3d 895 (5th Dist. 1990) See also, *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) ("conduct cannot be discretionary unless it involves an element of judgment or choice"). Here, the Ordinance denied all discretion to grant and when declared unconstitutional there would be no discretion but for Defendants to perform the constitutional duty and grant SAA a license.     Under

*Overend*, Defendants had no "discretion" to violate SAA's constitutional rights. The failure of a governmental entity to perform its ministerial duties cannot be allowed to derail the proper function of government. See *People ex rel. Needham v. Abbott Estate,* 47 Ill. 2d 491, 496 (1970) *Mandamus* is an appropriate cause of action. See *In re Application of Anderson*, 311 Ill. App.3d 440 (2nd Dist. 2000) Plaintiff must join a mandamus claim with a damage claim under § 1983 claim. See *Wozniak v. County of DuPage*, 845 F.2d 677 (7th Cir. 1998)

SAA can demonstrate that the refusal to issue a weapons license under the Old Gun Ban Ordinance (Comp. Ex. "A") would be a ministerial act if the unconstitutionality of the New Gun Ban Ordinance (Comp. Ex. "B") were to be declared unconstitutional and void because, to quote Defendants: "[i]ndeed, the Ordinance currently does not allow for the issuance of a license to sell firearms." (Defs' Memo p. 20) Should this Court declare the new Ordinance void *ab initio*, there would be a "process in place for the issuance of such a license ... [and a] ministerial act to perform." (Defs' Memo p. 20) SAA has pled it has complied with all of its provisions and that Defendants refuse to process its paid applications thus any further attempt would have been futile, and therefore can show a clear right to its issuance. (Comp. ¶ 33) Count XV should stand.

### K. SAA HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE IN COUNT X

The state law tort of intentional interference with prospective economic advantage can be established here because Plaintiffs plausibly plead, 1) the existence of a valid business expectancy; 2) knowledge of it by the alleged interferor; 3) intentional interference causing loss of the expectancy; and 4) damages. Defendants knew their intentional interference would cut off prospective business and customers as well as interstate trade – this was the intent, purpose and object of the Ordinance. They are fairly informed that their acts were directed toward causing a loss of business expectancy with their prospective customers that, in turn, caused an economic disadvantage to SAA.

Their argument flies in the face of the Constitution and public policy. Sections 2-203 and 2-

205 are inapplicable to this Count because Defendants' acts were intentional and not, a mere failure done pursuant to any valid law and caused the unconstitutional blanket deprivation of SAA's livelihood and licenses, not the mere garden variety failure to issue or deny a license. Defendants pooh pooh the obvious by asserting they did not know the Ordinance would constitute interference is wrong. Given the deliberate nature of their illegal actions no Defendant is immune. See *McGovern v. Pacetti,* No. 01 C 3722, 2002 WL 122314, at \*2 (N.D. Ill. Jan. 29, 2002) (Pallmeyer, J.) (denying defendant officer's motion to dismiss state law claims on the ground that more facts were necessary in order to determine the applicability of § 2-202) Further, the City is not immune from liability for damages for violation of a federally base right to a license because State law immunities do not apply to claims that may arise from denial of a license in a violation of federal law. See, e.g., Ancel, Glink, *Illinois Governmental Tort Immunity Handbook*, p. 15, ¶ D (2011 ed.) Count XVI should not be dismissed.

L.  COUNT XVII STATES A CLAIM

The Illinois due process clause has been interpreted to provide greater protections than its federal counterpart where we found an appropriate basis to do so. See *People v. Washington*, 171 Ill. 2d 475, 485-86 (1996); *People v. McCauley*, 163 Ill. 2d 414, 440 (1994)

KOLE seeks restitution on behalf of himself and a putative class of the payment of unconstitutional registration fees charged by the City. His claims arise under the Illinois Constitution. However, Count XVII does not violate Rule 8(a)(2) because it does not suffer from the alleged deficiencies identified in Part G of Defendants' Memo. For the sake of economy, Plaintiffs incorporate part G of this Memo, as if set forth herein. Because Count XVII is sufficient because it complies with Rule 10 (b) for the same reasons stated in Part I of this Memo, which Plaintiffs also incorporate as if set forth herein, it should stand.

M.  COUNT XVIII STATES A CLAIM

For purposes of economy, Plaintiffs incorporated Part H of this Memo that relates to Count XIII, as if set forth fully herein. Plaintiffs assert Count XVIII complies with Rule 10(b) for the same reasons identified in Part I of this Memo, which they also incorporate as if set forth herein. Thus, Count XVIII should not be dismissed.

N.  The Mayor, Superintendent, and Clerk Should Not Be Dismissed

The Court should not dismiss the Mayor, Superintendent, and Clerk as defendants because they, like Mayor Daley before them, have thumbed their nose at the Supreme Court and Seventh Circuit by ignoring, defying, evading and denouncing their rulings in *McDonald*, *Ezell* and *N.R.A.* doing all they could to defeat the constitutional rights of those with whom they happen to personally disagree. Their continued inclusion is necessary, to hold them accountable, and, to render them subject to mandamus and the other relief that may be granted should Plaintiffs prevail.

CONCLUSION

For the foregoing reasons, Plaintiffs pray this Court deny Defendants' Motion to Dismiss and grant them such further relief this Court deems just and proper in the premises.

Respectfully submitted,

R. JOSEPH FRANZESE d/b/a/ SECOND AMENDMENT ARMS, ROBERT M. ZIEMAN, SR., SHAUN A. KRANISH d/b/a ICARRY, and TONY KOLE, Plaintiffs,

By _/s/ Walter P. Maksym, Jr._
WALTER P. MAKSYM, JR., their attorney

Walter P. Maksym, Jr.
Attorney for Plaintiffs
2056 N. Lincoln Avenue
Chicago, IL 60614-4525
Telephone: (312) 218-4475
e-mail: wmaksym@gmail.com

24