# EXHIBIT A

Case: 1:10-cv-04184 Document #: 241 Filed: 01/14/14 Page 1 of 36 PageID #:11029

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Illinois Association of Firearms Retailers, Kenneth Pacholski, Kathryn Tyler, and Michael Hall, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10 C 04184 |
| v. | ) ) ) | Judge Edmond E. Chang |
| The City of Chicago and Rahm Emanuel, Mayor of the City of Chicago, | ) ) ) | |
| Defendants. | ) ) | |

PERMANENT INJUNCTION

1.     Under Federal Rule of Civil Procedure 65(d), this order permanently enjoins Defendants City of Chicago and the Mayor of the City of Chicago in his official capacity from enforcing the following sections of the Municipal Code of Chicago: Municipal Code § 8-20-100(a) and Municipal Code § 17-16-0201, to the extent that it prohibits the construction and operation of firearms sales businesses.

2.     Under Federal Rule of Civil Procedure 65(d)(2), this injunction also applies to Defendants' officers, agents, servants, employees, and attorneys; and other persons who are in active concert or participation with Defendants or Defendants' officers, agents, servants, employees, and attorneys.

3.     To satisfy the requirement of Federal Rule of Civil Procedure 65(a)(1)(A), the Memorandum Opinion and Order issued on January 6, 2014, is attached and incorporated into this permanent injunction.

4.     As explained during today's motion hearing, the effectiveness of this injunction, as well as the judgment entered on January 6, 2014, is stayed until July 14, 2014.

ENTERED:

                                   _____s/Edmond E. Chang_____
                                   Honorable Edmond E. Chang
                                   United States District Judge

DATE: January 14, 2014

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Illinois Association of Firearms Retailers, Kenneth Pacholski, Kathryn Tyler, and Michael Hall, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10 C 04184 |
| v. | ) ) ) | Judge Edmond E. Chang |
| The City of Chicago and Rahm Emanuel, Mayor of the City of Chicago, | ) ) ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Three Chicago residents and an association of Illinois firearms dealers brought this suit against the City of Chicago (Mayor Rahm Emanuel is sued in his official capacity, which is the same as suing the City), challenging the constitutionality of City ordinances that ban virtually all sales and transfers of firearms inside the City's limits.[1] R. 80, Second Am. Compl. The ban covers federally licensed firearms dealers; even validly licensed dealers cannot sell firearms in Chicago. The ban covers gifts amongst family members; only through inheritance can someone transfer a firearm to a family member. Chicago does all this in the name of reducing gun violence. That is one of the fundamental duties of government: to protect its citizens. The stark reality facing the City each year is thousands of shooting victims and hundreds of murders committed with a gun. But on the other side of this case is another feature of government: certain fundamental rights are protected by the Constitution, put outside

_____

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

government's reach, including the right to keep and bear arms for self-defense under the Second Amendment. This right must also include the right to *acquire* a firearm, although that acquisition right is far from absolute: there are many long-standing restrictions on *who* may acquire firearms (for examples, felons and the mentally ill have long been banned) and there are many restrictions on the sales of arms (for example, licensing requirements for commercial sales). But Chicago's ordinance goes too far in outright banning legal buyers and legal dealers from engaging in lawful acquisitions and lawful sales of firearms, and at the same time the evidence does not support that the complete ban sufficiently furthers the purposes that the ordinance tries to serve. For the specific reasons explained later in this opinion, the ordinances are declared unconstitutional.

## I. Background

After the Supreme Court invalidated the City of Chicago's handgun ban in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), Chicago enacted a new set of ordinances regulating firearms. Initially, this suit challenged three categories of ordinances. But in September 2013, the City amended its laws on carrying firearms in public and on the number of operable firearms permitted in homes. Both sides agree that those ordinances are no longer at issue, and Plaintiffs voluntarily dismissed them. R. 233 ¶ 3.[2] What remains on the books is the City's ban on the sales and transfers of

---

[2]Even earlier in the case, the parties agreed to a dismissal of Count III, which challenged the ban on firearms-training ranges in the City, because that challenge was mooted by a Seventh Circuit decision (and subsequent amendment to the pertinent ordinance). R. 147.

firearms within the City limits. The ban is virtually a blanket ban on sales and transfers: Municipal Code § 8-20-100 states, in relevant part, that "no firearm may be sold, acquired or otherwise transferred within the city, except through inheritance of the firearm." MCC § 8-20-100(a).

Plaintiffs in this case are a combination of Chicago residents and an association of Illinois firearms retailers. Kenneth Pacholski, Kathryn Tyler, and Michael Hall are Chicago residents who are licensed to possess firearms by Illinois and the City. R. 176, Pls.' Statement of Facts (PSOF) ¶¶ 1, 2, 6. Pacholski, Tyler, and Hall would like to shop for firearms in the City. Id. ¶¶ 11, 17, 21. Likewise, members of the Illinois Association of Firearms Retailers would like to sell firearms within the City. Id. ¶ 23.[3] Because both of these activities are currently illegal under the Municipal Code, Plaintiffs challenge, in Count II, the constitutionality of MCC § 8-20-100. Second Am. Compl. at 12-13. Plaintiffs similarly challenge, in Count VI, the constitutionality of the City's zoning ordinance, MCC § 17-16-0201, to the extent that it prohibits the

---

[3]The City does not dispute the Association's standing as a plaintiff in this case. *See generally* R. 158, Defs.' Br. at 23-37. The Illinois Association of Firearms Retailers is an organization that lobbies on behalf of firearms retailers and the retail firearms industry in Illinois. *See* R. 164, Defs.' Statement of Facts (DSOF) ¶ 1; R. 165-2, Defs.' Exh. 5, O'Daniel Dep. 21:15-24. Its members sell firearms, operate shooting ranges, or both. Second Am. Compl. ¶ 4. Although membership in the Association is open to "anyone who seeks to expand the commercial marketplace of the firearms retail industry," voting membership is restricted to federally licensed firearms dealers based in Illinois. R. 180-7, Pls.' Exh. 78, O'Daniel Decl. ¶ 4. In light of the Association's composition, and the relief sought in challenging the sales ban, it has associational standing to pursue the claim as a named plaintiff. *See Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011).

construction and operation of gun stores.[4] Second Am. Compl. at 15-16. After discovery, both parties filed cross-motions for summary judgment, and it is time to turn to those motions.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is an especially appropriate stage to resolve this case. Unlike in many other cases, the disputed facts here are not "adjudicative facts," or "simply the facts of the particular case." Fed. R. Evid. 201(a) advisory committee's note. Instead, the parties dispute the facts and data justifying the Municipal Code ordinances. These are so-called "legislative facts," or facts "which have relevance to . . . the lawmaking process . . . in the enactment of a legislative body." *Id.* "Only adjudicative facts are determined in trials, and only legislative facts are relevant to the constitutionality of the [Chicago] gun law." *Moore*

---

[4]Plaintiffs had also originally challenged the constitutionality of MCC § 4-144-010, which prohibited people from "selling, . . . giv[ing] away or otherwise transfer[ring], any firearm." *See* Second Am. Compl. at 12-13. The City's September 2013 amendment of the Municipal Code repealed that language from MCC § 4-144-010, so the parties agree that only MCC § 8-20-100(a) and the City's zoning ordinance are still at issue. *See* R. 233 ¶ 4.

