No. _____

In the
# Supreme Court of the United States

_____

ESPANOLA JACKSON; PAUL COLVIN; THOMAS BOYER; LARRY
BARSETTI; DAVID GOLDEN; NOEMI MARGARET ROBINSON;
NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.; SAN
FRANCISCO VETERAN POLICE OFFICERS ASSOCIATION,

*Petitioners*,

v.

CITY AND COUNTY OF SAN FRANCISCO; EDWIN M. LEE,
MAYOR FOR THE CITY AND COUNTY OF SAN FRANCISCO;
GREG SUHR, SAN FRANCISCO POLICE CHIEF,

*Respondents.*

_____

**On Petition for Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

_____

**PETITION FOR WRIT OF CERTIORARI**

_____

| | |
|---|---|
| C.D. MICHEL | PAUL D. CLEMENT |
| GLENN S. MCROBERTS | *Counsel of Record* |
| CLINTON B. MONFORT | ERIN E. MURPHY |
| ANNA M. BARVIR | TAYLOR MEEHAN |
| MICHEL & ASSOCIATES, P.C. | BANCROFT PLLC |
| 180 East Ocean Boulevard | 1919 M Street NW |
| Suite 200 | Suite 470 |
| Long Beach, CA 90802 | Washington, DC 20036 |
| | (202) 234-0090 |
| | pclement@bancroftpllc.com |

*Counsel for Petitioners*

December 12, 2014

## QUESTION PRESENTED

In 2007, San Francisco enacted an ordinance that requires all residents who keep handguns in their homes for self-defense to stow them away in a lock box or disable them with a trigger lock whenever they are not physically carrying them on their persons. The practical effect of this requirement is that law-abiding residents must keep their handguns inoperable or inaccessible precisely when they are needed most for self-defense—in the middle of the night, while the residents are asleep and decidedly not carrying. One year after this ordinance was enacted, this Court issued its landmark opinion in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which struck down both the District of Columbia's flat ban on possessing a handgun in the home as well as its trigger-lock requirement. In doing so, this Court concluded that the Second Amendment entitles law-abiding individuals to keep a handgun in the home in a constitutionally relevant condition, *i.e.*, to keep a handgun that is "operable for the purpose of immediate self-defense." *Id.* at 635. Nonetheless, the decision below upholds an ordinance that requires law-abiding residents of San Francisco to render their handguns either inoperable or inaccessible at the very time when they are most needed for self-defense.

The question presented is:

Is San Francisco's attempt to deprive law-abiding individuals of immediate access to operable handguns in their own homes any more constitutional than the District of Columbia's invalidated effort to do the same?

ii

## PARTIES TO THE PROCEEDING

Petitioners, who were plaintiffs and appellants below, are Espanola Jackson, Paul Colvin, Thomas Boyer, Larry Barsetti, David Golden, Noemi Margaret Robinson, the National Rifle Association of America, Inc., and the San Francisco Veteran Police Officers Association.

Respondents, who were defendants and appellees below, are the City and County of San Francisco, Mayor for the City and County of San Francisco Edwin M. Lee, and San Francisco Police Chief Greg Suhr.

iii

## CORPORATE DISCLOSURE STATEMENT

The National Rifle Association of America, Inc., has no parent corporation. It has no stock, so no publicly held company owns 10 percent or more of its stock.

The San Francisco Veteran Police Officers Association is a California nonprofit public benefit organization. It has no parent corporation and no stock, so no publicly held corporation owns 10 percent or more of its stock.

iv

# TABLE OF CONTENTS

QUESTION PRESENTED...........................................i

PARTIES TO THE PROCEEDING ..........................ii

CORPORATE DISCLOSURE STATEMENT........... iii

TABLE OF AUTHORITIES......................................vi

PETITION FOR WRIT OF CERTIORARI ................1

OPINIONS BELOW ...................................................2

JURISDICTION ........................................................2

CONSTITUTIONAL AND STATUTORY
PROVISIONS INVOLVED ........................................3

STATEMENT OF THE CASE ...................................3

    A.   Legal Background ........................................3

    B.   Parties and Proceedings Below....................5

REASONS FOR GRANTING THE PETITION..........9

I.   San Francisco's Trigger-Lock Law Is No More
   Constitutional Than The Trigger-Lock Law
   That This Court Struck Down In *Heller*............13

II.   The Lower Courts' Continued Resistance To
   *Heller* And *McDonald* Necessitates This
   Court's Intervention ..........................................18

CONCLUSION ........................................................26

APPENDIX

   Appendix A

      Opinion of the United States Court of
      Appeals for the Ninth Circuit,
      *Jackson v. City & County of San
      Francisco*, No. 12-17803 (Mar. 25,
      2014) ..................................................... App-1

v

Appendix B

Order of the United States Court of Appeals for the Ninth Circuit Denying Rehearing En Banc, *Jackson v. City & County of San Francisco*, No. 12-17803 (July 17, 2014) .............. App-29

Appendix C

Order of the United States District Court for the Northern District of California Denying Plaintiffs' Motion for Preliminary Injunction, *Jackson v. City & County of San Francisco*, No. 09-2143 (Nov. 26, 2012) ................ App-31

Appendix D

U.S. Const. amend. II .......................... App-43

U.S. Const. amend. XIV, §1 ............... App-43

S.F., Cal., Police Code art. 45, §4511 . App-44

S.F., Cal., Police Code art. 45, §4512 . App-50

vi

# TABLE OF AUTHORITIES

## Cases

*Am. Tradition P'ship, Inc. v. Bullock,*
132 S. Ct. 2490 (2012)............................................18

*Buckley v. Am. Constitutional*
*Law Found., Inc.,*
525 U.S. 182 (1999)................................................24

*Citizens United v. FEC,*
558 U.S. 310 (2010)..........................................16, 18

*City of Renton v. Playtime Theatres, Inc.,*
475 U.S. 41 (1986).................................................9

*Clark v. Jeter,*
486 U.S. 456 (1988)...............................................23

*District of Columbia v. Heller,*
554 U.S. 570 (2008)......................................*passim*

*Drake v. Filko,*
724 F.3d 426 (3d Cir. 2013) ............................20, 21

*El Vocero de P.R. v. Puerto Rico,*
508 U.S. 147 (1993)...............................................18

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011)..................................20

*Heller v. District of Columbia,*
670 F.3d 1244 (2011) ...........................................22

*Kachalsky v. Cnty. of Westchester,*
701 F.3d 81 (2d Cir. 2012) ..............................20, 21

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ......................................*passim*

*Moore v. Madigan,*
702 F.3d 933 (7th Cir. 2012)..................................25

vii

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of*
  *Alcohol, Tobacco, Firearms, & Explosives,*
  700 F.3d 185 (5th Cir. 2012)........................ 19, 20, 22

*Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol,*
  *Tobacco, Firearms, & Explosives,*
  714 F.3d 334 (5th Cir. 2012).................................... 19

*Osterweil v. Bartlett,*
  706 F.3d 139 (2d Cir. 2013) ..................................... 20

*Perry Educ. Ass'n*
  *v. Perry Local Educators' Ass'n,*
  460 U.S. 37 (1983).................................................. 23

*Peruta v. Cnty. of San Diego,*
  742 F.3d 1144 (9th Cir. 2014)..................... 21, 22, 24

*Press-Enterprise Co.*
  *v. Super. Ct. of Cal., Cnty. of Riverside,*
  478 U.S. 1 (1986).................................................... 18

*Reno v. Flores,*
  507 U.S. 292 (1993)................................................ 23

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
  411 U.S. 1 (1973).................................................... 23

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010)................................... 20

*United States v. Masciandaro,*
  638 F.3d 458 (4th Cir. 2011)................................... 23

*United States v. Playboy Entm't Grp., Inc.,*
  529 U.S. 803 (2000)................................................ 16

*United States v. Stevens,*
  559 U.S. 460 (2010)................................................ 17

*Woollard v. Gallagher,*
  712 F.3d 865 (4th Cir. 2013)............................ 20, 21

viii

**Statutes**

S.F., Cal., Police Code §4511 ........................................ 5

S.F., Cal., Police Code §4512 .................................. 3, 4

**Other Authorities**

Allen Rostron, *Justice Breyer's
   Triumph in the Third Battle
   over the Second Amendment*,
   80 Geo. Wash. L. Rev. 703 (2012) .......................... 22

Bureau of Justice Statistics, U.S. Dep't of
   Justice, Nat'l Crime Victimization Survey
   (2010), http://perma.cc/xmu8-e8wy .......................... 3

John R. Lott, Jr. & John E. Whitley,
   *Safe-Storage Gun Laws: Accidental
   Deaths, Suicides, & Crime*,
   44 J.L. & Econ. 659 (2001) ...................................... 6

Tr. of Oral Argument,
   *Heller v. District of Columbia*,
   670 F.3d 1244 (2011) (No. 07-290) ......................... 14

## PETITION FOR WRIT OF CERTIORARI

This Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), certainly did not purport to answer every conceivable question about the Second Amendment. But there are some things on which *Heller* is pellucidly clear. One is that law-abiding individuals are entitled to keep handguns in their homes that are both operable and immediately accessible for self-defense. *Heller* eliminated any doubt on that score by invalidating not just the District of Columbia's ban on possessing handguns in the home, but also its attempt to force individuals to keep their handguns trigger-locked or stowed away in a lock box. Indeed, at argument, this Court expressly considered the plight of the law-abiding resident who must struggle to find his reading glasses on the nightstand and then disable a trigger lock before confronting an intruder. And yet, the Court of Appeals in this case upheld a San Francisco ordinance that requires individuals to do just that. Under that ordinance, law-abiding individuals must render their handguns inoperable or inaccessible precisely when they are needed most, whenever they are not physically carrying them on their persons—including when they are asleep in the dark of night.

The decision below is impossible to reconcile with this Court's decision in *Heller*. San Francisco has no more right than the District of Columbia to force its residents to fiddle with lock boxes or fumble with trigger locks when the need to use a handgun for immediate self-defense arises. It certainly makes no difference that San Francisco's trigger lock does not apply around the clock, since it applies during the time

2

when the need for self-defense is most acute. The Court of Appeals' conclusion that San Francisco may venture where this Court forbade the District of Columbia to go is so patently wrong that summary reversal would be appropriate. But the reasoning of the decision below is powerful evidence that plenary review is needed. Although this is hardly the first time that a lower court has refused to take seriously this Court's watershed Second Amendment decisions, it is the first time that a lower court's machinations concerning core rights and standards of review have permitted it to flout one of *Heller*'s *explicit holdings*. And unless and until this Court provides courts with much-needed guidance in this area, the lower courts will continue to balance away the very Second Amendment rights that this Court has recognized as fundamental. But whether summary reversal or plenary review is the more appropriate course, the decision below cannot stand. This Court should intervene to reaffirm that San Francisco's residents have the same Second Amendment rights as residents of the District of Columbia and the rest of the Nation.

## OPINIONS BELOW

The panel opinion of the Court of Appeals is reported at 746 F.3d 953 and reproduced at App.1-28. The order of the District Court denying the petitioners' motion for a preliminary injunction is not reported but is reproduced at App.31-42.

## JURISDICTION

The Court of Appeals issued its opinion on March 25, 2014, and denied petitioners' timely petition for rehearing en banc on July 17, 2014. Justice Kennedy

3

extended the time for filing a petition to and including December 12, 2014. This Court has jurisdiction under 28 U.S.C. §1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

The relevant portions of the Second and Fourteenth Amendments to the United States Constitution and the San Francisco Police Code are reproduced at App.43-52.

## STATEMENT OF THE CASE

### A. Legal Background

In 2007, San Francisco enacted an ordinance that requires every resident who keeps a handgun in his or her home to render it inoperable whenever it is not physically carried on the person. *See* S.F., Cal., Police Code §4512. Specifically, section 4512 states that "[n]o person" except a peace officer "shall keep a handgun within a residence owned or controlled by that person unless the handgun is stored in a locked container or disabled with a trigger lock" or "is carried on the person of an individual over the age of 18." *Id.* §4512(a), (c). As a practical matter, this requirement precludes San Francisco residents from having ready access to an operable handgun precisely when ready access is most critical. Access is denied at any time when physically carrying the handgun is impossible or impractical—most notably, while residents are asleep during the night, when the need for self-defense in the home is most likely to arise.[1] Violations of this

---

[1] *See, e.g.*, Bureau of Justice Statistics, U.S. Dep't of Justice, Nat'l Crime Victimization Survey 6 tbl.9 (2010), http://perma.cc/xmu8-e8wy

4

intrusive ordinance, which quite literally extends into the bedroom, are punishable by six months in jail and a $1,000 fine. *Id.* §4512(e).

