**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS, *et al.*, | ) | |
| | ) | Case No.: 10-cv-4257 |
| Plaintiff, | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are gun owners and retailers who challenge the current and former versions of the City of Chicago's ordinance governing the use, sale, and possession of firearms within the City, arguing that those ordinances violated, and continue to violate, their constitutional rights. Before the Court is Defendants' motion to dismiss [155] Plaintiffs' fourth amended complaint. For the reasons set forth below, Defendants' motion [155] is granted in part and denied in part. A status hearing is set for 10/22/2015 at 9:00 a.m.

**I.     Background[1]**

**A.     Chicago's Gun Ordinances**

On June 28, 2010, the Supreme Court issued a landmark decision holding that the Second Amendment applied to the states by way of the Fourteenth Amendment, making state and municipal gun laws subject to the same Second Amendment standards that apply to federal gun laws. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). This forced the City of Chicago to rewrite its 1982 ordinance banning the possession of handguns within city limits. Four days after

---

[1]   The Court accepts as true the facts alleged in Plaintiffs' fourth amended complaint and makes all reasonable inferences in their favor. See *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 879 (7th Cir. 2012).

*McDonald*, Chicago passed a new ordinance (the "2010 Ordinance"), allowing the possession of guns within the City subject to a series of regulations governing both sale and ownership. Plaintiffs filed their original complaint [1] in this case one week later, on July 9, 2010.

Approximately three-and-a-half years later, a court in the Northern District of Illinois concluded that certain provisions in the 2010 Ordinance effectively banning the sale and transfer of firearms were unconstitutional. *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. Jan. 6, 2014) (regarding MCC[2] § 8-20-100 and § 17-16-0201, which banned gun sales and transfers other than inheritance). This prompted yet another round of revisions from the City of Chicago, which issued a revised gun ordinance approximately six months later, in July 2014 (the "2014 Ordinance").

As gun laws in the City of Chicago have evolved over the past four years, so too have Plaintiffs' allegations. [See 1, 4, 6, 51, 112, 146.] Now before the Court is Defendants' motion to dismiss [155] Plaintiffs' fourth amended complaint [146], which represents Plaintiffs' sixth attempt to crystallize their allegations and coherently frame their challenges to the City's gun laws. In their fourth amended complaint, Plaintiffs focus primarily on provisions within the 2014 Ordinance, but also make reference to purported harms stemming from provisions in the 2010 Ordinance.[3] Most of the provisions at issue are short and self-explanatory, and thus need no advanced introduction. However, certain provisions (namely, the zoning and special-permit provisions) are more complex and difficult to assess out of context. Accordingly, the Court provides the following summary of the various zoning provisions at issue in this case.

---

[2] "MCC" is the commonly-used abbreviation for references to the Municipal Code of Chicago.

[3] In particular, in Count I, Plaintiffs Franzese and Second Amendment Arms allege lost business stemming from the ban on firearms retailers in the 2010 Ordinance (MCC § 4-144-010), and in Count V, Plaintiff Kole raises class-action allegations relating to the City's now-repealed firearm registration requirement and the accompanying $15.00 registration-fee requirement (MCC §§ 8-20-140, 8-20-150).

### 1. Zoning Regulations in the 2014 Ordinance

Plaintiffs object to four zoning regulations in the 2014 Ordinance. Two of those provisions (MCC §§ 4-144-750, 17-9-0128) are self-explanatory: they say that firearms retailers can't be located within 500 feet of schools or parks. The other two provisions (MCC §§ 17-3-0207, 17-4-0207) are more complicated, as they involve complex tables that subdivide the City into discrete residential, commercial, and downtown zones, and then detail whether various land uses are permitted within each zone and, if so, what type of permitting application is required to gain approval for each particular land use.

### a. MCC § 17-3-0207

MCC § 17-3-0207 is a zoning ordinance that details land-use restrictions for various business operations across Chicago's six zones: B1 (neighborhood shopping district), B2 (neighborhood mixed-use district), B3 (community shopping district), C1 (neighborhood commercial district), C2 (motor-vehicle-related commercial district), and C3 (commercial, manufacturing, and employment district). Section 17-3-0207 says that firearms retailers can be built in Chicago's C2 and C3 zones—a restriction that also applies to light and heavy equipment sales/rental facilities, RV or boat storage facilities, and vehicle storage and towing facilities. There are several land uses that are regulated more extensively than firearms retailers under the provision (*e.g.*, cemeteries, mausoleums, columbarium facilities; coke and coal bulk material facilities; shooting ranges; cannabis cultivation centers), and there are multiple operations that are relegated specifically to the three commercial zones: C1, C2, and C3 (*e.g.*, detention and correctional facilities, hospitals, adult use facilities, stables, urban farms, construction storage yards, inter-track wagering facilities, flea markets, car washes, vehicle repair shops, recycling facilities, poultry slaughtering and retail sales facilities).

Section 17-3-0207 also explains the type of permit required to build a particular facility in each zone, which generally is either (a) no permit, or (b) a "special use" permit, where the intended land use "may be allowed if reviewed and approved in accordance with the special use procedures of § 17-13-0900. See MCC §§ 17-2-0202, 17-2-0203. Section 17-13-0900 sets out the procedure for submitting a special-use permit, which generally entails an application to the Zoning Board of Appeals, a recommendation from the Zoning Administrator to the Zoning Board of Appeals, a public hearing before the Zone of Appeals, and a final decision within 120 days of the application date. See MCC §§ 17-13-0900–10. At least 56 categories of land uses require special-use permits in at least one zone, and a number of categories, in addition to firearms facilities, require special-use permits regardless of the zone (*e.g.*, group community homes, domestic violence shelters, nursing homes, temporary overnight shelters, transitional residences and shelters, detention and correctional facilities, lodges and private clubs, community centers and recreational buildings, religious assembly facilities, schools, major utilities, adult use facilities, stables, drive-thru facilities, inter-track wagering facilities, payday lenders, pawn shops, flea markets, poultry slaughtering and retail sales facilities, fortune telling services, gas stations, hotels/motels, hookah bars, valuable objects dealers, outdoor vehicle storage and towing, freestanding wireless towers, cannabis dispensing organizations).

### b.    MCC § 17-4-0207

MCC § 17-4-0207 is another zoning ordinance that details land-use restrictions for the four zoning districts in Chicago's downtown area: DC (downtown core district), DX (downtown mixed-use district), DR (downtown residential district), and DS (downtown service district). See MCC § 17-4-0101–05. Section 17-4-0207 allows firearms retailers in Chicago's DS district only—a distinction that also applies to detention and correctional facilities; building maintenance

services; day labor employment agencies; certain sports facilities; flea markets; cremating facilities; residential support services; various vehicle service, sale, and storage facilities; and certain recycling facilities. Certain land-use categories are restricted completely under this provision (*e.g.*, coke & coal bulk material facilities, cannabis dispensing organizations), and approximately 45 land-use categories are limited to two or fewer of Chicago's four downtown zoning districts. Section 17-4-0207 also provides the type of permit required to build a particular facility in each district (*i.e.*, no permit, or a special-use permit), and firearms facilities is one among 39 land-use categories that requires a special-use permit in at least one zoning district, and one of 26 land-use categories that requires a special-use permit regardless of the zoning district.

## II.    Legal Standard

In reviewing the sufficiency of a complaint, a district court must accept all well-plead facts as true and draw all permissible inferences in favor of the plaintiff. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). A plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Supreme Court has described this notice-pleading standard as requiring a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). While factual allegations must be accepted as true, legal conclusions may not be considered. *Id.* "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

### III.    Analysis

#### A.    Count I

In Count I of their fourth amended complaint, Plaintiffs allege that certain provisions in the City's 2014 Ordinance violate the Second Amendment by depriving businesses of their right to sell firearms and, consequently, depriving individuals of their right to purchase firearms. Count I also includes a First Amendment challenge to a restriction in the 2014 Ordinance that prevents firearms dealers from displaying firearms or ammunition in store windows. Plaintiffs Second Amendment Arms and Franzese also seek monetary damages to compensate them for the lost business that they allegedly incurred based on the gun-store restrictions in "all previous and current versions of City ordinances." Defendants move to dismiss both substantive parts of Count I as well as Defendant Second Amendment Arms' claim for monetary damages.

