# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SECOND AMENDMENT ARMS,** | ) | |
| **R. JOSEPH FRANZESE, individually** | ) | |
| **and d/b/a SECOND AMENDMENT** | ) | |
| **ARMS, and TONY KOLE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 C 4257** |
| | ) | |
| **CITY OF CHICAGO,** | ) | **Judge Robert M. Dow, Jr.** |
| **LORI LIGHTFOOT,** | ) | |
| **EDDIE JOHNSON,** | ) | |
| **and ANNA VALENCIA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION (1) FOR SUMMARY**
**JUDGMENT AND (2) TO EXCLUDE THE TESTIMONY OF ROBERT SOUTHWICK**

<u>**TABLE OF CONTENTS**</u>

<u>**Page**</u>

INTRODUCTION……………………………………………………………………………1

FACTS……………………………………………………………………………………...3

    **A.**    **Procedural History**……………………………………………………...3

    **B.**    **Plaintiffs Franzese and Second Amendment Arms**……………....…………4

    **C.**    **Plaintiffs' Damages Expert, Mr. Rob Southwick**………………………….7

        **1.**    **Background**……………………………………………….....…7

        **2.**    **Southwick's Report**…………………………………………….8

           **a.**    **Southwick's Assumptions**…………………………….9

           **b.**    **Southwick's Two "Approaches"**……………………….10

    **D.**    **The City's Laser Sight Ordinance**…………………………………….15

ARGUMENT………………………………………………………...………16

**I.**    **JUDGMENT SHOULD BE ENTERED AGAINST PLAINTIFFS ON THEIR LOST PROFITS CLAIM BECAUSE THEY CANNOT PROVE DAMAGES RESULTING FROM THE 2010 ORDINANCE**......................................................16

    **A.**    **New Businesses Generally Cannot Recover Lost Profits**……………………17

    **B.**    **There Is No Non-Speculative Basis For Awarding Lost Profits In This Case**………………………………………………………18

    **C.**    **Plaintiffs Cannot Support Their Lost Profits Claim With Mr. Southwick's Unsubstantiated Assumption That Plaintiffs Would Have Been Able To Open Profitable Stores**………………………………21

**II.**    **THE CITY'S LASER SIGHT ORDINANCE IS CONSTITUTIONAL**..…………27

    **A.**    **The Second Amendment Does Not Cover Non-Essential Firearm Accessories Like Laser-Sight Devices**………………………………27

    **B.**    **The City's Ordinance Would Be Constitutional Even If The Second Amendment Covered Firearm Accessories Like Laser-Sight Devices**……..28

i

**III.    COUNT VII OF THE COMPLAINT IS DUPLICATIVE OF COUNTS I AND III**………………………………………………………32

**CONCLUSION**………………………………………………………………33

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Act II Jewelry, LLC v. Wooten*,
    318 F. Supp. 3d 1073 (N.D. Ill. 2018)……………………………………………..23

*Boyd v. Tornier, Inc.*,
    656 F.3d 487 (7th Cir. 2011)……………………………………………....17, 22

*Butler v. E. Lake Mgmt. Grp., Inc.*,
    No. 10-CV-6652, 2014 WL 273650 (N.D. Ill. Jan. 24, 2014)…………………….…28

*CDW LLC v. NETech Corp.*,
    906 F. Supp. 2d 815 (S.D. Ind. 2012)……………………………………………..24–25

*C.W. ex rel. Wood v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015)……………………………………………........21–22, 26

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)…………………………………………..……..21, 22, 26–27

*Dynegy Mktg. & Trade v. Multiut Corp.*,
    648 F.3d 506 (7th Cir. 2011)……………………………………………………17

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011)……………………………………………………32

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015)……………………………………………27, 29–32

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)…………………………………………………............……22

*Jackson v. City & Cty. of San Francisco*,
    746 F.3d 953, 967 (9th Cir. 2014)…………………………………………………30

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)……………………………………………………………...28

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014)……………………………………………...3

*Kiswani v. Phoenix Sec. Agency, Inc.*,

iii

247 F.R.D. 554 (N.D. Ill. 2008)……………………………………………..…….16, 17

*Larson v. Wisconsin Cent. Ltd.*,
No. 10-C-446, 2012 WL 359665 (E.D. Wis. Feb. 2, 2012)………………………..…23

*Lewis v. CITGO Petroleum Corp.*,
561 F.3d 698 (7th Cir. 2009)………………………………………………………….22

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005)…………………………………………………24

*Memphis Comm. Sch. Dist. v. Stachura*,
477 U.S. 299 (1986)………………………………………………………………...17

*Milex Prod., Inc. v. Alra Labs., Inc.*,
237 Ill. App. 3d 177 (2d Dist. 1992)…………………………………..…….18

*MindGames, Inc. v. W. Pub. Co.*,
218 F.3d 652 (7th Cir. 2000)…………………………………..……………17, 19

*Otis v. Doctor's Assocs., Inc.*,
No. 94 C 4227, 1998 WL 673595 (N.D. Ill. Sept. 14, 1998)………………………...25–26

*Shepard v. Madigan*,
734 F.3d 748 (7th Cir. 2013)………………………………………………………….33

*Smart Mktg. Grp. v. Publications Int'l Ltd.*,
624 F.3d 824 (7th Cir. 2010)………………………………………………………….21

*Smith v. Equilon Enters., LLC*,
No. CIV.JFM-03-139, 2004 WL 1465783 (D. Md. June 29, 2004)………..…………24

*Target Mkt. Pub., Inc. v. ADVO, Inc.*,
136 F.3d 1139 (7th Cir. 1998)…………………………………………….…...22–24

