C

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECOND AMENDMENT ARMS, et )
al, )
 )
        Plaintiffs, )
 ) No. 10-cv-4257
  vs )
 )
CITY OF CHICAGO, )
 )
        Defendant. )

      The discovery deposition of TONY KOLE, taken in the above-entitled cause before Steven J. Brickey, CSR, State of Illinois, at 30 North LaSalle Street, Chicago, Illinois, on the 1st day of August, A.D., 2018, commencing at 10:08 o'clock a.m.

TONY KOLE
August 1, 2018

Page 2

1  APPEARANCES:
2  LAW FIRM OF DAVID G. SIGALE, P.C.
     BY: MR. DAVID G. SIGALE
3    799 Roosevelt Road
     Suite 207
4    Glen Ellyn, Illinois 60137
     (630) 452-4547,
5    dsigale@sigalelaw.com
6       Appeared on behalf of the Plaintiffs;
7  CITY OF CHICAGO
     BY: MR. JUSTIN TRESNOWSKI
8    30 North LaSalle Street
     Room 1230
9    Chicago, Illinois 60602
     (312) 744-4746,
10   justin.tresnowski@cityofchicago.org
11      Appeared on behalf of the Defendant;
12 REPORTED BY:
13    Steven J. Brickey, CSR
      CSR License No. 084-004675

Page 3

1         I N D E X
2  THE WITNESS: TONY KOLE
3                    PAGE
4  Direct Examination by Mr. Tresnowski...... 4
5  Cross-Examination by Mr. Sigale........... 39
6  Redirect Examination by Mr. Tresnowski.... 45
7  Recross-Examination by Mr. Sigale......... 47

10        E X H I B I T S
12         Marked for
           Identification
13
   Exhibit No. 1 ......................... 13

Page 4

1         (Witness sworn.)
2            TONY KOLE
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5            E X A M I N A T I O N
6  BY MR. TRESNOWSKI:
7    Q.   Can you state and spell your full
8  name for the record.
9    A.   Tony Kole, T-O-N-Y, K-O-L-E.
10   Q.   And what is your residential
11 address?
12   A.   1120 West Northwest Highway,
13 Arlington Heights, Illinois.
14   Q.   That's actually -- I grew up in that
15 area.  So I know that is -- can be a long commute.
16   A.   Sure.
17   Q.   How long does it take you to get
18 into the city?  How long did it take you to get
19 here today?
20   A.   Well, today, it took well over an
21 hour.
22   Q.   Do you know how many miles that is
23 from the city?
24   A.   It's about 35, yeah.

Page 5

1    Q.   You recently moved to that address,
2  correct?
3    A.   Yes.
4    Q.   Where were you before?
5    A.   For prior to that, I lived in
6  Waukegan for about a year, year-and-a-half, I
7  think, and prior to Waukegan, I resided in Chicago
8  for approximately 35 years.
9    Q.   Okay.  So you moved from Chicago to
10 Waukegan?
11   A.   Correct.
12   Q.   What year?
13   A.   I want to say 2015.
14   Q.   We met outside.
15   A.   Sure.
16   Q.   My name is Justin Tresnowski.  I
17 represent the City of Chicago in this case Second
18 Amendment Arms versus City of Chicago.
19   A.   Okay.
20   Q.   My colleague, Tom McNullty, might
21 stop by.  He might not.
22   A.   Okay.
23   Q.   If some other guy walks in, that's
24 probably who it is.

L.A. Court Reporters, L.L.C.
312-419-9292

TONY KOLE
August 1, 2018

Page 6

1  A. All right.
2  Q. You've been deposed before,
3  correct --
4  A. Yes.
5  Q. -- in lawsuits involving Second
6  Amendment claims, firearms?
7  A. Yes.
8  Q. How many times have you been
9  deposed?
10 A. Twice, if not three times.
11 Q. So you're pretty familiar with the
12 process. I'll just go through some of the ground
13 rules. I'm going to ask you a series of
14 questions.
15 A. Sure.
16 Q. You know you're under oath just like
17 you would be at trial?
18 A. Okay.
19 Q. If you don't understand my question,
20 just let me know.
21 A. Okay.
22 Q. I can rephrase it to help you
23 understand.
24 A. Okay.

