**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a SECOND AMENDMENT ARMS, ROBERT M. ZIEMAN, SR., ICARRY, an unincorporated Association (and d/b/a of Shaun Kranish), SHAUN KRANISH, individually and d/b/a ICARRY, and TONY KOLE, | ) ) ) ) ) ) ) ) | Case No: 1:10-CV-4257 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Robert M. Dow, Jr. U.S. District Court Judge |
| CITY OF CHICAGO, a municipal corporation, RAHM EMANUEL, in his official capacity as Mayor of the City of Chicago, GARRY McCARTHY, Superintendent of Police of the City of Chicago, and SUSANA MENDOZA, City Clerk of the City of Chicago, | ) ) ) ) ) ) ) | Hon. Sheila M. Finnegan U.S. Magistrate Judge |
| Defendants. | ) | |

<u>**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

(TO BE FILED UNDER SEAL)

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COME the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, by and through undersigned counsel, and submits the following Response to Defendants' F.R.Civ.P. 56(a) Motion for Summary Judgment.

Dated: August 21, 2019                    Respectfully submitted,


By:        /s/ David G. Sigale
           David G. Sigale


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

ii

## TABLE OF CONTENTS

Table of Authorities ……………………………………………………………… iv

Introduction ........................................................................................... 1

Summary Judgment Standard …………………………………………….... 2

Argument.................................................................................................3

I.   THE DEFENDANTS VIOLATED PLAINTIFF'S SECOND AMENDMENT RIGHTS BY DENYING HIS BUSINESS LICENSE APPLICATION FOR A GUN STORE ………………………………………………………… 9

II.  PLAINTIFF HAS PROVEN HIS DAMAGES FROM NOT BEING ALLOWED TO OPEN A GUN STORE FROM 2010-2014 ...................... 13

III. ROBERT SOUTHWICK'S OPINIONS MEET THE *DAUBERT* STANDARD AND SHOULD NOT BE EXCLUDED …………………..

IV.  LASER SIGHTING DEVICES ARE PROTECTED BY THE SECOND AMENDMENT AND CANNOT BE PROHIBITED ………………………..

V.   PLAINTIFFS' ILLINOIS CONSTITUTION CLAIMS THAT ARE EQUIVALENT TO THE FEDERAL CLAIMS ARE LIKEWISE MERITORIOUS ……………………………………………………… 40

Conclusion ………………………………………....................................... 44

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Act II Jewelry, LLC v. Wooten*,
318 F. Supp. 3d 1073 (N.D.Ill. 2018) ....................................................... 21, 22

*Andrews v. State*,
50 Tenn. 165 (1871) ................................................................................ 4

*Bielskis v. Louisville Ladder, Inc.*,
663 F.3d 887 (7th Cir. 2011) ................................................................... 9

*Bryant v. City of Chicago*,
200 F.3d 1092 (7th Cir. 2000) ................................................................. 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ............................................................... 7, 8, 10, 20

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008) ................................................................. 3, 26, 28

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n*,
213 F.3d 198, 208-09 (5th Cir. 2000) ..................................................... 22

*Estate of Robinson* ex rel *Irwin v. City of Madison*,
2017 U.S. Dist. LEXIS 20733 (W.D.Wis. 2017) ................................. 10

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) .................................... 21, 24, 26, 27, 28

*Fitzsimmons v. Best*,
528 F.2d 692, 694 (7th Cir. 1976) ........................................................... 2

*Floyd v. Hefner*,
556 F.Supp.2d 617 (S.D.Tex. 2008) ...................................................... 20

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ........................................................... 27, 28

*Fyock v. Sunnyvale*,
779 F.3d 991 (9th Cir. 2015) ................................................................. 28

*GE v. Joiner*,
522 U.S. 136 (1997) ............................................................................... 8

*Hall v. Flannery*,
840 F.3d 922 (7th Cir. 2016) .............................................................. 9

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .......................................................... 28

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
961 F. Supp. 2d 928 (N.D. Ill. 2014) ............................................. 4, 28

*King v. Preferred Technical Group*,
166 F.3d 887 (7th Cir. 1999) ............................................................. 3

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ...................................................................... 8, 10

*La Playita Cicero, Inc. v. Town of Cicero*,
2017 U.S. Dist. LEXIS 44868 (N.D.Ill. 2017) ................................... 8, 9

*Lapsley v. Xtek, Inc.*,
689 F.3d 802 (7th Cir. 2012) ............................................................. 8

*Loeffel Steel Prods. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D.Ill. 2005) .............................................. 8, 22

*Martin v. Harrington & Richardson, Inc.*,
743 F.2d 1200 (7th Cir. 1984) ........................................................... 4

*McDonald v. City of Chicago*,
561 U.S. 742  (2010) ...................................................... 6, 19, 21, 24

*Mindgames, Inc. v. W. Publ'g Co.*,
218 F.3d 652 (7th Cir. 2000) ........................................................... 20

*Mintz v. Mathers Fund, Inc.*,
463 F.2d 495 (7th Cir. 1972) ............................................................. 3

*Poller v. Columbia Broadcasting System*,
368 U.S. 464 (1962) .......................................................................... 3

v

*Reliable Consultants, Inc. v. Earle,*
517 F.3d 738 (5th Cir. 2008) ............................................................... 4

*Six Star Holdings, LLC v. City of Milwaukee,*
821 F.3d 795 (7th Cir. 2016) ............................................................. 5

*Smith v. Equilon Enters., LLC,*
2004 U.S. Dist. LEXIS 11917 (D.Md. 2004) .................................... 23