4

*v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Thus, because "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial," resolving this case at summary judgment instead of proceeding to trial is the proper course of action. *Id.*

## III. Analysis

Plaintiffs mount a facial attack on the City's prohibition on gun sales and transfers within City limits. Their first general contention is that a historical review reveals that these ordinances are categorically unconstitutional, meaning that no further analysis is necessary. *See* R. 175, Pls.' Br. at 5. But even if it is not categorically unconstitutional, the ordinances fail heightened constitutional scrutiny. *See id.* at 6-9. In response, the City moves for summary judgment in its own right, asserting that Plaintiffs' desire to purchase firearms within City limits does not fall within the Second Amendment's historical scope. *See* R. 157, Defs.' Mot. Summ. J. ¶ 5. And even if the Second Amendment historically protected this activity, the City asks the Court to hold the ordinances to either the "undue burden" standard or intermediate scrutiny, where it is more easily justified. *See id.* ¶¶ 5, 7. So although the parties contemplate a historical inquiry and some sort of means-end analysis, they disagree about the specifics. Plaintiffs believe that the historical inquiry ought to assess whether the ordinances are so broad as to be categorically unconstitutional, but the City maintains that it ought to assess whether the regulated firearms activity deserves no Second Amendment protection. And they also differ on the level of constitutional scrutiny that ensues, assuming that the historical question is inconclusive: Plaintiffs want the Court

to apply a heightened level of scrutiny akin to strict scrutiny, but the City urges that the Court view the challenge through either an undue burden or intermediate scrutiny lens. And of course the parties quarrel about whether and how the ordinances are justified under whichever level of scrutiny applies.

Before reaching these disagreements, the Court first determines the general analytical framework to be applied to Second Amendment litigation, which, as the Seventh Circuit has noted, "is quite new." *Ezell*, 651 F.3d at 690. It then resolves these disagreements while applying that framework to the specific ordinances that Plaintiffs challenge.

### A. Second Amendment Analytical Framework

In *District of Columbia v. Heller*, the Supreme Court concluded that the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). *Heller* struck down the District of Columbia's prohibition on the possession of usable handguns in the home because the law banned "the quintessential self-defense weapon" in the place where the "need for defense of self, family, and property is most acute." *Id.* at 628-29, 635. The opinion did leave open many questions, which was not surprising given that it was the first detailed attempt at interpreting the Second Amendment. *See id.* at 635 ("But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ."). Among the open questions is the specific level of scrutiny to apply to firearms regulations. Instead, the Supreme Court made clear that the District's blanket ban on handguns in the home would fail "any of

6

the standards of scrutiny that we have applied to enumerated constitutional rights."

*Id.* at 628-29. And the Supreme Court noted that other gun control measures would

pass constitutional scrutiny:

> [N]othing in our opinion should be taken to cast doubt on longstanding
> prohibitions on the possession of firearms by felons and the mentally ill, or laws
> forbidding the carrying of firearms in sensitive places such as schools and
> government buildings, or laws imposing conditions and qualifications on the
> commercial sale of arms.

*Id.* at 626-27. Ultimately, however, because *Heller* did not need to go any further, the

opinion did not draw an explicit line between constitutional and unconstitutional

firearms regulations.

Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that

the Due Process Clause of the Fourteenth Amendment incorporates the Second

Amendment right to possess a handgun in the home for self-defense against state and

local governments. 130 S. Ct. at 3050. In *McDonald*, the Supreme Court struck down

a Chicago ordinance that, like the D.C. law, banned handguns in the home. *Id.* at 3026.

But again the Supreme Court did not set out the precise standard for analyzing Second

Amendment challenges, and instead reiterated that "incorporation does not imperil

every law regulating firearms." *Id.* at 3047; *see also Heller*, 554 U.S. at 627 n.26 ("We

identify these presumptively lawful regulatory measures only as examples; our list

does not purport to be exhaustive.").

In *Ezell v. City of Chicago*, 651 F.3d 684, the Seventh Circuit tackled some of the

open questions. The plaintiffs in *Ezell* challenged the constitutionality of a related

Chicago ordinance that required one hour of firing range training as a prerequisite to

7

lawful ownership, yet simultaneously prohibited virtually all firing ranges from operating in the City. *Id.* at 689-90. In reversing the district court's order denying the plaintiffs' motion for a preliminary injunction, *id.* at 711, the Seventh Circuit distilled, from *McDonald* and *Heller*, a two-step inquiry. It first took from those cases the principle that some gun laws regulate activity falling outside the scope of the Second Amendment right as it was publicly understood when the Bill of Rights was ratified. *Id.* at 702 (citing *McDonald*, 130 S. Ct. at 3038-47; *Heller*, 554 U.S. at 625-28). Accordingly, the Seventh Circuit first considered—and rejected—the City's historical evidence that cities could ban firearms discharge, finding that "most of the statutes cited by the City are not specific to controlled target practice and, in any event, contained significant carveouts and exemptions." *Id.* at 705. Because the City did not establish that target practice was unprotected by the Second Amendment as it was historically understood, the Seventh Circuit moved on to consider whether the City's restriction on range training survived constitutional scrutiny. *Id.* at 706. It determined that the range ban faced nearly strict scrutiny, reasoning that it was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. And it held that under this exacting standard, the plaintiffs faced a strong likelihood of success on the merits because the City presented no data or expert opinion to support its range ban. *Id.* at 709.

*Ezell*'s two-step inquiry governs this challenge. Under *Ezell*, the first step is to conduct a historical inquiry into the scope of the Second Amendment right as it was

understood either in 1791 (when the Bill of Rights was ratified) for federal law or in 1868 (when the Fourteenth Amendment was ratified) for state and local law. *Id.* at 702-03. At step one, the burden is on the City to "establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment." *Id.* If the City succeeds, then "the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* at 703.