In a legal regime where the Second Amendment protected only collective rights, San Francisco's trigger-lock law would be constitutional. But one year after San Francisco enacted section 4512, this Court issued its landmark decision in *Heller*, which not only rejected the collective rights theory of the Second Amendment but also struck down two D.C. laws: a ban on possessing handguns in the home, and a requirement that "firearms in the home be rendered and kept inoperable at all times." *Heller*, 554 U.S. at 630. In doing so, the Court concluded that the District could not preclude law-abiding individuals from keeping a "lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. Since then, the Court has confirmed that the Second Amendment and its decision in *Heller* are not limited to federal enclaves, but apply with equal force against states and municipalities. *See McDonald v. City of Chicago*, 561 U.S. 742, 779-80 (2010).

Although San Francisco has amended its firearms ordinances on multiple occasions since *Heller* and *McDonald*, it has retained its anomalous trigger-lock requirement. Indeed, in 2011, the city enacted a collection of post-hoc "findings" attempting to justify section 4512 on grounds, *inter alia*, that "[g]uns kept in the home are most often used in suicides and against family and friends rather than in self-

---

(reporting that between 2003 to 2007, an estimated 61.3 percent of robberies of occupied dwellings occurred between 6 p.m. and 6 a.m.).

5

defense." S.F., Cal., Police Code §4511(4). According to those findings, notwithstanding *Heller*, San Francisco may continue to force its residents to lock up their handguns whenever they are not carrying them because "[s]afe storage measures have a demonstrated protective effect in homes with children and teenagers" and may decrease "the risk that a young person's impulsive decision to commit suicide will be carried out." *Id.* §4511(3)(c), (5)(b). The findings conclude by declaring that section 4512 "does not substantially burden the right or ability to use firearms for self-defense in the home." *Id.* §4511(7).

**B. Parties and Proceedings Below**

1. Petitioners in this case are six law-abiding San Francisco residents who keep handguns in their homes for self-defense, as well as the National Rifle Association of America, Inc., and the San Francisco Veteran Police Officers Association. Shortly after *Heller*, petitioners initiated this lawsuit challenging, *inter alia*, the constitutionality of section 4512. As they explained, just like the trigger-lock provision that this Court struck down in *Heller*, section 4512 unconstitutionally deprives them of immediate access to operable handguns in their homes "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. For instance, Espanola Jackson, who is in her 80s, explained: "[I]f I heard an intruder break into my home in the middle of the night, I would have to turn on the light, find my glasses, find the key to the lockbox, insert the key in the lock and unlock the box (under the stress of the emergency), and then get my gun before being in position to defend myself. That is not an easy task at my age." Doc. 136-3, ¶ 6.

6

The other petitioners attested to similar burdens on their (or their members') ability to use a handgun for self-defense in the home. One petitioner must keep his handgun locked up in his garage, far away from his bedroom. Doc. 136-6, ¶ 6 (Decl. of Sheldon Paul Colvin). Others use lock boxes with coded locks, which impose a delay if the code is not entered correctly on the first try or require a key if, unbeknownst to the owner, the batteries have drained. Doc. 136-7, ¶ 6 (Decl. of Thomas Boyer); Doc. 143, ¶¶ 17-21 (Decl. of Massad Ayoob). Likewise, many trigger locks can be safely used only on *unloaded* firearms, which imposes an additional burden on the right to use a firearm for immediate self-defense in times of emergency. Doc. 136-10 at 7-8; *see also* John R. Lott, Jr. & John E. Whitley, *Safe-Storage Gun Laws: Accidental Deaths, Suicides, & Crime*, 44 J.L. & Econ. 659, 660 (2001). Petitioners thus attested that, but for section 4512, they or their members would keep their handguns operable and immediately accessible for self-defense not only when carrying them on their persons, but also at times when physically carrying a handgun is impossible or highly impractical, such as when sleeping, showering, or exercising.

2. Petitioners asked the District Court to preliminarily enjoin enforcement of section 4512, but the court denied their request, concluding that they were not likely to succeed on the merits of their constitutional claim. App.31-42.[2] In doing so, the court posited that because "San Franciscans may

_____

[2] The court did not dispute that petitioners would satisfy the other factors for injunctive relief given the constitutional nature of their claims. *See* App.42 n.7.

7

lawfully possess handguns in their own homes, may carry them in their own homes at any time, and may use them for self-defense without running afoul of any aspect of the ordinance," section 4512 gives them everything to which they are entitled under *Heller*. App.40. The court further concluded that "[e]ven assuming [section 4512] rises to the level of a 'substantial' burden" on Second Amendment rights, "plaintiffs have not shown the regulation to be overreaching or improper in any way, or that it fails to serve a legitimate governmental interest." App.41.

3. Petitioners timely appealed, and the Court of Appeals affirmed, agreeing with the District Court that section 4512 does not violate the Second Amendment. App.1-28. In reaching that conclusion, the court employed the now-prevailing "two-step inquiry," first asking whether the challenged law burdens conduct protected by the Second Amendment and, if so, then choosing a level of scrutiny. App.7. Under this approach, "if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, [courts] may apply intermediate scrutiny." App.9.

Applying this approach, the court first recognized that the conduct section 4512 burdens falls within the scope of the Second Amendment. As the court explained, section 4512 "resembles none of" the "'presumptively lawful' regulations" discussed in *Heller* "because it regulates conduct at home, not in 'sensitive places'; applies to all residents of San Francisco, not just 'felons or the mentally ill'; has no impact on the 'commercial sale of arms,' and it

8

regulates handguns, which *Heller* itself established
were not 'dangerous and unusual.'" App.12 (quoting
*Heller*, 554 U.S. at 626-27). Nor can section 4512 be
analogized to historical "restrictions on the storage of
gunpowder, a dangerous and highly flammable
substance." App.13. The court further concluded that
the conduct section 4512 burdens is not only "within
the scope" but at the very "core of the Second
Amendment right," as "[h]aving to retrieve handguns
from locked containers or removing trigger locks
makes it more difficult 'for citizens to use them for the
core lawful purpose of self-defense' in the home."
App.14-15 (quoting *Heller*, 554 U.S. at 630).

Notwithstanding those conclusions, however, the
court still refused to apply strict scrutiny, insisting
that the ordinance "does not substantially prevent
law-abiding citizens from using firearms to defend
themselves in the home" because "[t]he record
indicates that a modern gun safe may be opened
quickly." App.15. Likening section 4512 to a
regulation on "the time, place, or manner of speech,"
the court also posited that it "leaves open alternative
channels for self-defense in the home, because San
Franciscans are not required to secure their handguns
while carrying them on their person." App.15. The
court also emphasized that section 4512 "does not
constitute a complete ban … on the exercise of a law-
abiding individual's right to self defense." App.16.
Instead, the court deemed the requirement to render
handguns inoperable or inaccessible whenever they
are not physically carried "more similar to …
registration requirements." App.16. Accordingly, the
court pronounced "section 4512 … not a substantial
burden on the Second Amendment right itself," and

9

thus concluded that it would subject it to only "intermediate scrutiny." App.17.

Purporting to apply intermediate scrutiny, the court first noted that it would "not impose 'an unnecessarily rigid burden of proof … so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.'" App.18 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50-52 (1986)). Without identifying any actual evidence on which San Francisco relied, the court then deferred entirely to the city's post-hoc findings in section 4511, and what it described as the city's "reasonable inference that mandating that guns be kept locked when not being carried will increase public safety and reduce firearm casualties." App.19-20. Reiterating its view that "section 4512 imposes only a minimal burden on the right to self-defense in the home," the court also summarily rejected petitioners' contention that the ordinance is not sufficiently tailored to survive any meaningful level of scrutiny. App.20.

## REASONS FOR GRANTING THE PETITION

This should have been a very straightforward case. This Court has already held that the Second Amendment entitles law-abiding individuals to keep a handgun in the home in a constitutionally relevant condition. The Second Amendment protects not just a right to possess a handgun, but to possess a handgun that is operable and immediately accessible should the need for self-defense arise. That is why *Heller* struck down *both* D.C's ban on the possession of handguns in the home *and* its separate trigger-lock requirement, which effectively precluded individuals from actually

10

using their handguns for self-defense. Indeed, at argument, the Court explored the practical difficulties that a trigger lock poses to effective self-defense in the event of a late-night intruder. Accordingly, after *Heller*, it ought to have been crystal clear that the government has no business hamstringing law-abiding individuals who wish to keep handguns in their own homes for the lawful purpose of self-defense, especially in the wee hours of the night.

And yet, the Court of Appeals still managed to uphold a trigger-lock ordinance that has the very same forbidden effect as the one this Court struck down in *Heller*. Just like the District's law, San Francisco's ordinance deprives law-abiding residents of immediate access to operable handguns, the quintessential self-defense weapon, at the place (in their own homes) where and the time (in the middle of the night) when the need for self-defense is most likely to arise. Nonetheless, the court deemed San Francisco's trigger-lock law only a "minimal" burden on Second Amendment rights. Worse still, the court did so even as it openly acknowledged that the ordinance infringes on the core right that the Second Amendment "surely elevates above all other interests": the fundamental "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

That is perhaps the most direct repudiation of this Court's holding in *Heller* since the decision was handed down. While other cases have been unfaithful to *Heller*'s *reasoning*, the decision below endorses a result in direct contradiction with *Heller*'s *holding* that the D.C. trigger-lock law is unconstitutional.

11

This is not a case that turns on some unresolved question about the historical scope of the Second Amendment right, or the circumstances under which that right may be forfeited. Nor is it a case that turns on some unresolved question about the proper methodology or level of scrutiny for analyzing burdens on the Second Amendment right. Instead, it turns on specifically whether this Court actually meant what it said when it held that law-abiding individuals have a constitutional and fundamental right to keep a handgun in the home that is "*operable* for the purpose of *immediate* self-defense." *Id.* at 635 (emphasis added). Because *Heller* so clearly answers that question, the decision below is so patently wrong as to warrant summary reversal.

At the same time, the very fact that the Court of Appeals could reach a conclusion so flatly inconsistent with *Heller* is powerful evidence that plenary review may be necessary to underscore that *Heller* and *McDonald* are precedents to be followed, not obstacles to be overcome. Indeed, this is just one of the latest in a long line of cases in which lower courts have refused to heed those decisions and the mode of analysis that they employ. With only a few notable exceptions, courts have eschewed the type of analytical rigor that applies in other constitutional contexts in favor of a "two-step" approach that is not materially different from the "interest-balancing" approach that *Heller* and *McDonald* so adamantly rejected. In fact, in every instance in which courts have reached the point of selecting a level of scrutiny under the post-*Heller* two-step, the inevitable result has been to reject the Second Amendment claim. Rather than respect the balance struck by the Framers and embodied in the

12

Constitution, lower courts have repeatedly deemed the government's generic public safety interests more important than the interests of the individuals whose fundamental constitutional rights are being balanced away.

The decision below is a striking example of the inherent manipulability of the lower courts' post-*Heller* mode of analysis. Perhaps the one thing to be said for a this-far-but-no-further-until-the-Supreme-Court-says-so-expressly approach to the Second Amendment is that at least the actual holdings of *Heller* and *McDonald* would be faithfully applied. But the decision below upholds a trigger-lock law materially indistinguishable from the D.C. law struck down in *Heller*. And perhaps the one thing to be said for a two-step approach to the level of scrutiny is that at least rights at the core of the Second Amendment would be safeguarded. But the decision below applied a watered-down version of scrutiny even after acknowledging that the San Francisco ordinance burdens the very "core" of the Second Amendment right. This case is thus a stark illustration of the reality that, even after this Court's admonishment that the Second Amendment may not "be singled out for special—and specially unfavorable—treatment," *McDonald*, 561 U.S. at 778-79, courts continue to do just that. Whether through summary reversal or plenary review, this Court should use this opportunity to put an end to this disturbing trend.