##### 1.    Restrictions on Firearms Retailers within City Limits

Defendants challenge four provisions in the Ordinance that limit the potential location of firearms retailers within City limits. Specifically, MCC §§ 4-144-750 and 17-9-0128 say that any firearms retailer must be at least 500 feet from any school or park, and MCC §§ 17-3-0207 and 17-4-0207 limit firearms retailers to certain commercially-zoned districts in the City and within the downtown area specifically. Plaintiffs claim that these provisions violate the Second Amendment rights of Plaintiffs Second Amendment Arms and Franzese by prohibiting, or severely restricting, the operation of firearms dealers within the City, and of Plaintiffs Zeiman and Kole by impeding gun ownership and the ability to purchase firearms.

###### a.    Standing

As a preliminary issue, the Court must address whether the parties have standing to raise these claims. See *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 946 n.7 ("The precise limits of individual Second Amendment standing have not been explored post-*Heller*."). Because

6

standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), courts must consider this jurisdictional issue even though the parties did not raise it. See *Schirmer v. Nagode*, 621 F.3d 581, 584 (7th Cir. 2010) (citing *MainStreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 747 (7th Cir. 2007)). Generally speaking, to establish standing, Plaintiffs must demonstrate (1) that they suffered an injury in fact, (2) that Defendants' actions caused the injury, and (3) that the remedy they seek would redress the injury. *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). But "[w]hen the plaintiff applies for prospective relief against a harm not yet suffered—or one he believes he will suffer again—he must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical.'" *Bell*, 697 F.3d at 451 (alterations in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). A plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000); accord *Lyons*, 461 U.S. at 109 (holding that the plaintiff had standing to seek damages but not injunctive relief against abusive police practices).

The Supreme Court has "long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988); see also *Bell*, 697 F.3d at 451 ("As a general matter, a plaintiff who wishes to engage in conduct arguably protected by the Constitution, but proscribed by a statute, successfully demonstrates an immediate risk of injury" because "[t]he existence of the statute constitutes the

7

government's commitment to prosecute in accordance with it and, thus, a concrete prospect of future harm for one who would flout it."). As such, when a plaintiff expresses a credible intention to engage in activity proscribed by a statute, a sufficient likelihood of injury exists, and a pre-enforcement challenge is appropriate. See *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012) ("To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).

Individual Plaintiffs Zieman and Kole raise a facial challenge to the 2014 Ordinance, alleging that they are among the potential customers who are purportedly barred (or impermissibly restricted) from purchasing firearms in Chicago, and thus among those indirectly impacted by restrictions aimed at firearms sellers. However, neither individual alleged that he attempted to buy a firearm in Chicago since the passing of the 2014 Ordinance (let alone in the restricted zoning areas), or that he is even interested in doing so. By comparison, Zieman and Kole *did* allege their desire "to purchase within the City *a laser sighting device*," which is a firearm accessory that is also restricted by the 2014 Ordinance (and the subject matter of Count III, discussed below). [146, ¶ 25 (emphasis added).] By not expressing a desire to purchase firearms in the unauthorized zoning districts, Zeiman and Kole have not established the threat of immediate danger necessary to establish standing to pursue prospective relief. *Cf. Ezell v. City of Chicago*, 651 F.3d 684, 695–96 (7th Cir. 2011) (explaining in dicta that plaintiffs' injuries "easily support[ed] Article III standing" where plaintiffs challenging the Ordinance's provisions relating to firing ranges alleged that they owned firearms and wanted to maintain their

proficiency, and traveled outside of the City to complete the range training necessary to apply for a permit to legalize their firearm possession in the City). Because Zieman and Kole have failed to allege a real and immediate threat of injury, they lack standing to raise their Second Amendment challenges to the 2014 Ordinance. Accordingly, their claims are dismissed, though the dismissal is without prejudice. See *Harris v. Quinn*, 656 F.3d 692, 701 (7th Cir. 2011) ("Generally, when a complaint is dismissed because * * * the plaintiffs lack standing * * * it is dismissed without prejudice * * *."); *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 660 (7th Cir. 2011) (where a district court dismisses a suit for lack of standing, "it [has] no jurisdiction [and] therefore [can] only dismiss without prejudice").

Plaintiffs Franzese and Second Amendment Arms also raise a facial challenge to the constitutionality of the 2014 Ordinance, but from the sellers' perspective, alleging that the gun-store restrictions unconstitutionally impair their right to sell firearms. Before getting too far down in the weeds, the Court notes that "[w]here at least one plaintiff has standing [for a particular claim], jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell*, 651 F.3d at 696 n.7 (citing *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010) (en banc)). And the Seventh Circuit has cleared the way for firearms retailers to sue on behalf of their potential customers via the doctrine of "associational standing" (sometimes referred to as "third-party standing," "derivative standing," or "indirect standing"). See *Ezell*, 651 F.3d at 696 ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to 'act[] as [an] advocate[] of the rights of third parties who seek access to' its services.").

To establish associational standing, Second Amendment Arms must show that (1) its would-be customers would otherwise have standing to sue in their own right; (2) the interests it

seeks to protect are germane to its business purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual would-be customers in the lawsuit. See *Ezell*, 651 F.3d at 696 (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996)).

As to the first element, while the Court has concluded that Second Amendment Arms' would-be customers Zieman and Kole *did not* establish standing to challenge the gun-store restriction, that was not due to a systemic issue common to all of Second Amendment Arms' would-be customers, but rather to a curable pleading deficiency (*i.e.*, Zieman and Kole did not state a desire to purchase firearms in the restricted zoning areas). But Second Amendment Arms surely has many would-be customers who reside in Chicago who would have standing to sue in their own right. Regarding the second element, because Second Amendment Arms is a firearms dealer, its interest in seeking to protect the rights of firearm purchasers is clearly germane to its business purposes. And as to the third element, because the Court is only considering Second Amendment Arms' claim as it pertains to prospective *injunctive* relief based on the 2014 Ordinance, neither the claim asserted nor the relief requested requires the participation of individual would-be customers in the lawsuit. See *Ezell*, 651 F.3d at 696 (concluding that "[t]he Second Amendment Foundation and the Illinois Rifle Association have many members who reside in Chicago and easily meet the requirements for associational standing").

Accordingly, Plaintiff Second Amendment Arms has associational standing to sue Defendants for prospective injunctive relief based on the 2014 Ordinance on behalf of its would-be customers. And again, because at least one Plaintiff has standing to raise a facial challenge, "the court will adjudicate the case whether the additional plaintiffs have standing or not." *Ezell*, 651 F.3d at 696 n.7. Thus, the Court need not consider whether individual Plaintiff Franzese also

has standing to raise a facial challenge to the 2014 Ordinance, and any efforts by Zieman and Kole to amend their claims in order to establish standing would be unnecessary.

### b.      Rule 12(b)(6) Analysis

In *Heller*, the Supreme Court said that "conditions and qualifications on the commercial sale of arms" are "presumptively lawful" under the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); see also *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as * * * laws imposing conditions and qualifications on the commercial sale of arms. We repeat those assurances here."). Defendants argue that in order to overcome this presumption and to state a claim for relief, Plaintiffs must allege at least a colorable basis for supposing that the City's zoning restrictions impair the right to acquire firearms. See *Teixeira v. Cnty. of Alameda*, 2013 WL 707043, at *6 (N.D. Cal. Feb. 26, 2013) (dismissing challenge to zoning restrictions limiting the commercial sale of firearms, noting that "[t]he Ordinance is not a total ban on gun sales or purchases in Alameda County and therefore does not implicate the core right to possess a gun in the home for self-defense articulated in *Heller*," and concluding that "[t]he Ordinance is precisely the kind of presumptively valid restriction envisioned by *Heller*—it is a restriction on gun sales and purchases in or near sensitive places").