*TAS Distrib. Co. v. Cummins Engine Co.*,
491 F.3d 625 (7th Cir. 2007)……………………………………………..…...…17

*United States v. Cox*,
906 F.3d 1170 (10th Cir. 2018)……………………………………………...27–28

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
395 F.3d 416 (7th Cir. 2005)………………………………………………………….22

*Zimmer, Inc. v. Stryker Corp.*,
No. 3:14-CV-152 JD, 2018 WL 276324 (N.D. Ind. Jan. 3, 2018)…………………...23–24

iv

## INTRODUCTION

When Plaintiffs brought this suit nearly ten years ago, the thrust of their complaint was a Second Amendment challenge to a City ordinance that banned the sale of firearms within Chicago. That portion of Plaintiffs' suit became moot in 2014 when the City repealed the gun store ban and replaced it with an ordinance that allowed the sale of firearms within Chicago subject to certain regulations. Though Plaintiffs amended their complaint to challenge the constitutionality of the 2014 ordinance, this Court granted Defendants' motion to dismiss those claims.

Now, with the bulk of Plaintiffs' claims also moot or dismissed, only two claims remain. Plaintiffs Franzese and Second Amendment Arms ("SAA") seek damages for the profits they allegedly would have earned had Franzese been permitted to open and operate a gun store (called "Second Amendment Arms") during the period the City's ban on gun stores was in effect. And Plaintiff Tony Kole brings a Second Amendment challenge to the City's restriction on the sale and possession of laser-sight accessories to firearms. The fact that these two claims have survived this long, however, is no indication of their merit. To the contrary, following discovery, it is clear that Plaintiffs cannot prove either claim, and each one fails as a matter of law.

Plaintiffs' lost profits claim fails for the simple reason that there is no way to determine with the required degree of certainty whether SAA would have been profitable, or how profitable it would have been. And it is well established that a damages award cannot be based on speculation about potential sales, which is all that Plaintiffs offer. ██████████████████

████████████████████████████████████████████

██████████████████████████████ But those claims are based on Franzese's own hopes, not on any historical track record of business success. ███████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████ —

neither of which is remotely similar to operating a licensed firearm store in a city like Chicago,

and for which, in any event, Franzese has no documents showing he ever made a profit.

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ And the claim that the City's prior ban on gun stores

was the only thing keeping Plaintiffs from operating a profitable business █████████████

████████████████████████████████████████████████████

████████████████████████████ is belied by the plain reality that no one, Plaintiffs

included, has tried to open a gun store in the City following the repeal of the City's ban.

Plaintiffs try to buttress their claims with the expert report of Robert Southwick, a fish,

wildlife and outdoor recreation consultant, but Southwick's opinions are also based on

speculative assumptions. Because speculation—even from a purported expert—cannot be the

basis for a damages claim, the Court should grant summary judgment for Defendants on

Plaintiffs' claim for lost profits.

Plaintiffs' Second Amendment challenge to the City's restriction on laser sights fails for

the simple reason that the Second Amendment does not cover firearm accessories. This is

apparent from the amendment's text, which protects only the right to "keep and bear Arms," not

accessories to arms. But even if the Second Amendment applied, the City's ordinance would be

constitutional under the governing Seventh Circuit test because (1) nothing similar to a laser sight was a "common weapon" at the time of the Constitution's ratification, (2) individuals retain adequate means to self-defense even if laser sights are not allowed, and (3) the City's law is an appropriate means of advancing the legitimate government purpose of protecting the public's safety and sense of safety.  Thus the Court should grant summary judgment for Defendants on Plaintiffs' claim challenging the City's laser-sight restriction.

<div align="center">

**FACTS**

</div>

**A.      Procedural History**

On July 2, 2010, the City Council enacted the ordinance prohibiting the sale of firearms within Chicago (the "2010 Ordinance").  SUMF ¶ 8.  Plaintiffs filed their first complaint one week later on July 9, 2010.  *See* Dkt. 1.  Over three years later, in January 2014, another court in this district ruled that the gun sale prohibition was unconstitutional.  *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. 2014).  In response, on June 25, 2014, the City Council repealed the 2010 Ordinance and enacted a new ordinance (the 2014 Ordinance) that permits the sale of firearms subject to certain regulations.  SUMF ¶ 9.  Plaintiffs filed their most recent complaint (the Fourth Amended Complaint) on October 22, 2014.  *See* Dkt. 146.  In that complaint, Plaintiffs sought, among other things, to invalidate the 2014 Ordinance as unconstitutional under the Second Amendment and to recover monetary damages to "compensate Franzese and [SAA] for the lost business due to the deprivation of their civil rights under all previous and current versions of City ordinances."  *Id.* at pp. 10, 12.  In September 2015, this Court dismissed Plaintiffs' Second Amendment and due-process challenges to the 2014 Ordinance. *See* Sept. 2015 Mem. Op. & Order at 11–15, 16–23, 28–31.  Plaintiffs' claim for lost profits during the period that the ban on gun stores was in effect, 2010–

<div align="center">

3

</div>

2014, proceeded to discovery.

**B.    Plaintiffs Franzese and Second Amendment Arms**

███████████████████████████ SUMF ¶ 12. ██████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████ *Id.* ¶ 13. ████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ██████████████

█████████████████████████████ *Id.*

█████████████████████████████████ *Id.* ¶ 14 ████████

████████████████ *Id.* ███████████████████ *Id.* █████████████

██████████████████████████████████. *Id.* ███

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███ *Id.* ████████████████████████████████████

██████████████████████████████████. *Id.* ¶ 15. ████████

█████████████████████████████████████████████████████

██████████████████████████████████ *Id.* ████████████████

████████████████████████████████████████████████

██████████████████████████████████ *Id.* ████████████████

█████████████████████████████████████████████████████

██████████████████████████████████. *Id.* ¶ 16.