Page 7

1  Q. For the court reporter's benefit,
2  try to answer orally instead of nodding your
3  head --
4  A. Sure.
5  Q. -- just so he can get it on the
6  record.
7  A. Okay. Sure.
8  Q. We'll both try not to interrupt or
9  talk over each other so he can get a clean record
10 of what we're saying.
11 A. Okay.
12 Q. If you need to take a break at any
13 time, just let me know.
14 A. Okay.
15 Q. Mr. Sigale might make objections,
16 but unless he instructs you otherwise, you can
17 answer the question --
18 A. Okay.
19 Q. -- when he objects. I know counsel
20 mentioned that you recently had surgery.
21 A. Correct.
22 Q. Are you currently under the
23 influence of any -- any drugs?
24 A. No.

Page 8

1  Q. You're not --
2  A. No.
3  Q. -- under the influence of any drugs
4  right now?
5  A. No.
6  Q. So there's no reason you wouldn't be
7  able to answer truthfully?
8  A. That's correct. Yeah, there is no
9  reason.
10 Q. Nothing that would impair your
11 memory?
12 A. No. No. Other than old age.
13 Q. You're a plaintiff in this case,
14 correct?
15 A. Correct.
16 Q. Do you know the other plaintiffs in
17 this case?
18 A. I know of them. I don't know -- I'm
19 not acquainted with any of them.
20 Q. Okay. So you're not acquainted with
21 Joseph Franzese?
22 A. No.
23 Q. Or with his entity Second Amendment
24 Arms?

Page 9

1  A. No, I've heard of them, but I'm not
2  acquainted with them.
3  Q. And you don't know anything about
4  Second Amendment Arms' plans to open a gun store
5  in Chicago?
6  A. No, I don't know anything about
7  their plans.
8  Q. So why are you suing the City?
9  A. At the time, I was a resident of the
10 city and specifically the issue of -- I think some
11 of the other issues had been resolved in the
12 courts, specifically conceal carry, you know, the
13 right to possess handguns in the home, so on and
14 so forth, but with respect to this lawsuit it's
15 the possession of laser sight accessories and that
16 is something that I am contesting as not being
17 lawful, if you will.
18 Q. So you're interested in purchasing
19 laser sight accessories?
20 A. Purchasing and possessing.
21 Q. Purchasing and possessing --
22 A. Yes.
23 Q. -- within the City of Chicago?
24 A. Sure. Absolutely.

3 (Pages 6 to 9)

TONY KOLE
August 1, 2018

Page 14

1  device --
2  A.  Correct.
3  Q.  -- you were referring to previously?
4  A.  Correct.
5  Q.  And you just said that that laser
6  sight can be attached to other firearms that you
7  have besides the ones listed here?
8  A.  Correct, provided that those
9  firearms have accessory rails because the
10 light/laser combo on the TRL-2 attaches to an
11 accessory rail.
12 Q.  Do all those firearms have that
13 rail?
14 A.  Yes, all these firearms listed,
15 including the one I no longer own, do have those
16 rails, correct.
17 Q.  And what about the other 13 to 17
18 firearms that you own?
19 A.  Yes, they do.  They're standard --
20 it's what's called mill standard 1913 Picatinny
21 rail and so the Streamline TRL-2 will mount to any
22 firearm that has that rail.  It also comes with
23 additional adapters to mount to other firearms
24 such as Glock's that don't have a standard -- mill

Page 15

1  standard 1913 rail.  So the Streamline TRL-2 is
2  adaptable to many types of firearms regardless of
3  whether the accessory rail has been standardized
4  or not.
5  Q.  So are you currently looking to
6  purchase another laser sight?
7  A.  Absolutely.
8  Q.  And you wish to purchase it within
9  the City of Chicago?
10 A.  It would -- I would not be opposed
11 to it.  It would be convenient considering I spend
12 a lot of time here during the week.  Sometimes
13 it's easier to make a stop on the way home as
14 opposed to going home and then going out to the
15 local gun store and driving however many miles.
16 It's just -- for me, it would be convenient.
17 Q.  Can you buy laser sights on the
18 Internet?
19 A.  Yes.
20 Q.  Would that be more convenient than
21 buying it at a brick and mortar store?
22 A.  It can be.  I'm sure it can be.
23 Sometimes, you know, like most people the instant
24 gratification, you know, factor is something that