*Smith v. Ford Motor Co.,*
215 F.3d 713 (7th Cir. 2000) ............................................................. 9

*Target Mkt. Publ. v. ADVO, Inc.,*
136 F.3d 1139 (7th Cir. 1998) ......................................................... 21

*TAS Distrib. Co. v. Cummins Engine Co.,*
491 F.3d 625 (7th Cir. 2007) ........................................................... 21

*Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.,*
223 F.3d 585 (7th Cir. 2000) ........................................................... 10

*United States v. Cox,*
906 F.3d 1170 (10th Cir. 2018) ....................................................... 26

*United States v. Jones,*
132 S.Ct.945 (2012) ................................................................ 25, 26

*United States v. Miller,*
307 U.S. 174 (1939) ......................................................................... 26

*United States v. Parra,*
402 F.3d 752 (7th Cir. 2005) ............................................................. 8

*Walker v. Soo Line R. Co.,*
208 F.3d 581 (7th Cir. 2000) ............................................................. 9

*Winter v. Minn. Mut. Life Ins. Co.,*
199 F.3d 399 (7th Cir. 1999) ............................................................. 2

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.,*
395 F.3d 416 (7th Cir. 2005) ..................................................... 19, 20

vi

*Constitutional Provisions*

U.S. Const. amend. II ........................................................................ *passim*

*Statutes, Rules, and Ordinances*

F.R.E. 702 ................................................................................... 8, 9

F.R.E. 703 ..................................................................................... 20

F.R.Civ.P. 56(c) ................................................................................ 3

430 ILCS 66/1 ............................................................................... 6, 19

720 ILCS 5/12-29(c)(5) ....................................................................... 29

720 ILCS 5/24.6-20(a) ......................................................................... 29

MCC § 4-144-010 ............................................................................... 4

MCC § 8-20-060(a) ............................................................................ 24

MCC § 8-20-100 ................................................................................. 4

*Other Sources*

John R. Chapman, *The Improved American Rifle* (1844) ................................... 25

Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms. The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983) ........... 4

## INTRODUCTION

Defendants' pending Motion for summary judgment should be denied. The Defendants have disclosed no witnesses in this matter – not to justify their gun store ban in 2010, nor to justify their current laser sight ban, nor to counter Plaintiff's or Plaintiff's expert's testimony as to lost profit damages. Instead, they attempt to pillory Plaintiff for not putting together all the details of a multiple-location gun store business – real estate, bank loans, inventory, insurance, security, staff, *etc…*, when the entire time at issue Plaintiff was prohibited from even obtaining a business license in Chicago, much less an FFL which would have allowed him to actually be in the firearms business in Chicago. The Catch 22 in which Defendants attempt to put Plaintiff is simply *chutzpah*, as if it would have been reasonable, or even prudent, for Plaintiff to invest much time and resources into opening a prohibited business. That Plaintiff does not make a claim for any time after 2014 does not eliminate Plaintiff's injuries and damages for the time period of 2010-2014, when obtaining a license was impossible. Defendants are attempting to profit from their own wrongdoing, when their flat denial was the cause of everything Plaintiff did or did not do.

Plaintiff's expert, Robert Southwick, relies on established economic methodologies, and reliable industry data, to calculate the lost profits had Plaintiff been allowed to open his stores. From the deposition testimony and Plaintiff's business plan, Southwick believes that Plaintiff had the know-how, the experienced people and contacts, and the backing to make his dream a reality, despite his not

1

being an established business. The opportunity was high, the political and legal climates were optimal, and all it would take was the City not slamming its door in Plaintiff's face. Further, the City kept Plaintiff hanging for 18 months before turning him down, at which point his pending FFL application had to be withdrawn as well. Defendants offer no one and no evidence to contradict any of this, and should not be allowed to avoid a trier of fact hearing Plaintiff's claims.

Finally, laser sights are not traditional accessories and are protected by the Second Amendment. Defendants have no information, besides a few newspaper articles, to try and justify its laser sight ban. The articles are unavailing, and speak more to the criminal misuse of firearms than they do about laser sights. They are useful for self-defense, all witnesses testified there is no safety reason to ban them, and, again, Defendants disclosed no one to contradict that testimony.

Defendant's Ordinances that prohibited Plaintiff's business plans violated the Plaintiff's Second Amendment right to sell firearms. Defendants do not even argue otherwise. Therefore, Defendant's Motion for summary judgment should be denied, because Plaintiffs suffered injuries and damages as a result of Defendant's actions, and the laser sight ban is unconstitutional.

## SUMMARY JUDGMENT STANDARD

". . . [S]ummary judgment is appropriate only if it appears that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.

2

1976) (citing F.R.Civ.P. 56(c); quoting *Poller v. Columbia Broadcasting System*, 368
U.S. 464 (1962)).

"As a procedural matter, granting summary judgment, while a drastic
remedy, is a wholesome one where applicable to the circumstances. It is never
warranted except on a clear showing that no genuine issue as to any material fact
remains for trial. If the pleadings and proof in the form of depositions, affidavits
and admissions on file disclose that no real cause of action or defense exists, the
court may determine there is no issue to be tried and may grant a summary
judgment." *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972).

In evaluating a summary judgment motion, the court focuses on whether any
material dispute of fact exists that would require a trial. *Winter v. Minn. Mut. Life
Ins. Co.*, 199 F.3d 399, 408 (7th Cir. 1999). In making this determination, the court
construes all facts and draws all reasonable inferences in favor of the nonmoving
party. *King v. Preferred Technical Group*, 166 F.3d 887, 890 (7th Cir. 1999).