But if the City does not succeed at step one—either because the historical evidence is inconclusive or the regulated activity is not categorically unprotected—then the analysis proceeds to a second step. *Id.* At that step, the Court must examine the strength of the City's justifications for regulating that activity by evaluating the regulations the government has chosen to enact and the public-benefits ends it seeks to achieve. *Id. Ezell* teaches, after analyzing First Amendment jurisprudence—which *Heller* and *McDonald* suggest is an appropriate analogue, *see Heller*, 554 U.S. at 582; *McDonald*, 130 S. Ct. at 3045—that the means-end inquiry is a sliding scale and not fixed or static:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 706, 708. But no matter where on the sliding scale the challenged statute is located, one thing is sure: the standard of judicial review is always stricter

than rational basis review. *See Heller*, 554 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *Ezell*, 651 F.3d at 701 ("[T]he Court specifically excluded rational-basis review."); *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (per curiam).

    *Moore v. Madigan*, 702 F.3d 933, further demonstrates the application of this two-step framework. In *Moore*, the Seventh Circuit invalidated an Illinois law prohibiting a person from carrying a gun ready to use when not on the person's own property, home, fixed place of business, or on the property of someone who has permitted the person to carry a ready-to-use gun. *Id.* at 934. The Seventh Circuit held that, under *Heller* and *McDonald*, the Second Amendment's core right of armed self-defense extends past the four walls of the home and into the public. *See id.* at 942. In doing so, *Moore* first rejected the State's historical evidence that purported to show that there was no generally recognized private right to carry arms in public in 1791, finding that *Heller*'s historical analysis to the contrary controlled. *See id.* at 935-37. The Seventh Circuit then went on to assess the State's public-safety rationales for banning public gun carriage, concluding that the State's empirical evidence did not provide a justification for a complete public-carriage ban. *See id.* at 937-39, 942. Because the State thus failed to "provide [the court] with more than merely a rational basis for believing that its uniquely sweeping ban is justified by an increase in public safety," the Seventh Circuit remanded to the respective district courts for the entry of

declarations of unconstitutionality and for the issuance of permanent injunctions. *Id.* at 942.

Thus, *Moore* implicitly applied the *Ezell* two-step analysis, even if it did not explicitly state it was doing so. It first evaluated the State's historical argument that the regulated activity was, purportedly, categorically unprotected by the Second Amendment because there was no generally recognized right to publicly carry a gun in 1791. After finding this evidence unpersuasive in the wake of *Heller*'s analysis of the historical evidence, the Seventh Circuit then moved on to assess the State's empirical evidence in favor of banning public carriage. *Heller* then held that the State did not justify its broad ban at this step either, and thus the Seventh Circuit struck down the law. This was *Ezell*'s two-step framework in action.

Importantly, *Moore* added two key details to the two-step analysis. First, although *Ezell* said that the relevant time period for analyzing the scope of the Second Amendment right is either 1791 or 1868, depending on whether the law is federal (1791) or State or local (1868), arguably under *Moore* the critical year for determining the amendment's historical meaning is always 1791. *Id.* at 935. *Moore* cites to *McDonald* for that principle, which in turn reasons that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the *same standards that protect those personal rights against federal encroachment.*" *McDonald*, 130 S. Ct. at 3035 (emphasis added) (internal quotation marks omitted). And *McDonald* expressly incorporated the Second Amendment right recognized in *Heller*, *id.* at 3050, which analyzed the meaning of the Second

11

Amendment as it was understood in 1791, *see Heller*, 554 U.S. at 578-605. Finally, *McDonald* itself examined history to determine whether the right to keep and bear arms was fundamental to ordered liberty in 1791. *See* 130 S. Ct. at 3036-37. Thus, the relevant time period for the first-step historical analysis is 1791.

Second, *Moore* reiterates that the level of scrutiny during the second-step means-end analysis varies according to the breadth of the challenged Second Amendment restriction. *Compare* 702 F.3d at 940 ("A blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof it would."), *with id.* ("In contrast, when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need."). But in doing so, *Moore* makes clear that the breadth of restriction is not just a function of *what* is affected, but also *who* is affected. *Moore* reasoned that the State had to make a stronger empirical showing that its gun ban was vital to public safety than the federal government had to in *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc). There, the government successfully justified a federal law that forbids convicted domestic-violence misdemeanants from possessing firearms. *Id.* at 639, 645. But *Moore* held the State to a higher standard because the "curtailment of gun rights was much narrower [in *Skoien*]: there the gun rights of persons convicted of domestic violence,

here the gun rights of the entire law-abiding adult population of Illinois." *Moore*, 702 F.3d at 940. So *Moore* ultimately looked to two factors on the sliding scale to fashion the level of scrutiny: how much activity was regulated (a blanket prohibition of gun carriage and not a lesser burden on armed self-defense), and who was regulated (law-abiding citizens and not people with criminal records). Based on these factors, *Moore* concluded that the State needed to make an extremely strong showing that its law furthered public safety. *Id.*

This, then, is the framework that *Moore* and *Ezell* have crafted. For each challenged Municipal Code ordinance, the City bears the burden of first establishing that the ordinance regulates activity generally understood in 1791 to be *un*protected by the Second Amendment. If the City does not carry that burden, then it must proffer sufficient evidence to justify the ordinance's burden on Second Amendment rights. And in this means-end analysis, the quantity and persuasiveness of the evidence required to justify each ordinance varies depending on how much it affects the core Second Amendment right to armed self-defense and on whose right it affects. The more people it affects or the heavier the burden on the core right, the stricter the scrutiny. If the City also fails at this second stage, the ordinance is unconstitutional.

With these principles in mind, the Court returns to the merits of Plaintiffs' challenge to the ordinances at issue.

13

**B. Constitutional Challenge to MCC §§ 8-20-100 and 17-16-0201**

Plaintiffs challenge MCC § 8-20-100 and the City's zoning ordinance (MCC § 17-16-0201), which both prohibit firearms from being sold or otherwise transferred within the city, except through inheritance of a firearm. Pls.' Br. at 10-22.

Plaintiffs first argue that the ban on firearm sales and transfers is categorically unconstitutional, under the notion that the right to *acquire* a firearm is a necessary prerequisite to exercise the right to possess that firearm for self-defense, so banning sales and transfers is just like banning possession for self-defense. *Id.* at 10. To be sure, there is arguably a reading of *Moore* that supports Plaintiffs' argument that some ancillary restrictions on firearms inhibit the exercise of the core right itself so much as to be categorically unconstitutional. *See* 702 F.3d at 939 ("If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, *Heller* would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois."). But *Moore* nonetheless gave Illinois the chance to justify (although the justification had to be extremely strong) the public-carriage ban and, rather than categorically reject it, the Seventh Circuit evaluated the empirical strengths of that justification. *See id.* at 937-40 ("[S]o substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment . . . ."). And so did *Ezell* in evaluating the constitutionality of a ban on gun ranges in Chicago, even though Chicago required range training as a prerequisite to lawful gun ownership. 651 F.3d at 689-90. *Ezell* nevertheless went through both

14

steps of the analysis, reasoning that only "broadly prohibitory laws restricting the core Second Amendment right" were categorically unconstitutional. *Id.* at 703. In any event, the Court need not draw the line here between restrictions that are prerequisites to the exercise of the core Second Amendment right, and thus might be categorically unconstitutional, and lesser restrictions on the core right that require historical and means-end analyses. As discussed below, the ban on gun transfers and sales is unconstitutional even if analyzed under *Ezell* and *Moore*'s two-step framework.