13

## I. San Francisco's Trigger-Lock Law Is No More Constitutional Than The Trigger-Lock Law That This Court Struck Down In *Heller*.

This is the rare Second Amendment case that does not require this Court to explore the contours of the constitutional right or the manner in which laws that burden that right should be analyzed. That is because the Court has already answered the question that this case presents. *Heller* held unconstitutional two distinct legal provisions: the District's ban on the possession of handguns in the home, and its requirement that "firearms in the home be rendered and kept inoperable at all times." *Heller*, 554 U.S. at 630. In striking down the latter, *Heller* made crystal clear that the Second Amendment protects the right of law-abiding individuals to possess not just a handgun in the abstract or a handgun useful only for brandishing, but a handgun "*operable* for the purpose of *immediate* self-defense," in the home. *Id.* at 635 (emphasis added). Indeed, there is nothing more central to "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.*, than the predicate right to keep arms in a constitutionally relevant condition—*i.e.*, to keep arms that are actually capable of being used, and used immediately, should the need for self-defense arise.

That predicate right is precisely what San Francisco has denied its residents. Under section 4512, law-abiding individuals who wish to keep handguns in their homes must either render them inoperable or store them in a lock box whenever they are not physically carried on the person. In other words, section 4512 prevents law-abiding individuals

14

from having immediate access to an operable handgun at the very moment when such access is needed most—in the night, when they are asleep and poorly positioned to undertake the rigmarole necessary to render a trigger-locked handgun operable or locate and unlock a lockbox. It is precisely at that point—when an intruder is awake and carrying (unburdened by San Francisco's trigger-lock ordinance) and the home owner is asleep and not carrying—that the right to immediate, unimpeded self-defense is most critical. Yet just like the District's unconstitutional law, San Francisco's ordinance forces an individual, should an emergency arise in the dark of night, to first "turn on the lamp next to [his] bed," "pick up [his] reading glasses," and hope to recall and successfully enter the code in order to gain access to an operable firearm. Tr. of Oral Argument at 83-84, *Heller*, 554 U.S. 570 (No. 07-290).

As these exchanges with the Chief Justice and Justice Scalia at the argument in *Heller* vividly illustrate, the notion that trigger locks and lock boxes impose "only a minimal burden," App.20, on Second Amendment rights is fanciful. To state the obvious, a handgun that is disabled by a trigger lock, or is operable but locked away at the critical moment, is no substitute for a handgun that is both operable and immediately accessible. To the extent there were any doubt on that score, the evidence petitioners presented in this case eliminates it. As one firearms expert attested below, during an emergency, even fractions of a second matter. Doc. 143, ¶ 10; *see also id.* ¶ 11 (explaining that the famed Tueller Drill demonstrates that an attacker 21 feet away can close the distance between him and his victim in 1.5 seconds). That is

15

why this Court specified that the Second Amendment
entitles law-abiding individuals to keep a handgun
that is not just "operable," but "operable for the
purpose of *immediate* self-defense." *Heller*, 554 U.S.
at 635 (emphasis added). In doing so, the Court
necessarily foreclosed any suggestion that the rights
protected by the Second Amendment exist only in the
theoretical realm. The right to keep arms is a right to
keep them in a constitutionally and practically
relevant manner.

The Court of Appeals nonetheless deemed San
Francisco's trigger-lock law consistent with the
Constitution, on the theory that it "limits only the
*manner* in which a person may exercise Second
Amendment rights." App.24. But that ignores the
reality that this Court has already established "the
manner" in which individuals are entitled to exercise
their Second Amendment rights in their homes, which
is by keeping a handgun that is "operable for the
purpose of immediate self-defense." *Heller*, 554 U.S.
at 635. Precluding individuals from exercising that
right at the time of day when they are most likely to
need it is no more a permissible "time, place, and
manner" regulation than precluding them from
exercising their core right to political speech *only*
during the final days before an election, or restricting
the privilege against self-incrimination *only* for
capital crimes. Restricting a constitutional right in
the time, place, and manner where it matters most is
a constitutional vice, not a constitutional virtue.

It is sufficient for summary reversal that the
Court of Appeals upheld San Francisco's ordinance
even though it imposes the same severe burden on

16

Second Amendment rights as the District's trigger-lock law. That the court deemed the ordinance subject only to intermediate scrutiny—and a watered-down form of intermediate scrutiny, at that—adds insult to injury. As the court readily conceded, *see* App.14-15, section 4512 explicitly restricts the extent to which "law-abiding, responsible citizens" may use "the quintessential self-defense weapon" in the place "where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628, 629, 635. The law thus quite consciously "burdens the core," App.15, of the right that the Second Amendment "surely elevates above all other interests." *Heller*, 554 U.S. at 635. To dismiss such a restriction as "only a minimal burden" just because it "does not constitute a *complete ban* … on the exercise of a law-abiding individual's right to self defense," App.16, 20 (emphasis added), is to render the Second Amendment precisely the kind of "second-class right" that this Court has already concluded it is not. *McDonald*, 561 U.S. at 780.

Indeed, the Court of Appeals' approach would not pass muster in any other constitutional context. When the government intrudes upon the "core" of the First Amendment, for instance, by imposing restrictions on political speech or the content of speech, such laws are subject to—and routinely fail—the strictest of scrutiny, regardless of whether they constitute a "complete ban" on the exercise of First Amendment rights (which laws rarely, if ever, do). *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000); *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Even when it comes to restrictions on forms of speech that many may consider "valueless or

17

unnecessary," this Court has admonished that there is no place for "ad hoc balancing of relative social costs and benefits" because "[t]he First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *United States v. Stevens*, 559 U.S. 460, 470, 471 (2010).

So, too, with the Second Amendment: "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634. That is because the Second Amendment "is the very *product* of an interest-balancing by the people" that neither the courts nor the legislatures may "conduct for them anew." *Id.* at 635. Yet here, the Court of Appeals concluded that individuals may be denied immediate access to an operable handgun at the place and time when they need it most based on San Francisco's simple say-so that its own "interest in preventing firearms from being stolen and in reducing the number of handgun-related suicides and deadly domestic violence incidents," App.20, is more important than the interest that the Second Amendment "surely elevates above all other[s]"— namely, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

That is exactly the kind of "freestanding 'interest-balancing' approach" that "[t]he very enumeration of" the Second Amendment is supposed to foreclose. *Id.* at 634; *see also, e.g.*, *McDonald*, 561 U.S. at 791. Worse still, it is ad hoc interest-balancing in service of

18

reaching precisely the opposite holding as *Heller* concerning a materially indistinguishable trigger-lock law. Even if this Court prefers to allow issues not directly decided in *Heller* and *McDonald* to percolate, there is no reason to let stand a decision that approves precisely what *Heller* invalidated and denies the central right to possess a handgun that is "operable for the purpose of *immediate* self-defense." *Heller*, 554 U.S. at 635 (emphasis added).

## II. The Lower Courts' Continued Resistance To *Heller* And *McDonald* Necessitates This Court's Intervention.

The decision below is so patently incompatible with *Heller* that summary reversal would be appropriate. Indeed, this Court has not hesitated to summarily reverse when courts and legislatures have insisted that laws burdening constitutional rights survive decisions in which this Court invalidated virtually identical restrictions. *See, e.g.*, *Am. Tradition P'ship, Inc. v. Bullock*, 132 S. Ct. 2490 (2012) (summarily reversing Montana Supreme Court's refusal to follow *Citizens United*, 558 U.S. 310). Nor has the Court hesitated to summarily reverse when courts attempt to circumvent its decisions by invoking trivial distinctions between the laws they are considering and laws that this Court has invalidated. *See, e.g.*, *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147 (1993) (summarily reversing Puerto Rico Supreme Court decision upholding bar on public access to preliminary criminal proceedings that was nearly identical to law invalidated in *Press-Enterprise Co. v. Superior Court of California, County of Riverside*, 478 U.S. 1 (1986)).

19

But while the result reached below fully justifies summary reversal, the reasoning employed to arrive at that result is symptomatic of a broader problem that merits plenary review. The decision below is just the latest example of lower court decisions that treat *Heller* and *McDonald* as effectively limited to their narrow facts, rather than as watershed constitutional decisions that reject the notion that the Second Amendment can be brushed aside as a second-class right. Despite the landmark nature of *Heller* and *McDonald*, little has changed in the lower courts. Before *Heller*, nearly every circuit embraced a collective rights view of the Second Amendment. And since *Heller*, those same circuits have rejected virtually every Second Amendment case to come before them.

The principal mechanism for preserving the status quo *ante* is the now-prevailing "two-step" approach, which is so malleable as to allow courts to avoid any meaningful form of scrutiny of burdens on Second Amendment rights. Although the two-step approach begins with the right question—asking whether the conduct being burdened is protected by the Second Amendment—courts have managed to make serious mischief even on that score. For instance, according to one court, law-abiding adults under the age of 21 likely are "unworthy of the Second Amendment guarantee" even though both the federal government and every state required all 18-year-old males to enroll in the militia when our Nation was founded. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*BATF*"), 700 F.3d 185, 195 (5th Cir. 2012). *But see* 714 F.3d 334, 339 (5th Cir. 2012) (Jones, J., dissenting from

20

denial of rehearing en banc) ("[T]he properly relevant historical materials … couldn't be clearer:  the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period in our nation's history.").  And according to another, whether the right to possess a handgun applies with equal force at an individual's summer home is "a serious constitutional question."  *Osterweil v. Bartlett*, 706 F.3d 139 (2d Cir. 2013).

But the real possibilities for manipulation come in the second part of the two-part approach, which allows courts to decide what level of scrutiny to apply by examining "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011); *see also, e.g.*, *BATF*, 700 F.3d at 194; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); App.8.  Time and again, courts have used this open-ended inquiry to constrain the scope of the Second Amendment by deeming everything other than the precise conduct at issue in *Heller* outside its "core."  And even if laws burden conduct within that core, anything less than a complete ban is deemed "only a minimal burden."  App.16, 20.

For instance, three circuits have held that, even assuming the Second Amendment protects a right to carry a handgun outside the home, law-abiding individuals may be categorically foreclosed from exercising that right because it is not at the "core" of the Second Amendment.  *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013).  As the Ninth Circuit observed in refusing to follow their lead, these courts

21

have done so without even "undertak[ing] a complete historical analysis of the scope and nature of the Second Amendment right outside the home." *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1173 (9th Cir. 2014). In other words, courts have applied the how-close-to-the-core prong of the second step of the inquiry in such a manner as to render the critical first step of the inquiry irrelevant.

And, of course, once courts deem conduct outside the "core" of the Second Amendment, they engage in nothing more—and often less—than "quick look" review, largely deferring to the legislature's judgment that the public interest lies in precluding, not protecting, the exercise of Second Amendment rights. *See, e.g.*, *Drake*, 724 F.3d at 440 ("[w]e refuse … to intrude upon the sound judgment and discretion of the State of New Jersey" that only "those citizens who can demonstrate a 'justifiable need' to do so" may carry handguns outside the home); *Woollard*, 712 F.3d at 881 (deferring to "the considered judgment of the General Assembly that the good-and-substantial-reason requirement strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland"); *Kachalsky*, 701 F.3d at 100 (deferring to New York's "determin[ation] that limiting handgun possession to persons who have an articulable basis for believing they will need the weapon for self-defense is in the best interest of public safety and outweighs the need to have a handgun for an unexpected confrontation").

22

As courts and commentators alike have observed, this exceedingly deferential form of scrutiny, under which the government gets deference not just on the importance of its interest, but also on the extent to which its law actually furthers that interest in a sufficiently tailored manner, "is near-identical to the freestanding 'interest-balancing inquiry' that Justice Breyer proposed—and that the majority explicitly rejected—in *Heller*." *Peruta*, 742 F.3d at 1176; *see also, e.g.*, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1276-80 (2011) (Kavanaugh, J., dissenting); Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 752 (2012) ("An intermediate scrutiny analysis applied in a way that is very deferential to legislative determinations and requires merely some logical and plausible showing of the basis for the law's reasonably expected benefits, is the heart of the emerging standard approach.").