As to the appropriate legal standard for reviewing Plaintiffs' allegations, the Court cannot overlook the Supreme Court's repeated assurance that conditions and qualifications on the commercial sale of arms are presumptively valid. Unfortunately, the Supreme Court did not explain what is needed to overcome this presumption, particularly at the pleading stage. At a minimum, this presumption distinguishes restrictions on the sale of firearms under the Second Amendment from similar restrictions on speech in the First Amendment (*e.g.*, a restriction that

11

an adult bookstore cannot be located within 200 feet of a church).[4] In the First Amendment context, the initial burden is on the municipality to provide "some evidence" supporting its rationale for its ordinance; "a municipality [cannot] get away with shoddy data or reasoning." *New Albany DVD, LLC v. City of New Albany, Inc.*, 581 F.3d 556, 560 (7th Cir. 2009) (quoting *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–39 (2002)). Once the municipality provides this rationale, the burden then shifts to the plaintiffs "to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Alameda Books*, 535 U.S. at 438–39. And "[i]f plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* The *Alameda Books* burden-shifting analysis is a poor fit for assessing presumptively-valid restrictions on the sale of firearms in the Second Amendment context. The presumption afforded to such restrictions, at a minimum, puts the initial burden on the plaintiff to establish that the restriction on the sale of firearms violates the Second Amendment. At the pleading stage, plaintiffs accomplish this by articulating specific facts to create a plausible inference that the restrictions on the sale of firearms abridge the individual right to possess firearms for protection.

Turning to Plaintiffs' fourth amended complaint, Plaintiffs use strong language regarding the impact of the zoning provisions in the 2014 Ordinance: "The complained-of laws *deprive* Plaintiffs of their constitutional rights to keep, bear and sell arms;" "sections work *to effectively prohibit* gun stores from opening and operating by unjustifiably burdening their construction, operation and use;" and "City's laws *effectively prohibit* the operation of firearms dealers who

---

[4] See *Bolton v. Bryant*, 71 F. Supp. 3d 802, 816–17 (N.D. Ill. 2014) (discussing the trend of importing First Amendment jurisprudence into the Second Amendment context, citing cases).

wish to sell lawful firearms to the law-abiding public." [146, at 2, 6, 9 (emphasis added).] Plaintiffs also argue (in the alternative, they say) that "to the extent gun stores might be technically feasible under the ordinance, their construction, operation and use is *unjustifiably burdened* by the challenged provisions." [146, at 6 (emphasis added).]

To the extent that Plaintiffs' allegation is interpreted as alleging that the 2014 Ordinance acts as a total ban on the sale of firearms within the City, it fails to state a plausible claim. Although a complete ban on sales is the type of zoning restriction that would give rise to a Second Amendment violation, the plain text of the 2014 Ordinance clearly allows for the sale of firearms at various locations within the City. Equally unavailing is Plaintiffs' allegation that the zoning ordinances present an "effective ban" on firearms retailers in the City. As set forth in detail above, the zoning restrictions at issue here apply to numerous commercial operations in the City of Chicago, including light and heavy equipment sales and rental facilities, RV and boat storage facilities, vehicle storage and towing facilities, flea markets, certain sports facilities, certain recycling facilities, and various vehicle service, sale, and storage facilities, to name just a few. To claim that firearms retailers are effectively banned from the City would be to say that all of these other facilities are also effectively banned from the City. This language is too strong, and is not plausible.

Plaintiffs are more on-track when they argue that the 2014 Ordinance presents an unjustifiable burden on the sale of firearms, but those conclusory statements, without any further factual support, still fall short of what is needed at the pleading stage to overcome the presumption of validity. See *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 947 ("[N]othing in this opinion prevents the City from considering other regulations—short of the complete ban—on sales and transfers of firearms * * *."); *Iqbal*, 556 U.S. at 678 ("A pleading that offers

13

'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)). Nowhere in Plaintiffs' fourth amended complaint do Plaintiffs allege any basis as to how or why the zoning restrictions unjustifiably burden the rights of citizens of Chicago to purchase firearms within the City.[5] Plaintiffs avoid any mention of the specifics of the zoning restrictions, including how each of these restrictions impacts their Second Amendment rights. Does the geographical location of a firearm retailer impact the individual right to possess a firearm? Do Plaintiffs need to sell guns near schools and in zones B1, B2, B3, or C1 in order to reach the gun-buying public? Is there anyone in the City who will be unable to purchase a firearm because of this restriction? Plaintiffs' complaint raises many questions like this. But without this information, the Court is unable to assess whether Plaintiffs have legitimate claims against these various zoning restrictions, or whether Plaintiffs are objecting to any and all zoning restrictions, regardless of their actual impact. Were it not for the presumption of validity, perhaps Plaintiffs could state a Second Amendment claim based on *any* zoning restriction whatsoever, regardless of whether the restriction limited gun retailers to 1 percent of the City's retail space or 99 percent. But the presumption puts the onus on the plaintiff to allege some set of facts to create a plausible inference that the zoning restrictions in question impair (or completely ban) the right to acquire firearms. Plaintiffs have failed to do that here.

The presumption of validity is not surprising. The Second Amendment's "central component is the right to possess firearms for protection." *Ezell*, 651 F.3d at 699; *Heller*, 554

---

[5] Plaintiffs' fourth amended complaint lacks specificity (bordering on a Fed. R. Civ. P. 12(e) problem) as to exactly which provisions within the 2014 Ordinance are at issue, and how each provision violates the Second Amendment. Plaintiffs don't reference any provisions within Count I itself. And while Plaintiffs do reference certain provisions in their statement of facts, at times they omit relevant provisions (*e.g.*, omitting any mention of MCC § 17-3-207 and § 17-4-207, which are the actual zoning restrictions at issue) and at other times misstate the substance of provisions (*e.g.*, mislabeling MCC § 17-9-0128, a provision preventing firearms retailers within 500 feet of schools and parks, as a provision limiting firearms retailers within Commercial 2, Commercial 3, and Downtown Services Districts).

U.S. at 592 (the Second Amendment codifies a preexisting "individual right to possess and carry weapons in case of confrontation"). Requiring an individual to drive to one part of a city as opposed to another in order to purchase a firearm does not, on its face, burden the core right to possess a firearm for protection. Perhaps, on average, individuals might have to drive a marginally longer distance to visit a firearm store (or perhaps not), but even so, this would only delay a potential firearm purchase by a matter of minutes. While preventing a firearms retailer from setting up shop at a marquee Michigan Avenue location might impact walk-up sales and impulse buys, for those intent on purchasing a firearm (which is what the Second Amendment is concerned with), a slight diversion off the beaten path is no affront to their Second Amendment rights. This is why the presumption exists, and this is why Plaintiffs' boilerplate allegations fail to state a plausible Second Amendment violation. This claim must be dismissed.

### 2.     Display of Firearms

Plaintiffs make a facial challenge to the constitutionality of MCC § 4-144-790(g), which says that a licensed firearms dealer shall "not display firearms or ammunition in any window." MCC § 4-144-790(g). Plaintiffs allege that this provision "deprives individuals and businesses, including the Plaintiffs, of their right to display arms and ammunition for sale, in violation of the First and Fourteenth Amendments." [146, ¶ 32.]

### a.     Standing

As mentioned above, when a plaintiff expresses a credible intention to disobey a statute, a sufficient likelihood of injury exists such that the plaintiff has standing to raise a pre-enforcement challenge. See *Alvarez*, 679 F.3d at 591 ("To satisfy the injury-in-fact requirement in a preenforcement action, the plaintiff must show an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder." (citation omitted)).

15

Because Plaintiffs Second Amendment Arms and Franzese currently do not operate a firearms store in the City of Chicago (nor have they sought licenses to do so), they are not faced with a real and immediate danger of violating the City's display restriction. Nor have Plaintiffs expressed any desire to display firearms or ammunition in a store window. Arguably, then, the Court lacks jurisdiction to hear Plaintiffs' First Amendment challenge as well.

That being said, reading Plaintiffs' fourth amended complaint generously, the Court can infer Plaintiffs' desire to display firearms and ammunition in their store window, should they ever obtain one. The inference is reasonable here based on the context of the allegation (*i.e.*, a complete ban on window displays), and because there are no other reasonable explanations as to why one would object to a gun-display ban other than one's desire to display guns.[6] Accordingly, the Court concludes that Plaintiffs Second Amendment Arms and Franzese have standing to make a facial challenge to the constitutionality of MCC § 4-144-790(g).

### b.    Rule 12(b)(6) Analysis

Displaying a product for sale is a type of commercial speech,[7] and the First Amendment protects commercial speech from unwarranted governmental regulation. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980); *Bigelow v. Virginia*, 421 U.S. 809, 821 (1975). However, "[t]he Constitution * * * affords a lesser protection to commercial speech than to other constitutionally guaranteed expression," such as political or religious speech, and "[t]he protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation."