█████████████████████████████████████████████████████

4

██████████████████████████████████████████████████████

████████████████████████████████. *Id.*

Franzese maintains that, but for the City's 2010 Ordinance, he would have been able to open and operate a multi-million-dollar firearm retail enterprise—also called Second Amendment Arms—consisting of five gun stores within the city limits of Chicago. *See id.* ¶¶ 17–18. On July 2, 2010, the day the City Council enacted the 2010 Ordinance, Franzese submitted an application on behalf of SAA to obtain a business license at 415 West Armitage in Chicago for a firearms store. *Id.* ¶ 10. The zoning classification for that address does not permit business or retail uses at the property, regardless of whether gun stores were banned or not. *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████ *Id.* ¶ 11. █████████████████████████

███████████████████████████ *Id.* ████████ █████████████

████████████████████████████████████████ *Id.* ¶ 10.

███████████████████████████████████████████████████

███████████████████████████████████████████ *Id.* ¶ 18.

████████████████████████████████████████████████████

█████████████████. *Id.* █████████████████████████████

███████████████████████████████████████████

█████████████████████████. *Id.* ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 23.

5



*Id.* ¶ 18.

" *Id.*

*Id.* ¶ 22.

*Id.* ¶ 20.

*Id.*

*Id.*

. *Id.*

*Id.*

*Id.*

*Id.* ¶ 21.

. *Id.*

. *Id.*

*Id.* ¶ 24.

*Id.*

███████████. *Id*

███████████████ *Id.* ███████████████

████████████████████████████

█████████████████████████

██████████ *Id.* ¶ 25. █████████

███████████████████. *Id.*

████████████████████████

███████████████████████

█████████. *Id.* ¶ 10. Indeed, to Defendants' knowledge, during that same time frame, no

business or individual has applied for a license to open a firearm retail store within Chicago.

**C.      Plaintiffs' Damages Expert, Mr. Rob Southwick**

**1.      Background**

Plaintiffs have designated Rob Southwick as an expert witness for the purpose of

quantifying the net profits SAA would have earned had it operated in Chicago during the period

from 2010 (when the lawsuit was filed) to 2014 (when the 2010 Ordinance was repealed).  *See*

Expert Witness Testimony of Robert Southwick ("Southwick Rep."), Ex. K to SUMF, at 1.

Southwick is the second damages expert Plaintiffs have designated; they withdrew their first

expert.[1] ████████████████████████

███████████████ Southwick Rep. at 16. █████████

████████████████████████████

████████████████████████

---

[1]      Plaintiffs withdrew their first damages expert, Miles Hall, on the date a *Daubert* hearing
was scheduled to address his proposed testimony in *Kole v. Village of Norridge*, Case No. 11 C 3871
(N.D. Ill.) (Durkin, J.), a separate case involving similar issues and the same counsel for the plaintiffs.
Defendants have recounted the history of Plaintiffs' withdrawal of Hall's testimony in a previous
submission in this case.  *See* Dkt. 242.

████████████████████████████████████████

██████████████████ *Id.* ████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████ *Id.*; *see also* Dep. of Robert Southwick ("Southwick Dep."), Ex. 1 hereto,

9:4–17, 10:1–6. ██████████████████████████████

██████████████████████████████. *Id.* 10:7–13. ██████████████

████████████████████████████████████████

███████████████████████ *Id.* at 15:7–16:7.

2.     **Southwick's Report**

████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

      **a.**     **Southwick's Assumptions**

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████ SUMF ¶ 18. ██████████████

█████████████████████████████████████████

██████████████████████████████████████████████

Southwick Rep. at 5 n.1. ████████████████████████████████████

████████████████████ Southwick Dep. at 17:1–18:5. ████████████████

███████████████████████████████████████████████

███████ *Id.* at 18:10–14. ████████████████████████████████████

████████████████████████████████████████████████ *Id.* at

18:14–16. █████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████. SUMF ¶ 20. █████████████████

███████████████████████████████████████████████."

[redacted] Southwick Rep. at 5. [redacted] *Id.* [redacted] Southwick Dep. 23:18–21, [redacted] *id.* at 23:11–13.

[redacted] Southwick Rep. at 4. [redacted] *Id.* [redacted]. *Id.* [redacted] Southwick Dep. at 31:8–15. [redacted] *Id.* at 34:15–35:3.

**b. Southwick's Two "Approaches"**

[redacted]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ 2018 Shooting Sports

Industry Financial Benchmarking Report ("NSSF Report"), Ex. 2 hereto, at ii.[2] ███████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████ *Id.* ████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████ *See* Southwick Dep. 45:16–24.

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

█████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[2]    Defendants added the roman-numeral pagination to Exhibit 3 for citation purposes.



[redacted][3] *Id.* at 9–10. [redacted] *Id.*

[redacted] Southwick Dep. 68:15–21. [redacted]. *Id.* at 63:7–10. [redacted]. *Id.* at 69:6–16. [redacted] *Id.* at 69:17–70:5. [redacted]

[redacted]

[3] [redacted] Southwick Dep. at 26:22–27:4.



████████████████████████████████████████

██████████████████████ NSSF Report at 3. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████ *Id.* ████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████ *Id.* at 82. ████████████████

████████████████████████████ *Id.*

█████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████[4] Southwick Rep. at 12. ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

*Id.* at 13. ████████████████████████████████ *Id.* at 14.

---

[4] ████████████████████

████ Southwick Dep. 82:21–83:4. ████████████████

████ *See* SUMF ¶ 19.