Page 16

1  is sought after.  Sometimes I'll order things on
2  Amazon if I don't need it right away or I don't
3  want it right away.  Sometimes I'm willing to pay
4  more to have it right away.  It just varies.  For
5  an example, let me give you a great example.
6  If I did -- because I do have a
7  valid conceal carry permit.  So if I were to -- if
8  it were legal to carry or to have a laser sight
9  accessory mounted to my carry pistol and while in
10 the City of Chicago something happens, I drop it,
11 it breaks, it no longer functions and, to me, it's
12 a critical component of my defensive weapon
13 system, I may be inclined to go and buy one
14 because I have an immediate need for it and my
15 immediate need trumps the fact that I'm going to
16 save 20 percent by ordering it from Amazon, for
17 example.  So I think there is many different
18 scenarios.
19 For me being kind of a guy's
20 guy, buying things, having them -- you know, the
21 tactile experience and having them right away and
22 walking out of the store with them is -- is part
23 of my makeup.  You know, on the other hand,
24 sometimes I like to save money.  But you have to

Page 17

1  make that decision is this a critical component?
2  And in this case, it would be because it's part of
3  a defensive system and if part of that system
4  failed, I'd want to rectify that failure as soon
5  as possible and if I were able to just go into
6  Dick's Sporting Goods, for example, or what have
7  you and just purchase one over-the-counter and be
8  about my business that would be great as opposed
9  to just ordering it on Amazon or eBay or from any
10 of the online retailers and waiting three to five
11 days, you know, it may not satisfy that urgent
12 need if I were to do it that way.
13 Q.  Are you aware of brick and mortar
14 stores that are closer to your current home than
15 the 35 miles that it would take to get to Chicago
16 that -- sorry -- that sell firearms?  Are you
17 aware -- I guess my question is --
18 A.  Sure.
19 Q.  -- you said that you're 35 miles
20 from the city.  Are you aware of brick and mortar
21 firearm stores within a 35-mile radius?
22 A.  Sure.  I'm sure they exist, but,
23 again, going back to the scenario I just played
24 out.  If I were, you know, in the City because my

5 (Pages 14 to 17)

L.A. Court Reporters, L.L.C.
312-419-9292

TONY KOLE
August 1, 2018

**Page 26**

skill of shooting with iron sights. So that being the case, the laser itself as -- as an improvement tool, in my opinion, does not degrade the fundamental skill of shooting and aiming without a laser sight. I think there is other benefits that it does provide. Being more accurate is one of them. I mean, I think that's part and parcel to what it is designed to do, but there are other features that come with utilizing a laser accessory sight on a firearm.
BY MR. TRESNOWSKI:
    Q.    What are those other features?
    A.    Well, for example, if we compare using iron sights, a standard firearm has a front sight and a rear sight. The distance between the two are called the sight radius. The human eye can only focus on one distance at a time and so what ends up happening is as you're focusing on the front sight, your rear sight is somewhat blurry and then it creates sort of a tunnel vision and it's hard to maintain situational awareness of your periphery.
        One of the important things that a laser sight allows you to do is overcome that --

**Page 27**

that human deficiency, if you will, by -- if I had an attacker, an aggressor, if I were to put -- if I were to point my laser on my attacker, I don't sacrifice any of the situational awareness. I'm able to maintain a point of aim while simultaneously visually assessing body language, body movement, movement of others in the area, if you will.
        So it allows me as a defender in that situation, under stress caused by adrenaline and increased heart rate, to overcome the loss of the fine motor skills that that would do and a laser, I think, is a great tool for that because I'm able to maintain more control in that situation had I not had a laser sight because my brain would be focusing on the -- the conflicting visual focus between the front and the rear sight and then not being able to focus on other things around me which can also be very critical in a -- in a situation where you're under duress like that.
        I mean, clearly, hands are an indicator of action that someone may take and if I were to hold somebody at gunpoint, an intruder in

**Page 28**

my house for example, in the dark with iron sights, my focus is to get my point of aim and point of impact where it needs to be, not on the aggressor's hands. I think that's clearly -- you know, it's one of the reasons that when you see police apprehending a subject, one of the first things they say is "Show me your hands. Show me your hands" and it's really hard, I think, to be able to focus on -- you know, to fight that human effect that your eye has when it's trying to focus between two distances and also try to maintain awareness of what someone's hands might be doing or if they have accomplices, for example. It's really hard to do.
        With a laser, you can point, aim. I'm confident that if something were to happen, if this person were to reach for a gun or a knife or a blunt object or something, I don't have to -- I don't have to think and get my body to do what it is supposed to do under duress. I know that laser is pointed on target and if there is a movement where, you know, the aggressor goes for a gun, I can easily squeeze the trigger and defend myself and I think that's very critical.