## ARGUMENT[1]

## I.     THE DEFENDANTS VIOLATED PLAINTIFF'S SECOND AMENDMENT RIGHTS BY DENYING HIS BUSINESS LICENSE APPLICATION FOR A GUN STORE.

Government has attempted to ban gun sales and purchases in the past.
"Between the Restoration and the Glorious Revolution, the Stuart Kings" used
disarmament as a means of "suppress[ing] political dissidents." *District of Columbia
v. Heller*, 554 U.S. 570, 592 (2008). Charles II restricted the trade in arms as a

---

[1] Plaintiffs incorporate their *L.R.56(b)(3)(C) Statement of Additional Undisputed Facts* into this document (listed as SAUF), as well as their Summary Judgment Response Exhibits.

3

tactic to suppress the people. Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms. The Common Law Tradition*, 10 HASTINGS CONST. L.Q. 285, 299-300 (1983).

But in 2014, in *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D.Ill. 2014), Judge Change struck down the City's ban on gun stores, holding "the City's lack of compelling justifications for why it banned all gun stores in Chicago is sufficient in and of itself to render MCC § 8-20-100 unconstitutional." *Id.* at 945. Ultimately the Court held "MCC § 8-20-100 and its zoning ordinance (to the extent that it bans the operation of gun stores in Chicago) are therefore unconstitutional." *Id.* at 947.

In response to the Courts ruling that the ban on gun stores in Chicago was unconstitutional, rather than appeal, the City amended its Ordinances (MCC § 4-144-010, *et seq.* and MCC § 8-20-100) such that they were allowed with certain regulations and requirements. *See* Defs' SJ Exh. E; Dkt. #254-5.

Though pivotal, *Illinois Retailers* was not the only court decision holding that the retail market for firearms was protected by the Second Amendment. "The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Further, the Courts have held that ". . . restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008). Indeed, in *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), the Seventh Circuit confronted the issue of strict tort liability for firearms

4

manufacturers when a criminal caused injury with a handgun. The Court said "[i]mposing liability for the sale of handguns, which would in practice drive manufacturers out of business, would produce a handgun ban by judicial fiat in the face of the decision by Illinois to allow its citizens to possess handguns." *Id.* at 1204.

Therefore, in light of the above precedent, there can be no question that the denial of Plaintiff's business license application to open a gun store was unconstitutional and a violation of Plaintiff's Second Amendment rights. Plaintiff is entitled to damages for this constitutional violation alone. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016).

## II.  PLAINTIFF HAS PROVEN HIS DAMAGES FROM NOT BEING ALLOWED TO OPEN A GUN STORE FROM 2010-2014.

However, beyond the damages for Defendants' constitutional violations, Plaintiff has proven economic loss as well. At the least, they have raised a genuine issue of material fact such that summary judgment should be denied on the subject. Plaintiff had a business plan, knowledgeable people, and a uniquely beneficial commercial and political-legal climate for success.

Defendants claim that Plaintiff would not have been able to obtain a bank loan, but that is simply argument without factual support. Defendants have no witnesses or evidence to suggest Plaintiff could not have done so. Likewise, Defendants' argument that Plaintiff could not have opened a successful gun store is simply that, as Defendants put forth no witnesses as to that, either. Plaintiff and his team have been involved in all aspects of the firearms industry for decades.

SAUF 8, 13, 17. It was the perfect time in Chicago history to open a firearms store, due to *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and the passage of the Firearms Concealed Carry Act, 430 ILCS 66/1, *et seq.*, and Defendants blocked it completely.

Plaintiff has met his burden (or at the least, raised a question of material fact), as to his damages. Though a new business, it was not a new industry or a new product, and Plaintiff has supplied data (through his expert witness Robert Southwick) of firearm businesses in the area during the relevant timeframe. It is true Plaintiff attempted to estimate his own damages in his Answers to Interrogatories, but at his deposition made clear he was relying on the experts. SAUF 31.

And while Plaintiff did initially submit a report from Miles Hall whose opinion of lost profits was vastly larger (Defs' SJ Exh. F; Dkt. # 254-10), Plaintiff withdrew that report and witness after it was became evident that his methodology and conclusions were not legally sufficient, and substituted Southwick, whose work is sufficient under *Daubert* (*See* Dkt. # 240). It would be a different story, Plaintiff supposes, if the Southwick report were $38 million *more* than the Hall report instead of $38 million less. Defendant is attempting to argue that Plaintiff cannot make up his mind, that his opinions keep changing, but in reality the only opinion that matters is the expert, and Southwick is an expert. It is unfortunate that Plaintiff retained an ill-equipped expert initially, but the Court should disregard

6

that report as Plaintiff has, and Defendants' effort to keep using the withdrawn

Hall report as an albatross around Plaintiff's neck should be disregarded as well.

## III. ROBERT SOUTHWICK'S OPINIONS MEET THE *DAUBERT* STANDARD AND SHOULD NOT BE EXCLUDED.

Plaintiff has disclosed Robert Southwick, of Southwick & Associates in

Fernandina Beach, Florida, to opine as to the lost profits Plaintiff suffered by not

being allowed to open a retail firearms store in Chicago from 2010 to 2014. Using

census and market research data, information from the industry, and drawing on

his 20 years of analyzing the shooting sports industry, Southwick has calculated a

reasonable opinion as to Plaintiff's lost profits.

Defendants have offered no witness to counter Southwick's conclusions,

which are made to a reasonable degree of certainty. At best, Defendants'

arguments are topics for cross-examination. In light of this, Defendants' Motions

for Summary Judgment and to Exclude Southwick as a witness should be denied.