### 1. Historical Understanding

Again, at the first step, the City bears the burden of demonstrating that firearms sales and transfers are categorically outside the scope of the Second Amendment as it was understood in 1791. *Moore*, 702 F.3d at 935; *Ezell*, 651 F.3d at 702-03. Although the City argues that "state bans of the sale of even popular and common arms stretch back nearly 200 years," Defs.' Br. at 24, the only historical support that it musters are three statutes from Georgia, Tennessee, and South Carolina banning the sale, manufacture, and transfer of firearms within their borders. *See* R. 158, Defs.' App. at A109, Georgia Act of Dec. 25, 1837, ch. 367, § I; Defs.' App. at A112-13, Tennessee Act of Mar. 17, 1879, ch. 96, § 1; Defs.' App. at A115, South Carolina Act of Feb. 20, 1901, ch. 435, § 1. But these isolated statutes were enacted 50 to 110 years *after* 1791, which is "the critical year for determining the amendment's historical meaning." *Moore*, 702 F.3d at 935. These statutes are thus not very compelling historical evidence for how the Second Amendment was historically understood. And citation to a few isolated statutes—even to those from the appropriate

15

time period—"fall[] far short" of establishing that gun sales and transfers were historically unprotected by the Second Amendment. *Ezell*, 651 F.3d at 706. The City's proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment, so the Court must move on to the second step of the inquiry.

## 2. Means-End Analysis

Before embarking on a review of the City's justifications for its ban on gun sales and transfers, it is necessary to determine the appropriate level of scrutiny to apply. At the outset, the City urges the Court to import the "undue burden" standard from the Supreme Court's abortion cases at this stage. Under that standard, the ordinances are valid so long as they do not "place a substantial obstacle in the path" of a person seeking to own a gun for self-defense. *See* Defs.' Br. at 25 (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 878 (1992)). But in *Ezell*, the Seventh Circuit "decline[d] the invitation" to apply the "undue burden" test, noting that First Amendment analogues like intermediate or strict scrutiny were more appropriate under *Heller* and *McDonald*. 651 F.3d at 706-07. The City argues that *Ezell* does not control because unlike *Ezell*, "this case does not involve a Chicago Firearm Permit . . . precondition that Chicago prohibits residents from fulfilling within its borders." Defs.' Br. at 24. True, *Ezell* does say, "That the City conditions gun possession on range training is an additional reason to closely scrutinize the range ban." 651 F.3d at 708. The Seventh Circuit made that statement, however, when deciding whether to apply intermediate or strict scrutiny, and the Seventh Circuit by that point in the analysis

16

had *already* rejected the undue-burden standard, meaning that the lack of a precondition here is not a meaningful distinction when considering *whether* to apply the undue-burden standard. Indeed, when *Ezell* decided not to apply the undue-burden standard, it noted with approval the majority of circuits that have imported the standard of review (usually intermediate scrutiny) from the Supreme Court's free-speech cases and not the abortion cases. *See Ezell*, 651 F.3d at 706-07 (collecting cases); *see also Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012); *Heller v. Dist. of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011). Thus, because there is no reason why *Ezell* is distinguishable on this point, the City's request to import the undue-burden standard is declined, as it was in *Ezell*. Some higher level of scrutiny is therefore appropriate.

### a. Standard of Scrutiny

As a fallback position, the City urges the application of intermediate scrutiny, not strict scrutiny. Defs.' Br. at 27. Remember that the Seventh Circuit in *Skoien* applied intermediate scrutiny (after a concession by the government) when evaluating the government's justifications for a federal law that forbade convicted domestic violence misdemeanants from possessing firearms. 614 F.3d at 639, 641-42. But that case involved the gun rights of domestic violence misdemeanants, whereas as here the Municipal Code ordinances here affect "the gun rights of the entire law-abiding adult population of [Chicago]." *Moore*, 702 F.3d at 940. *Moore* suggests that intermediate scrutiny is too light given who is impacted by these Municipal Code ordinances.

17

With regard to the other variable on the sliding scale, the scope of the right affected, although these ordinances do not prevent the use of firearms for self-defense, they sweepingly prevent the acquisition of firearms within Chicago, via both legitimate sales and other transfers, such as gifts. And under *Ezell*, "serious encroachments" on "important corollar[ies] to the meaningful exercise of the core right to possess firearms for self-defense" are substantial burdens that deserve more stringent scrutiny than intermediate scrutiny. 651 F.3d at 708. Indeed, just like the gun-range ban in *Ezell* prevented Chicagoans from meeting a Chicago Firearms Permit prerequisite of legal gun ownership, the ban on gun sales and transfers prevents Chicagoans from fulfilling, within the limits of Chicago, the *most fundamental* prerequisite of legal gun ownership—that of simple acquisition.

The City argues in response that these ordinances do not ban acquisition, but merely regulate *where* acquisition may occur. Defs.' Br. at 23. It is true that some living on the outskirts of the City might very well currently live closer to gun stores now than they would absent these ordinances. But *Ezell* makes clear that this type of argument "assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption." 651 F.3d at 697. It was no answer there that plenty of gun ranges were located in the neighboring suburbs, or even right on the border of Chicago and the suburbs. Instead, the Seventh Circuit drew on First Amendment jurisprudence to reason that Second Amendment rights must be guaranteed within a specified geographic unit—be it a city or a State. *See id.* ("In the First Amendment context, the

18

Supreme Court long ago made it clear that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'" (quoting *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981))).[5] Indeed, this reasoning makes sense, because if all cities and municipalities can prohibit gun sales and transfers within their own borders, then all gun sales and transfers may be banned across a wide swath of the country if this principle is carried forward to its natural conclusion. Therefore, just as in *Ezell*, where the fact "[t]hat residents may travel outside the jurisdiction to fulfill the training requirement is irrelevant to the validity of the ordinance inside the City," *id.* at 712 (Rovner, J., concurring in the judgment), so too here: the fact that Chicagoans may travel outside the City to acquire a firearm does not bear on the validity of the ordinance *inside* the City.