This case starkly illustrates the inherent manipulability of the lower courts' post-*Heller* approach to the Second Amendment. The one thing that could be said in defense of other lower court decisions effectively limiting *Heller* and *McDonald* to their facts is that they were at least nominally consistent with the holdings of those cases. But the decision below upholds an ordinance that is materially indistinguishable from the trigger-lock law invalidated in *Heller*. And the one thing that could be said in defense of the post-*Heller* two-step is that courts at least pledged to employ rigorous scrutiny of laws burdening the core rights protected by the Second Amendment. *See, e.g.*, *BATF*, 700 F.3d at 195 ("[a] regulation that threatens a right at the core of the

23

Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny") (citation omitted); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"). But this case renders that a false promise. Even after candidly recognizing that the San Francisco ordinance "burdens the core of the Second Amendment right," App.15, the Court of Appeals applied a watered-down version of intermediate scrutiny to uphold a trigger-lock law not materially different from the law that this Court struck down in *Heller*.

In doing so, the court confirmed once again that lower courts are bound and determined to continue "singl[ing] out" the Second Amendment "for special—and specially unfavorable—treatment," *McDonald*, 561 U.S. at 778-79, unless and until this Court underscores that *Heller* and *McDonald* were no sport. Strict scrutiny typically applies *whenever* a law burdens "fundamental constitutional rights," no matter how severe the burden. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973); *see also*, *e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny applie[s] when government action impinges upon a fundamental right"); *Reno v. Flores*, 507 U.S. 292, 302 (1993) (government may not "infringe certain 'fundamental' liberty interests … unless the infringement is narrowly tailored to serve a compelling state interest"); *Clark v. Jeter*, 486 U.S. 456, 461 (1988)

24

("classifications affecting fundamental rights … are given the most exacting scrutiny"). At a bare minimum, strict scrutiny applies whenever the "core" of a constitutional right is concerned without regard to whether the challenged law "severely burdens" that right. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 207 (1999) (Thomas, J., concurring). Indeed, to refuse to apply strict scrutiny even to a law that *concededly* burdens the core Second Amendment "right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635, is to deny that the amendment protects a fundamental right.

The decision below thus reveals that the two-step inquiry is infinitely manipulable, to the point of permitting the conclusion that the very kind of law invalidated in *Heller* survives a form of constitutional scrutiny that purports to be consistent with *Heller*. Indeed, it should come as little surprise that in the few cases in which a court has struck down a law or policy as foreclosed by the Second Amendment, the court has foresworn a full embrace of the two-step approach and resorted more directly to the reasoning employed in *Heller*. For instance, once the Ninth Circuit concluded that the Second Amendment protects a right to carry arms outside the home in *Peruta*, it saw no need to settle on a level of scrutiny because it recognized that a law that flatly prohibits constitutionally protected conduct is void *ab initio*. *See Peruta*, 742 F.3d at 1170 ("*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa."). Likewise, the Seventh Circuit recognized that "degrees of scrutiny" were beside the point once it

25

concluded that Illinois' "flat ban on carrying ready-to-use guns outside the home" burdened conduct protected by the Second Amendment. *Moore v. Madigan*, 702 F.3d 933, 940, 941 (7th Cir. 2012).

While those decisions are faithful to this Court's precedents, they are far too easy for other courts to dismiss in the same way that they dismiss *Heller*, as relevant only to "extreme" or "outlier" laws that "completely destroy" the Second Amendment right. The majority of courts have instead eschewed the rigorous analysis *Heller* demands by employing the two-step analysis, which boils down to one question: whether the law is a complete ban or merely a restriction on the exercise of Second Amendment rights. These circuits pay lip service to the first step of the two-step analysis, and the real action lies in application of the second step. The very fact that a court reaches the second step all but guarantees that the challenged law will survive. This is a case in point: The court below concluded that more rigorous scrutiny was unwarranted notwithstanding the burden on "core" conduct because San Francisco's trigger-lock ordinance "does not constitute a complete ban … on the exercise of a law-abiding individual's right to self defense." App.16. If that were the standard under which burdens on core First Amendment rights were analyzed, it is hard to imagine what restriction short of a complete ban on speech that would not survive. So, too, if meaningful scrutiny were not even an option unless laws burdened the "core" of the First Amendment right.

As the foregoing illustrates, this case is really a symptom of a broader problem that can be cured only

26

by this Court's re-entry into the Second Amendment fray. Lower courts have had time enough to consider how to implement the Court's watershed decisions in *Heller* and *McDonald*, and with only a few notable exceptions, their efforts have consistently come up short. Worse still, with the decision below, courts have now crossed the Rubicon, moving from confining *Heller* to its precise holdings to circumnavigating even those. Accordingly, while the result reached below merits summary reversal, the reasoning employed below is so typical of lower courts that it merits plenary review. Either way, the decision below cannot stand.

## CONCLUSION

For the reasons set forth above, this Court should grant the petition for certiorari.

Respectfully submitted,

| | |
|---|---|
| C.D. MICHEL | PAUL D. CLEMENT |
| GLENN S. MCROBERTS | *Counsel of Record* |
| CLINTON B. MONFORT | ERIN E. MURPHY |
| ANNA M. BARVIR | TAYLOR MEEHAN |
| MICHEL & ASSOCIATES, P.C. | BANCROFT PLLC |
| 180 East Ocean Boulevard | 1919 M Street NW |
| Suite 200 | Suite 470 |
| Long Beach, CA 90802 | Washington, DC 20036 |
| | (202) 234-0090 |
| | pclement@bancroftpllc.com |

*Counsel for Petitioners*

December 12, 2014

# APPENDIX

## TABLE OF APPENDICES

Appendix A

Opinion of the United States Court of
Appeals for the Ninth Circuit, *Jackson v.
City & County of San Francisco*,
No. 12-17803 (Mar. 25, 2014)...................... App-1

Appendix B

Order of the United States Court of
Appeals for the Ninth Circuit Denying
Rehearing En Banc, *Jackson v. City &
County of San Francisco*, No. 12-17803
(July 17, 2014) .......................................... App-29

Appendix C

Order of the United States District Court
for the Northern District of California
Denying Plaintiffs' Motion for
Preliminary Injunction, *Jackson v. City &
County of San Francisco*, No. 09-2143
(Nov. 26, 2012)........................................... App-31

Appendix D

U.S. Const. amend. II ............................... App-43

U.S. Const. amend. XIV, §1...................... App-43

S.F., Cal., Police Code art. 45, §4511 ........ App-44

S.F., Cal., Police Code art. 45, §4512 ........ App-50

App-1

*Appendix A*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

————————

No. 12-17803

————————

ESPANOLA JACKSON; PAUL COLVIN;
THOMAS BOYER; LARRY BARSETTI; DAVID GOLDEN;
NOEMI MARGARET ROBINSON; NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC.; SAN FRANCISCO
VETERAN POLICE OFFICERS ASSOCIATION,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO; EDWIN M. LEE,
Mayor for the City and County of San Francisco;
GREG SUHR, San Francisco Police Chief,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for the
Northern District of California, Richard Seeborg,
District Judge, Presiding, No. 3:09-cv-02143-RS

————————

Argued and Submitted:
October 7, 2013—San Francisco, California
Filed: March 25, 2014

————————

Before: Dorothy W. Nelson, Milan D. Smith, Jr.,
and Sandra S. Ikuta, Circuit Judges.
Opinion by Judge Ikuta

————————

App-2

## OPINION

IKUTA, Circuit Judge:

I

This appeal raises the question whether two of San Francisco's firearm and ammunition regulations, which limit but do not destroy Second Amendment rights, are constitutional. We conclude that both regulations withstand constitutional scrutiny, and affirm the district court's denial of Jackson's motion for preliminary injunction.

II

San Francisco Police Code section 4512 provides that "[n]o person shall keep a handgun within a residence owned or controlled by that person unless" (1) "the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice," or (2) "[t]he handgun is carried on the person of an individual over the age of 18."[1] S.F., Cal., Police Code art. 45, § 4512(a), (c)(1). Violations of section 4512 are punishable by a fine of up to $1,000 and up to six months in prison. *Id.* § 4512(e).

San Francisco Police Code section 613.10(g) prohibits the sale of ammunition that (1) has "no sporting purpose," (2) is "designed to expand upon impact and utilize the jacket, shot or materials embedded within the jacket or shot to project or disperse barbs or other objects that are intended to increase the damage to a human body or other target,"

---

[1] Section 4512 also contains an exception for a handgun "under the control of a peace officer."

App-3

or (3) is "designed to fragment upon impact." S.F., Cal., Police Code art. 9, § 613.10(g). Bullets that expand or fragment upon impact are generally referred to as "hollow-point" ammunition.

On May 15, 2009, Espanola Jackson, Paul Colvin, Thomas Boyer, Larry Barsetti, David Golden, Noemi Margaret Robinson, the National Rifle Association, and the San Francisco Veteran Police Officers Association brought suit against the City and County of San Francisco, and other defendants, to challenge the validity of Police Code sections 4512 and 613.10(g) as impermissible violations of the right to bear arms under the Second Amendment.[2] The individual plaintiffs are handgun owners and citizens of San Francisco "who presently intend to keep their handguns within the home in a manner ready for immediate use to protect themselves and their families." The organizations have brought this suit on behalf of their members, who have an interest in keeping handguns within their home for self-defense.

On August 30, 2012, Jackson moved for a preliminary injunction. The district court denied that motion on November 26, 2012. Plaintiffs filed a timely notice of appeal on December 21, 2012.

III

Jackson challenges the district court's order denying her motion for preliminary injunction of sections 4512 and 613.10(g) on the ground that both infringe upon her Second Amendment rights. To obtain a preliminary injunction, Jackson must

_____

[2] We refer to plaintiffs collectively as "Jackson." We refer to the defendants as "San Francisco."

App-4

establish that (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A denial of preliminary injunction is reviewed for abuse of discretion. *See Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012). However, "[t]he district court's interpretation of the underlying legal principles . . . is subject to de novo review." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

IV

We turn first to the question whether the district court abused its discretion in concluding that Jackson did not carry her burden of showing a likelihood of success on the merits of her challenge to sections 4512 and 613.10(g).

We begin with the text of the Second Amendment: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II. Our analysis of this text starts with *District of Columbia v. Heller*, 554 U.S. 570 (2008). In *Heller*, the Supreme Court considered whether the District of Columbia's regulations, which barred the possession of handguns both inside and outside the home, and required other firearms to be kept "unloaded and disassembled or bound by a trigger lock or similar device," violated the plaintiff's Second Amendment

App-5

rights. 554 U.S. at 575. After undertaking a lengthy analysis of the original public meaning of the Second Amendment, the Court concluded that it confers "an individual right to keep and bear arms." *Id.* at 595. Guided by the same historical inquiry, the Court emphasized that "the inherent right of self-defense has been central to the Second Amendment right." *Id.* at 628.

Therefore, prohibiting the possession of handguns was unconstitutional. *Id.* at 628–29. Similarly, the District of Columbia's requirement that "firearms in the home be rendered and kept inoperable at all times" made "it impossible for citizens to use [firearms] for the core lawful purpose of self-defense and [was] hence unconstitutional." *Id.* at 630.[3]

*Heller* did not purport to "clarify the entire field" of Second Amendment jurisprudence and does not provide explicit guidance on the constitutionality of regulations which are less restrictive than the near-total ban at issue in that case. *Id.* at 635. But *Heller*'s method of analysis suggests a broad framework for addressing Second Amendment challenges. First, *Heller* determined whether the possession of operable weapons in the home fell within "the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625. In conducting this analysis, *Heller* indicated that the Second Amendment does not preclude certain "longstanding prohibitions" and "presumptively lawful regulatory measures," such as "prohibitions on carrying

---

[3] *McDonald v. City of Chicago* held that the Second Amendment right recognized in *Heller* is fully applicable to the States. 130 S. Ct. 3020, 3050 (2010).

App-6

concealed weapons," "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," "laws imposing conditions and qualifications on the commercial sale of arms," and prohibitions on "the carrying of 'dangerous and unusual weapons,'" referring to weapons that were not "in common use at the time" of the enactment of the Second Amendment. *Id.* at 626–27, 627 n.26 (internal citations and quotations omitted).

Next, after determining that the possession of operable weapons fell within the scope of the Second Amendment, *Heller* considered the appropriate level of scrutiny for the challenged regulation. In light of the severity of the restriction posed by the D.C. regulation, *Heller* determined that it was unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628. As *Heller* made clear, "'[a] statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.'" *Id.* at 629 (quoting *State v. Reid*, 1 Ala. 612, 616–17 (1840)). While *Heller* did not specify the appropriate level of scrutiny for Second Amendment claims, it nevertheless confirmed that rational basis review is not appropriate, explaining that "[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Id.* at 628 n.27.