---

[6] One potential explanation is that Plaintiffs' misread the provision as one barring the display of firearms and ammunition *altogether* [see, *e.g.*, 146, ¶ 32], as opposed to a restriction regarding window displays only. The Court will excuse Plaintiffs' hyperbole for purposes of this order.

[7] Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980).

*Cent. Hudson*, 447 U.S. at 562–63. Commercial speech is not entitled to First Amendment protections if it is misleading or deceptive, *Friedman v. Rogers*, 440 U.S. 1, 13–16 (1979), or related to illegal conduct, *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 387 (1973). In contrast, regulations "that target more truthful, nonmisleading commercial messages rarely protect consumers from such harms," and thus draw a greater level of scrutiny. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502–03 (1996).

Specifically, to assess whether a regulation unconstitutionally burdens commercial speech, courts follow the four-part inquiry set forth in *Central Hudson*: (1) is the speech is protected by the First Amendment, (2) is the government's interest in regulating the speech is substantial, (3) does the challenged regulation directly advance the governmental interest, and (4) is the regulation is narrowly tailored; *i.e.*, no more extensive than necessary to further the government's interest. *Hudson*, 447 U.S. at 566. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995). "The party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983); see also *Edenfield v. Fane*, 507 U.S. 761, 770 (1993).

Here, Plaintiffs have accomplished the technical requirements of pleading a facial challenge to Defendants' restriction on commercial speech, as they have targeted a particular provision that restricts commercial speech, and the parties agree that the speech in question is protected by the First Amendment. But Defendants dig deeper, arguing that the City's restriction on commercial speech is justified under the *Central Hudson* intermediate scrutiny standard.

As a threshold matter, because Defendants bear the burden of justifying the purported restriction on commercial speech, and because a motion to dismiss examines only the pleadings, there is an inherent quandary as to how a defendant could meet such a burden absent at least

some discovery. See, *e.g.*, *Peterson v. Vill. of Downers Grove*, 2015 WL 1929737, at *9 (N.D. Ill. Apr. 27, 2015) (engaging in an extensive analysis of a facial challenge to a commercial-speech regulation at the motion to dismiss stage and concluding that more information was needed as to the "reasonable fit" factor). But defendants are not entirely handcuffed in their attempt to argue the merits of the claim at the pleading stage. Indeed, "the government's burden of justifying its legislative enactment against a facial challenge may be carried by pointing to the enactment itself and its legislative history." *Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), *cert. granted, judgment vacated and remanded for further consideration*, 517 U.S. 1206 (1996), *and opinion adopted in part*, 101 F.3d 325 (4th Cir. 1996). And "[f]or purposes of Rule 12(b)(6), the legislative history of an ordinance is not a matter beyond the pleadings but is an adjunct to the ordinance which may be considered by the court as a matter of law." *Id.* Here, the parties have provided the Ordinance itself along with certain legislative materials relevant to the Ordinance. [See 146-1; 160-1.]

In addition, in assessing a facial challenge to a commercial-speech restriction, the Supreme Court observed that "in other First Amendment contexts, we have permitted litigants to justify speech restrictions * * * based solely on history, consensus, and simple common sense," implying that these would be suitable reference points in the commercial-speech arena as well. *Fla. Bar*, 515 U.S. at 628 (citing *Burson v. Freeman*, 504 U.S. 191, 211 (1992)). In other words, the plain text of a law, its legislative history, and simple common sense could allow a district court to dismiss a facial challenge to a provision restricting commercial speech at the pleading stage.

Defendants argue that the restriction in question advances the City's substantial interest in protecting public safety by reducing opportunities for firearms and ammunition theft. The City

18

cites to the 2014 Ordinance itself, which says that "[i]n 2012, more than 16,000 firearms were lost or stolen from licensed firearms dealers across the country."[8] [146-1, at 1.] Courts have repeatedly held that public safety is a substantial, if not compelling, government interest. *See, e.g., Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (finding public safety a compelling state interest); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) ("The State also has a strong interest in ensuring the public safety * * *."); *Scott v. Harris*, 550 U.S. 372, 383 (2007) (referencing the "paramount governmental interest in ensuring public safety"); *United States v. Salerno*, 481 U.S. 739, 750, 754 (1987) (preventing crime is a compelling state interest).

In addition, when the empirical data comes from the legislature itself, "the substance of [the legislature's findings] cannot be trumped by the fact finding apparatus of a single court." *Anheuser-Busch, Inc.*, 63 F.3d at 1312; *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985) ("When Congress makes findings on essentially factual issues * * * those findings are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue."); *Rostker v. Goldbert*, 453 U.S. 57, 68 (1981) (holding that, when dealing with constitutional questions, courts "must be particularly careful not to substitute * * * [their] own evaluation of the evidence for a reasonable evaluation by the Legislative Branch."); *Turner v.*

---

[8] Plaintiffs note that the 2014 Ordinance presents data and references studies without providing the underlying support for their findings. But, as the Supreme Court said, "we do not read our case law to require that empirical data come to us accompanied by a surfeit of background information." *Fla. Bar*, 515 U.S. at 628. Regardless, Defendants' figure comes from a study by the Bureau of Alcohol, Firearms and Explosives entitled "2012 Summary: Firearms Reported Lost and Stolen," available at https://www.atf.gov/file/11846/download, which reported that in 2012, there were 190,342 reported lost or stolen firearms, and that 16,667 of those were the result of thefts or losses from federal firearms licensees. The City cites to this study in a study of its own entitled "Tracing the Guns: The Impact of Illegal Guns on Violence in Chicago," available at http://www.cityofchicago.org /dam/city/depts/mayor/Press%20 Room/Press%20Releases/2014/May/05.27.14TracingGuns.pdf, which the City released on May 27, 2014, just weeks before the City passed the 2014 Ordinance.

*FCC*, 520 U.S. 180, 195–96 (1997) (noting that the legislative branch "is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions"); *Friedman v. City of Highland Park, Ill.*, 2015 WL 1883498, at *5 (7th Cir. Apr. 27, 2015) ("[W]hen there is no definitive constitutional rule, matters are left to the legislative process."); *Heller v. District of Columbia*, --- F.3d ---, 2015 WL 5472555, at *15 (D.C. Cir. Sept. 18, 2015) (Henderson, J., concurring in part and dissenting in part) ("[T]he nature of firearms regulation requires ample deference to the legislature.").

With this in mind, the Court returns to the third and fourth steps of *Central Hudson*'s four-part analysis. As to the third step, whether the City's restriction directly advances its public-safety interest depends on whether firearms in display windows are potential theft targets, whether stolen firearms present a safety threat to the public, and whether the City's regulation prevents these potential harms. *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) ("[A] governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."). Here, Defendants thread the needle of the *Central Hudson* test by constructing a syllogism from the preamble to the 2014 Ordinance, noting that because (a) more than 16,000 firearms were lost or stolen from licensed firearms dealers in 2012, and because (b) regulating firearms dealers is associated with reductions in illegal gun trafficking and firearm theft, which threaten public safety, then (c) an ordinance regulating firearm theft would increase public safety. [See 146-1, at 1.] Defendants further advance their argument by appealing to common sense, arguing that *of course* firearms in store windows present a safety threat ("a criminal need only break the glass to take them" [160, at 7]), *of course* stolen firearms are a danger to society, and *of course* restricting that form of advertising will alleviate this harm.

Defendants' logic is facially sound, and presents a compelling argument in support of the regulation.

The fourth *Central Hudson* step "complements" the third step, "asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Greater New Orleans*, at 188. "'[T]he least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, * * * a means narrowly tailored to achieve the desired objective.'" *Lorillard*, 533 U.S. at 556 (quoting *Fla. Bar*, 515 U.S. at 632). Defendants focus on the minimal burden that the content-based restriction imposes on gun retailers in arguing that their regulation is narrowly tailored. Regarding advertising in windows, gun retailers can advertise their firearms in a multitude of ways, including signs, photographs, product logos, etc. And regarding advertising in general, gun retailers are free to display firearms and ammunition, just within the store itself (subject to other regulations in the ordinance not at issue here). In general, the Court sees the logic behind Defendants' arguments and agrees that the burden that the regulation imposes on retailers' speech interests is minimal and that the restriction still allows retailers "other means of exercising any cognizable speech interest in the presentation of their products." *Lorillard*, 533 U.S. at 569–70.