[redacted] Southwick Dep. 95:13–96:13.[5] [redacted] Southwick Rep. at 14. [redacted] *Id.* at 14. [redacted], Southwick Dep. 106:1–8, [redacted] *id.* at 136:24–138:6.

[redacted] *Id.* at 81:9–12. [redacted]

[5] [redacted]. Southwick Dep. 96:14–97:20.

████████████████████████████████████████████████ *See, e.g.*, *id.* at
48:2–49:11, 49:24– 50:5.

**D.      The City's Laser Sight Ordinance**

Plaintiff Tony Kole lives in Arlington Heights, Illinois, but he says he is interested in
purchasing and possessing a laser-sight accessory within Chicago.  SUMF ¶ 27.  He brings a
Second Amendment challenge to sections 8-20-060(a), 8-20-060(c), and 8-20-070 of the
Municipal Code of Chicago, which prohibit possession of laser-sight firearm accessories and
provide penalties for violation of that prohibition.

The challenged code provisions originated in a 1999 City ordinance.  On January 9, 1999,
Chicago Police Officer John C. Knight was shot and killed while on duty.  Local newspapers
reported that Officer Knight had been shot by a gang member who used a handgun equipped
with a laser-sight device.  *Id.* ¶ 28.  Two months later, the City Council passed an ordinance (the
"Laser Sight Ordinance") prohibiting the sale, purchase, and possession of "laser sight
accessories," which the ordinance defined as "laser sighting device[s] which [are] either
integrated into a firearm or capable of being attached to a firearm."  *Id.* ¶ 29.  The ordinance also
included the City Council's finding that "the public health and safety of [Chicago] citizens, most
particularly [Chicago] police officers, are being endangered by the use of laser sights."  *Id.* ¶ 30.
Nearly three years prior, the *Chicago Tribune* had reported that Chicago-area gangs were going
"high tech" by using laser gun sights.  *Id.* ¶ 31. These "latest additions to the criminal arsenal,"
the *Tribune* reported, could "turn a novice into a marksman."  *Id.*

A firearm may be sold with a laser sight already integrated, or a laser sight may be
attached to a firearm by means, for example, of a firearm's "accessory rail."  *Id.* ¶ 32.  When
turned on, a laser-sighting device emits a laser that casts a colored dot on the target at which the

firearm is aimed. *Id.* A laser sight is not necessary to the function of any firearm. *Id.* ¶ 33. Even firearms that are sold with laser sights integrated into the device will still function if the laser-sight component is removed or stops working. *Id.* As Plaintiff Tony Kole explained, a laser sight is "an accessory"; it is "not a fundamental part of the design of the firearm." *Id.* If the laser-sight accessory attached to one of his firearms happened to be broken, Kole stated, he would "absolutely" still be able to defend himself if necessary. *Id.*

Since the enactment of the Laser Sight Ordinance in 1999, multiple news articles about mass-shooting tragedies have reported that the shooters used firearms equipped with laser sights to carry out their attacks; these shootings include the recent 2019 shooting in Aurora, Illinois, the 2018 shooting during a video game tournament in Jacksonville, and the 2009 Fort Hood shooting. *See id.* ¶ 35. Recent news reports also suggest that gang members have used guns equipped with laser sights to carry out gang-related shooting attacks. *See, e.g.*, *id.* ¶ 36.

## ARGUMENT

### I. JUDGMENT SHOULD BE ENTERED AGAINST PLAINTIFFS ON THEIR LOST PROFITS CLAIM BECAUSE THEY CANNOT PROVE DAMAGES RESULTING FROM THE 2010 ORDINANCE.

Plaintiffs Franzese and SAA seek damages for "lost profits" that SAA allegedly would have earned from the time Plaintiffs filed this lawsuit in 2010 until the 2014 repeal of the City's ban on gun stores. Plaintiffs cannot prevail on this claim, as a matter of law, because they do not have sufficient evidence that they would have had the means to open gun stores in Chicago at all, much less earn a profit.

When a plaintiff claims damages resulting from the alleged violation of constitutional rights, the availability of damages is "generally determined in accordance with principles derived from the common law of torts as a matter of federal common law." *Kiswani v. Phoenix Sec.*

*Agency, Inc.*, 247 F.R.D. 554, 557 (N.D. Ill. 2008) (citing *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986)). One "bedrock principle" of the common law is that "damages may not be awarded on the basis of speculation and conjecture." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 521 (7th Cir. 2011); *see also Boyd v. Tornier, Inc.*, 656 F.3d 487, 496 (7th Cir. 2011). This bar on speculative damages makes it "difficult to recover [lost profits damages] in any case," and a court will allow a claim for lost profits to proceed before a jury only if the loss of profits can be "proved with a reasonable degree of certainty." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (internal quotation marks omitted).

## A.    New Businesses Generally Cannot Recover Lost Profits.

Courts look with particular skepticism upon lost profits claims where the party asserting lost profits is, like SAA, a new venture that has never opened its doors for business. "[A]s a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery." *Id.* Usually, "a new business has no right to recover lost profits because it has yet to demonstrate what its profits will be." *Kiswani*, 247 F.R.D. at 558. Even "prior success with a similar business generally does not provide ample information to calculate lost profits for a new business because conditions vary with each business venture." *Id.* Though the so-called "new business rule" does not preclude a recovery of lost profits for *all* new businesses, it is generally accepted that the standard against "undue speculativeness" in damage awards should not allow a start-up company "to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate." *MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 657 (7th Cir. 2000).