**Page 29**

        I think a lot of the times when we talk about these things and what is really not taken into account is the effect that stress has on the body, what it does to my fine motor skills, for example. When your body is under stress, you're not going to be able to put a key in a keyhole. You know, you're not going to unlock your car. You're going to fumble and you're going to get it in there very clumsily but you'll get it in there eventually and, you know, if this is happening to you under stress, now I have to utilize fundamental iron sights to be able to stop that threat. I -- I don't think that's of any benefit to me or to anybody for that matter over having a laser sight accessory.
    Q.    **Would you say that you feel more confident in your ability to shoot a firearm when you have a laser sight attached to it?**
        MR. SIGALE: I'm just going to object as to vagueness. You mean are you referring to any possible situation? Like are you equalizing being at a firing range versus having an attacker come at you? That's my objection. If you understand, answer it, but --

TONY KOLE
August 1, 2018

Page 30

1  BY THE WITNESS:
2  A. I understand it to a degree. With
3  respect to let's use the word confidence at the
4  range -- at the range, it's a training tool. Does
5  it make me feel more confident that I'm going to
6  train better? I don't think it does -- I don't
7  think it has an effect on confidence, but in a
8  situation where I hope to never find myself
9  defending my life or my family's life, would it
10 make me feel more confident in succeeding -- in
11 achieving success in the defense of myself, my
12 life or my family? Absolutely. Absolutely.
13 Because it's one less thing to worry about.
14       And it's really hard to say how
15 one is going to react when they're under stress,
16 when they're under attack. They think -- human
17 instincts kick in and they take over. You know,
18 the one -- it's one reason why we train because
19 when we -- when these situations present
20 themselves, all we have to rely on is our training
21 and if I go to the range and I train with a laser
22 or I train without a laser, I'm just creating
23 greater chances and odds of surviving a terrible
24 situation. Because, in that case, that's what I'm

Page 31

1  going to rely on.
2  BY MR. TRESNOWSKI:
3  Q. In a situation where you felt like
4  you had to defend your own personal safety and use
5  a firearm to do so, would you be able to defend
6  yourself if your laser sight happened to be broken
7  on your firearm?
8  A. Absolutely. We -- I'm one -- and
9  there are many people out there trained to their
10 point of failure. You know, I've also -- one of
11 the sayings I've always had is two is one and one
12 is none. You know, I'll carry two guns because if
13 one gun fails, I have a backup. I'll carry two
14 flashlights. If one fails, I have a back up. I
15 take that into my work. I have two -- I have two
16 sets of everything in my tool bag because if one
17 fails, I still have another one.
18       So just because somebody has
19 designed an accessory to make you more accurate or
20 help you in training, if -- if you rely on that as
21 your sole means of defense, in this case the
22 laser, then you've failed from day one. You train
23 for every possible scenario with a firearm. If my
24 laser doesn't work, if my batteries run out, if my

Page 32

1  flashlight doesn't work, then, yes, absolutely, I
2  better be able to defend myself with an iron --
3  iron sights.
4        I don't think anybody in their
5  right mind or any instructor would teach a student
6  to only train with a laser sight, for example,
7  because it's not a fundamental -- it's an
8  accessory. So it's not a fundamental part of the
9  design of the firearm and that fundamental design
10 is the iron sights. So, absolutely, you need to
11 train because that's your -- that's your backup.
12 If my laser fails, I have something to revert to.
13       Now, if somebody were to use a
14 laser sight without any backup iron sights, I
15 think that's ridiculous and I don't think anybody
16 would do that. You know, I mean, you're putting
17 your life in the hands of an electronic device
18 that can fail for a number of reasons.
19 Q. What -- what would cause a laser
20 device to fail?
21 A. Well, if -- if it was damaged, if
22 the batteries are dead. You know, lasers for the
23 most part utilize a lot of energy and batteries
24 really don't store too much. So that could cause