### STANDARD FOR F.R.E. 702 MOTION

"[A] trial court may consider one or more of the more specific factors that

*Daubert* mentioned when doing so will help determine that testimony's reliability.

But, as the Court stated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579 (1993), the test of reliability is 'flexible,' and *Daubert*'s list of specific factors

neither necessarily nor exclusively applies to all experts or in every case. Rather,

the law grants a district court the same broad latitude when it decides how to

determine reliability as it enjoys in respect to its ultimate reliability

determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-142 (1999) (citing *Daubert*).

"The inquiry is always, and of necessity, highly fact- specific, and no one factor, even when applicable, is outcome-determinative." *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 801 (N.D.Ill. 2005).

"The admissibility of expert testimony is governed by Federal Rule of Evidence (F.R.E.) 702 and the Supreme Court's seminal decision in [*Daubert*]. *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). F.R.E. 702 allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"—to help the trier of fact "understand the evidence or [ ] determine a fact in issue." F.R.E. 702. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.*" *La Playita Cicero, Inc. v. Town of Cicero*, 2017 U.S. Dist. LEXIS 44868, *3-4 (N.D.Ill. 2017).

"District courts have broad discretion in determining the admissibility of expert testimony." *La Playita Cicero, Inc.*, 2017 U.S. Dist. LEXIS at 44868, *4 (citing *GE v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012)).

8

"In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue." *La Playita Cicero, Inc.*, 2017 U.S. Dist. LEXIS 44868, *4-5 (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893-94 (7th Cir. 2011).

**<u>Southwick's experience is relevant to the question at hand.</u>**

Though Defendants cannot seem to resist taking a few pot-shots at Southwick, they do not challenge his qualifications.  Dkt. # 256 at p.22, fn.1.  However, Plaintiffs will briefly touch on the topic to demonstrate Southwick's suitability for the task at hand.

"As for qualifications, the question is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of formal education. 'While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience,' *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).' *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.

9

2000)." *Estate of Robinson* ex rel *Irwin v. City of Madison*, 2017 U.S. Dist. LEXIS 20733 at \*24 (W.D.Wis. 2017).

"The notion that [*Daubert*] requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which *Daubert* interprets rather than overrides, do not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character. [*Kumho Tire*, 526 U.S. at 150; remaining internal citations omitted]. Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Southwick's credentials and experience are in his report (Defs' SJ Exh. K; Dkt. #254-11 at pp.16-26). He is the owner, as well as in charge of management and specialty research, of Southwick Associates in Fernandina Beach, Florida. SAUF 34. He performs market research and economic research specializing in outdoor activities – primarily hunting, target shooting, sport fishing, boating, and similar activities. *Id.*

Southwick received a B.S. in Economics from the University of Florida in 1988, and studied topics like sample biases, sampling errors, confidence intervals, margins of error, and progression analysis. *Id.* He started Southwick Associates in 1990, and before that worked for the sport fishing industry as an economist. *Id.*

Southwick has conducted lost profits analyses in the past, usually in breach of contract matters for products or services, or in land encroachment that caused

10

loss of business. SAUF 35. Southwick is more than qualified to render expert opinion in this matter.

**Southwick's methodology is sound.**

Per Southwick's description summary, in order to formulate his opinions in this matter he used the following data sources:

[redacted]

- **2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation**

This report is made from a national general population survey conducted by the Census Bureau for the U.S. Fish and Wildlife Service, U.S. Department of the Interior. The 2011 National Survey provides information on participants in hunting, fishing, and wildlife-associated recreation. Specific information includes: state in which participation occurred, days of participation, number of trips taken, expenditures, and other activities hunters, anglers, and wildlife-watchers participate in (such as target shooting).

12



- **2018 Target Shooting in America: An Economic Force for Conservation**

  This report was produced by Southwick Associates for the NSSF and quantifies the impact that target shooters in America had on the economy based on their expenditures. Although it's not included in the final report, target shooters' expenditures were broken out by type of spending in the data analysis. The average spent on firearms by target shooters was taken from the unpublished breakouts of target shooting expenditures. The spreadsheet from where these data were extracted was submitted along with the actual report.

- **ArcGIS Business Analyst**

  The current consumer and retail market was estimated using market potential data housed within ArcGIS Business Analyst, a software extension of ESRI's mapping and analytics platform. The Business Analyst functionality of ArcGIS provides location-based market intelligence through access to 15,000+ data types (demographics and lifestyle to consumer spending and purchasing power) at a desired geographical scale, such as the City of Chicago.

13

Information on ArcGIS is at https://www.esri.com/en-us/arcgis/about-arcgis/overview (last checked August 21, 2019).

Southwick described his methodology in his report and deposition.

In calculating the amounts in his opinions, Southwick used the above-referenced data sources available to him on operating statistics for firearm retailers across the United States. Southwick has statistics on hunting, target shooting participation. He also has data and statistics on sales and commerce related to people buying firearms for protection purposes plus accessories. SAUF 38. Then, he used standard statistical analysis, everything from running large datasets and software programs, such as R or SPSS, to Excel spreadsheets. Standard statistical analyses were used. *Id.* Southwick ran the methodologies and content; sometimes he had assistants run data inquiries under his direction. *Id.* There were no assumptions provided by counsel.

Southwick's report was provided to Defendants' counsel, and discussed at his deposition, and its contents are incorporated herein (Defs' SJ Exh. K; Dkt. # 254-11).