The City would limit this principle from *Ezell* to issues of irreparable harm because it appears in that section of the opinion and not in the section addressing the likelihood of success on the merits. R. 186, Defs.' Resp. Br. at 8. But the irreparable harm in *Ezell* was the *violation* of the plaintiffs' Second Amendment rights. *See Ezell*,

---

[5]In the First Amendment context, although "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech," these restrictions must still "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation mark and citation omitted). And those alternative channels must be made available *within* the geographic unit. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986) ("In our view, the First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater *within the city* . . . ." (emphasis added)). By completely banning gun transfers and sales within city limits, the City leaves open no "alternative channels" in Chicago, much less ample ones.

651 F.3d at 699 ("*Heller* held that the Amendment's central component is the right to possess firearms for protection. Infringements of this right cannot be compensated by damages." (citation omitted)). In other words, the measure of irreparable harm in *Ezell* was the weight of the *burden* the ordinance placed on the core Second Amendment right, which is precisely the very issue now. This means that *Ezell*'s requirement that the Second Amendment be exercisable within a specific geographic unit is not cabined to the specifics of *Ezell*'s procedural posture. And under MCC § 8-20-100, any new would-be gun owners cannot exercise their right to acquire a gun for self-defense within Chicago itself. This is a serious burden on that right. *Cf. United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("Section 922(a)(3) prohibits the transportation into one's state of residence of firearms acquired outside the state; but it does nothing to keep someone from purchasing a firearm in her home state, *which is presumptively the most convenient place to buy anything*." (emphasis added)). So *Ezell* too indicates that intermediate scrutiny is too light.

Thus, *Ezell*, rather than *Skoien*, governs this challenge. And under *Ezell*'s heightened review, which is "not quite strict scrutiny," the City bears the burden of establishing a strong public-interest justification for its ban on gun sales and transfers. *Ezell*, 651 F.3d at 708 (internal quotation marks omitted). To carry its burden, the City must establish a "close fit" between the sales-and-transfer ban and the actual public interests it serves, and prove that the public's interests are strong enough to justify "so substantial an encumbrance on individual Second Amendment rights." *Id.* at 708-09. Put differently, the City must demonstrate that otherwise legitimate gun sales and

transfers create such genuine and serious risks to public safety that prohibiting them within Chicago is justified. *Id.* at 709. So with that, the Court turns to the City's proffered justifications.

### b. The City's Justifications

The City presents three objectives that the ban on gun sales and transfers seeks to achieve: (1) restrict criminals' access to licensed dealers; (2) restrict gun acquisition in the illegal market; and (3) eliminate gun stores from Chicago, which are dangerous in themselves and cannot be safely regulated. Defs.' Br. at 27-37. The Court considers each in turn.

### i. Restricting Criminals' Access to Licensed Dealers

The City believes that licensed dealers are a significant source of guns used in crime. Although guns used in crimes generally pass through several hands before being acquired by the ultimate perpetrator, almost all firearms used in crime were first sold at retail by a federally licensed dealer. DSOF ¶ 52. Indeed, in 1998, 1.2% of federally licensed dealers accounted for 57% of all guns that were submitted to the Bureau of Alcohol, Tobacco, and Firearms by law enforcement agencies for tracing back to their original dealers. R. 177, Pls.' Resp. DSOF ¶ 68-B. But as Plaintiffs' rebuttal expert, Dr. Gary Kleck, points out, that might well be because a small share of licensed dealers account for most of the lawful gun sales. R. 179-1, Pls.' Exh. 2-I, Kleck Expert Report at 33. And a higher sales volume naturally means (all other things being equal) that a larger number of that dealer's lawfully sold guns will eventually find their way into criminal hands, usually via residential burglaries. *Id.*

The City responds that even if "[i]llicit gun selling is almost all done at a very low volume," R. 179-4, Pls.' Exh. 30, Gary Kleck & Shun-Yung Kevin Wang, *The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun Tracing Data*, 56 UCLA L. REV. 1233, 1291 (2009), even low-volume dealers remain a risk because of their potential willingness to sell to "straw purchasers," that is, gun buyers who illegally buy for others who are unauthorized to possess a gun, *see* R. 168-3, Defs.' Exh. 42, S.B. Sorenson & K.A. Vittes, *Buying a Handgun for Someone Else: Firearm Dealer Willingness to Sell,* 9 INJURY PREVENTION 147, 147-48 (2003) (finding, in a survey of 6 handgun dealers from each of the 20 largest cities in the U.S., that 52.5% of dealers indicated that they were willing to sell a handgun to the caller when told it was for a girl/boyfriend "who needs it"); *see also* R. 168-4, Defs.' Exh. 43, Garen Wintemute, *Firearm Retailers' Willingness to Participate in an Illegal Gun Purchase*, 87 J. URB. HEALTH 865, 867, 872 (2010) (finding, in a survey of 300 handgun dealers in California, that 20% of the dealers in the study population agreed to assist a potential handgun buyer with a transaction that had many attributes of a straw purchase). But these studies themselves acknowledge that "dealers' stated intent may not correspond to their actual behavior. Although not necessarily a usual business practice, some dealers might say that they would sell a handgun while on the telephone but not do so if the potential customer was on-site." Sorenson & Vittes, *supra*, at 149. More importantly, the potential threat that *some* otherwise-legitimate businesses may break the law cannot justify the drastically overinclusive step of banning the entire *category* of legitimate businesses. The City's concern over the subset of firearms dealers who sell

22

to straw purchasers can be addressed by other, more focused approaches, such as law enforcement operations that target dealers who would sell to straw purchasers. *See* DSOF ¶¶ 60-64 (describing Operation Gunsmoke, a 1998 CPD sting operation investigating scofflaw firearms dealers).

The City also presents several studies finding that dealer proximity to urban environments is a primary characteristic of importance in predicting whether those guns were used in a crime, recovered by police, and traced back to the dealer. One study found that in major cities, a disproportionately high prevalence of dealers per capita was associated with significantly higher gun homicide rates, while in suburbs, a disproportionately high prevalence of dealers was associated with significantly lower gun homicide rates. R. 169-2, Defs.' Exh. 57, Douglas J. Wiebe et al., *Homicide and Geographic Access to Gun Dealers in the United States*, 9 BMC PUB. HEALTH 199 (2009), at CITY 000592. But that study did not have data for the sales volumes of the dealers in the dataset it used, so the effect it found might have been due to the simple fact that urban dealers sold more guns than suburban dealers. *See id.* at CITY 000596 ("Our analysis also had limitations. As discussed, we could not account for the actual volume of firearms introduced by each [dealer] into the community."). Similarly, another study found that "[g]uns sold by dealers operating within 5 miles of either [Baltimore or Washington, D.C.] were over twice as likely to be recovered [after a crime] as were guns sold by dealers operating further than 20 miles from both cities," and this risk declined as a dealer's distance from both cities increased. R. 169-3, Defs.' Exh. 58, CHRISTOPHER S. KOPER & MARY SHELLEY, CRIME GUN RISK FACTORS: BUYER,