App-7

Like the majority of our sister circuits, we have discerned from *Heller*'s approach a two-step Second Amendment inquiry. *See United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013) (collecting cases). The two-step inquiry we have adopted "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Id.* at 1136 (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). As other circuits have recognized, this inquiry bears strong analogies to the Supreme Court's free-speech caselaw. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702–03, 706 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that First Amendment analogies are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." (internal citation omitted)).

In the first step, we ask "whether the challenged law burdens conduct protected by the Second Amendment," *Chovan*, 735 F.3d at 1136, based on a "historical understanding of the scope of the [Second Amendment] right," *Heller*, 554 U.S. at 625, or whether the challenged law falls within a "well-defined and narrowly limited" category of prohibitions "that have been historically unprotected," *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733, 2734 (2011). To determine whether a challenged law falls outside the historical scope of the Second Amendment, we ask whether the regulation is one of the "presumptively lawful regulatory measures" identified in *Heller*, 554 U.S. at 627 n.26, or whether

App-8

the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment, *Chovan*, 735 F.3d at 1137. *See also United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (noting that only "the few historic and traditional categories [of conduct] long familiar to the bar" fall outside the scope of First Amendment protection (internal quotations omitted)).

If a prohibition falls within the historical scope of the Second Amendment, we must then proceed to the second step of the Second Amendment inquiry to determine the appropriate level of scrutiny. *Chovan*, 735 F.3d at 1136. When ascertaining the appropriate level of scrutiny, "just as in the First Amendment context," we consider: "(1) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.'" *Chovan*, 735 F.3d at 1138 (quoting *Ezell*, 651 F.3d at 703).

In analyzing the first prong of the second step, the extent to which the law burdens the core of the Second Amendment right, we rely on *Heller*'s holding that the Second Amendment has "the core lawful purpose of self-defense," 554 U.S. at 630, and that "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635; *see also Chovan*, 735 F.3d at 1138 (stating that a core right under the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home").

App-9

In analyzing the second prong of the second step, the extent to which a challenged prohibition burdens the Second Amendment right, we are likewise guided by First Amendment principles. *Cf. Ezell*, 651 F.3d at 706–07. As we explained in *Chovan*, laws which regulate only the "*manner* in which persons may exercise their Second Amendment rights" are less burdensome than those which bar firearm possession completely. 735 F.3d at 1138; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (noting that laws that place "reasonable restrictions on the time, place, or manner of protected speech" and that "leave open alternative channels for communication of information," pose less of a burden on the First Amendment right and are reviewed under intermediate scrutiny). Similarly, firearm regulations which leave open alternative channels for self-defense are less likely to place a severe burden on the Second Amendment right than those which do not. *Cf. Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to a regulation which "leaves a person free to possess any otherwise lawful firearm he chooses—so long as it bears its original serial number").

A law that imposes such a severe restriction on the core right of self-defense that it "amounts to a destruction of the [Second Amendment] right," is unconstitutional under any level of scrutiny. *Heller*, 554 U.S. at 629 (internal quotations omitted). By contrast, if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, we may apply intermediate scrutiny. *See, e.g., Chovan*, 735 F.3d at 1138–39; *cf. Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("[A]

App-10

regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify.").

V

We now apply these principles to the facts of this case. We begin by addressing Jackson's facial and as-applied challenge to the constitutionality of section 4512, which requires handguns to be stored in a locked container when not carried on the person.

A

As a threshold issue, San Francisco argues that Jackson may not bring a facial challenge to section 4512. San Francisco contends that Jackson conceded that locked storage is appropriate in some circumstances, such as when it is foreseeable that a child would otherwise gain possession of a firearm. Therefore, San Francisco claims that section 4512 has a "plainly legitimate sweep," and a facial challenge is inappropriate. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Wash. v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997)).

San Francisco's argument reflects a misunderstanding of the Supreme Court's jurisprudence. Facial challenges are disfavored for two reasons. First, when considering "complex and comprehensive legislation," we may not "resolve questions of constitutionality with respect to each potential situation that might develop," especially when the moving party does not demonstrate that the legislation "would be unconstitutional in a large

App-11

fraction of relevant cases." *Gonzales v. Carhart*, 550 U.S. 124, 167–68 (2007) (internal quotation omitted). Second, facial challenges "often rest on speculation." *Wash. State Grange*, 552 U.S. at 450. Consequently, "they raise the risk of premature interpretations of statutes on the basis of factually barebones records," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner inconsistent with the Constitution." *Id.* at 450–51.

Jackson's facial challenge to section 4512 raises neither concern. First, section 4512 is not an example of "complex and comprehensive legislation" which may be constitutional in a broad swath of cases. Either it is a permissible burden on the Second Amendment right to "keep and bear arms" or it is not. Second, unlike the voting scheme at issue in *Washington State Grange*, the constitutionality of section 4512 does not turn on how San Francisco chooses to enforce it. The statute constitutes a flat prohibition on keeping unsecured handguns in the home. On its face, it does not give courts the opportunity to construe the prohibition narrowly or accord the prohibition "a limiting construction to avoid constitutional questions." *Id.* at 450.

B

We next apply the two-step inquiry to determine whether section 4512 is constitutional. We consider whether section 4512 burdens conduct protected by the Second Amendment. If so, we then determine an appropriate level of scrutiny. *Chovan*, 735 F.3d at 1136.

App-12

First, we ask whether section 4512 regulates conduct "historically understood to be protected" by the Second Amendment "right to keep and bear arms." *Chovan*, 735 F.3d at 1136, 1137. In analyzing the scope of the Second Amendment, we begin with the list of "presumptively lawful" regulations provided by *Heller*. *See* 554 U.S. at 626–27; *see also Chovan*, 735 F.3d at 1137. Section 4512 resembles none of them, because it regulates conduct at home, not in "sensitive places"; applies to all residents of San Francisco, not just "felons or the mentally ill"; has no impact on the "commercial sale of arms," and it regulates handguns, which *Heller* itself established were not "dangerous and unusual." 554 U.S. at 626–27.

Nor does section 4512 resemble the prohibitions discussed in "historical evidence in the record before us." *Chovan*, 735 F.3d at 1137 (internal citation omitted). *Heller* discusses two founding-era laws which regulated the storage of firearms and gunpowder. *See* 554 U.S. at 631–32. First, it notes a 1783 Massachusetts law that prohibited residents of Boston from taking loaded firearms into "any Dwelling House, Stable, Barn, Out-house, Ware-house, Store, Shop or other Building." *Id.* at 631 (quoting Act of Mar. 1, 1783, ch. 13, 1783 Mass. Acts p. 218.) *Heller* indicated that this statute should be construed narrowly in light of its context, "which makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the 'depositing of loaded Arms' in buildings." 554 U.S. at 631. *Heller* also concluded that the Massachusetts law was an outlier that contradicted "the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home." *Id.* at 632. With respect to

App-13

"gunpowder-storage laws," *Heller* noted they "did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home." *Id.* Because *Heller* rejected the probative value of this evidence, these historical precedents do not establish that San Francisco's requirement is historically longstanding.

The other historical evidence in the record does not establish that prohibitions such as those in section 4512 fall outside the scope of "the Second Amendment, as historically understood." *Chovan*, 735 F.3d at 1137. San Francisco and its amici note that many states regulated the storage of gunpowder in the founding era, *see, e.g.*, Act of June 28, 1762, 1762–1765 R.I. Acts & Resolves 132 (mandating that large quantities of gunpowder be stored in a powder house); 1784 N.Y. Laws 627 (requiring gunpowder to be stored in appropriate containers), and also point to reconstruction-era state court decisions upholding gunpowder-storage regulations as lawful applications of the state's police powers, *see, e.g.*, *Williams v. City Council of Augusta*, 4 Ga. 509, 511–12 (1848); *Foote v. Fire Dep't of the City of New York.*, 5 Hill 99, 100 (N.Y. Sup. Ct. 1843). But, as noted by *Heller*, such laws are best described as "fire-safety" regulations. 554 U.S. at 632. The fact that states historically imposed modest restrictions on the storage of gunpowder, a dangerous and highly flammable substance, does not raise the inference that the Second Amendment is inapplicable to regulations imposing restrictions on the storage of handguns.

Because storage regulations such as section 4512 are not part of a long historical "tradition of

App-14

proscription," *Entm't Merchants Ass'n*, 131 S. Ct. at 2734, we conclude that section 4512 burdens rights protected by the Second Amendment, *see Chovan*, 735 F.3d at 1137.

## C

Having determined that section 4512 regulates conduct within the scope of the Second Amendment, we now turn to the second step of the inquiry: deciding what level of heightened scrutiny to apply to the ordinance. The level of scrutiny depends upon "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Id.* at 1138 (internal quotations omitted).

We first consider whether the conduct regulated by section 4512 is close to the core of the Second Amendment. On its face, section 4512 implicates the core because it applies to law-abiding citizens, and imposes restrictions on the use of handguns within the home. *See Heller*, 554 U.S. at 635 (emphasizing "the right of law-abiding responsible citizens to use arms in defense of hearth and home"). Section 4512 requires San Franciscans to choose, while in their homes, between carrying a handgun on their person and storing it in a locked container or with a trigger lock. S.F., Cal., Police Code art. 45, § 4512(a), (c)(1). As Jackson argues, there are times when carrying a weapon on the person is extremely impractical, such as when sleeping or bathing. Therefore, as a practical matter, section 4512 sometimes requires that handguns be kept in locked storage or disabled with a trigger lock. Having to retrieve handguns from locked containers or removing trigger locks makes it more

App-15

difficult "for citizens to use them for the core lawful purpose of self-defense" in the home. *Heller*, 554 U.S. at 630. Section 4512 therefore burdens the core of the Second Amendment right.

This is not the end of our inquiry, however. We next look to the severity of section 4512's burden on the Second Amendment right. Section 4512 does not impose the sort of severe burden imposed by the handgun ban at issue in *Heller* that rendered it unconstitutional. *Id.* Unlike the challenged regulation in *Heller*, *id.* at 629, section 4512 does not substantially prevent law-abiding citizens from using firearms to defend themselves in the home. Rather, section 4512 regulates how San Franciscans must store their handguns when not carrying them on their persons. This indirectly burdens the ability to use a handgun, because it requires retrieving a weapon from a locked safe or removing a trigger lock. But because it burdens only the "*manner* in which persons may exercise their Second Amendment rights," *Chovan* 735 F.3d at 1138, the regulation more closely resembles a content-neutral speech restriction that regulates only the time, place, or manner of speech. The record indicates that a modern gun safe may be opened quickly. Thus, even when a handgun is secured, it may be readily accessed in case of an emergency. Further, section 4512 leaves open alternative channels for self-defense in the home, because San Franciscans are not required to secure their handguns while carrying them on their person. Provided San Franciscans comply with the storage requirements, they are free to use handguns to defend their home while carrying them on their person.

App-16

Thus, Section 4512 does not impose the sort of severe burden that requires the higher level of scrutiny applied by other courts in this context. In *Moore v. Madigan*, for instance, the government was obliged to meet a higher level of scrutiny than intermediate scrutiny to justify a "blanket prohibition" on carrying an operable gun in public. 702 F.3d 933, 940 (7th Cir. 2012). By contrast, section 4512 does not constitute a complete ban, either on its face or in practice, on the exercise of a law-abiding individual's right to self defense. Nor does section 4512 burden Second Amendment rights to the same degree as a Chicago ordinance prohibiting firing ranges in the city, which the Seventh Circuit analyzed under "a more rigorous showing" than intermediate scrutiny, "if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708. The Seventh Circuit reasoned that the "ban is not merely regulatory; it *prohibits* the law-abiding, responsible citizens of Chicago from engaging in target practice in the controlled environment of a firing range," and was therefore "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* (internal quotation marks omitted). Section 4512 does not impose such a serious encroachment on the core right; rather, it is more similar to the registration requirements upheld in *Heller II*. In that case, the D.C. Circuit applied intermediate scrutiny to evaluate registration requirements, including mandatory firearm training and instruction, which "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-

App-17

defense in the home . . . ." 670 F.3d at 1255. The D.C. Circuit reasoned that "none of the District's registration requirements *prevents* an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose," and therefore intermediate scrutiny was appropriate. *Id.* at 1257–58 (emphasis added). Likewise, section 4512 does not prevent an individual from possessing a firearm in the home.