However, *Lorillard* and the other cases relied on by Defendants are summary judgment cases, and dismissal is only warranted at the motion-to-dismiss stage if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[9] *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). But despite this low standard, Plaintiffs

---

[9] To be sure, courts have engaged in the *Central Hudson* analysis at the motion to dismiss stage and found that commercial-speech restrictions did not violate the First Amendment. See, *e.g.*, *Green v. Anthony Clark Int'l Ins. Brokers, Ltd.*, 2010 WL 431673, at *1–4 (N.D. Ill. Feb. 1, 2010); *Holtzman v. Caplice*, 2008 WL 2168762, at *3–6 (N.D. Ill. May 23, 2008); *Centerline Equip. Corp. v. Banner Personnel Serv.,*

have failed to rebut Defendants' arguments. First, Plaintiffs adhere to an overbroad reading of the statute, alleging that "[b]ecause of the ordinance, Plaintiff Second Amendment Arms is forbidden from displaying its products." [169, at 10.] Plaintiffs hyperbolize the scope of the provision—it does not prohibit the right to display arms and ammunition *generally*, but only the right to display arms and ammunition *in any window*. This alone is a sufficient ground to determine that Plaintiffs failed to state a claim upon which relief can be granted.

Plaintiffs also oppose the government's purported interest in public safety, arguing that the City "has no substantial interest (except for those assumed or imagined) in banning Plaintiffs from promoting their business." [169, at 12.] But this conclusory argument is not enough to advance Plaintiffs' claim beyond the pleading stage, as it fails to present any factual scenario that would negate the City's stated interest in public safety. Plaintiffs further argue that "[t]here is nothing misleading nor harmful about letting the public see firearms" and "[t]here are no secondary effects of seeing firearms." [169, at 12.] But these arguments have no bearing on the Court's *Central Hudson* analysis because (a) the intermediate-scrutiny standard applies to speech regardless of whether it is misleading, (b) the harm in question is not *seeing* firearms, it is *stealing* firearms from display windows, and (c) there is no logical connection between the potential secondary effects (or primary effects, for that matter) of seeing firearms—whatever they may be—and the City's interest in preventing the theft of firearms. Even straining to do so, the Court cannot conceive of any evidence (or expert testimony) that would convince a trier of fact that public safety is *not* directly enhanced by restricting the display of firearms in a storefront window, and Plaintiffs' have not offered any insight to guide the Court through this task.

---

*Inc.*, 545 F. Supp. 2d 768, 773–77 (N.D. Ill. 2008); *Contest Promotions, LLC v. City & Cnty. of San Francisco*, 2015 WL 1849525, at *3–4 (N.D. Ill. Apr. 22, 2015).

In short, Defendants put their cards on the table at the pleading stage by divulging the City's interest in passing the provision in question, evidenced by statements made in the Ordinance itself, and corroborated by the legislative history and common sense. In effect, they called Plaintiffs' bluff. Forced to show their hand (*i.e.*, state some plausible ground for their claim that would entitle them to relief), Plaintiffs advanced clumsy platitudes and reiterated conclusory allegations without adding any fuel to the fire. The Court has sufficient evidence to rule on this primarily legal question at this stage in the litigation, and sees no reason to force the parties to engage in costly discovery (driven, surely, by a battle of the experts) when Plaintiffs cannot articulate why such discovery is warranted or, more basically, why their claim is plausible. Accordingly, Defendants' motion to dismiss Plaintiffs' First Amendment challenge to MCC § 4-144-790(g) is granted, again without prejudice.

### 3. Monetary Damages Claim

#### a. Standing

In addition to Plaintiffs' facial challenge to the 2014 Ordinance, Plaintiffs Franzese and Second Amendment Arms also seek monetary damages[10] to compensate them for their alleged

---

[10] There appears to be some confusion over which Plaintiffs are seeking monetary damages. In paragraph 33 of their fourth amended complaint [146], Plaintiffs say that "*Second Amendment Arms* is * * * entitled to its actual monetary damages suffered as a result of City's previous and continued enforcement and maintenance of its unconstitutional customs, policies, and practices," but just below that, in their prayer for relief, Plaintiffs request "[m]onetary damages in an amount to fully compensate *Franzese and Second Amendment Arms* for the lost business due to the deprivation of their civil rights under all previous and current versions of City ordinances." [146, at 10 (emphasis added).] Plaintiffs do not specify whether this refers to Franzese in his individual capacity or d/b/a Second Amendment Arms (or both).

In their motion to dismiss, Defendants seek to dismiss Second Amendment Arms' claim for monetary damages, but say nothing of Franzese's (possible) request for the same. The Court is unsure whether this was intentional on Defendants' part, or whether they were confused by Plaintiffs' internally-contradictory pleading. For purposes of this motion, because Franzese does not allege any damages that would differ from those of the business, the Court will assess the damages claim on behalf of the business entity only (Second Amendment Arms and Franzese d/b/a Second Amendment Arms). To the extent that Franzese is seeking monetary relief in his individual capacity, that claim is dismissed because Franzese fails to state a plausible claim upon which monetary relief can be granted to him individually.

lost business under "all previous and current versions of City ordinances." [146, at 10]; see also *Friends of the Earth*, 528 U.S. at 191–92 (noting that plaintiffs must demonstrate standing for each form of relief they seek).

As to the 2014 Ordinance, Plaintiffs have not alleged an injury-in-fact. That is, while Plaintiffs *do* allege that they submitted firearms-retailer applications to the City of Chicago in 2010 (*i.e.*, under the old, now-unconstitutional 2010 Ordinance), they have not submitted any applications since the 2014 Ordinance went into effect. [146, ¶ 22.] Instead, they allege only that they "desire[], plan[] and intend[] to submit additional applications to open gun stores at locations within the City." [*Id.*] While a plausible statement of intent to engage in statutorily proscribed conduct can create standing for a facial challenge, an actual injury is needed for an as-applied challenge.

However, in support of their claim for damages based on *previous* ordinances, Plaintiffs have alleged an injury-in-fact: *i.e.*, that they submitted weapons-dealer applications (with application fees) to the City on June 30, 2010 and July 2, 2010 to open gun shops at two separate locations within the City, but the City "rejected and refused to process or grant them because of the prohibition on gun stores" in the 2010 Ordinance (pursuant to the then-governing restriction that was later deemed unconstitutional by the district court in *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014)). [146, ¶¶ 14, 22 (referencing MCC § 4-144-010 in the 2010 Ordinance as the provision barring the sale of firearms in the City).] This allegation is sufficient to meet the standing requirements set forth in *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012).

Because Second Amendment Arms and Franzese have pled an actual injury stemming from gun-store ban in the 2010 Ordinance as applied to them, they have standing to pursue their claim for monetary damages.

### b.      Rule 12(b)(6) Analysis

Defendants argue that even if Plaintiffs' have adequately pled an injury in fact relating to the 2010 Ordinance, Plaintiff Second Amendment Arms—a business entity—should be categorically barred from pursuing monetary damages because the Second Amendment only protects *individual* rights, not corporate rights.[11] [See 160, at 8]; see generally Darrell A.H. Miller, *Guns, Inc.: Citizens United, McDonald, and the Future of Corporate Constitutional Rights*, 86 N.Y.U. L. REV. 887 (2011).

The Second Amendment says that "the right of *the people* to keep and bear Arms[] shall not be infringed." U.S. CONST. amend. II (emphasis added). And the Supreme Court has confirmed that this language confers an "*individual* right to possess and carry weapons." *Heller*, 554 U.S. at 593 (emphasis added); see also *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) (referring to the "individual right to keep and bear arms" as discussed in *Heller*); *Friedman v. City of Highland Park, Ill.*, 2015 WL 1883498, at *1 (7th Cir. Apr. 27, 2015) (same); *id.* at *5 ("*McDonald* holds that the Second Amendment creates individual rights that can be asserted against state and local governments."); *Ezell*, 651 F.3d at 689 ("*Heller* held that the [Second] Amendment secures an individual right to keep and bear arms * * *."). The simple answer is that because businesses are not people, Second Amendment Arms' claim must fail.

---

[11] Second Amendment Arms cannot sue for damages indirectly for injuries it incurs as the result of abridgments *to the individual right* to possess firearms for protection. This option is foreclosed by the rules for associational standing, which do not allow indirect plaintiffs to sue for damages. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 554 (1996) (holding that absent congressional authorization to the contrary, an organization cannot establish associational standing to seek damages on behalf of its members).