There are exceptional scenarios where, because of the nature of the business or industry

17

itself, it is relatively certain that a new business within a certain industry would be profitable, and the amount of profits lost can be calculated with some degree of precision. This is generally the case, for example, where a new business is strikingly similar to an existing or prior business and has demonstrated its ability to maintain a long-term operation. *See, e.g.*, *Milex Prod., Inc. v. Alra Labs., Inc.*, 237 Ill. App. 3d 177, 192 (2d Dist. 1992) (allowing lost profits where an existing business sought to sell the generic (but chemically identical) version of a prescription drug that already had "an established market"). Here, however, Plaintiffs identify no retail firearm operation that would be so similar to SAA's hypothetical operation as to allow a precise calculation of profits, and as discussed in greater depth below, Plaintiffs otherwise have no competent evidence to show that they could have opened and maintained any firearm enterprise, much less a profitable one. Thus the general rule against recovery of lost profits for new businesses applies and requires judgment against Plaintiffs on their damages claim.

**B.** **There Is No Non-Speculative Basis For Awarding Lost Profits In This Case.**

Even if there were not a general bar on lost profits damages for new businesses, the record in this case could not support a finding that Plaintiffs would have earned profits but for the City's ban on gun stores. As discussed above, the lack of historical revenue or expense data for Franzese's hypothetical Chicago firearms operation makes it impossible to project the amount of lost profits with any reasonable degree of certainty.[6] But Plaintiffs' damages theory

---

[6] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* SUMF ¶ 26. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* In response to an interrogatory, Plaintiffs projected that SAA would earn $20,000 to $30,000 *per week* in gross revenues in the first six months of SAA's operation in 2010 and over $29 million in total gross revenues through the end of 2015. *Id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮

faces a more fundamental problem: ████████████████████████████████████
█████████████████████████████████████████████. There is no good evidence
that SAA would have opened and maintained a firearms retail store over the time period at issue,
let alone a *profitable* retail store, let alone *five* profitable retail stores in the same market, let
alone five retail stores generating the significant profits Plaintiffs assert in this case. There is, in
short, no justified basis for allowing Plaintiffs to "capitaliz[e] fantasized earnings into a huge
present value sought as damages." *MindGames, Inc.*, 218 F.3d at 658.

      A finding that Franzese would have opened and operated a multi-million dollar firearms
enterprise in Chicago would require numerous speculative assumptions. As an initial matter, at
the time Plaintiffs filed their case, the only Chicago address for which Franzese had submitted a
business license application was zoned only for residential use, meaning that it was not a viable
gun store even if the City's ban on gun stores in general did not exist. ████████████████
████████████████████████████████████████████████████████████
████████████████████████ As the Court noted in its previous ruling on standing,
"the fact that SAA could not have opened a gun store at 415 West Armitage may significantly
curtail any 'lost profits' it could hope to recover from being the first gun store in Chicago" and
on the merits, "may be an insurmountable hurdle for Plaintiff to establish a viable, non-
speculative damages theory." Aug. 2017 Mem. Op. & Order at 8 n.2.

      And now the record is clear that Plaintiffs' hurdles to establishing that they would have
been able to open a profitable gun store go well beyond a zoning roadblock at Franzese's initially
chosen location. To date, apart from that initial location, Plaintiffs have not identified any
specific location for any of the ██████████████████████████████████████

████████████████████████. *Id.*

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ Southwick Rep. at 5.

Plaintiffs cannot plug these evidentiary gaps by pointing to the record of any other firearm retailer in Chicago since the ordinance's repeal, because no other firearm retailer—including SAA—has attempted to open a firearm retail store in Chicago since it became legal to do so in 2014. ██████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ SUMF ¶ 24. ████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ SUMF ¶ 21. █████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

Thus, to conclude that SAA's hypothetical Chicago stores would have been profitable from 2010 to 2014, one would have to assume, among other things,  But assumptions are not enough to sustain a proposed new business's lost profits claim. "Many new businesses fail, after all; *evidence* is necessary before a court can conclude that any particular one would have been successful." *Smart Mktg. Grp. v. Publications Int'l Ltd.*, 624 F.3d 824, 831 (7th Cir. 2010) (emphasis added).

### C. Plaintiffs Cannot Support Their Lost Profits Claim With Mr. Southwick's Unsubstantiated Assumption That Plaintiffs Would Have Been Able To Open Profitable Stores.

Plaintiffs cannot make up for their lack of concrete evidence to prove lost profits by relying on the testimony of their proposed expert, Rob Southwick. As discussed below, Southwick's proposed testimony is itself based on speculative assumptions and is not admissible as expert testimony. Indeed, Southwick assumes what he, and Plaintiffs, must establish *with evidence*: that SAA would have been able to open and operate at a profit.

Southwick's unsubstantiated assumptions are not only insufficient to support Plaintiffs' lost profits claim, they render his testimony unreliable and inadmissible. In assessing the reliability of an expert's scientific theories under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts may consider a range of factors in any given case. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) (providing non-

21

exhaustive, non-mandatory list of factors that might be considered). But what is clear in every case is that an expert's opinion must be based on scientific analysis, not "belief or unsupported speculation." *Daubert*, 509 U.S. at 590. An opinion that is "connected to existing data only by the *ipse dixit* of the expert" is not admissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."). As the proponents of Southwick's testimony, Plaintiffs bear the burden of establishing its reliability. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Mr. Southwick's proposed testimony is unreliable and should be excluded for a fundamental reason: He does not base his opinions on scientific analysis of evidence.[7] Instead, his opinions rely upon assumptions that are either purely speculative or flatly contradicted by the record in this case.