Page 33

1  it to fail. It could -- it could not have been
2  attached correctly, secured properly to the
3  firearm and the recoil of the firearm could cause
4  it to dislodge, for example. That's a failure.
5  The laser may work, the batteries may be good, but
6  if it's sitting on the ground, it's useless. So
7  there is many reasons for failure. I think those
8  are just a few.
9  Q. But it's your position if the laser
10 sight failed, the laser sight wouldn't be
11 necessary to defend yourself, you would still be
12 able to defend yourself in that situation?
13 A. Sure. And if my firearm failed, I
14 would use whatever I could to defend myself. But
15 the point is in a situation -- you know, if you're
16 put in a situation where you have to defend
17 yourself, you want to have every tool available to
18 you to do it as safely, easily and effortlessly as
19 possible. You know, if I'm being attacked by
20 somebody with a machete, for example, I'd prefer
21 to reach for my pistol instead of the baseball bat
22 next to the door because I don't want to combat
23 the guy with a baseball bat. I want to stop the
24 threat as quick as I can.

9 (Pages 30 to 33)

TONY KOLE
August 1, 2018

Page 50

```
 1         UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3
   SECOND AMENDMENT ARMS, et  )
 4 al,                        )
                              )
 5         Plaintiffs,  )
                        ) No. 10-cv-4257
 6    vs                )
                        )
 7 CITY OF CHICAGO,     )
                        )
 8         Defendant.   )
 9         I hereby certify that I have read
   the foregoing transcript of my deposition given on
10 August 1, 2018, at the time and place aforesaid,
   consisting of Pages 1 through 49, inclusive, and I
11 do again subscribe and make an oath that the same
   is a true, correct and complete transcript of my
12 deposition so given as aforesaid.
13
           please check one:
14
         _____  I have submitted errata sheet(s)
15       _____  No corrections were noted
16       _____
                    TONY KOLE
17
   SUBSCRIBED AND SWORN TO
18 before me this ____ day
   of _____, A.D., 2018.
19
20 _____
     Notary Public
21
22
23
24
```

Page 51

```
 1          WITNESS ERRATA SHEET
 2
      I wish to make the following changes for the
 3 following reasons:
 4 Page  Line
     ____ ____ Change: _____
 5         Reason: _____
     ____ ____ Change: _____
 6         Reason: _____
 7
     ____ ____ Change: _____
 8         Reason: _____
     ____ ____ Change: _____
 9         Reason: _____
10
     ____ ____ Change: _____
11         Reason: _____
     ____ ____ Change: _____
12         Reason: _____
13
     ____ ____ Change: _____
14         Reason: _____
     ____ ____ Change: _____
15         Reason: _____
16
     ____ ____ Change: _____
17         Reason: _____
     ____ ____ Change: _____
18         Reason: _____
19
     ____ ____ Change: _____
20         Reason: _____
     ____ ____ Change: _____
21         Reason: _____
22
     ____ ____ Change: _____
23         Reason: _____
24    (Signed) _____
```

Page 52

```
 1         UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                 EASTERN DIVISION
 3      I, Steven Brickey, Certified Shorthand
 4 Reporter, do hereby certify that on the 1st day of
 5 August, A.D., 2018, the deposition of the witness,
 6 TONY KOLE, called by the Defendant, was taken
 7 before me, reported stenographically, and was
 8 thereafter reduced to typewriting under my
 9 direction.
10      The said deposition was taken at 30 North
11 LaSalle Street, Chicago, Illinois, and there were
12 present counsel as previously set forth.
13      The said witness, TONY KOLE, was first duly
14 sworn to tell the truth, the whole truth, and
15 nothing but the truth, and was then examined upon
16 oral interrogatories.
17      I further certify that the foregoing is a
18 true, accurate, and complete record of the
19 questions asked of and answers made by the said
20 witness, TONY KOLE, at the time and place
21 hereinabove referred to.
22      The signature of the witness, TONY KOLE, was
23 reserved by agreement.
24      The undersigned is not interested in the
```

Page 53

```
 1 within case, nor of kin or counsel to any of the
 2 parties.
 3      Witness my official signature in and for
 4 Cook County, Illinois, on this _____ day of
 5 _____, A.D., 2018.
 6
 7
 8
 9          _____
10          STEVEN BRICKEY, CSR
11          8 West Monroe Street
            Suite 2007
12          Chicago, Illinois 60603
            Phone: (312) 419-9292
13          CSR No. 084-004675
14
```

14 (Pages 50 to 53)

L.A. Court Reporters, L.L.C.
312-419-9292