If one has the proper capital and people, then opening five stores in 18 months is realistic. It depends on the people and the situation. SAUF 40. If there was the capital to open two stores, then the cash flow could be used to capitalize the remaining stores. Southwick used the analysis of 1500 square feet, a relatively small operation. Southwick felt $2.5 million was sufficient. *Id.* Reading SAA's

14

business plan, and knowing their contacts and background, Southwick opined it was reasonable that SAA had the knowledge and contacts to obtain financing. *Id.*

Southwick considered Chicago in 2010 a unique situation, and it made sense to move fast to become established, and it was not unreasonable to pursue the strategy as SAA wanted. SAUF 41. The market potential was significant. The business would need a combination of capital or good support from vendors and experience. *Id.*

Southwick concluded the net profit in the first twelve months would be 50% of the profit in subsequent months, based on examinations of retailers, retail surveys performed in the past, and the time it takes a retailer to come up to speed. Knowing initial start-up profit can vary by industry, opportunity and competition, and that an average market may require 12-18 months to turn a profit, but Southwick opined that the large demand and lack of competition in the City would make them turn a profit faster. SAUF 42. This is based on observing a wide range of retailers over a number of industries over years. *Id.* Southwick has been studying the firearms retail business closely for fifteen years, and does not recall any firearms retailer opening and failing in the first year. *Id.*

Southwick opined that SAA operations would have been typical or average compared to other regional firearm retailers. SAUF 43. While there may be the ability to do a lot more, the SAA business plan and deposition testimony struck Southwick as a typical firearms retailer. *Id.* But based on their experience within the industry, their contacts, and history, it was very reasonable to assume they

15

knew what a decent firearms business was all about. With their background, it would be reasonable to assume they could run a superior business, but it was not documented for Southwick to give them that type of credit within our analysis. So Southwick concluded that SAA would have run a business at least average, if not above average, versus average to below average. *Id.*

Southwick calculated two approaches to reaching his lost profit opinion. SAUF 44. Approach No. 1 pertains to the average firearm retailer anywhere in the country. *Id.* at 36:9-14. It was a bare-minimum estimate, and did not reflect the "unique opportunity that Chicago presented to a potential firearm retailer." *Id.*

For Approach No. 1, Southwick relied on data from the ██████████████ ███████████████████████████████, and used the data to estimate revenues, costs, and expenses for SAA. SAUF 45. Because one of the four factors considered to obtain average numbers was geographic region (Midwest), the numbers in Approach No. 1 are weighted towards the Midwest. *Id.* Southwick used 2017 data because NSSF did not have 2010-2014 data available. *Id.* Costs, estimates, and revenues would have fluctuated from 2011 to 2014. *Id.* However, the differences would be minor. *Id.* Southwick is still very confident in his numbers and results. *Id.* Sales were at the industry's all-time highs from 2009 through 2015, and peaking in 2015 and 2016. *Id.*

Fixed and variable costs are inherently built into the numbers Southwick used. SAUF 46. Southwick is not concerned about survivor bias because Southwick believes SAA had the experience, contacts, and backing to succeed. *Id.* Southwick

16

did not see expenses unique to Chicago versus other locations. *Id.* The numbers in the 2018 NSSF report overlap and track a study Southwick does for NSSF, which tracked trends over time, percentages, marketing, and hiring and employment. *Id.*

After calculating all the data for Approach No. 1, the conclusion of lost profits is $668,018.00. Southwick believes it is an underestimate because it is the expected profit for a firearms store anywhere in the Midwest, which does not take the significant opportunity in Chicago into account. SAUF 47. Approach No. 2 does take some of that into account, which is why Southwick does not recommend Approach No. 1. He is confident in the number for Approach No. 1, and that it is an extreme underestimate. *Id.* His confidence is 90% +/- 5% that $668,018.00 is going to be the result for someone opening a retail firearms store in the Midwest. *Id.* This is based on the sample size and the survey in the NSSF Report. *Id.*

Approach No. 2 explored other data sources to determine the value of the business opportunity. It uses the cost and expense estimates from Approach No. 1, but was a better, fairer characterization of the market opportunity compared to Approach No. 1. SAUF 48. The only thing different from Approach No. 1 is the method for estimating net sales. *Id.*

Approach No. 2 looks at the actual population within Chicago, the actual market itself instead of relying on this broader regional national picture. Southwick applied business analyst software where the data indicates the habits of people within specific neighborhoods, and can look at the overall market, and the expected consumer market for these products. And then they know how much such

17

consumers spend per year on firearms and accessories within the Chicago metro area.  SAUF 49.

The Business Analyst data includes census data, tax and property information, surveys from market research firms, business revenue and credit reporting.  SAUF 50.  They have data on the target-shooting and hunting markets, as well as those who purchase a firearm for protection but do not go to a range which was a small number.  *Id.*  That last number came from a 2015 consumer segmentation analysis and is based on national data.  *Id.*  He assumes the actual number is higher in Chicago, since there is no range for them to visit.  *Id.*

Then Southwick employed the Huff Model to account for competition, and the fact that people will generally go to a closer store for what they want.  SAUF 51.  The Huff Model shows the percentage of consumers within a zip code who would shop at a location, and the dollars spent.  *Id.*  For Southwick's analysis, they used the average attractiveness of all the firearm stores in the 40-mile radius based on revenue.  *Id.*  Any cannibalization effect of multiple stores would be offset during the period by the pent-up demand.  *Id.*  The theory of pent-up demand is that there were consumers who wanted a firearm but did not want to go to the suburbs to buy one.  *Id.*  It is not reflected because there is no data for it.  *Id.*  But basic economic theory states that there are people who would purchase in town if it were convenient to do so.  *Id.*

Approach No. 2 is superior, therefore, because it takes into account the local population and their interests.  It better reflects the unique market circumstances

that SAA had in Chicago. SAUF 52. Southwick is very and more confident in the lost profit number of $1,211,662.00 in Approach No. 2 than he is for the lost profit number of Approach No. 1 for these reasons. *Id.* This is based on his professional judgment, his studying the industry for years, and comparing both Approaches and their data sources. *Id.*

The ultimate lost profit opinion is conservative, for though there were surely marketplace spikes following the Supreme Court's *McDonald* opinion allowing handgun ownership in Chicago, and the passage of Illinois' Firearms Concealed Carry Act (430 ILCS 66/1, *et seq.*), the amounts could not be measured or assumed and so were not included. SAUF 53.