23

Sᴇʟʟᴇʀ, Fɪʀᴇᴀʀᴍ, ᴀɴᴅ Tʀᴀɴsᴀᴄᴛɪᴏɴ Cʜᴀʀᴀᴄᴛᴇʀɪsᴛɪᴄs Assᴏᴄɪᴀᴛᴇᴅ ᴡɪᴛʜ Gᴜɴ Tʀᴀꜰꜰɪᴄᴋɪɴɢ ᴀɴᴅ Cʀɪᴍɪɴᴀʟ Gᴜɴ Usᴇ 72 (2007). Unlike the Wiebe et al. study, the Koper & Shelley study seems to account for dealer sales volume. *See id.* at 68 n.55 (acknowledging that "we can expect that dealers who sold more guns were linked to higher numbers of gun recoveries," but stating that it "largely factored out" sales volume "[b]ecause this analysis focuses on the risk that each firearm was used in crime"). Notably, though, the study itself does not contemplate banning dealers from urban areas. *See id.* at 87 (recommending only that "emphasis should be given to the *monitoring* of large volume dealers in urban areas and, more generally, to dealers with a relatively large percentage of their sales resulting in crime gun recoveries" (emphasis added)). Nor do these studies offer any detailed explanations for *why* dealers located in major cities are more likely to have sold (at some point) more recovered crime guns than dealers located outside major cities.

The City, however, does supply a reason: it contends that inner-city gang members and criminals find it hard to travel to the suburbs, thus making it more difficult for them or their likely straw purchasers to shop at gun stores. *See* DSOF ¶ 78. Dr. Philip Cook, one of the City's experts, attributes this travel difficulty to the "parochial[ism]" of gang members, and CPD Commander Gorman believes that making the trip to the suburbs is dangerous for gang members because they may have to cross rival gang boundaries both in Chicago and in the suburbs. *Id.* So through these ordinances, Chicago intentionally increases the distance that Chicagoans have to travel to get to gun stores in order to tack on extra transaction costs (measured in time, effort,

24

and danger) to any criminal attempt to buy guns. These extra transaction costs, the argument goes, deter would-be criminals from buying guns.

But these transaction costs are also borne by law-abiding residents of these neighborhoods, who are equally parochial and may suffer many of the same dangers by crossing into gang-infested territory. *See* Pls.' Resp. DSOF ¶¶ 78-A, 78-B. So whatever burdens the City hopes to impose on criminal users also falls squarely on law-abiding residents who want to exercise their Second Amendment right. What's more, it is doubtful that keeping criminal users away from legitimate retail stores will choke the supply of guns to those users. According to a survey of convicted felons proffered by the City itself, "[l]egitimate firearms retailers play a minor and unimportant role as direct sources of the criminal handgun supply." R. 166-4, Defs.' Exh. 31, JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 229 (2d ed. 2008). Indeed only 16% of the 939 inmates surveyed ever acquired a handgun via a straightforward cash transaction at a retail dealer. *Id.* at 185. Similarly, Dr. Kleck asserts that "a majority of [crime guns] get into criminals' hands directly or indirectly as a result of theft, most commonly residential burglary." R. 214-1, Kleck Dep. 163:2-4. Dr. Cook also seems to agree; he prefaces his citation of the "1.2 percent of dealers account[] for 57 percent of all [crime] guns" statistic with this observation: "[M]ost guns used in crime were not sold directly to the criminal by an FFL [federally licensed firearms dealer]." R. 163-3, Defs.' Exh. 13-A, Cook Expert Report at 11. And he has reasoned that "[g]uns in the home may pose a threat to burglars but may also serve as an inducement, since guns are particularly valuable loot. Other things equal,

25

a gun-rich community provides more lucrative burglary opportunities than one in which guns are more sparse." R. 169-7, Defs.' Exh. 67, Philip J. Cook & Jens Ludwig, *Guns and Burglary*, *in* EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE 74, 75 (Jens Ludwig & Philip J. Cook eds., 2003) (footnote omitted). Thus, it is likely that residents who seek to legally buy a gun bear *more* of the share of the added transaction costs in time, effort, and danger than gang members or would-be criminals, who rarely buy guns from legitimate dealers directly. Given the close fit between justification and means that the City must demonstrate, it cannot justify its ban on legitimate gun sales and transfers with overinclusive means that impact *more* law-abiding citizens than criminals. And without a valid explanation for how its chosen means actually achieves its goal of reducing criminal access to guns, the City's first justification fails.

### ii. Restricting Gun Acquisition in the Illegal Market

Second, the City justifies its ban on gun sales and transfers by contending that it makes gun acquisition in the illegal gun market more expensive and more difficult for those who seek to buy guns for criminal purposes. DSOF ¶ 58. In 2007, Dr. Cook and his team established the existence of substantial transaction costs in the underground gun market in Chicago through a series of in-depth ethnographic interviews and survey data. R. 165-3, Defs.' Exh. 12, Philip J. Cook et al., *Underground Gun Markets*, ECON. J., Nov. 2007, at F558, F559. The study found that those seeking to buy guns in the illegal market paid between $250 to $400 for low-quality guns that retailed for prices between $50 to $100 online. *Id.* at F564. Thus, the transaction costs in the illegal market included a substantial markup in gun prices. Moreover, the

26

transaction costs included search costs like paying local brokers to find a gun for the purchaser or failed transaction attempts due to mistrust of the seller. *Id.* at F565. The City argues that pushing gun stores to the suburbs increases these frictions in the illegal market by creating "information problems in matching prospective buyers and sellers." *Id.* at F568.

Even if Plaintiffs' challenge to the price-markup results in this study was unpersuasive, *see* Pls.' Resp. DSOF ¶ 53, this study does not entirely support the proposition that the frictions in the illegal market are caused by the ban on legitimate gun stores in Chicago. Rather, the study itself attributes its findings to two other factors: "To the extent to which Chicago's gun market works less well than in other places, the most likely explanations are the city's low rate of household gun ownership and police emphasis on guns, rather than the city's ban on private possession of handguns." *Id.* at F573. But, as explained next, there is no evidence that the challenged ordinances would combine with those factors to keep illegal-market transaction costs high.