Accordingly, we conclude section 4512 is not a substantial burden on the Second Amendment right itself. Even though section 4512 implicates the core of the Second Amendment right, because it does not impose a substantial burden on conduct protected by the Second Amendment, we apply intermediate scrutiny. *Cf. id.*

D

Having determined the applicable standard of review, we must now determine whether section 4512 withstands intermediate scrutiny. "[C]ourts have used various terminology to describe the intermediate scrutiny standard." *Chovan*, 735 F.3d at 1139; co*mpare Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989) (holding that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so,") *with Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (requiring "the government goal to be substantial, and the cost to be carefully calculated," and holding that "since the State bears the burden of justifying its restrictions, it must affirmatively

App-18

establish the reasonable fit we require" (internal citation omitted)). But "all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139.

In analyzing the first prong of intermediate scrutiny review, whether the government's stated objective is significant, substantial, or important, we must first define the government's objective. *Cf. id.* According to San Francisco, the governmental objective in enacting section 4512 was to reduce the number of gun-related injuries and deaths from having an unlocked handgun in the home. *See* S.F., Cal., Police Code art. 45, § 4511(1)–(4). In considering a city's justifications for its ordinance, we do not impose "an unnecessarily rigid burden of proof . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50–52 (1986). Here, as the legislative findings explain, "[h]aving a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death." *Id.* § 4511(2). San Francisco relied on evidence that "[g]uns kept in the home are most often used in suicides and against family and friends rather than in self-defense," and that children are particularly at risk of injury and death. *Id.* § 4511(3)–(4). San Francisco therefore sought to "reduce[] the risk of firearm injury and death" in the home through the use of trigger locks or lock boxes under section 4512. *Id.* § 4511(5). "It is self-evident," *Chovan*, 735 F.3d at 1139, that public safety is an important government interest.

App-19

*See, e.g.*, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 670–71, 677 (1989) (holding that government's compelling interest in public safety justifies drug testing of border agents who carry firearms); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State also has a strong interest in ensuring the public safety and order . . . ."). Accordingly, San Francisco has carried its burden of demonstrating that its locked-storage law serves a significant government interest by reducing the number of gun-related injuries and deaths from having an unlocked handgun in the home.

We next turn to the question whether section 4512 is substantially related to San Francisco's important interest. In considering the question of fit, we review the legislative history of the enactment as well as studies in the record or cited in pertinent case law, *Chovan*, 735 F.3d at 1140, giving the city "a reasonable opportunity to experiment with solutions to admittedly serious problems," *City of Renton*, 475 U.S. at 52 (internal quotations omitted). In the legislative findings accompanying section 4512, San Francisco concluded that firearm injuries are the third-leading cause of death in San Francisco, and that having unlocked firearms in the home increases the risk of gun-related injury, especially to children. *See* S.F., Cal., Police Code art. 45, § 4511(1)(e), (2)–(3). The record contains ample evidence that storing handguns in a locked container reduces the risk of both accidental and intentional handgun-related deaths, including suicide. Based on the evidence that locking firearms increases safety in a number of different respects, San Francisco has drawn a reasonable inference that mandating that guns be

App-20

kept locked when not being carried will increase public safety and reduce firearm casualties. This evidence supports San Francisco's position that section 4512 is substantially related to its objective to reduce the risk of firearm injury and death in the home.

Jackson contends that section 4512 is over-inclusive because it applies even when the risk of unauthorized access by children or others is low, such as when a handgun owner lives alone. We reject this argument, because San Francisco has asserted important interests that are broader than preventing children or unauthorized users from using the firearms, including an interest in preventing firearms from being stolen and in reducing the number of handgun-related suicides and deadly domestic violence incidents. *See id.* § 4511(2)(d), (4). Intermediate scrutiny does not require that section 4512 be the *least* restrictive means of reducing handgun-related deaths. *Ward*, 491 U.S. at 798. Moreover, the burden imposed by the legislation is not substantial. San Francisco relied on evidence showing that section 4512 imposes only a minimal burden on the right to self-defense in the home because it causes a delay of only a few seconds while the firearm is unlocked or retrieved from storage. Because the ordinance imposes only a minimal burden on the right to self-defense and San Francisco's interest encompasses more than just preventing minors from gaining access to firearms, the ordinance is appropriately tailored to fit San Francisco's interest.

Accordingly, San Francisco has shown that section 4512's requirement that persons store handguns in a locked storage container or with a

App-21

trigger lock when not carried on the person is substantially related to the important government interest of reducing firearm-related deaths and injuries. Jackson is thus not likely to succeed on the merits, and we therefore affirm the district court's denial of Jackson's motion for preliminary injunction. Because we decide on this basis, we need not reach Jackson's arguments that she established the remaining prongs of the preliminary injunction standard. *See Am. Trucking Ass'ns*, 559 F.3d at 1052.

VI

We now turn to the constitutionality of section 613.10(g), which prohibits the sale of hollow-point ammunition within San Francisco.

A

As a threshold issue, San Francisco contends that Jackson lacks standing to challenge section 613.10(g). To satisfy Article III standing, a plaintiff must show: "(1) an 'injury in fact' that is 'concrete and particularized' and 'actual or imminent,' not 'conjectural or hypothetical'; (2) a 'causal connection between the injury' and the challenged action of the defendant; and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Multistar Indus., Inc. v. U.S. Dep't of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An injury in fact is an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 560.

San Francisco asserts that Jackson has not suffered an injury in fact because she could easily obtain hollow-point ammunition outside San Francisco. But the injury Jackson alleges is not the

App-22

inconvenience of leaving San Francisco; rather, she alleges that the Second Amendment provides her with a "legally protected interest," *id.*, to purchase hollow-point ammunition, and that but for section 613.10(g), she would do so within San Francisco. That Jackson may easily purchase ammunition elsewhere is irrelevant. "In the First Amendment context, the Supreme Court long ago made it clear that one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place. The same principle applies here." *Ezell*, 651 F.3d at 697 (internal citations and quotations omitted). Accordingly, section 613.10(g) constitutes an injury in fact to Jackson, and she has standing to challenge it.

## B

Applying the two-step analysis outlined above, we first ask whether a prohibition on the sale of hollow-point ammunition regulates conduct "historically understood to be protected" by the Second Amendment "right to keep and bear arms." *Chovan*, 735 F.3d at 1136–37.

The Second Amendment protects "arms," "weapons," and "firearms"; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose. *Cf. Heller*, 554 U.S. at 630 (holding that "the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times . . . makes it impossible for citizens to use them for the

App-23

core lawful purpose of self-defense and is hence unconstitutional"). Thus "the right to possess firearms for protection implies a corresponding right" to obtain the bullets necessary to use them. *Cf. Ezell*, 651 F.3d at 704 (holding that the right to possess firearms implied a corresponding right to have access to firing ranges in order to train to be proficient with such firearms). Indeed, *Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves. *See* 554 U.S. at 632. Rather, the Court considered the burden certain gunpowder-storage laws imposed on the Second Amendment right, and determined that they did not burden "the right of self-defense as much as an absolute ban on handguns." *Id.* This observation would make little sense if regulations on gunpowder and ammunition fell outside the historical scope of the Second Amendment.

Conducting our historical review, we conclude that prohibitions on the sale of ammunition do not fall outside "the historical understanding of the scope of the [Second Amendment] right." *Id.* at 625. *Heller* does not include ammunition regulations in the list of "presumptively lawful" regulations. *See id.* at 626–27, 627 n.26. Nor has San Francisco pointed to historical prohibitions discussed in case law or other "historical evidence in the record before us" indicating that restrictions on ammunition fall outside of the historical scope of the Second Amendment. *Chovan*, 735 F.3d at 1137 (internal quotation omitted).

Because restrictions on ammunition may burden the core Second Amendment right of self-defense and the record contains no persuasive historical evidence

App-24

suggesting otherwise, section 613.10(g) regulates conduct within the scope of the Second Amendment.

C

We next turn to the appropriate level of scrutiny to apply to the challenged regulation. We consider how close section 613.10(g) is to the core of the Second Amendment right, and the severity of its burden on that right. *See Chovan*, 735 F.3d at 1138.

We first consider how close San Francisco's ban on the sale of hollow-point bullets comes to the core of the Second Amendment right. Jackson contends that hollow-point bullets are far better for self-defense than fully jacketed ammunition because they have greater stopping power and are less likely to overpenetrate or ricochet. Barring their sale, she argues, therefore imposes a substantial burden on the right of self-defense. We disagree. There is no evidence in the record indicating that ordinary bullets are ineffective for self-defense. Moreover, section 613.10(g) prohibits only the sale of hollow-point ammunition within San Francisco, not the use or possession of such bullets. Such a sales prohibition burdens the core right of keeping firearms for self-defense only indirectly, because Jackson is not precluded from using the hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction.

Nor does section 613.10(g) place a substantial burden on the Second Amendment right. A ban on the sale of certain types of ammunition does not prevent the use of handguns or other weapons in self-defense. The regulation in this case limits only the manner in which a person may exercise Second Amendment rights by making it more difficult to purchase certain

App-25

types of ammunition. This is akin to a content-neutral time, place, and manner restriction, such as a regulation which prevents a person from owning a firearm with an obliterated serial number while not barring the possession of an otherwise lawful firearm. *See Marzzarella*, 614 F.3d at 97. Further, section 613.10(g) leaves open alternative channels for self-defense in the home. Jackson may either use fully-jacketed bullets for self-defense or obtain hollow-point bullets outside of San Francisco's jurisdiction. Because section 613.10(g) neither regulates conduct at the core of the Second Amendment right nor burdens that right severely, we review it under intermediate scrutiny.

D

In considering whether section 613.10(g) withstands intermediate scrutiny, we must first define the governmental interest served by section 613.10(g), and determine whether it is substantial. Again, we review the legislative history of the enactment as well as studies in the record or cited in pertinent case law. *Chovan*, 735 F.3d at 1139. In the legislative findings accompanying section 613.10(g), San Francisco states that it "has a legitimate, important and compelling government interest in reducing the likelihood that shooting victims in San Francisco will die of their injuries by reducing the lethality of the ammunition sold and used in the City and County of San Francisco." S.F., Cal., Police Code art. 9, § 613.9.5(6). It is self-evident that San Francisco's interest in reducing the fatality of shootings is substantial. *See Chovan*, 735 F.3d at 1139.

App-26

We next consider the fit between section 613.10(g) and this interest to determine whether section 613.10 is substantially related to San Francisco's important interest of reducing the lethality of ammunition. *See id.* at 1140.

Legislative findings explain San Francisco's reasons for adopting the approach in section 613.10(g). Section 613.9.5(2) states that hollow-point bullets are "designed to tear larger wounds in the body by flattening and increasing in diameter on impact," and that "[t]hese design features increase the likelihood that the bullet will hit a major artery or organ." Therefore, San Francisco concluded that hollow-point bullets are "more likely to cause severe injury and death than is conventional ammunition that does not flatten or fragment upon impact." *Id.* Jackson generally argues that these legislative findings rely on bad science and erroneous assumptions. More specifically, she challenges San Francisco's conclusion that hollow-point ammunition is more lethal than other bullets. She bases this argument on an American Bar Association publication, which states that "medical examiners have been unable to show any difference in lethality between hollow-point and traditional round-nosed lead bullets." Lisa Steel, Ballistics, in Science for Laywers 11 (ABA Sec. of Sci. & Tech. Law) (Eric York Drogin ed., 2008).

We are not persuaded by Jackson's arguments. The Supreme Court has held that a municipality may rely on any evidence "reasonably believed to be relevant" to substantiate its important interest in regulating speech. *City of Renton*, 475 U.S. at 51–52. Of course, "the municipality's evidence must fairly

App-27

support the municipality's rationale for its ordinance," *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality), and courts should not credit facially implausible legislative findings. In this case, San Francisco's evidence more than "fairly supports" its conclusion that hollow-point bullets are more lethal than other types of ammunition. At most, Jackson's evidence suggests that the lethality of hollow-point bullets is an open question, which is insufficient to discredit San Francisco's reasonable conclusions. Section 613.10(g) is a reasonable fit for achieving its objective of reducing the lethality of ammunition because it targets only that class of bullet which exacerbates lethal firearm-related injuries.