That being said, the Supreme Court has held that corporations can assert both First and Fourth Amendment challenges, despite the fact that the plain text of those amendments also grants rights exclusively to "the people." See *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977) ("Nor can it be claimed that corporations are without some Fourth Amendment rights."); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 342 (2010) ("The Court has recognized that First Amendment Protection extends to corporations."); see also 13D Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Richard D. Freer, *Federal Practice and Procedure* § 3573.1 (3d ed. Supp. 2008) (Although a corporation is not a "citizen" within the meaning of the Privileges and Immunities Clause, it is a "person" for purposes of the Due Process and Equal Protection Clauses, and thus may vindicate its federal rights under § 1983."); *Levy v. Pappas*, 510 F.3d 755, 762 (7th Cir. 2007) (same). And both the Supreme Court and the Seventh Circuit have used the Bill of Rights, particularly the First and Fourth Amendments, as interpretative analogs for the pseudo-frontier of Second Amendment law. See *Heller*, 554 U.S. at 579 (comparing the text of the Second Amendment to the First, Fourth, and Ninth Amendments and concluding that the phrase "right of the people" creates an individual right); *United States v. Meza-Rodriguez*, --- F.3d ---, 2015 WL 4939943, at *5 (7th Cir. Aug. 20, 2015) (concluding that "the people" has the same meaning in the Second Amendment context as it does throughout the Bill of Rights); *Bolton v. Bryant*, 71 F. Supp. 3d 802, 816–17 (N.D. Ill. 2014) (discussing the trend of importing First Amendment jurisprudence into the Second Amendment context).

To analogize further to the First Amendment context, Plaintiffs' claim is similar to adult-oriented businesses that seek lost profits when ordinances impair their First Amendment rights to display adult-oriented materials. See, *e.g.*, *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993) (declining to decide whether an adult business had standing to assert

the First Amendment rights of the public when the ordinance in question infringed upon the business's own First Amendment rights). In those instances, damages are available to corporations injured by the enforcement of First Amendment restrictions, even though the First Amendment—like the Second Amendment—protects "intangible and unquantifiable interests." *Bolton*, 71 F. Supp. 3d at 818.

Absent any clear or precedential guidance on the issue, the Court is persuaded by the longstanding line of cases recognizing the rights afforded to corporations in the First and Fourth Amendment contexts. Based on that ever-growing body of law, it seems inevitable that the same principles will hold true in the Second Amendment context. And at this point, Defendants have not presented the Court with any persuasive authority as to why Second Amendment protections should not extend to businesses. Accordingly, Second Amendment Arms' claim for monetary damages may proceed.

The remaining question is whether the Second Amendment protects the sale of firearms. But this is an issue more suited for the summary-judgment stage, where Second Amendment Arms will need to establish that the 2010 Ordinance was unconstitutional as-applied to them under the two-part test set forth in *Ezell*. See *Ezell*, 651 F.3d at 702–03. The first part of that test involves a burden-shifting framework that assesses the historical understanding of whether the sale of firearms was within the scope of the Second Amendment as understood in 1791. At least one court in this district has already concluded, based on the evidence provided in that case, that the City failed to establish that gun sales were categorically unprotected by the Second Amendment. See *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 937. And the fact that *Heller* and *McDonald* instruct that restrictions on firearms sales are presumptively valid under the Second Amendment—as opposed to categorically unprotected by the Second Amendment—

implies that, at least in part, the sale of firearms is protected by the Second Amendment. As expected, other courts have disagreed. See *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) ("Indeed, although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm."); *United States v. Conrad*, 923 F. Supp. 2d 843, 852 (W.D. Va. 2013) ("An individual's decision to give or sell a firearm to another person does not directly bear on the individual's capacity to possess firearms in her own right."). But this is a question for another day, and the parties will have their opportunity to present their arguments and evidence on the issue.

To recap, Plaintiff Second Amendment Arms may proceed on its claim for monetary damages based on the alleged loss of business that it suffered as a result of zoning restrictions in the 2010 Ordinance. To be clear, the finding in *Illinois Ass'n of Firearms Retailers* that the gun-store ban in the 2010 Ordinance was facially unconstitutional does not obviate Plaintiffs' burden in establishing that the ban was unconstitutional *as applied* to them. Plaintiffs' remaining claims under Count I are dismissed.

### B.     Count II

In Count II, Plaintiff Franzese requests injunctive and monetary relief, alleging that Defendants' "arbitrary and capricious action"—presumably the enactment of the 2014 Ordinance—has prevented him from selling firearms within the City in violation of his substantive due process rights under the Fourteenth Amendment. More specifically, Franzese argues that Defendants' action violates his "fundamental right[] to sell firearms through retail sales, and to display those firearms and ammunition for sale," as well as his "fundamental right to earn his livelihood in any lawful manner in which he chooses." [146, at 11.]

28

First, regarding standing, Plaintiff Franzese has not applied for a license under the 2014 Ordinance, and so he lacks standing to raise an as-applied challenge to that ordinance. This eliminates Plaintiff's claim for monetary damages. Plaintiff does have standing to seek injunctive relief by way of a facial challenge to the 2014 Ordinance.

Regarding whether Plaintiff has stated a claim for injunctive relief, substantive due process is an "amorphous" concept of "very limited" scope. *Tun v. Whitticker*, 398 F.3d 899, 900–02 (7th Cir. 2002). The Supreme Court has defined two categories of substantive due process claims. One category protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience. *See Chavez v. Martinez*, 538 U.S. 760, 787 (2003) (Stevens, J., concurring in part and dissenting in part) ("The Due Process Clause of the Fourteenth Amendment protects individuals against state action that either 'shocks the conscience,' or interferes with [fundamental] rights 'implicit in the concept of ordered liberty'" (citations omitted)). A plaintiff can challenge executive action under both the "fundamental liberty" and "shocks the conscience" standards of the Fourteenth Amendment's substantive due process doctrine. See *White v. Rochford*, 592 F.2d 381, 383 (7th Cir. 1979). Here, Plaintiff Franzese's claim falls into the former category.

Plaintiff Franzese's first allegation is that the 2014 Ordinance impairs his "fundamental right[] to sell firearms through retail sales, and to display those firearms and ammunition for sale." However, the Supreme Court has held that where another Amendment "provides an explicit textual source of constitutional protection against [the alleged] source of physically intrusive government conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing [the] claims." *Graham v. Connor*, 490 U.S. 386, 395 (1989). As explained above, the right to sell firearms is a Second Amendment concern, and

29

the right to display firearms falls under the protections of the First Amendment. As such, this portion of Plaintiff's substantive due process challenge is dismissed, as Plaintiff must pursue these theories under his First and Second Amendment claims.

What remains of the substantive due process claim is Plaintiff's allegation that the 2014 Ordinance impairs his "fundamental right to earn his livelihood in any lawful manner in which he chooses." To determine whether an allegation triggers substantive due process protections, the Court must first articulate a "careful description" of the interest said to be violated. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 462 (7th Cir. 2007) (citing *Doe v. City of Lafayette*, 377 F.3d 757, 768 (7th Cir. 2004)). The Court must then decide whether that interest is "fundamental"—"that is, whether it is so deeply rooted and sacrosanct that no amount of process would justify its deprivation." *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). If a fundamental right is at stake, the Court must then determine "whether the government has interfered 'directly' and 'substantially' with the plaintiffs' exercise of that right." *Id.* (citing *Zablocki v. Redhail*, 434 U.S. 374, 386–87 & n.12 (1978)). Finally, if a fundamental right has been impaired, the Court must determine "whether the governmental action can find 'reasonable justification in the service of a legitimate governmental objective,' or if instead it more properly is 'characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)).

"[I]n any due process case where the deprivation of property is alleged, the threshold question is whether a protected property interest actually exists." *Cole v. Milwaukee Area Tech. College Dist.*, 634 F.3d 901, 904 (7th Cir. 2011). A plaintiff must allege more than an "abstract need or desire for" a protectable property interest and more than a "unilateral expectation of it;" a

plaintiff must have a "legitimate claim of entitlement to it." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

To the extent that Plaintiff Franzese is arguing that he has a valid property interest in a license for a firearms business that would allow him to build a store in an area restricted by the 2014 Ordinance, because Plaintiff has no legitimate claim of entitlement to such a license, he lacks a cognizable property interest, and his claim must fail. But really, Plaintiff's claim is nothing more than a Second Amendment claim in Fourteenth Amendment clothing, and thus the Second Amendment "must be the guide for analyzing" that claim. *Graham*, 490 U.S. at 395. To the extent that Plaintiff Franzese is arguing that he has a valid property interest in a firearm business license *in general*, then his complaint fails to state a plausible claim, because the 2014 Ordinance does allow for firearm retailers in certain locations. If Plaintiff had satisfied the eligibility requirements for a license and the City nonetheless withheld that license without justification, then Plaintiff would be on the right track to stating a due process claim. But that is not what Plaintiff alleges here. Plaintiff has failed to state a substantive due process claim, and so Count II must be dismissed.