Because lost profits cannot be awarded on the basis of speculation, the assumptions informing the opinions of a lost-profits expert must be "buttressed by . . . more than conjecture and hope." *Boyd*, 656 F.3d at 496 (concluding that award of lost profits was abuse of discretion because there was no reasonable basis in the record from which amount of damages could be inferred or approximated). A lost-profits expert's testimony is therefore unreliable, and inadmissible, if based upon unfounded, speculative assumptions. *See, e.g.*, *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998) (affirming exclusion of purported expert

---

[7]      Though Defendants do not challenge Southwick's qualifications in this case, it is not because they are beyond reproach. ████████████████████████████████████████
████████████████████████ His qualifications are not an issue in this case, however, because his opinions are based on simple arithmetical computations using discrete data sources and thus barely require any expertise at all. The primary problem with Southwick's proposed testimony in this case is the methods (or lack thereof) underlying his opinions.

on lost profits where expert report was based on implausibly "optimistic assumptions"); *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-CV-152 JD, 2018 WL 276324, at *1 (N.D. Ind. Jan. 3, 2018) ("[I]if the principal assumptions underlying [the expert's] opinions lack the reliability expected by experts in the field, his lost profits calculations do not satisfy Rule 702.") (internal quotation marks omitted); *Larson v. Wisconsin Cent. Ltd.*, No. 10-C-446, 2012 WL 359665, at *2 (E.D. Wis. Feb. 2, 2012) ("Where the [damages] expert's opinions are based upon assumptions that are unrealistic or unsupported by the record or leave the jury to speculate, they are not helpful to the jury and should be excluded.").

Both of Southwick's "approaches" rely critically on the assumptions that (1) SAA would have opened not one, but five, stores—all within 18 months, (2) the stores would be profitable within their first year, and (3) following their first year, the stores' profits would have been "average" as compared to firearm retail stores that existed outside of Chicago. But in premising his entire analysis on these assumptions, Southwick "assumes a success not guaranteed to any new business." *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1086 (N.D. Ill. 2018)

Southwick provides no sound basis for these assumptions. 

*See* SUMF ¶ 20.

Southwick Dep. at 18:14–16.



*id.* 34:15–35:3, and, as explained above, there is no evidence that they did. ████████████████

████████████████████████████

████████████████ *Id.* 31:8–15. ████

████████████████████

████████████ Southwick's reliance on these unfounded assumptions as a critical basis for his opinions renders the entirety of his testimony unreliable and inadmissible. *See Target Mkt. Pub.* 136 F.3d at 1144; *Zimmer*, 2018 WL 276324, at *1; *see also Smith v. Equilon Enters., LLC*, No. CIV.JFM-03-139, 2004 WL 1465783, at *1 (D. Md. June 29, 2004) ("[The expert's] methodology and ultimate opinion are fundamentally flawed because, as he has admitted, he assumed to be true the very fact his expert opinion is necessary to establish: that [the plaintiff's] start-up businesses would have been profitable.").[8]

For the simple reason that Southwick's opinions depend upon speculative assumptions, his testimony should be disregarded and is otherwise insufficient to support Plaintiffs' lost profits claim. Regardless of the particular methods he used to quantify the particular *amounts* of SAA's supposed lost profits (and, as discussed immediately below, those methods are flawed and insufficient to overcome summary judgment), his opinion fails at the threshold, because there is no competent evidence that SAA would have even gotten out of the gate by being able to open profitable gun stores in Chicago at all.

---

[8]      Courts have specifically criticized Southwick's practice here of calculating lost profits by assuming average profitability. *See Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 814 (N.D. Ill. 2005) (agreeing with the Fifth Circuit that it would be impermissible for an expert to assume that "because McDonald's franchises earn a certain average rate of return, a particular franchise will perform to the average"); *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012) (excluding opinion of lost-profits expert who relied upon averages to calculate lost profits rather than comparing the plaintiff "to the actual experience of any other business entity").

* * *

The lack of support for his key assumptions makes Southwick's opinions inadmissible.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Defendants highlight only the most significant gaps here. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ It is well-established

that "[a]n expert's choice in data sampling is at the heart of his methodology." *CDW LLC*, 906

F. Supp. 2d at 824. ███████████████████████████████████

Southwick Dep. 14:4, █████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ NSSF Report at 3. ████

██████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ Southwick Dep. 69:17–70:5████

██████████████████████████████████████████████

████████ Southwick Dep. 63:7–10, 68:15–21.  Nor did Southwick do anything to account for

the fact that the NSSF Report only provided self-reported data from existing stores, thereby

excluding data from failed stores and skewing the numbers in Plaintiffs' favor.  Thus even if the

calculation of the amount of profits for five "average" Chicago firearm stores were an

appropriate exercise in this case, Plaintiffs cannot carry their burden to show "evidence

indicating that the methodology [Southwick] used is anything more than an exercise in

25

arithmetic based on inherently unreliable values." *Otis v. Doctor's Assocs., Inc.*, No. 94 C 4227, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998) (Williams, J.).

[redacted] Southwick Rep. at 14. [redacted] Southwick Dep. 136:4–10. [redacted] "This approach is not the stuff of science." *C.W. ex. Rel Wood.*, 807 F.3d at 837. What Plaintiffs cannot prove by way of evidence, they should not be permitted to present to the jury in the form of an expert's assumptions and hypotheses. *See Daubert*, 509 U.S. at 590 ("[I]n order to qualify

as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.").