Southwick's opinions are to a reasonable degree of certainty in the field of economic lost profit analysis. SAUF 54. The methods he used are considered reliable methodologies among those practicing in his field. *Id.* Southwick reliably applied the facts and data to those methodologies as would be done by those in his field. *Id.* His data and methodologies are not affected by the fact that SAA did not open in 2015, because it does not change the opportunity from 2010 to 2014. *Id.* Southwick believes another economist using the same NSSF report and data would reach the same conclusions. *Id.*

At a minimum, Plaintiffs have shown enough of a reasonable certainly in Southwick's data and methods to qualify him as an expert to testify at trial. This case is not like *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005), where the purported expert did not rely on any data at all, and apparently

19

disdained it. *Id.* at 418. In contrast, Southwick applied standard economic methodologies to industry data derived from a variety of sources. In no way is his opinion based solely on "his expertise" or intuition. *See Zenith*, 395 F.3d at 418.

Southwick is entitled, under F.R.E. 703, to rely on Plaintiff's business plan and the deposition testimony of the witnesses, in addition to market and industry data, in formulating his opinions. Defendants were free to try and counter that evidence, but did not. If Defendants disagree with Plaintiff's testimony, they are still able at trial to engage in "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [which] are the traditional and appropriate means of attacking shaky but admissible evidence." *Floyd v. Hefner*, 556 F.Supp.2d 617, 639 (S.D.Tex. 2008) (citing *Daubert*, 509 U.S. at 596).

And though Defendants claim to be challenging his methodologies, they really are not. Nor are they really questioning his data about the firearms market in the Midwest and within a 40 mile radius of the 60614 zip code in 2010-2014.

Ultimately, they are challenging whether Plaintiff would have been able to open the business and be successful, as Southwick believes.

In *Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652 (7th Cir. 2000), which applied Arkansas law, the Court stated: "some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." *Id.* at 658. And Defendants are the wrongdoers in this case. The 2010 gun store ban was borne of the same mentality and desire to deny

constitutional rights as the range ban struck down in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), and the home handgun ban struck down in *McDonald*.

In *Target Mkt. Publ. v. ADVO, Inc.*, 136 F.3d 1139 (7th Cir. 1998) the damages expert relied on events that demonstrably had not occurred. *Id.* at 1144 (plaintiff had opportunity to make sales efforts into marketing zones but did not do so, and sales in market it did attempt to penetrate declined and were minimal). Here, due to the Defendants' constitutional violations, Plaintiff was never given the opportunity to sell an item that Chicagoans wanted. Defendants make much that Plaintiff's operations in the suburbs were small, but that is exactly why Plaintiff wanted to take advantage of the Chicago market. And he had experienced people working with him – both Tapkowski and Lajoy had decades of experience in firearms training and gunsmithing, respectively, plus Lajoy had spent decades in the retail firearms industry. Southwick based his opinions not only on the industry data, but on Tapkowski and Lajoy's experience and know-how.

Therefore, this case is also not like *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073 (N.D.Ill. 2018), where the Court found that what was "noticeably absent from either report is an analysis of established profits from a business analogous to [plaintiff]. *Id.* at 1086. The Court specifically noted that:

> The "new business rule" is not a hard-and-fast rule and the general rule may be overcome by sufficient evidence. *See*, *TAS Distrib.* [*Co. v. Cummins Engine Co.*], 491 F.3d [625, 633 (7th Cir. 2007)] (recognizing exceptions to the "new business rule"). For example, new businesses have successfully established lost profits by using historical data from similar franchise operations in similar locations, by using profits made by previous owners in

21

the same business, and by establishing a profit history based on
competitors' sales of the same product.

*Act II Jewelry*, 318 F. Supp. 3d at 1085-1086 (internal citations omitted).

In this case, Southwick backed up his conclusions with industry and market
data regarding actual sales figures of firearms dealers in the area. Defendants may
disagree with the data, but that is a weight, not admissibility, issue.

Further, the case of *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d
794 (N.D.Ill. 2005) is inapposite. In *Loeffel*, the Court noted that the expert's
"[a]nalysis itself has no textual elaboration or explanation, and the reader is left to
divine its meaning from the headings, captions, and the figures on its charts and
spreadsheets. A meaningful understanding can only be gained by reference to [he
expert's] deposition testimony." *Id.* at 798-99. This included the fact that the
expert apparently made up his own definition of "economic loss." *Id.* at 803. Here,
Southwick's report and analysis are traditional and clear, and while his deposition
expounds on his report, the testimony is not necessary to glean the report's
meaning. Unlike the expert in *Loeffel*, Southwick could "demonstrate the reliability
of the methodology." *Id.* at 800.

And contrary to Defendants' assertion, the *Loeffel* Court's concerns regarding
comparable businesses was that the comparators offered were clearly not
comparable. *Id.* at 813. And there was no information about the comparators
offered either in *Eleven Line, Inc. v. N. Texas State Soccer Ass'n*, 213 F.3d 198, 208-
09 (5th Cir. 2000), which was the problem cited in *Loeffel*.