With regard to Chicago's low gun-ownership rate, the study found that Cook County experienced a temporary dip in the number of suicides committed by a firearm (the study's proxy variable for gun prevalence) after it banned handguns in 1982. *Id.* at F575. But that dip was actually smaller than the dip found in surrounding counties *un*affected by the possession ban. *Id.* The study therefore concluded that "[t]he fact that Chicago and DC have low gun ownership rates may be more cause than consequence of restrictive local gun laws." *Id.* at F576. Although the study speculates

27

that "Chicago's handgun ban may also have helped to reduce criminal access to guns by preventing the location of licensed gun dealers in high-crime neighbourhoods," *id.*, it does not attempt to break out the specific effect of the gun-store ban on either illegal-market transaction costs or on gun-ownership rates. Nor does the City present any evidence of a gun-store ban on gun-ownership rates. On this record, then, the gun-store ban has no effect on Chicago's low household gun-ownership rate, which the City's own study cites as a key driver of the frictions in the illegal market for guns.[6]

The study also cites, as the second cause of illegal-market frictions, an increased police emphasis on illegally carried guns in Chicago. But the City has presented no evidence that suggests that allowing legal gun sales and transfers would prevent the CPD from continuing its "tradition" of placing a high priority on confiscating illegally carried guns. *See* DSOF ¶ 22. Instead, the City presents several studies of urban policing showing that targeted police tactics of stop-and-talk contacts with citizens plus protective frisks (in Pittsburgh) and police focus on specific suspicious behavior and individuals in high-crime areas (in Indianapolis) may have been effective in reducing gun crime by 30% to 40%. *Id.* ¶¶ 24-25. But those studies actually show that the targeted police tactics were effective despite the legalization of public carriage via a permitting regime in those cities. Pls.' Resp. DSOF ¶¶ 24-25. For example, in Pittsburgh, open alcohol container and traffic violations—which are unaffected by legal

---

[6]It is also doubtful that minimizing household gun ownership is, after *Heller* and *McDonald*, even a valid basis for gun regulation: possession of a gun for self-defense in the home is the core right protected by the Second Amendment, so trying to minimize the exercise of that right cannot be a valid basis for the sales-and-transfer ban.

public carriage—frequently justified the traffic stops and stop-and-talk police contacts; when warranted for reasons of officer safety (usually because of suspicious actions or demeanor), police officers were still able to frisk for weapons. R. 165-7, Defs.' Exh. 25, Jacqueline Cohen & Jens Ludwig, *Policing Crime Guns, in* EVALUATING GUN POLICY: EFFECTS ON GUNS AND VIOLENCE, *supra,* at 217, 221. And in Indianapolis, those police performing traffic and pedestrian stops targeted at suspicious individuals were three times more likely to uncover an illegal firearm than other police performing a general strategy of maximum traffic stops. R. 166-1, Defs.' Exh. 26, EDMUND F. MCGARRELL ET AL., REDUCING GUN VIOLENCE: EVALUATION OF THE INDIANAPOLIS POLICE DEPARTMENT'S DIRECTED PATROL PROJECT 5, 8 (2002). It is crucial that police officers targeting suspicious individuals were able to seize illegally carried guns despite the larger number of legally carried guns. *See id.* at 8 exh. 3. These studies of policing tactics demonstrate that Chicago police officers still have a legal and practical means to successfully interdict illegal gun carriage under a permitting regime. What the studies do *not* demonstrate is that Chicago police officers can no longer exercise those tactics once the ban on gun sales and transfers within city limits is lifted. Thus, there is also no record evidence showing that the sales-and-transfer ban itself plays any role in allowing the CPD to emphasize policing against the illegal carriage of guns. And that means that the sales-and-transfer ban does not significantly reduce illegal-market gun acquisition by increasing the frictions inherent in illegal sales. So the City's second justification fails as well.

### iii. Eliminating Dangerous Gun Stores from Chicago

Finally, the City argues that it can ban gun stores because federally licensed firearms dealers are part of "a chronically-diseased regime that is fundamentally broken." Defs.' Br. at 33. The City points to reports that the federal agency that regulates firearms, the Bureau of Alcohol, Tobacco, and Firearms (ATF), is either unwilling or unable to properly monitor dealer violations of federal firearms laws or revoke dealer licenses when justified. *See* DSOF ¶¶ 86, 91-96. And the City contends that gun stores are "cache[s] just waiting to be raided." Defs.' Br. at 33; *see also* DSOF ¶¶ 72-76.

The parties quarrel over the extent of the ATF's ineffectiveness—Plaintiffs assert that the ATF misapplies its resources, *see* Pls.' Resp. DSOF ¶ 86, but the City says that ATF lacks the proper resources to oversee every gun dealer, *see* R. 187, Defs.' Reply to Pls.' Resp. DSOF ¶ 86—but, even assuming for argument's sake that the ATF is ineffectual, the reason why does not matter in deciding the constitutional challenge. This is because the challenged ordinances do not really address the ATF's effectiveness. Consider a scofflaw arms dealer that sets up shop in Chicago before the sales ban. The dealer freely sells guns to straw buyers and known gang members under the supposed ineffectual supervision of the ATF, which is, in this scenario, unable to properly monitor the dealer and stop the dealer's illegal gun sales. After the City enacts its ban against gun stores, sales, and transfers within its limits, the dealer closes its Chicago doors and relocates to a bordering suburb. But the forced relocation does not prevent the dealer from continuing its illegal sales. Why not? Because MCC § 8-20-100 does not

30

offer more resources to the ATF or pledge increased CPD cooperation with the ATF—indeed, nothing the City has enacted affects the ATF's operations at all—so the ATF is *still* unable to audit Dealer A and revoke its federal license. And MCC § 8-20-100 does not prohibit *whom* dealers can sell to, so the dealer can still continue to sell to gang members without any effect by the ordinances. In fact, the only difference in this scenario is that the physical distance between the dealer and its illicit customer base has increased after the ban; gang members now find the dealer harder to get to. So the City's solution to the purported ineffectiveness of the ATF boils down to, once again, trying to increase transaction costs for gun sales. As explained earlier, this rationale for banning gun sales and transfers is insufficient to justify the ban, because relatively few criminals buy guns from legitimate retail dealers and the ban's burdens fall even more harshly on Chicagoans who want to legitimately own guns for self-defense.

It is true that, with a sales-and-transfer ban, the Chicago police would not have to worry about investigating burglaries of gun dealers or devoting manpower to preventing those burglaries. But a blanket ban on all gun dealers to solve the burglary problem sweeps too broadly. To address the City's concern that gun stores make ripe targets for burglary, the City can pass more targeted ordinances aimed at making gun stores more secure—for example, by requiring that stores install security systems, gun safes, or trigger locks, in much the same vein that MCC § 8-20-040 requires individual gun owners to render surplus guns inoperable. *Cf. Ezell,* 651 F.3d at 709 ("Indeed, on this record those concerns are entirely speculative and, in any event, can be addressed

31

through sensible zoning and other appropriately tailored regulations. That much is apparent from the testimony of the City's own witnesses . . . who testified to several common-sense range safety measures that could be adopted short of a complete ban."). Or the City can consider designating special zones for gun stores to limit the area that police would have to patrol to deter burglaries. Such regulations would be a far closer fit with the City's desired goal of reducing burglaries at gun stores, as opposed to a blanket ban on the operation of *all* gun stores (even the most secure ones) within Chicago. The general danger that some gun stores may pose does not justify banning all gun sales and transfers within Chicago.