Jackson contends that San Francisco could have adopted less burdensome means of restricting hollow-point ammunition, for example by prohibiting the possession of hollow-point bullets in public, but allowing their purchase for home defense. *See, e.g.*, N.J. Stat. Ann. § 2C:39-3(f), (g). Even if this is correct, intermediate scrutiny does not require the least restrictive means of furthering a given end. *Ward*, 491 U.S. at 798. *City of Renton* emphasizes that a "city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." 475 U.S. at 52 (internal quotation omitted). We also doubt that the laws to which Jackson points are indeed less burdensome than section 613.10(g). Because section 613.10(g) affects only the *sale* of hollow-point ammunition, San Franciscans are free to use and possess hollow-point bullets within city limits. Under Jackson's "less burdensome" alternatives, individuals would face criminal prosecution for possessing such ammunition outside the home. Given

App-28

the availability of alternative means for procuring hollow-point ammunition, section 613.10(g) imposes only modest burdens on the Second Amendment right.

Accordingly, we conclude that San Francisco carried its burden of establishing that section 613.10(g) is a reasonable fit to achieve its goal of reducing the lethality of ammunition, and section 613.10(g) thus satisfies intermediate scrutiny. We therefore conclude that Jackson has not carried her burden of showing she is likely to succeed on the merits. Accordingly, we need not reach the remaining preliminary injunction factors. *See Am. Trucking Ass'ns*, 559 F.3d at 1052.

### VII

We recognize the significance of the Second Amendment right to keep and bear arms. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 130 S. Ct. at 3042. But we also recognize that the Second Amendment right, like the First Amendment right to freedom of speech, may be subjected to governmental restrictions which survive the appropriate level of scrutiny. Because San Francisco's regulations do not destroy the Second Amendment right, and survive intermediate scrutiny, the district court did not abuse its discretion in concluding that Jackson would not succeed on the merits of her claims. We therefore affirm the district court's denial of Jackson's motion for preliminary injunction.

AFFIRMED.

App-29

*Appendix B*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

————————

No. 12-17803

————————

ESPANOLA JACKSON; PAUL COLVIN;
THOMAS BOYER; LARRY BARSETTI; DAVID GOLDEN;
NOEMI MARGARET ROBINSON; NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC.; SAN FRANCISCO
VETERAN POLICE OFFICERS ASSOCIATION,

*Plaintiffs-Appellants*,

v.

CITY AND COUNTY OF SAN FRANCISCO; EDWIN M. LEE,
Mayor for the City and County of San Francisco;
GREG SUHR, San Francisco Police Chief,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for the
Northern District of California, Richard Seeborg,
District Judge, Presiding, No. 3:09-cv-02143-RS

————————

Filed: July 17, 2014

————————

Before: D.W. NELSON, M. SMITH, and IKUTA,
Circuit Judges.

————————

**ORDER**

The panel has unanimously voted to deny
appellants' petition for rehearing. The petition for

App-30

rehearing en banc was circulated to the judges of the court, and no judge requested a vote for en banc consideration.

The petition for rehearing and the petition for rehearing en banc are DENIED.

App-31

*Appendix C*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

————————

No. C 09-2143 RS

————————

Espanola Jackson, et al.,

*Plaintiffs*,

v.

City and County of San Francisco, et al.,

*Defendants*.

————————

Filed: November 26, 2012

————————

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

Plaintiffs move to enjoin preliminarily the City and County of San Francisco from enforcing two of its local ordinances, one of which requires firearms in the home either to be carried on the person, or kept under lock and key, and one which bans the sale of particular types of ammunition within the jurisdiction. While courts of appeal in other circuits have articulated standards to be applied in Second Amendment cases in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), the only Ninth Circuit decision directly to address those points has been superseded by an opinion that did not. *See Nordyke v. King*, 644 F.3d 776

App-32

(9th Cir. 2011) (rehearing *en banc* granted) ("the *Nordyke* panel opinion"); *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (*en banc*). *Heller* itself focused on addressing the more fundamental question of whether the Second Amendment enshrined any individual rights at all. After concluding that it did, *Heller* overturned the extremely broad handgun ban before it, but expressly left for future consideration the full scope of the Second Amendment, and the mode of analysis to be employed in evaluating the constitutionality of particular regulations.

Plaintiffs insist that the principles explicated in *Heller* compel the conclusion that San Francisco's ordinances are invalid, even if its holding does not. Ultimately, however, *Heller* left too much unsettled for it to dictate a particular result here. Against the backdrop of evolving law, and in the absence of controlling precedent, the conclusion emerges that plaintiffs have failed to show a probability of success on the merits of their claims that the challenged ordinances are constitutionally infirm. Accordingly, the motion for a preliminary injunction will be denied.

## II. BACKGROUND

Two provisions of the San Francisco Police Code ("SFPC") remain under challenge in this action. Section 4512, "The Safe Storage Law," generally allows San Francisco residents to possess handguns in their homes at any time, but requires them to apply trigger locks or to store such weapons in locked containers when not carried on their persons.[1]

_____

[1] In a prior order, the ordinance was described as only requiring that handguns be secured when not "under direct, personal

App-33

Section 613.10(g), entitled "Prohibiting Sale Of Particularly Dangerous Ammunition," prohibits gun shops from selling ammunition that has been enhanced to increase the damage it inflicts on the human body, such as fragmenting bullets, expanding bullets, bullets that project shot or disperse barbs into the body, or other bullets that serve no "sporting purpose." Plaintiffs contend that while bullets designed to expand or fragment upon impact fall within this ban, they are particularly suited for self-defense because they are designed, for safety reasons, to prevent ricochet and to eliminate over-penetration of unarmored assailants. Plaintiffs assert the police often use such bullets for the same reasons, and that they are unlike so-called "cop killer" or armor-penetrating bullets that might more reasonably be characterized as "particularly dangerous."

Plaintiffs' prior motion for judgment on the pleadings was denied. They now seek a preliminary injunction, in what they candidly acknowledge is at least in part an attempt to obtain a legal ruling, one way or the other, that would permit appellate review.

III. LEGAL STANDARDS

A preliminary injunction order is an "extraordinary remedy" that is "never granted as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain preliminary relief, a plaintiff must "establish that he is likely to succeed on

---

control." Plaintiffs argue that, except for peace officers, San Francisco residents must actually be carrying handguns on their persons to avoid the requirement of using trigger locks or gun safes. The prior language, although imprecise, was not intended to suggest otherwise.

App-34

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 21-22. The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id.* at 1135.

## IV. DISCUSSION

The ordinances at issue in *Heller* in effect (1) completely banned possession of handguns, and (2) required long guns kept in the home to be "unloaded and disassembled or bound by a trigger lock or similar device." *Heller*, 554 U.S. at 574-575. Notably, the relief sought by the *Heller* plaintiff was a declaration of his right, "to render a firearm operable and carry it about his home in that condition only when necessary for self-defense." *Id.* at 576.[2] After

---

[2] While not dispositive, this weighs against a conclusion that section 4512 is plainly invalid under *Heller*, as it provides exactly the relief the *Heller* plaintiff sought and obtained, or even more, in that it does not require an explicit need for self-defense.

App-35

extensively reviewing historical and legal authorities, and parsing the grammatical construction of the Second Amendment, *Heller* declared that "the inherent right of self-defense has been central to the Second Amendment right" and that "the need for defense of self, family, and property is most acute" in the home. *Id*. at 628. Accordingly, the Court held, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster." *Id.* at 628-29 (footnote, citations, and internal quotations omitted).

*Heller* cautioned, however, "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court specifically observed that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. Moreover, it stated that this list of permissible types of regulations, "does not purport to be exhaustive." *Id.* at 627 n. 26.

Circuit court decisions after *Heller* have generally applied a "two-step" approach, first examining whether the challenged law places a burden on conduct falling within the scope of the Second Amendment as historically understood, and then applying either strict or intermediate scrutiny, depending on the severity of any such burden. *See, e.g.*, *U.S. v. Marzzarella*, 614 F.3d 85, 89 (3d Cir.

App-36

2010); *U.S. v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). The Ninth Circuit has yet to issue a binding determination on the point, but concurring opinions in the most recently issued decision in the *Nordyke* matter suggest at least some of its judges would embrace the two-step approach. *See Nordyke v. King*, 681 F.3d 1041, 1045-1046 (9th Cir. 2012) (O'Scannlain, J., concurring).

Plaintiffs read in *Heller* a rejection of *any* approach that would call for a court to engage in balancing or evaluation of the claimed benefits of a gun control regulation with respect to either the degree to which it burdens rights of gun owners, or is well-designed to achieve its stated ends. Plaintiffs rely on a portion of the majority opinion addressing a proposal in Justice Breyer's dissent. Justice Breyer advocated an "interest-balancing inquiry" that "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." 554 U.S. at 689-90 (Breyer, J., dissenting). In response, the majority said:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no

App-37

constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.

554 U.S. at 634-635.

Because both intermediate and strict scrutiny, as traditionally applied in other areas, require evaluation of, and balancing among, the goals of the law, the degree of infringement on rights, and the "fit" between the law's effects and the governmental interests purportedly served, arguably tension arises between this passage and any application of those traditional forms of scrutiny.[3] *Heller*, however, does not actually hold that some form of further analysis will *never* be appropriate; it merely concluded that as to the ordinance before it, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster." 554 U.S. at 628-29.

Plaintiffs' proposed analytical framework is wholly unsatisfactory, because it would effectively mean that virtually any regulation of firearms is

---

[3] Although likely dicta, there is no dispute that a footnote in *Heller* precludes application of rational basis review scrutiny—the City does not argue otherwise. *See*, 554 U.S. at 629 n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.").

App-38

impossible unless the law plainly fell into one of the categories specifically mentioned in *Heller* (despite the Court's express warning that its list was non-exhaustive) or could otherwise be shown as a type of regulation with long historical pedigree. Plaintiffs contend that the first *Heller* "step" requires examination of historical precedents to determine if the law is within the "scope" of the Second Amendment, and then, if it is, a further historical evaluation to determine if it falls within some exception.

As an threshold matter, the *Heller* opinion does not plainly adopt or support such an approach. There, most of the historical analysis was addressed to the question of whether the Second Amendment is an *individual* right—an issue no longer in play in this or in any other litigation. *See* 554 U.S. at part II. While the Court also reviewed historical precedents to identify some longstanding exceptions, *see* 554 U.S. at part III, that analysis more properly should be seen as part of the first "step"—i.e., whether the challenged law falls within the scope of the Second Amendment's protections in the first instance. When the Court ultimately turned to the question of the validity of the particular law before it, its reference to historical precedents was more abbreviated, and does not represent the type of analysis plaintiffs suggest must be undertaken in the second "step." *See* 554 U.S. at part III.

Furthermore, as proposed by plaintiffs, the second "step" would be little more than a reiteration of the first, with the result that virtually no regulations of firearms other than those with long historical

App-39

antecedents would ever be permissible. While some portions of *Heller* could be read to support that view, the Court drew no such bright line, and expressly cautioned that it was not providing "utter certainty" as to the parameters of constitutionally permissible gun control measures. *See* 554 U.S. at 635 ("since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field.").

The question remains, then, as to the appropriate framework for analyzing the constitutionality of these SFPC provisions, post-*Heller*, in the absence of any controlling Circuit precedent. It may well be that before any final judgment is entered in this action, the Circuit will settle the now-existing questions, or at least case law will emerge providing clearer answers. At this juncture, however, the concurring opinion in *Nordyke*, which is consistent with the trends developing in other circuits, represents the best available guidance. Under that approach, which incorporates by reference the *Nordyke* panel opinion, a court is to "consider[] carefully the extent of the regulation's burden on Second Amendment rights." 681 F.3d at 1045 (O'Scannlain, J., concurring). Furthermore, "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny." *Nordyke* panel opinion, 644 F.3d at 786.[4]

Utilizing that analytical structure, it is clear that plaintiffs have not met their burden to show that

---

[4] The panel opinion declined to decide "precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights." 644 F.3d at 786 n. 9.