## C.    Count III

Chicago's Municipal Code provision § 8-20-060(a) makes it "unlawful for any person to carry, possess, display for sale, sell or otherwise transfer any laser sight accessory." In addition, MCC § 8-20-060(c) says that laser-sighting devices displayed or sold in violation of the laser-sight ban shall be declared contraband and seized by and forfeited to the City, and MCC § 8-20-070 says that vehicles containing laser-sighting devices shall be impounded. Plaintiff Franzese (unclear whether in his individual capacity or d/b/a Second Amendment Arms) says that these provisions violate his Second Amendment right to display and sell laser-sighting devices, and

Plaintiffs Zieman and Kole say that these provisions violate their Second Amendment right to purchase and possess laser-sighting devices. All Plaintiffs seek injunctive relief, and Plaintiff Franzese seeks monetary damages based on lost business.

First, regarding standing, Plaintiff Franzese has not applied for a license under the 2014 Ordinance, and so he lacks standing to raise an as-applied challenge to this restriction. This eliminates Plaintiff's claim for monetary damages. Plaintiffs do have standing to raise a facial challenge to these provisions.

Defendants argue that laser sights are not protected by the Second Amendment because they are not "arms"—*i.e.*, they are not weapons meant for protection. This argument invokes step one of the two-part test set forth in *Ezell*, which uses the historical context of the Amendment as the gauge for its scope. See *Ezell*, 561 F.3d at 702–03 ("[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review."). Defendants also rely on *Heller*, which defined the scope of weapons protected under the Second Amendment as those "in common use at the time," such that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 624–24; 626–27. Defendants make the predictable argument that laser-guided firearm accessories were not in common use in 1791.

Plaintiffs argue that sighting devices *in general* have been in common use for hundreds of years, and *laser* sighting devices are only the modern-day equivalent of that accessory. *Cf. United States v. Jones*, 132 S. Ct. 945, 950 n.3 (2012) (noting that while GPS devices did not

exist when the Fourth Amendment was adopted, "a constable's concealing himself in the target's coach in order to track its movements" was a suitable analogue). And while laser-sighting devices are not arms, neither are firing ranges, and yet the Seventh Circuit found those to be within the protectable scope of the Second Amendment, recognizing that "the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708.

Whether laser-sighting devices are the sort of devices that are protected under the Second Amendment and whether possession of laser-sighting devices is an important corollary to the right to possess firearms for self-defense are questions for another day. For now, Plaintiffs have stated a claim for injunctive relief based on the laser-sighting-device restrictions in the 2014 Ordinance.

### D. Count IV

In Count IV, Plaintiff Zeiman argues that the following provision in the 2014 Ordinance violates his Second Amendment rights:

> It is unlawful for any person to keep or possess any firearm or ammunition in his home if the person knows or has reason to believe that a minor under the age of 18 years is likely to gain access to the firearm or ammunition, unless:
>
> (1) the person is physically present in the home and the firearm is either being held by the person or is physically secured on the person's body;
>
> (2) the firearm is secured by a trigger lock or other mechanism, other than the firearm safety mechanism, designed to render a firearm temporarily inoperable; or
>
> (3) the firearm and ammunition are placed in a securely locked box or container.

MCC § 8-20-050(a)(1)–(3). Zeiman has standing to raise this claim because he has alleged that he "has a minor under age 18 living in his residence." [146, ¶ 44.] Also, "Defendants assume, for purposes of this motion only, that gun storage requirements fall within the scope of [the] Second Amendment." [160, at 13.]

33

Regardless, Defendants argue that this claim should be dismissed because Plaintiffs fail to allege a plausible basis as to why these storage requirements are impermissible under the Second Amendment. Defendants rely heavily on *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2013), where the Ninth Circuit upheld similar storage restrictions that applied more broadly to firearms in all homes, not just in homes where minors under the age of 18 are likely to gain access to the firearm. *Jackson*, 746 F.3d at 964–66; see also *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 945 ("[T]he City can pass more targeted ordinances aimed at making gun stores more secure—for example, by requiring that stores install * * * trigger locks."). However, *Jackson* was a preliminary injunction case where the court was assessing the likelihood of success on the merits, and *Illinois Association of Firearms Retailers* was a summary judgment case. Just because Plaintiffs may face an uphill battle on the merits of their claim does not mean that they failed to state one. Plaintiffs may proceed on Count IV.

### E.     Count V

Plaintiff Kole brings Count V individually and as a class representative, challenging the registration requirement in the 2014 Ordinance—in particular, the registration fees. He seeks declaratory relief and restitution on behalf of the putative class. Plaintiff fails to identify the provisions that he challenges, but Defendants speculate that the likely culprits are the now-repealed provisions MCC § 8-20-140, which required a firearm registration certificate, and § 8-20-150, which required an application fee of $15.00 to obtain a registration certificate.

#### 1.     Registration Fee Requirement

Plaintiff Kole does not object to the amount of the registration fee ($15.00), nor does he claim that the fee is exclusionary in any way; his sole contention is that fee requirements *in general* are inherently unconstitutional. The Court disagrees.

A near identical challenge to a registration-fee requirement was dismissed in *Justice v. Town of Cicero, Ill.*, 827 F. Supp. 2d 835 (N.D. Ill. 2011). The *Justice* court relied heavily on the district court opinion in *Heller* (on remand from the Supreme Court), which found a similar registration-fee provision to be valid because the fee was meant to subsidize registration costs, including "fingerprinting registrants, * * * processing applications and maintaining a database of firearms owners." *Heller v. District of Columbia*, 698 F. Supp. 2d 179, 192 (D.D.C. 2010), *rev'd in part on other grounds*, 670 F.3d 1244 (D.C. Cir. 2011). The D.C. Circuit recently affirmed its position on this issue. See *Heller v. District of Columbia*, --- F.3d ---, 2015 WL 5472555, at *11 (D.C. Cir. Sept. 18, 2015) ("As we already said in *Heller II*, 'administrative * * * provisions incidental to the underlying regime'—which include reasonable fees associated with registration—are lawful insofar as the underlying regime is lawful." (quoting *Heller*, 670 F.3d at 1249 n.*)). Relying on this standard, the *Justice* court dismissed a claim challenging a $25 registration-fee requirement, finding that there was "no indication that [the municipality's] fee was imposed for any other purpose." *Justice*, 827 F. Supp. 2d at 842. Similarly, there is no indication here that the City's $15 fee was intended for any other purpose.

Also persuasive is the *Justice* court's analogy to registration fees in the First Amendment context. Specifically, in *Cox v. New Hampshire*, 312 U.S. 569 (1941), the Supreme Court held that a fee for a parade permit did not violate the First Amendment. In that instance, the fee was valid because it "t[ook] into account the greater public expense" and was "not a revenue tax, but one to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id.* at 577.

The Second Circuit agreed with *Justice* and *Heller* that "the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing plaintiffs' fee

claims under the Second Amendment." *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013). In that case, the Second Circuit affirmed a grant of summary judgment in favor of the municipality, holding that the evidence supported the municipality's contention that the $340 registration fee was meant to defray administrative costs of licensing firearms, and there was no evidence that the $340 fee was prohibitive or exclusionary to would-be firearm owners. *Id.* at 168.