## II.     THE CITY'S LASER SIGHT ORDINANCE IS CONSTITUTIONAL.

Plaintiff Tony Kole's Second Amendment challenge to the City's Laser Sight Ordinance cannot succeed.  As an initial matter, laser sights are not protected by the Second Amendment because they are firearm accessories, not arms.  As the Tenth Circuit has recently recognized, the Second Amendment does not apply to laws restricting accessories to firearms.  *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a gun silencer is not covered by the Second Amendment at all because it is an accessory, not an arm), *cert. denied*, (June 10, 2019), and *cert. denied sub nom. Kettler v. United States* (June 10, 2019).  But even if the Second Amendment applied, the Laser Sight Ordinance would still be constitutional.  The ordinance does not ban any "weapons that were common at the time of [the Amendment's] ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia," and a restriction on a non-essential firearm accessory allows "law-abiding citizens [to] retain adequate means of self-defense."  *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015).  Moreover, the ordinance serves important governmental objectives because restricting laser sights provides the "substantial benefit" of tending to "increase the public's sense of safety."  *Id.* at 411.

### A.     The Second Amendment Does Not Cover Non-Essential Firearm Accessories Like Laser-Sight Devices.

The Second Amendment does not apply to the City's prohibition on laser-sight accessories to firearms because laser sights are accessories, not arms.  Plaintiffs' claim should therefore be rejected without applying any form of Second Amendment scrutiny.

The Second Amendment protects "the right of the people to keep and bear *Arms*." U.S. Const., amend. II (emphasis added).  Whether a device falls within the scope of the Second

27

Amendment's protection, therefore, depends upon whether the device is an "Arm" as that word was understood at the time of the founding. *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (referring to founding-era dictionaries that defined "Arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another"). A laser-sight accessory is not itself an "Arm" or a "weapon of offence." A laser sight cannot be used to strike another or otherwise inflict offensive injury, or as defensive armor. Plaintiff Tony Kole himself admitted that a laser sight is "an accessory . . . not a fundamental part of the design of the firearm." SUMF ¶ 33. *See also Butler v. E. Lake Mgmt. Grp., Inc.*, No. 10-CV-6652, 2014 WL 273650, at *2 (N.D. Ill. Jan. 24, 2014) (Dow, J.) ("The statements in Plaintiffs' deposition constitute binding admissions under oath, and those admissions are inescapable."). A non-essential "firearm accessory" that is "not a weapon in itself," is not "a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186.[9] Thus restrictions on laser sights, like the silencer restrictions at issue in *Cox*, are not subject to review under the Second Amendment.

### B. The City's Ordinance Would Be Constitutional Even If The Second Amendment Covered Firearm Accessories Like Laser-Sight Devices.

Even if the Second Amendment applied to the City's ordinance, the ordinance would still be a constitutional exercise of the City's legislative authority. Where a legislative enactment restricts use or ownership of an arm, thereby implicating the Second Amendment, the law's constitutionality turns on "whether [the] regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of

---

[9] That the term "Arms" as used in the Second Amendment does not include weapon accessories is also supported by the text of a founding-era military statute, which referred separately to "arms," "ammunition," and "accoutrements." *See Heller*, 554 U.S. at 650 (Stevens, J., dissenting) (quoting from an Act ... for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § III, p. 2).

a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense." *Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015). In *Friedman*, the court upheld the City of Highland Park's ordinance prohibiting the possession and sale of semi-automatic assault weapons. The court noted that the modern weapon features prohibited by the assault weapon ban were not common in 1791. *Id.* And though some of the weapons prohibited by the ordinance were used for military and police functions, the court ruled that "states, which are in charge of militias, should be allowed to decide when civilians can possess military-grade firearms." *Id.* at 411. Finally, the court reasoned that residents were left with adequate means of self-defense even though assault-weapons were banned, because they were still permitted to own and use "most long guns plus pistols and revolvers." *Id.*

Laser sights share all of the features of assault weapons that were relevant under *Friedman*, and the City's ordinance should therefore be upheld. Because a laser sight is not a "weapon," it cannot be a weapon that was "common at the time of the [Second Amendment's] ratification." Plaintiffs, for their part, have not identified any device resembling a laser sight—or any similar alternative to a firearm's standard sight—that was common at that time. The alternative sighting accessories referenced in Plaintiffs' prior briefing—namely, scopes—were, according to Plaintiffs, invented at least 40 years after the Second Amendment's ratification. *See* Dkt. 169 at 14. Next, laser sights are no more necessary for the preservation or efficiency of a well regulated militia than the assault weapons at issue in *Friedman*. Militias long existed before the advent of laser sights, and Defendants are aware of no evidence showing a relationship between laser sights and the preservation or efficiency of a well regulated militia. Further, as in *Friedman*, Chicagoans are left with ample means for self-defense despite the restriction on laser-sight accessories. Nothing in the Laser Sight Ordinance restricts the ability of Chicago residents

29

to possess and use long guns and handguns (whether in their home or in public) and to train and practice shooting their firearms at ranges. It is also undisputed that firearms without laser sights are still fully functional. *See* SUMF ¶ 33.[10]

And though the ordinance prohibits one specific type of sighting accessory (lasers), it does not restrict or regulate firearms' standard iron sights, which Plaintiff Tony Kole explained are the sighting mechanism provided by a firearm's "fundamental design." *Id.* ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████ *id.* ¶ 34, ████████████████████████████████████ ██████████████████████ *id.* Plaintiff Kole stated that if the laser sight on his firearm were to break, he "absolutely" would still be able to defend himself if necessary. *Id.* ¶ 33. And not only does the ordinance have no effect on iron sights, it also places no restrictions on other sighting device accessories, such as white lights or scopes. Thus the restriction on laser-sight accessories leaves Chicago residents with ample means of self-defense, including the ability to use alternative sighting devices.