Here, Southwick's data shows the close comparisons between SAA and the comparators. *See* Defs' SJ Exh. K at p.8-9; Dkt. # 254-11. Specifically, in Approach No. 1, Southwick reviewed actual sales data from firearms stores in the Midwest with a similar store size, community size, and type of business (brick & mortar FFL with no firing range), and then discounted for competition in the local area using the accepted Huff model. SAUF 51. For Approach 2, he added specific demographic data about the neighborhood where the store would be located, including interest and money spent on firearms and firearm accessories. SAUF 49, 52; SJ Exh. 20.

This distinguishes the instant case from *Smith v. Equilon Enters., LLC*, 2004 U.S. Dist. LEXIS 11917 (D.Md. 2004), where no other business has been successful in the area during the relevant timeframe. *Id.* at *3. Here, Southwick relied on sales data to show there were successful firearms businesses in the area. Rather than assuming SAA would be profitable (the problem in *Smith*, *see *4)*, Southwick's assumption was simply that SAA would have been able to open. Given the success of other firearms retailers within a 40 mile radius (SJ Exh. 23), the opinion from profits resulted not from Plaintiffs claiming they would have been successful, but from the market and Plaintiff's (and his team's) knowledge and experience in the firearms industry.

Defendants emphasize Southwick's conclusions as if they are outrageous. But Defendants have no witness or evidence to contradict Southwick's conclusions, data, or methodologies, and instead offer argument better suited for cross-

examination.  Therefore, other than Southwick's opinion, there is no countervailing opinion as to Plaintiff's lost profits.

## IV.   LASER SIGHTING DEVICES ARE PROTECTED BY THE SECOND AMENDMENT AND CANNOT BE PROHIBITED.

Defendant argues that an item – sometimes attached, sometimes built in - that makes one more accurate when needing to fire a gun in self-defense is a bad thing, and has banned them.  Plaintiff Second Amendment Arms wishes to sell laser sights, and Plaintiff Kole wishes to purchase and possess them.  The Defendants have offered no witnesses or evidence, except for a few random news articles where a laser sight may or may not have had anything to do with the shooting that was the subject of the story.  In any event, the laser sight was not the instrument that caused harm – it was the illegal act of murder by someone illegally discharging the firearm.  The laser sight, useful for self-defense purposes, is simply a scapegoat.

The City banned laser sights in 1999, before *Heller* and *McDonald*, codified at MCC § 8-20-060(a).  There was no analysis or consideration as to people's Second Amendment rights before banning them.  The impetus was apparently that gang members used them, but the larger problem was that gang members were using illegal firearms in the first place.  The laser sight ban was borne of the same mentality that spawned the firing range ban struck down in *Ezell,* and the home handgun ban struck down in *McDonald*.  Simply put, the Defendants cannot even offer a rational basis reason for enacting the ban, especially as they have no witnesses.

24

Sighting devices have been used on handguns and rifles for hundreds of years; only the technology has changed. Virtually all firearms include fixed iron sights, or little notches on the front and/or rear of the top of the forearm for aiming. Telescopic sights were invented between 1835 and 1840 by John Chapman and Morgan James. John R. Chapman, *The Improved American Rifle* (1844). The standard telescopic sights used during the Civil War were made by William Malcolm of Syracuse, NY in 1855 (http://www.scopesguide.com/malcolm-scope.html), and L.M. Amidon of Vermont. The first effective and practical refracting telescopic sight was invented by August Fiedler, then the forestry commissioner in Austria (http://www.shotmade.com/history-of-long-range-shooting-telescopic-sights/)

Laser sights are simply a modern technological improvement to something that has been aiding the aim of shooters since colonial times, and certainly since the time of the ratification of the Fourteenth Amendment. They are not accessories in the sense of silencers and barrel shrouds; they are an improvement (for many) to a standard feature that has been a part of any firearm since 1791.

In *United States v. Jones*, 132 S.Ct.945 (2012), the Supreme Court confronted the issue of whether placing a GPS tracking device on a vehicle for the police to track constituted a search under the Fourth Amendment. In ruling that it was a search, notwithstanding the fact that GPS devices obviously did not exist at the time of the framers, the Court looked to eighteenth century analogues for the GPS device:

25

> But in fact it posits a situation that is not far afield--a constable's concealing himself in the target's coach in order to track its movements. *Ibid*. There is no doubt that the information gained by that trespassory activity would be the product of an unlawful search--whether that information consisted of the conversations occurring in the coach, or of the destinations to which the coach traveled.

*Jones*, 132 S.Ct. at 950, fn.3.

This acknowledgement by the Supreme Court that the law must sometimes catch up with technology comports with the holding in *Heller* that weapons in common use are constitutionally protected (as opposed to only muskets) (*See Heller*, 554 U.S. at 627 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)) while the First Amendment protects many more forms of communication than quill pens and town criers.

Comparing this situation to the range ban in *Ezell*, that Court held: "the City has not come close to satisfying this [heightened scrutiny] standard. In the district court, the City presented no data or expert opinion to support the range ban, so we have no way to evaluate the seriousness of its claimed public-safety concerns. Indeed, on this record those concerns are entirely speculative and, in any event, can be addressed through sensible zoning and other appropriately tailored regulations." *Ezell*, 651 F.3d at 709. In particular, the Court noted that "the City produced no empirical evidence whatsoever." *Id.* So it is here.

The Defendants argue laser sights are not protected by the Second Amendment, and cite to *United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018). But *Cox* is distinguishable. First, silencers and laser sights are not the same. There is

26

no "original" colonial-era equivalent to a silencer, but as noted above, there have been sights on firearms, and with good reason, for hundreds of years. Despite Tony Kole's offhand characterization, a laser sight is not an accessory as much as it is an improvement on a standard feature. One cannot say the same about silencers. People will still be able to defend themselves with a firearm without a silencer. Without the ability to properly aim to the shooter's satisfaction, the Second Amendment guarantee erodes.

Further, a laser sight is in no way comparable to the assault weapons (or their particular features) discussed in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). A laser sight is not, by any stretch of the imagination, a "military-grade firearm," *Id.* at 411, nor does a firearm equipped with one become such a weapon. So Defendants' assertion that "[l]aser sights share all of the features of assault weapons" under *Friedman* is simply wrong. And it makes no difference that someone prefers not to use them; the fact is there are people who do, for whom a laser sight makes a necessary act of self-defense easier, and that should be the important factor, especially since Defendants have nothing to support their ban besides inflammatory news articles. Two of the Plaintiffs' witnesses testified about the usefulness of a laser sight with diminishing eyesight (SAUF 57, 64); all of the fact witnesses testified as to their usefulness generally. And since it is Defendants' burden to justify the ban, the Defendants have fallen woefully short.

And *Friedman* did not overrule the two-part Second Amendment analysis of *Ezell* (never mind that all three elements of *Friedman* were specifically rejected in

27

*Heller*). At most, *Friedman* applies only to the issue of assault weapons. *Friedman* did not even mention *Ezell*, and the two cases it did cite were both assault weapon and/or large capacity magazine cases. *Friedman*, 784 F.3d at 410 (citing *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011); *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)).

When *Ezell*'s two-step analysis is applied, it is clear that firearm sights, even in their most modern incarnation, are long-standing and protected by the Second Amendment, and that the Defendant has shown nothing to meet any standard of heightened scrutiny. The City argues about the "public sense of safety" cited in *Friedman*, but has not a shred of evidence that such a feeling exists in Chicago, where they are banned, or that there a sense of danger anywhere else in the state, where they are not. In essence, the Defendants are asking the Court to completely discard the Defendants' responsibility to prove the justification for an infringement with actual data and evidence, and simply rubber-stamp its wishes.

The City can regulate laser sights, but not ban them. The appropriate sentiment is expressed in *Illinois Retailers*: "the potential threat that some otherwise-legitimate businesses may break the law cannot justify the drastically overinclusive step of banning the entire category of legitimate businesses." *Illinois Retailers*, 961 F.Supp.2d at 940. "If the City is concerned about reducing criminal access to firearms, either through legitimate retail transactions or *via* thefts from gun stores, it may enact more appropriately tailored measures." *Illinois Retailers*, 961 F.Supp.2d at 946-47.

And though it is Defendants' job to draft ordinances, Plaintiffs offer that regulations prohibiting the use of laser sights during illegal shootings, or using them to assault or frighten, or prohibiting shining them at planes or moving vehicles, would be more targeted legislation that an outright that tramples on the rights of the law-abiding. For example, 720 ILCS 5/24.6-20(a) prohibits aiming a laser pointer at a peace officer. And 720 ILCS 5/12-29(c)(5) states that a person commits an aggravated assault when he "[k]nowingly and without lawful justification shines or flashes a laser gun sight or other laser device attached to a firearm, or used in concert with a firearm, so that the laser beam strikes near or in the immediate vicinity of any person." Since the City's concerns already are addressed through State law (except for illegal shootings, which obviously go far beyond laser sights), this ban on law-abiding citizens using a self-defense aid for lawful purposes is not only necessary, but unconstitutional as well.

There is no reason, compelling, substantial, or otherwise, to ban something that can better help a City resident in the effort of self-defense. At a minimum, there is no reason Second Amendment Arms cannot stock them to sell to non-Chicago residents, though that of course raises Fourteenth Amendment Equal Protection Clause concerns. In any circumstance, the Motion for Summary Judgment as to Count III should be denied.

V.     PLAINTIFFS' ILLINOIS CONSTITUTION CLAIMS THAT ARE
       EQUIVALENT TO THE FEDERAL CLAIMS ARE LIKEWISE
       MERITORIOUS.

Plaintiffs have limited the provisions of the Illinois Constitution under which they are bringing their challenges to Article I, Section 22 (State version of Second Amendment). *See* Dkt. # 185, ¶¶ 10-12 (also covering Article I, Section 2 at that time, but there is no comparable federal claim pending).

As to Article I, Section 22, and since "[t]o the extent that the rights guaranteed by the Illinois Constitution mirror the federal Bill of Rights, the Court's rulings on Plaintiffs' federal claims may well resolve some of these state law issues. Plaintiffs assert that Defendants are liable for violating Section 22 of the Illinois Constitution's Bill of Rights, the same as in Plaintiffs' Second Amendment claim in Counts I and III. Plaintiffs incorporate their arguments as to the Second Amendment as if fully restated herein. Based on those arguments, Defendant's Motion for summary judgment should be denied.

## CONCLUSION

WHEREFORE, the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, requests this Honorable Court to deny Defendant's F.R.Civ.P. 56(a) Motion for Summary Judgment in its entirety, and to grant Plaintiffs any and all further relief as this Court deems just and proper.

Dated: August 21, 2019                      Respectfully submitted,


                                   By:          /s/ David G. Sigale
                                          Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

31

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

      1.     On August 21, 2019, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

      2.     Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CMJECF participants in this matter.


                    /s/ David G. Sigale
                    Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com