Although the City's lack of compelling justifications for why it banned all gun stores in Chicago is sufficient in and of itself to render MCC § 8-20-100 unconstitutional, it is also worth noting that these ordinances ban other forms of transfers besides sales, such as private gifts, even amongst family members. *See* MCC § 8-20-100(d). In barring even family gifts, the ordinance goes well beyond federal and state law. Federal law does not prohibit a person from giving a firearm to another person residing in the transferor's home state. *See* 18 U.S.C. § 922(a)(5). Illinois law does not prohibit a person from giving a firearm to someone as long as that person is over eighteen years old, is not disqualified from possessing a gun, and has a valid Firearm Owner Identification Card. *See* 720 ILCS 5/24-3. Although no Chicago-specific research exists that measures gifts as a percentage of legitimate firearm acquisitions (the absence of a study is understandable given Chicago's prior ban on handguns and current ban on firearms transfer), some studies of other locations—albeit dated

32

ones—show that gifts are a non-trivial source of lawfully acquired guns. *See* R. 170-1, Defs.' Exh. 82, David C. Grossman et al., *Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries*, 293 JAMA 707, 708-09, 711 tbl.2 (2005) (15% of 480 randomly selected control firearms from Washington, Oregon, and Missouri were acquired as gifts); *see also* PHILIP J. COOK & JENS LUDWIG, GUNS IN AMERICA: NATIONAL SURVEY ON PRIVATE OWNERSHIP AND USE OF FIREARMS 1, 6 exh. 5 (1997), *available at* https://www.ncjrs.gov/pdffiles/165476.pdf (19% of the 251 guns in the nationwide survey sample were acquired as gifts). Yet the City not only bans all gifts, but does so without offering any study or evidence that justifies its reasons for going beyond where Congress and the Illinois General Assembly chose to stop. This lack of justification only bolsters the conclusion that these Municipal Code ordinances are substantially overinclusive and do not pass muster under *Ezell*'s rigorous scrutiny.[7]

---

[7]Plaintiffs do not specifically contend that MCC §§ 8-20-100 is unconstitutional because it bans receiving firearms as legitimate gifts. Perhaps Plaintiffs refrain from making this argument out of fear that they lack standing to make it, and indeed they have not demonstrated that they suffer the specific concrete injury of being prohibited from receiving firearms as gifts. *See* PSOF ¶¶ 7-28 (stating only that Plaintiffs wish to buy and sell firearms in Chicago). But they might not need to suffer a concrete injury to that level of specificity. The precise limits of individual Second Amendment standing have not been explored post-*Heller*, but in the First Amendment context, an overbreadth claim is an exception to the normal rule that plaintiffs must prove, in making a facial challenge, that the law is unconstitutional in every application. *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). For First Amendment claims, individual plaintiffs have standing to bring overbreadth claims and pursue prospective relief as long as they "substantiate a concrete and particularized chilling effect on [their] protected speech or expressive conduct." *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

In *Bell*, a would-be protester had standing to facially challenge an ordinance criminalizing the failure to disperse when three or more people are committing acts of disorderly conduct in the immediate vicinity. *Id.* at 449, 455. Although the defendants argued that Bell could not demonstrate a concrete injury unless he intended to participate in a protest where three or more persons in his immediate vicinity are committing acts of disorderly

In sum, given the rigorous showing that *Ezell* demands, the City has not demonstrated that allowing gun sales and transfers within city limits creates such genuine and serious risks to public safety that flatly prohibiting them is justified. If the City is concerned about reducing criminal access to firearms, either through legitimate retail transactions or via thefts from gun stores, it may enact more appropriately tailored measures. Indeed, nothing in this opinion prevents the City from considering other regulations—short of the complete ban—on sales and transfers of firearms to minimize the access of criminals to firearms and to track the ownership of firearms. But the flat ban on legitimate sales and transfers does not fit closely with those goals.

---

conduct, the Seventh Circuit held that Bell had established an injury in the form of being deterred from future conduct, reasoning that he had been previously arrested under the ordinance in a protest and represented that he wished to protest in the future. *See id.* at 452, 454. By analogy to the First Amendment, then, Plaintiffs here have sufficiently demonstrated that their Second Amendment right to acquire firearms via legitimate transfers have been chilled because they have represented that they would acquire firearms through purchases if it were legal to do so. PSOF ¶¶ 11, 17, 21. In other words, they have substantiated a concrete chilling effect on their Second Amendment right to armed self-defense. And just as the *Bell* protester did not have to establish that he personally intended to participate in a protest where specifically three or more persons in his immediate vicinity are committing acts of disorderly conduct, *see Bell*, 697 F.3d at 454, these Plaintiffs arguably do not have to establish that they personally intend to acquire guns through the specific transfer of gift-giving. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 957 (1984) ("To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another . . . with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." (internal quotation marks and citations omitted)). By analogy, it is enough that Plaintiffs have substantiated a chilling effect on protected Second Amendment conduct; they need not substantiate *every* chilling effect.

In any event, the Court does not rest its holding on the City's failure to justify prohibiting legitimate firearm gift-giving; as stated above, the City's failure to convincingly justify prohibiting legitimate firearm sales (which Plaintiffs assuredly have standing to contest) is sufficient to invalidate MCC § 8-20-100. The City's failure to justify prohibiting legitimate firearm gift-giving simply buttresses this conclusion.

34

MCC § 8-20-100 and its zoning ordinance (to the extent that it bans the operation of gun stores in Chicago) are therefore unconstitutional.

## IV. Conclusion

For the reasons discussed above, Plaintiffs' motion for summary judgment [R. 174] is granted and the City's motion for summary judgment [R. 157] is denied. Municipal Code § 8-20-100 and the City's zoning ordinance (MCC § 17-16-0201), which ban gun sales and transfers other than inheritance, are declared unconstitutional under the Second Amendment. The Court will enter judgment for Plaintiffs. For now, however, the judgment's effect is stayed, at the very least until after the City has filed a motion for stay pending appeal, after Plaintiffs are given a chance to respond (perhaps Plaintiffs would not object to a stay pending appeal), and after the Court rules on that stay motion. Even if the City were to decide not to appeal, the City should have a limited time, before the judgment becomes effective, to consider and enact other sales-and-transfer restrictions short of a complete ban. In any event, the parties may address this (and any other issues they want to present) in the stay-motion briefs. The City's motion to stay pending appeal is due by January 13, 2014. A status hearing is set for January 14, 2014, at 11:30 a.m., to set further briefing on the stay motion.

ENTERED:


　　　s/Edmond E. Chang　　　
Honorable Edmond E. Chang
United States District Judge

DATE: January 6, 2014

35