App-40

issuance of a preliminary injunction is warranted against section 613.10(g), which prohibits the sale of certain types of ammunition within city limits. As explained in the *Nordyke* panel opinion, "when deciding whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes." 644 F.3d at 787. Additionally, "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise." *Id.* at 787-88. Even assuming a constitutional right to possess and use the particular types of ammunition within the ambit of section 613.10(g) could be found, plaintiffs simply have not shown that prohibiting sales of such ammunition within City limits imposes a substantial burden on their ability to acquire it.[5]

Plaintiffs' showing as to the severity of the burdens imposed by section 4512, "The Safe Storage Law," is only marginally better. As noted above, section 4512 gives San Francisco residents the very set of rights the *Heller* plaintiff sought and obtained. San Franciscans may lawfully possess handguns in their own homes, may carry them in their own homes at any time, and may use them for self-defense without running afoul of any aspect of the ordinance.[6]

_____

[5] Plaintiffs' alternative argument that section 613.10(g) is unconstitutionally vague is not persuasive.

[6] In examining the Second Amendment phrase "keep and bear arms," *Heller* concluded that it refers to two separate concepts. "Bear arms" means "carrying [arms] for a particular purpose—

App-41

Plaintiffs have offered only the possibility that in a very narrow range of circumstances, the delay inherent in rendering a handgun operable or in retrieving it from a locked container theoretically could impair a person's ability to employ it successfully in self-defense. Even assuming this rises to the level of a "substantial" burden, however, thereby triggering some heightened degree of scrutiny, plaintiffs have not shown the regulation to be overreaching or improper in any way, or that it fails to serve a legitimate governmental interest. Indeed, as noted in *Heller* itself, nothing in its analysis "suggest[s] the invalidity of laws regulating the storage of firearms to prevent accidents." 554 U.S. at 632.

At heart, plaintiffs' contention that the challenged ordinances are unconstitutional turns on a reading of *Heller* that goes well beyond its text. Although the law in this arena undoubtedly will continue to develop, especially with respect to the precise analytical standards and terminology to be employed, plaintiffs have not shown there is reason to believe these provisions of the SFPC are in conflict with the Second Amendment regardless of the particular articulations that may emerge as other district and appellate courts attempt to answer the questions explicitly left open by

---

confrontation." "Keep arms" means to "have weapons" or "possess weapons." 554 U.S. at 583-84. Section 4512 imposes no *direct* restrictions at all on the right to "bear" arms. Nor does it preclude anyone from "keeping" arms. The only question is whether its restrictions on how handguns maybe stored interferes with the underlying purposes served by the rights, insofar as they might delay a person's ability to go from merely "keeping" a handgun to "bearing" it in a condition suitable for use in self-defense.

App-42

*Heller.* Accordingly, plaintiffs have not met their burden to show that a preliminary injunction should issue.[7]

## V. CONCLUSION

The motion for a preliminary injunction is denied.

IT IS SO ORDERED.

Dated: 11/26/12

s/_____

RICHARD SEEBORG

UNITED STATES DISTRICT JUDGE

---

[7] Because plaintiffs are claiming infringement of constitutional rights, and contend that their ability to exercise self-defense is impaired, some degree of irreparable harm and hardship to them likely could be presumed. Even on the "sliding scale" of *Cottrell*, however, the balance of the circumstances do not warrant preliminary relief.

App-43

*Appendix D*

### U.S. Const. amend. II

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

### U.S. Const. amend. XIV, §1

All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

App-44

**S.F., Cal., Police Code art. 45, §4511**

FINDINGS.

1. Firearm injuries have a significant public health impact both nationally and locally.

a. In the United States, firearm injuries accounted for 6.6 percent of premature deaths from 1999-2007. Shootings are a leading cause of injury deaths in the nation, second only to motor vehicle crashes. On average, there were 30,125 firearm deaths in the United States annually between 2000 and 2007, inclusive. In 2007, 31,224 Americans died in firearm-related homicides, suicides, and unintentional shootings—the equivalent of 85 deaths each day and more than three deaths each hour.

b. Nationally, more than two thirds of homicides and over half of all suicides are committed with firearms.

c. Unintentional shootings killed over 5,700 people in the U.S. between 2000 and 2007. In 2009, over 18,000 people were treated for unintentional gunshot wounds in the United States.

d. The firearm-related homicide, suicide, and unintentional death rates for children 5-14 years old in the United States are significantly higher than those other industrialized nations.

e. Over the last five years, firearm injuries have ranked third of all causes of injury death in San Francisco, after pedestrian fatalities and falls, respectively. Almost two thirds of these firearm deaths were homicides. In addition,

App-45

gunshot wounds were the third most common reason for injury-related hospitalizations in San Francisco from 2005 to 2008 and fourth in 2009. Firearm-related suicides accounted for 16.2 percent of the suicide deaths in San Francisco in Fiscal Year 2009-2010.

f. San Francisco General Hospital, as the only trauma center in San Francisco, treats approximately 98 percent of the city's shooting victims annually. Approximately 80 percent of the individuals treated for violent injuries at San Francisco General Hospital are uninsured.

2. Having a loaded or unlocked gun in the home is associated with an increased risk of gun-related injury and death.

a. A firearm stored loaded or unlocked increases the risk of an accidental shooting.

b. All U.S. case control studies (12 to date) have found that people who die by suicide are more likely to have lived in a home with a gun than similar people who did not die by suicide. Studies have also shown that the risk of suicide increases in homes where guns are kept loaded or unlocked.

c. A 2007 study compared the 40 million people who live in the states with the lowest firearm prevalence (Hawaii, Massachusetts, Rhode Island, New Hampshire, Connecticut, and New York) to about the same number living in the states with the highest firearm prevalence (Wyoming, South Dakota, Alaska, West Virginia, Montana, Arkansas, Mississippi, Iowa, North Dakota, Alabama, Kentucky, Wisconsin,

App-46

Louisiana, Tennessee, and Utah). Although non-firearm suicides were about equal in the two groups, total suicides were almost twice as high in the high-gun states.

d. Keeping unsecured guns in the home increases the flow of illegal guns into the community. More than half a million firearms are stolen each year in the United States and many are subsequently sold illegally.

3. Children are particularly at risk of injury and death, or causing injury and death, when they can access guns in their own homes or homes that they visit.

a. The authors of a 2005 study found that an estimated 1.69 million children age 18 and under are living in households with loaded and unlocked firearms. Many young children, including children as young as three years old, are strong enough to fire handguns.

b. A significant majority of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend. Of youths under who died by firearm suicide, the vast majority used a family member's gun, usually a parent's. And more than two thirds of school shooters obtained their gun(s) from their own home or that of a relative.

c. Quick access to loaded firearms heightens the risk that a young person's impulsive decision to commit suicide will be carried out without reflection or seeking help, and that the impulsive attempt will be fatal. One third of youths who died by suicide had faced a crisis within the previous

App-47

24 hours. Among people who nearly died in a suicide attempt, almost a quarter indicated that fewer than five minutes had passed between deciding on suicide and making the attempt. While fewer than 10 percent of suicide attempts by other means are fatal, at least 85 percent of firearm suicide attempts end in death.

4. Guns kept in the home are most often used in suicides and against family and friends rather than in self-defense.

a. Guns kept in a home are more likely to be involved in an unintentional shooting, criminal assault, or suicide attempt than to kill or injure in selfdefense.

b. Only one in ten firearm homicides in the shooter's home is considered justifiable, meaning the shooter was not the assailant. Of every ten firearm homicide victims killed at the shooter's residence, six were intimate partners or family members of the shooter, three were friends or acquaintances of the shooter, and only one was a stranger to the shooter.

5. Applying trigger locks or using lock boxes when storing firearms in the home reduces the risk of firearm injury and death.

a. Keeping a firearm locked when it is not being carried ensures that it cannot be accessed and used by others without the owner's knowledge or permission. This simple measure significantly decreases the risk that the gun will be used to commit suicide, homicide, or inflict injury, whether intentionally or unintentionally.

App-48

b. Safe storage measures have a demonstrated protective effect in homes with children and teenagers where guns are stored.

6. There is a wide consensus among medical professionals, police chiefs, gun control advocates and gun rights groups that applying trigger locks or using lock boxes to store unsupervised guns in the home promotes health and safety.

a. The International Association of Chiefs of Police recommends that state and local governments mandate safe storage of firearms.

b. The American Academy of Pediatrics recommends that if families must have firearms in their homes, the firearms should be stored locked, unloaded, and separate from locked ammunition.

c. Both gun control and gun rights advocates endorse the use of locking devices when storing guns to ensure that unauthorized or untrained persons cannot use the gun to inflict injury or death. For example, the National Rifle Association's Home Firearm Safety Handbook, developed and used as part of the National Rifle Association (NRA) Basic Firearm Training Program, emphasizes that "there is one general rule that must be applied under all conditions: Store guns so they are not accessible to untrained or unauthorized persons." The NRA Guide To The Basics Of Personal Protection In The Home further explains that "all storage methods designed to prevent unauthorized access utilize some sort locking method."

App-49

7. Requiring unsupervised firearms stored to be secured with trigger locks or in a locked container does not substantially burden the right or ability to use firearms for self-defense in the home.

    a. The locking requirements apply only to handguns that are not being carried. Gun owners and adults over 18 may carry loaded and unlocked handguns in the home at any time. The safe storage requirements also permit owners who wish to do so to store their handguns fully loaded.

    b. Gun security does not preclude quick access. For example, affordable lockboxes using Simplex-type locks, which pop open immediately when several keys or pushbuttons are touched in a preset sequence, are widely available. Users report that they can retrieve a loaded weapon in just two to three seconds, and that the locks are also easy to open in the dark. The NRA describes this type lockbox as providing "a good combination of security and quick access." Some lockboxes also feature biometric locks, which provide immediate access when they scan the owner's fingerprint.

    c. Portable lockboxes can store loaded weapons such that they are always within easy reach on counters, tables or nightstands. Such safely stored weapons are more quickly and easily retrieved for use in self-defense than unlocked guns that have been hidden away in seldom-used locations.

App-50

**S.F., Cal., Police Code art. 45, §4512**

HANDGUNS LOCATED IN A RESIDENCE TO BE KEPT IN A LOCKED CONTAINER OR DISABLED WITH A TRIGGER LOCK.

(a) Prohibition. No person shall keep a handgun within a residence owned or controlled by that person unless the handgun is stored in a locked container or disabled with a trigger lock that has been approved by the California Department of Justice.

(b) Definitions.

(1) "Residence." As used in this Section, "residence" is any structure intended or used for human habitation including but not limited to houses, condominiums, rooms, in law units, motels, hotels, SRO's, time-shares, recreational and other vehicles where human habitation occurs.

(2) "Locked container." As used in this Section, "locked container" means a secure container which is fully enclosed and locked by a padlock, key lock, combination lock or similar locking device.

(3) "Handgun." As used in this Section, "handgun" means any pistol, revolver, or other firearm that is capable of being concealed upon the person, designed to be used as a weapon, capable of expelling a projectile by the force of any explosion or other form of combustion, and has a barrel less than 16 inches in length.

(4) "Trigger lock." As used in this Section, a "trigger lock" means a trigger lock that is listed in the California Department of Justice's list of

App-51

approved firearms safety devices and that is identified as appropriate for that handgun by reference to either the manufacturer and model of the handgun or to the physical characteristics of the handgun that match those listed on the roster for use with the device under Penal Code Section 12088(d).

(c) Exceptions. This Section shall not apply in the following circumstances:

(1) The handgun is carried on the person of an individual over the age of 18.

(2) The handgun is under the control of a person who is a peace officer under Penal Code Section 830.

(d) Lost or Stolen Handguns. In order to encourage reports to law enforcement agencies of lost or stolen handguns pursuant to San Francisco Police Code Section 616, a person who files a report with a law enforcement agency notifying the agency that a handgun has been lost or stolen shall not be subject to prosecution for violation of Section 4512(a) above.

(e) Penalty. Every violation of this Section shall constitute a misdemeanor and upon conviction shall be punished by a fine not to exceed $1,000.00 or by imprisonment in the county jail not to exceed six months, or by both.

(f) Severability. If any provision, clause or word of this chapter or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect any other provision, clause, word or application of this Section which can be given effect without the invalid provision, clause or word, and to

App-52

this end the provisions of this Section are declared to
be severable.