Here, unlike in *Heller*, Defendants have not provided any specific evidence establishing that the $15 registration fee was intended to defray the administrative costs of the City's licensing scheme.[12] That being said, the *Justice* court still dismissed a claim based on a $25 registration-fee requirement where "[t]here [wa]s no indication that [the municipality's] fee was imposed for any other purpose." *Justice*, 827 F. Supp. 2d at 842. And here, Plaintiff Kole's only allegation regarding the unconstitutionality of the fee requirement is that "Defendants under color of law unlawfully deprived [Kole and his class members] of monies by wrongfully charging and collecting fees thereunder to obtain firearms permits and firearm registration certificates in violation of the Second and Fourteenth Amendments to the United States Constitution." [146, ¶ 47.] In other words: all registration fees violate the Second Amendment. But as the Court has already noted, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555)). The Court agrees with the *Justice* court that a conclusory

---

[12] The fact that a fee is nominal is telling, but even a nominal fee can be unconstitutional in certain circumstances. See, *e.g.*, *Murdock v. Pennsylvania*, 319 U.S. 105, 113–14 (1943) (striking down a license tax that was "not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question"); *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 137 (1992) ("This sentence [in *Murdock*] does not mean that an invalid fee can be saved if it is nominal, or that only nominal charges are constitutionally permissible.").

allegation that a firearm-registration fee violates the Second Amendment is insufficient to allow a claim to proceed beyond the pleading stage. This claim must be dismissed.

### 2.    Registration Requirement

Also at issue is the constitutionality of the now-repealed registration requirement MCC § 8-20-140, which required a firearm registration certificate as a prerequisite to possession of a firearm.

As a threshold matter, the Court notes that it has already dismissed the monetary component of Plaintiff Kole's class claim—*i.e.*, the restitution of the $15 registration fee. All that remains of the claim is the sought-after declaration that the *now-repealed* registration requirement was unconstitutional as applied to all those who registered firearms while the registration requirement was still in effect. But generally speaking, "[a] case challenging a statute's validity normally becomes moot if the statute is repealed or invalidated," unless accompanied by a viable claim for damages. *Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013); *Federation of Advertising Industry Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (noting that a question of mootness arises when "a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief").

The question, then, is whether Plaintiff Kole requested damages as part of his challenge to the registration requirement. Plaintiffs seek both declaratory relief and damages in Count V, but the damages claim is clearly aimed at the registration-fee requirement. [146, ¶ 47 ("Plaintiff and the class have thus been damaged and are therefore entitled to declaratory relief and restitution of all such [registration] fees.").] The only other mention of damages comes in Plaintiff Kole's prayer for relief, where he requests damages "for [Defendants'] unlawful enforcement and application and prosecution of [the 2010] Ordinance." [146, at 16.] As written,

this is a challenge to the entire ordinance, and as such fails to align itself with any of the claims in Count V, especially the claim relating to the alleged unconstitutionality of the firearm registration requirement. But even if it did relate to the registration requirement, Plaintiff Kole has not made a reasonable allegation that he (or his class) suffered any damages stemming from the City's application of that provision; his only viable claim is for declaratory relief. As such, his claim was mooted by the City's repeal of the registration requirement.

Alternatively, Plaintiff Kole's boilerplate allegation that Defendants violated the Second Amendment "[b]y requiring law-abiding citizens and residents, including Kole and his fellow class members, to register all firearms prior to their acquisition" fails to state a claim. [146, ¶ 47]; *Iqbal*, 556 U.S. at 678. First, Plaintiff Kole does not even mention MCC § 8-20-140, giving Defendants no notice of what provision(s) is/are allegedly unconstitutional. And the Court is not entirely convinced that Plaintiff Kole is even challenging this registration provision at all—the only apparent objection in Count V, read as a whole, is aimed solely at the registration *fee*:

> By requiring law-abiding citizens and residents, including Kole and his fellow class members, to register all firearms prior to their acquisition under the unconstitutional [2010] Ordinance, Defendants under color of law unlawfully deprived them of monies by wrongfully charging and collecting fees thereunder to obtain firearms permits and firearm registration certificates in violation of the Second and Fourteenth Amendments to the United States Constitution. Plaintiff and the class have thus been damaged and are therefore entitled to declaratory relief and restitution of all such fees.

[146, ¶ 47.] Because Plaintiff Kole fails to mention any actual provisions, Defendants are left guessing as to whether this paragraph is meant to challenge both the registration requirement and the fee requirement, or just the latter. In their motion to dismiss, Defendants assume both, and Plaintiff Kole follows suit in his response. But the Court is not convinced. Anyway, the pleading requirements for federal court obviate the need to guess by requiring plaintiffs to give defendants sufficient notice as to the claims against them. Plaintiff Kole failed to meet that standard here.

Finally, Plaintiff Kole's allegation is conclusory, and says nothing about how the registration requirement restricted the exercise of Kole's Second Amendment rights. Simply saying that the registration requirement violated the Second Amendment is not enough to give Defendants fair notice of what the claim is and the grounds upon which it rests.

Even if Plaintiff Kole were to rephrase this claim in a non-conclusory fashion, he would still need to show that the purported abridgment of his Second Amendment rights outweighs the City's interests in requiring registration, one of which appears within the Ordinance itself:

> When a gun is registered with the City, certain personal identifying information, such as the registrant's address, is obtained so that a first responder can be advised that a gun is present in that home.

Journal of the Proceedings of the City Council of the City of Chicago, Illinois, at 96237 (July 2, 2010) [160-1, at 7]; see also *Justice*, 827 F. Supp. 2d at 843–46 (reviewing the applicable standard of review and dismissing a similar claim regarding registration requirements). While the Court would be entitled to delve into the merits at this stage (as the *Justice* court did), that is not necessary here based on the multiple pleading deficiencies in Plaintiffs' fourth amendment complaint. For the reasons stated above, Count V is dismissed.

### F.     Count VI

In Count VI, Plaintiff Kole, again on behalf of a putative class of similarly-situated individuals, alleges "[t]hat as a result of the foregoing and said ordinances violating the Illinois Constitution, Article I, §§ 1, 2, 4, 6, 12, 22 and 24, City has been unjustly enriched and therefore Kole and the Class are entitled to restitution." [146, ¶ 52.]

This is a woefully inadequate pleading. See *Iqbal*, 556 U.S. at 678. Plaintiff Kole essentially says that "the foregoing and said ordinances" violate seven provisions of the Illinois Constitution. He doesn't say which ordinances, or how each ordinance allegedly violates the various provisions in the Illinois Constitution. The only hint comes in Plaintiff's prayer for relief,

where he requests that he be awarded "fees paid or collected by the City to obtain firearms permits and firearms registration certificates." [146, ¶ 52(2).] In other words, Count VI appears to be a repeat of Count V, except it invokes state constitutional law as opposed to federal. But this switch in operable law does not cure the pleading defects that torpedoed Plaintiff's claims in Count V. Plaintiff's sought-after declaratory relief regarding the registration requirement was mooted by the repeal of that provision, and Plaintiff's demand for restitution based on the registration-fee requirement is conclusory and fails to allege how the assessed fee impacted Plaintiff's rights under the Illinois Constitution. Count VI is also dismissed.

### G. Count VII

Defendants did not move to dismiss Count VII, in which Plaintiffs seek a declaration pursuant to 28 U.S.C. § 2201 that "[t]he complained-of sections of the Municipal Code of Chicago and the Chicago Zoning Ordinance are against public policy and violative of Article I, §§ 1, 2, 12, 15, 22, 24 and Due Process, Equal Protection and takings clauses of the Illinois Constitution, thus rendering them unconstitutional, null and void *ab initio*, and unenforceable." [146, ¶ 54.] Although the Court is equally confounded as to what exactly Plaintiffs are challenging here, because Defendants did not move to dismiss this count, Plaintiffs may continue to pursue their requested relief.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss [155] is granted in part and denied in part as follows:

Count I:     Plaintiff Second Amendment Arms may proceed on its as-applied challenge to the 2010 Ordinance. All remaining claims under Count I are dismissed.

Count II:    Count II is dismissed in its entirety.

Count III:   Plaintiffs may proceed on Count III for injunctive relief only.

40

Count IV:        Plaintiffs may proceed on Count IV as pled.

Count V:         Count V is dismissed in its entirety.

Count VI:        Count VI is dismissed in its entirety.

Count VII:       Defendants did not move to dismiss this count, and so Plaintiffs may proceed as
                 with this count as pled.[13]


Dated: September 28, 2015                    _____
                                             Robert M. Dow, Jr.
                                             United States District Judge


_____

[13] The dismissals are without prejudice should Plaintiffs believe that they can replead consistent with Fed.
R. Civ. P. 11 within 28 days of this order. Although Plaintiffs already have had multiple opportunities to
plead, only one of those opportunities took place since the 2014 Ordinance took effect.