In short, the City's ordinance does not meaningfully infringe upon the activity protected by the Second Amendment. At the same time, like the ordinance at issue in *Friedman*, the City's ordinance serves important governmental objectives—namely, providing the "substantial benefit" of tending to "increase the public's sense of safety." *id.* at 411. In *Friedman*, the Seventh Circuit took seriously the severe erosion of the public's sense of safety that results from highly salient episodes of violence like mass shootings and the shootings of law enforcement

---

[10] Restrictions on non-essential accessories like laser sights are thus distinguishable from restrictions on ammunition. *Cf. Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless.").

officers. *Id.* at 412. Laws like the City's that take steps to reduce "the perceived risk from a mass shooting" can have the "substantial benefit" of "mak[ing] the public feel safer as a result." *Id.* Here, the City enacted its ordinance for the express purpose of alleviating the concern that "the [the City's] citizens, most particularly its police officers, [were] being endangered by the use of laser sights." SUMF ¶ 30. The City Council passed the ordinance in the immediate aftermath of reports that a Chicago police officer had been shot and killed by a suspect using a handgun equipped with a laser-sight device. *Id.* ¶ 28. Just years prior, an article in the *Chicago Tribune* had reported that gang members, in the course of their criminal operations, had begun equipping firearms with laser sights capable of "turn[ing] a novice into a marksman." *Id.* ¶ 31. And in the two decades since the ordinance's enactment, laser sights have remained at the fore of public consciousness, with numerous articles reporting on shooters using laser-sight devices in high-profile mass shootings. SUMF ¶ 35. To reduce the risks and perceived risks posed by criminal use of laser sights, the City has reasonably enacted an ordinance aimed at restricting the availability of laser sights within City limits.

Ultimately, Plaintiffs cannot point to a rule in the Constitution's text or in precedent that prevents the City from prohibiting firearm accessories such as laser-sight devices in circumstances where residents retain ample means of self defense. And "when there is no definitive constitutional rule, matters are left to the legislative process." *Friedman*, 784 F.3d at 412. Here, the legislature determined that laser-sight devices pose a risk to public safety and restricted their possession within City limits. Plaintiffs offer no sound basis for overturning that local legislative determination.

\* \* \*

The Court's ruling on Defendants' motion to dismiss with respect to Plaintiffs' laser-sight

count looked to the Seventh Circuit's ruling in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir.

2011), for guidance. *Ezell* called for analyzing Second Amendment challenges by applying

different levels of scrutiny to governmental restrictions depending on "how close the law comes

to the core of the Second Amendment right and the severity of the law's burden on the right."

651 F.3d at 703. Yet *Friedman*, which was decided nearly four years after *Ezell*, called *Ezell*'s

framework into question, and provides the analysis that controls here. *See Friedman*, 784 F.3d at

410 (applying the *Friedman* framework discussed above "instead of trying to decide what 'level'

of scrutiny applies, and how it works, inquiries that do not resolve any concrete dispute"). Even

if *Ezell* applied in this case, however, the Laser Sight Ordinance would be constitutional. First,

the ordinance would survive under *Ezell* because the ability to possess and use a laser-sight

accessory is not "an important corollary to the meaningful exercise of the core right to possess

firearms for self-defense." *Ezell*, 651 F.3d at 708. As discussed above, laser sights are non-

essential accessories: firearms are fully functional without laser sights, and Chicago residents

retain adequate ability to defend themselves with firearms without the use of laser sights. And

second, under *Ezell*, "modest burdens" on the "core right" of self defense are "more easily

justified." *Id.* A restriction on non-essential firearm accessories places, at most, a "modest

burden" on the "core right." Thus, *Ezell*'s more relaxed standard would apply, and the legitimate

government interests that justify the laser-sight restriction under *Friedman* would satisfy the

applicable standard under *Ezell*.

## III.     COUNT VII OF THE COMPLAINT IS DUPLICATIVE OF COUNTS I AND III.

In Count VII of the complaint, Plaintiffs seek a declaration under 28 U.S.C. § 2201 that

the "complained-of sections of the Municipal Code of Chicago and the Chicago Zoning

Ordinance are against public policy and violative of Article 1, §§ 1, 2, 4, 6, 12, 15, 22, 24, and

Due Process, Equal Protection and takings clauses of the Illinois Constitution, thus rendering them unconstitutional, null and void *ab initio*, and unenforceable." In ruling on Defendants' motion to dismiss, the Court stated that it was "confounded as to what exactly Plaintiffs are challenging here" but allowed the count to proceed because Defendants did not move to dismiss it. Sept. 2015 Mem. Op. & Order at 40. Defendants respectfully move for judgment in their favor on this count, which is no clearer today. Because, for the reasons stated in section I above, Plaintiffs cannot recover damages based on the 2010 Ordinance, Count VII is moot to the extent Plaintiffs seek a declaration that the now-repealed 2010 Ordinance is unconstitutional. *See Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013) ("A case challenging a statute's validity normally becomes moot if the statute is repealed or invalidated."). To the extent Plaintiffs seek a declaration that the 2014 Ordinance is unconstitutional, this Court has already ruled to the contrary. *See* Sept. 2015 Mem. Op. & Order. And to the extent Plaintiffs seek a declaration that the Laser Sight Ordinance is unconstitutional, judgment should be entered for Defendants on this count for the reasons stated in Section III above.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court exclude the testimony of Mr. Robert Southwick and enter judgment in favor of Defendants, and against Plaintiffs, on all Counts remaining in the Complaint.

Date: July 12, 2019                    Respectfully submitted,


                                       MARK A. FLESSNER
                                       Corporation Counsel of the City of Chicago

                                       By:        /s/ Justin Tresnowski_____
                                             Assistant Corporation Counsel

33

Thomas P. McNulty
Justin Tresnowski
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0307 / 744-4216
Attorneys for Defendants

Exhibit 1

Exhibit 2

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED