## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a SECOND AMENDMENT ARMS, ROBERT M. ZIEMAN, SR., ICARRY, an unincorporated Association (and d/b/a of Shaun Kranish), SHAUN KRANISH, individually and d/b/a ICARRY, and TONY KOLE, | ) ) ) ) ) ) ) ) ) | Case No: 1:10-CV-4257 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Robert M. Dow, Jr. U.S. District Court Judge |
| CITY OF CHICAGO, a municipal corporation, RAHM EMANUEL, in his official capacity as Mayor of the City of Chicago, GARRY McCARTHY, Superintendent of Police of the City of Chicago, and SUSANA MENDOZA, City Clerk of the City of Chicago, | ) ) ) ) ) ) ) | Hon. Sheila M. Finnegan U.S. Magistrate Judge |
| Defendants. | ) ) | |

## PLAINTIFFS' L.R.56(b)(3)(C) STATEMENT OF ADDITIONAL UNDISPUTED FACTS

(TO BE FILED UNDER SEAL)

## PLAINTIFFS' L.R.56(b)(3)(C) STATEMENT OF ADDITIONAL UNDISPUTED FACTS

NOW COME the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, by and through undersigned counsel, and, pursuant to L.R. 56(b)(3)(C), submits their Statement of Additional Undisputed Facts in Response to Defendant's F.R.Civ.P. 56(a) Motion for Summary Judgment, and therefore states as follows:

## CHICAGO'S 2010 WEAPON DEALERS ORDINANCE

1.      As of July 2, 2010, Section 4-144-010 of the Municipal Code of Chicago ("MCC") prohibited one from engaging in the business of selling firearms in the City of Chicago (Ordinance) (Defs' SJ Exh. D; Dkt. # 254-4).

2.      As of July 2, 2010, MCC § 8-20-100 prohibited one from selling or otherwise transferring a firearm (except through inheritance) in the City of Chicago (E-mail from Kelly to Bender) (Defs' SJ Exh. D; Dkt. # 254-4)..

## SECOND AMENDMENT ARMS' PLANS AND EFFORTS TO OPEN AND OPERATE

3.      On July 2, 2010, R. Joseph Franzese d/b/a Second Amendment Arms ("SAA") filed Application #7270 for a business license to open a retail firearm store in the City of Chicago at 415 W. Armitage (Business Application).  He chose that location on the advice of his previous counsel, and because there was a sign on the front of the building that said the location was commercial space.  Franzese Dep. at 102:6-10, 18-24.

4.      Upon filing for said City of Chicago business license, Franzese then filed for a Federal Firearms License ("FFL"), which required a business address.

5.      Franzese eventually wished to open five SAA stores in the City, and three in the first year. Franzese Dep. at 11:2-6, 45:12-15.  The branding for SAA was going to be as the first legal firearms dealer in Chicago in decades.  Franzese Dep. at 59:1-4.  Building number five was going to be built out with a range and training facility.  Franzese Dep. at 236:21-22.

6.      Ideal locations would have been on the south side, north side, and lakefront, so that people would not have to travel an hour and a half to get to a store.  Lajoy Deposition at 14:7-23.

7.      Franzese was going to operate SAA with Joe Lajoy and Roman Tapkowski.  Franzese Dep. at 11:7-11.  Lajoy was to be the Chief Operating Officer, and Tapkowski the Chief Training Officer (Defs' SJ Exh. G; Dkt.# 254-7).

8.      Franzese assists in referring customers to Lajoy, who is an owner and manager of Lajoy Precision in Fox Lake, Illinois, a gunsmithing and firearm manufacturing business, as well as a firearm and archery instruction center.  *See* https://www.lajoyprecision.com/.  *See also* Franzese Dep. at 14:3-24; *See also* Lajoy deposition at 16:22 – 17:8.  A gunsmith is a trained professional in firearm repair, maintenance, and building.  Lajoy Dep. at 19:6-8.  Lajoy provides training and sells firearms, ammunition, holsters, gun cleaning equipment, targets, gun cases, parts, accessories, optics, optic accessories, and pretty much anything in the sporting goods industry.  *Id.* at 20:7-18.  He has had an FFL for six years.  *Id.* at 21-14-16.

3

He has a Class 07 FFL. *Id.* at 24:17-23. Lajoy has been in the gunsmithing
industry for 29 years. *Id.* at 22:20-23. He has been in the retail side of the
firearms industry since he was 21 years old. *Id.* at 78:9-11. He worked at Gun
World in Bensenville as the firearms instructor and sale manager, at Bass Pro Shop
in Gurnee as the assistant manager of the hunting department (gun department,
knife department, sales floor, range). *Id.* at 77:16 – 78:8. He guarantees he could
do his gunsmithing work at 415 W. Armitage without seeing the property in
advance. *Id.* at 29:5-18.

9.     Lajoy is also a certified NRA instructor for the pistol, rifle, shotgun,
personal protection, home and outdoor firearms safety. He is also a certified range
safety officer. He was one of the first Illinois concealed carry instructors, and is also
certified to teach that in Utah, Florida, and Wisconsin. Lajoy Dep. at 79:6-21.
There is no aspect of the firearms industry in which Lajoy does not have experience.
*Id.* at 81:15-17.

10.     Lajoy's experience would help him at SAA with logistics, planning,
customer service, and staffing. Lajoy Dep. at 83:14-22. It is also helpful for
marketing and displaying product, inventory purchasing, and analyzing sales
trends. *Id.* at 84:6-13. Lajoy stated Franzese knows how to bring people together,
how to build stuff, and while he may not know every aspect of the firearms
industry, he knows how to find people like Lajoy who does know all aspects. *Id.* at
85:8-23. Lajoy planned to run both SAA and Lajoy Precision, until SAA built a
range and then he would close Lajoy Precision and just work at SAA. *Id.* at 89:4-11.

4

11.     Lajoy obtained the NSSF market report for Franzese, which shows the concentration of people engaging in certain activities in around a given location and shows whether the location is good or not. Lajoy deposition at 31:22 - 32:11.  Lajoy has experience running a gun store and what will make it profitable.  Lajoy Dep. at 39:18 – 40:4.  They ordered the report in August, 2014 because they thought with the court order overturning the gun store ban in January, 2014, and the resulting gun store ordinance in July, 2014, they thought it would be a good time to get the work started.  Lajoy Dep. 63:12 – 64:14.  It would have been a waste of money prior to that.  *Id.* at 64:17-21.

12.     Lajoy believes the NSSF report showed a number of people in Chicago interested in shooting sports that that SAA would have been profitable.  Lajoy Dep. at 93:5-15.  The original plan was to open three stores first and then open two more within the next year or two.  *Id.* at 95:15-21.  Lajoy told Franzese they would discuss the specifics when they were able to move forward.  *Id.* at 96:11-19.

13.     Tapkowski was a Chicago Policer Officer for 32 years.  Tapkowski Dep. at 6:2-3.  He taught small arms in the Illinois National Guard in the 1970's.  *Id.* at 10-21-23.  He then was a firearms trainer from 2006-2017.  *Id.* at 11:1-14.  He taught basic security, private investigation, armed security, Illinois concealed carry, and tactical training. *Id.* at 17:6-16.  He has written several manuals regarding basic security, armed security, private investigation, concealed carry, and other subjects.  *Id.* at 11:22 – 12:3.  He wrote a Chicago Handgun Compliance course (*Id.* at 12:2-3), wrote the private security firearms courses for IDFPR (*Id.* at 12:8-14,

14:7-19), and wrote an Illinois concealed carry course (*Id.* at 12:15-18). He has one of the few, if not only, certified 40 hour State firearms certification courses. *Id.* at 90:2-13.

14.     Tapkowski is an Illinois concealed carry instructor, an NRA certified law enforcement handgun and shotgun instructor, an NRA certified range safety officer, and the range safety officer at the Conservation Club in Kenosha, Wisconsin. Tapkowski Dep. at 12:18 – 13:2.

15.     Tapkowski met Franzese in approximately 2008, and started talking about SAA in 2008 or 2009. Tapkowski Dep. at 47:4-11. Franzese asked Tapkowski if he wanted to teach at SAA. *Id.* at 47:16-19. Tapkowski said he was interested. *Id.* at 48:4-6. Franzese wanted to teach concealed carry and security-related courses, but they needed a location first. *Id.* at 49:17-21. Tapkowski has courses written, and PowerPoints, and books, and could go teach "tomorrow" if he has a place to teach. *Id.* at 50:1-9. If SAA opens, Tapkowski would still be interested in participating. *Id.* at 87:14-17.

16.     Franzese did not file a business license application for purposes of a lawsuit. He "wanted to be the guy" who wanted to work 15-20 years and "retire with a stable working business model that would be known region wide." Franzese Dep. at 101:2-12.

17.     Franzese previously had an FFL from 2008-2012, which was connected to SAA's previous locations in Deerfield and Lake Villa. Franzese Dep. 16:1-24, 19:2-11. The Deerfield location was at a friend's residence, and when the friend

moved, Franzese's accountant offered to share/segment space at his office. Though his rent at the Lake Villa address was far below normal ($100.00/month), he would have been able to rent other premises if needed. Franzese Dep. at 18:20-19:1, 29:15-24, 32:8-12, 33:12-24, 34:7-10.

18.     At the Lake Villa address, Franzese sold firearms and firearms accessories, but no ammunition or clothing. Franzese Dep. at 22:2-16. He would sell firearms, put the proceeds in his bank account, and fill out the paperwork required by federal law. Franzese Dep. at 56:7-16. He sold approximately 300 firearms while in Lake Villa. Franzese Dep. at 21:23-22:1. While he was waiting for Chicago to respond to his business license application, he was still operating SAA at the Lake Villa location. Franzese Dep. at 239:5-14.

19.     Franzese closed the Lake Villa location because his previous counsel advised him it would not be long before he could get a license in Chicago. Franzese Dep. at 20:2-5.

20.     Franzese never received a written denial of his Chicago business license application.   On one of his follow-up phone calls to the City, in approximately October, 2011, a woman told Franzese that his license was denied because the City does not allow gun stores. Declaration at par. 5. The City has no record that it notified Franzese in writing about the denial. (Correspondence from Aguiar to Sigale).

21.     Franzese was going to get inventory from the distributors listed in his business plan, and has used them in the past, but cannot contact them until he has

an FFL.  Defs' SJ Exh. G, Dkt. #254-7; Franzese Dep. at 145:17 – 146:4.  Nor can he, without an FFL, contact other vendors (*Id.* at 146:14-18) or contract outside ranges (*Id.* at 148:19-23).

22.     Based on Franzese's experience, with his FFL and either money or credit, there is no reason a distributor would not have sold to him.  Franzese Dep. at 237:13-17.

23.     Lajoy believes the business plan covers not only the generalities for opening a gun store, but also contains the specific plans for operating the store.  Lajoy Dep. at 69:5 – 70:2.

24.     Franzese plans to use video and audio recording, as well as point-of-sale photographs, to record gun sales at his locations.  Franzese Dep. at 42:5-10.

25.     To implement his business plans, Franzese was relying on a market report he commissioned (through Lajoy) from the National Shooting Sports Foundation ("NSSF").  Franzese Dep. at 70:11-17, 71:13-24, 184:13 – 185:4, 197:22 – 198:11.  He also planned on utilization of the Strategic Position and Action Evaluation (SPACE) Matrix, an aggressive marketing tool he has applied in his barber business.  *Id.* at 72:15-24 – 73:1-13, 20, 76:9-22.  *See also* http://www.differentiateyourbusiness.co.uk/space-analysis-strategic-position-and-action-evaluation-matrix (last checked August 19, 2019).  There was no need to create a specific plan because there was no need, as he could not get a business license.  *Id.* at 74:17-20, 75:6-15, 76:3-8.  He would casually speak to his former counsel, and people he met at gun shows, and communicate on the icarry.com forum

8

about locations for a Chicago gun store.  *Id.* at 78:13-80:17.  He wanted the various stores to resemble their neighborhoods.  *Id.* at 106:4-11.  He did not locate any other locations because for 18 months he heard nothing from the City.  *Id.* at 109:4-5.

26.     Tapkowski charged $250.00/person for a concealed carry class on his own; if he taught it through the College of Lake County he charged $299.00. Tapkowski Dep. at 26:19 – 27:1.  When concealed carry first started, he was generating $6,000.00/class per week.  *Id.* at 51:8-17.  In 2010, the security classes and basic firearm classes went for $100.00-125.00/person.  *Id.* at 52:9-17.  That would usually generate around $1,800.00/class with two to three classes per week. *Id.* at 53:2-16.  The best three profitable classes are concealed carry, armed security, and private investigation.  *Id.* at 60:10-18.  It would have been reasonable to expect 30-45 students per week at SAA.  *Id.* at 81:20 – 82:8.

27.     SAA was planning to offer classes in concealed carry (beginning in 2014), Firearms I and II (20 and 40 hour classes), private investigation, security, PERC certification, and planned to work with law enforcement.  Franzese Dep. at 87:13-14, 88:1-6.  Tapkowski was going to be the Chief Training Officer, and in charge of teaching the classes initially and then getting additional staffing for the classes.  Franzese Dep. at 92:3-11.

28.     The number of Chicago residents taking firearms classes increased in 2010 due to the Chicago Firearms Permit requirement.  Tapkowski Dep. at 97:8 – 99:20.  Tapkowski would have taught those classes at SAA had it been allowed to open.  *Id.* at 99:21 – 100:3.

29.     The firearms business has increased greatly since 2008, which is when the United States Supreme Court ruled there is an individual right to own a firearm for self-defense (554 U.S. 570 (2008)), and when President Obama was elected. *See* https://www.forbes.com/sites/frankminiter/2016/04/12/the-gun-industry-says-it-has-grown-158-since-obama-took-office/#2ee3093e7f4e (last checked August 19, 2019); See also https://www.washingtonpost.com/news/the-fix/wp/2015/03/11/barack-obama-may-have-been-at-least-a-9-billion-boon-to-the-gun-industry-so-far/ (last checked August 19, 2019).

30.     After eighteen months, BATFE denied Franzese's FFL application because he did not have a Chicago business license or address. Franzese Dep. at 13:1-13. Franzese stopped doing business as SAA in 2012. Franzese Dep. at 13:15-17.

31.     Franzese is claiming lost profits as a result of being prohibited from opening his stores. Franzese Dep. at 44:13-15. He would rely on experts for projections of those lost profits. Franzese Dep. at 95:14-18. He also had a business plan, which was his only written documentation of expected revenues. *See* SAA Business Plan (Defs' SJ Exh. G, Dkt. #254-7). He wrote it to take to a bank, but never did as there was no need to do so. Franzese Dep. at 122:4-11. He estimated he wanted $2.5 million for initial stock and staffing, and would also open lines of credit with manufacturers. Franzese Dep. at 137:13 – 138:4. He planned to obtain it from the bank. Franzese Dep. at 140:19-22.

32.     Franzese still plans to submit business license applications for five SAA locations in different areas of Chicago.  Franzese Dep. at 37:12-22, 39:15-19. He has not done so while still in litigation.  Franzese Dep. at 37:24-38:12.

33.     Even in 2015, when someone else tried to open a gun store in Chicago, it was blocked by the local Alderman.

https://www.dnainfo.com/chicago/20160120/river-west/chicagos-first-gun-shop-eyes-other-locations-after-alderman-says-no-way/ (last checked August 19, 2019).  This occurrence has deterred Franzese from attempting to open at least until this litigation is concluded.  Franzese Dep. at 165:15 - 166:21; 168:3-10, 169:7-9.

## ROBERT SOUTHWICK

34.     Robert Southwick, is the owner, as well as in charge of management and specialty research, of Southwick Associates in Fernandina Beach, Florida, Southwick Dep. at 5:12-20.  He performs market research and economic research specializing in outdoor activities – primarily hunting, target shooting, sport fishing, boating, and similar activities.  *Id.* at 5:21 – 6:3.  He received a B.S. in Economics from the University of Florida in 1988, and studied topics like sample biases, sampling errors, confidence intervals, margins of error, and progression analysis. *Id.* at 8:7 – 9:3.  He started Southwick Associates in 1990.  *Id.* at 9:18-20, and before that worked for the sport fishing industry as an economist.  *Id.* at 9:23-24.

35.     Southwick has conducted lost profits analyses in the past, usually in breach of contract matters for products or services, or in land encroachment that caused loss of business.  *Id.* at 6:23 – 7:16.

11

36.     Southwick was asked to opine as to the amount of lost profits by SAA if they had been able to operate from 2010-2014.  Southwick Dep. at 11:24 – 12:3.

37.     Southwick opined that Franzese lost $1,211,622 in profits from 2010-2014 for not being allowed to open his planned five stores of Second Amendment Arms in the City of Chicago, referring to page 15 of his report.  Southwick Dep. 12:8-12.

38.     In calculating this amount, Southwick used existing data sources available to him on operating statistics for firearm retailers across the United States.  Southwick has statistics on hunting, target shooting participation.  He also has data and statistics on sales and commerce related to people buying firearms for protection purposes plus accessories.  Southwick Dep. 13:15-23.  Then, he used standard statistical analysis, everything from running large datasets and software programs, such as R or SPSS, to Excel spreadsheets.  Standard statistical analyses were used.  *Id.* at 14:1-8.  Southwick ran the methodologies and content; sometimes he had assistants run data inquiries under his direction.  *Id.* at 15:10 – 16:7.  There were no assumptions provided by counsel.  *Id.* at 16:22-24.

39.     Southwick's report was provided to Defendants' counsel, and discussed at his deposition, and its contents are incorporated herein (Defs' SJ Exh. K; Dkt. # 254-11).

40.     If one has the proper capital and people, then opening five stores in 18 months is realistic.  It depends on the people and the situation.  Southwick Dep. at 17:7-16.  If there was the capital to open two stores, then the cash flow could be

used to capitalize the remaining stores. Southwick used the analysis of 1500 square feet, a relatively small operation. They felt $2.5 million was sufficient. *Id.* at 18:19 − 19:7. Reading SAA's business plan, and knowing their contacts and background, it was reasonable that SAA had the knowledge and contacts to obtain financing. *Id.* at 19:13 − 20:24.

41.     Southwick considered Chicago in 2010 a unique situation, and it made sense to move fast to become established, and it was not unreasonable to pursue the strategy as SAA wanted. Southwick Dep. at 21:12-20. The market potential was significant. *Id.* at 22:12-16. The business would need a combination of capital or good support from vendors and experience. *Id.* at 22:17-21.

42.     Southwick concluded the net profit in the first twelve months would be 50% of the profit in subsequent months, based on examinations of retailers, retail surveys performed in the past, and the time it takes a retailer to come up to speed. Knowing initial start-up profit can vary by industry, opportunity and competition, and that an average market may require 12-18 months to turn a profit, but Southwick opined that the large demand and lack of competition in the City would make them turn a profit faster. Southwick Dep. at 24:1-14, 27:9-11. This is based on observing a wide range of retailers over a number of industries over years. *Id.* at 25:3-5. Southwick has been studying the firearms retail business closely for fifteen years, and does not recall any firearms retailer opening and failing in the first year. *Id.* at 30:15-21.

43.     Southwick opined that SAA operations would have been typical or average compared to other regional firearm retailers.  Southwick Dep. 32:14-19. While there may be the ability to do a lot more, the SAA business plan and deposition testimony struck Southwick as a typical firearms retailer. Southwick Dep. at 33:1-7.  But based on their experience within the industry, their contacts, and history, it was very reasonable to assume they knew what a decent firearms business was all about.  With their background, it would be reasonable to assume they could run a superior business, but it was not documented for Southwick to give them that type of credit within our analysis.  So Southwick concluded, in reading the information, that SAA would have run a business at least average, if not above average, versus average to below average.  *Id.* at 33:12 – 34:14.

44.     Southwick calculated two approaches to reaching his lost profit opinion.  Southwick Dep. at 36:5-6.  Approach No. 1 pertains to the average firearm retailer anywhere in the country.  *Id.* at 36:9-14.  It was a bare-minimum estimate, and did not reflect the "unique opportunity that Chicago presented to a potential firearm retailer." *Id.* at 36:19-23.

45.     For Approach No. 1, Southwick relied on data from the ███████ ████████████████████████, which has national average data, and used the data to estimate revenues, costs, and expenses for SAA.  Southwick Dep. at 37:20 – 38:2.  Because one of the four factors considered to obtain average numbers was geographic region (Midwest), the numbers in Approach No. 1 are weighted towards the Midwest.  *Id.* at 41:5-13.  Southwick used 2017 data because NSSF did not have

14

2010-2014 data available. *Id.* at 38:21 – 39:4. Costs, estimates, and revenues would have fluctuated from 2011 to 2014. *Id.* at 39:14-17. However, the differences would be minor. *Id.* at 70:6-10. Southwick is still very confident in his numbers and results. *Id.* at 40:12-14. Sales were at the industry's all-time highs from 2009 through 2015, and peaking in 2015 and 2016. *Id.* at 71:11-17.

46. Fixed and variable costs are inherently built into the numbers Southwick used. Southwick Dep. at 43:1-5. Southwick is not concerned about survivor bias because Southwick believes SAA had the experience, contacts, and backing to succeed. *Id.* at 46:5-14. Southwick did not see expenses unique to Chicago versus other locations. *Id.* at 48:4-6, 49:6-11, 49:21-23, 50:2-5. There was no data to do a regression analysis, and it would have been inaccurate because it would have had to go back prior to 2009 when the firearms retail market was significantly different. *Id.* at 54:18 – 55:1, 55:16 – 56:10. The numbers in the 2018 NSSF report overlap and track a study Southwick does for NSSF, which tracked trends over time, percentages, marketing, and hiring and employment. *Id.* at 59:14 – 61:2.

47. After calculating all the data for Approach No. 1, the conclusion of lost profits is $668,018.00. Southwick believes it is an underestimate because it is the expected profit for a firearms store anywhere in the Midwest, which does not take the significant opportunity in Chicago into account. Southwick Dep. at 66:19 – 67:19. Approach No. 2 does take some of that into account, which is why Southwick does not recommend Approach No. 1. He is confident in the number for Approach

15

No. 1, and that it is an extreme underestimate.  *Id.* at 68:3-9.  His confidence is 90%
+/- 5% that $668,018.00 is going to be the result for someone opening a retail
firearms store in the Midwest.  *Id.* at 68:15-23.  This is based on the sample size and
███████████████████████████.  *Id.* at 69:8-10.

48.    Approach No. 2 explored other data sources to determine the value of
the business opportunity.  It uses the cost and expense estimates from Approach
No. 1, but was a better, fairer characterization of the market opportunity compared
to Approach No. 1.  Southwick Dep. at 37:5-19.  The only thing different from
Approach No. 1 is the method for estimating net sales.  *Id.* at 76:4-11.

49.    Approach No. 2 looks at the actual population within Chicago, the
actual market itself instead of relying on this broader regional national picture.
Southwick applied business analyst software where the data indicates the habits of
people within specific neighborhoods, and can look at the overall market, and the
expected consumer market for these products.  And then they know how much such
consumers spend per year on firearms and accessories within the Chicago metro
area.  Southwick Dep. at 76:14 – 78:12.

50.    The Business Analyst data includes census data, tax and property
information, surveys from market research firms, business revenue and credit
reporting.  *Id.* at 80:6 – 81:8.  They have data on the target-shooting and hunting
markets, as well as those who purchase a firearm for protection but do not go to a
range which was a small number.  *Id.* at 84:1-8.  That last number came from a
2015 consumer segmentation analysis and is based on national data.  Southwick

16

Dep. at 87:11-23. He assumes the actual number is higher in Chicago, since there is no range for them to visit. *Id.* at 88:11-23.

51. Then Southwick employed the Huff Model to account for competition, and the fact that people will generally go to a closer store for what they want. Southwick Dep. at 78:13 – 79:13, 91:12 – 94:19. The Huff Model shows the percentage of consumers within a zip code who would shop at a location, and the dollars spent. *Id.* at 95:17-22. For Southwick's analysis, they used the average attractiveness of all the firearm stores in the 40-mile radius based on revenue. *Id.* at 97:15 – 98:9. Any cannibalization effect of multiple stores would be offset during the period by the pent-up demand. *Id.* at 105:1-9. The theory of pent-up demand is that there were consumers who wanted a firearm but did not want to go to the suburbs to buy one. *Id.* at 106:19-23. It is not reflected because there is no data for it. *Id.* at 106:9-16. But basic economic theory states that there are people who would purchase in town if it were convenient to do so. *Id.* at 108:10-18.

52. Approach No. 2 is superior, therefore, because it takes into account the local population and their interests. It better reflects the unique market circumstances that SAA had in Chicago. Southwick Dep. 79:11 – 80:5. Southwick is very and more confident in the lost profit number of $1,211,662.00 in Approach No. 2 than he is for the lost profit number of Approach No. 1 for these reasons. *Id.* at 122:18-24. This is based on his professional judgment, his studying the industry for years, and comparing both Approaches and their data sources. *Id.* at 124:6-11.

17

53. The ultimate lost profit opinion is conservative, for though there were surely marketplace spikes following the Supreme Court's opinion allowing handgun ownership in Chicago (*McDonald v. City of Chicago*, 561 U.S. 742 (2010)), and the passage of Illinois' Firearms Concealed Carry Act (430 ILCS 66/1, *et seq.*), the amounts could not be measured or assumed and so were not included. Southwick Dep. at 127:11-13.

54. Southwick's opinions are to a reasonable degree of certainty in the field of economic lost profit analysis. Southwick Dep. at 124:20 – 125:8. The methods he used are considered reliable methodologies among those practicing in his field. *Id.* at 128:10-15. Southwick reliably applied the facts and data to those methodologies as would be done by those in his field. *Id.* at 128:16-20. His data and methodologies are not affected by the fact that SAA did not open in 2015, because it does not change the opportunity from 2010 to 2014. *Id.* at 128:21 – 130:3. Southwick believes another economist using the same NSSF report and data would reach the same conclusions. Southwick Dep. at 75:21 – 76:18.

## LASER SIGHTS

55. Laser sights are "essential" because "they offer a good line of intimidation," a "definite first shot and no friendly fire frame for a first shooter." Franzese Dep. at 228:7-17. It does not affect aim and accuracy – it shows the shooter where the bullet is going to land. Franzese Dep. at 232:1-6. Franzese planned to sell them at his stores. *Id.* at 232:20-23.

18

56.     When a law-abiding person is using a laser sight on her firearm, there is no harm to accuracy, or the shooter's ability to use the firearm competently or safely.  Franzese Dep. at 240:17-23.  If a bad guy has a firearm with a laser sight to commit a crime, the bigger danger is from having an illegal firearm.  Franzese Dep. 244:3-9.

57.     Lajoy installs laser sights as part of his gunsmithing work.  Lajoy Dep. at 40:21 – 41:10.  It is for target acquisition, and helps to make sure the gun is sighted and on target.  *Id.* at 42:13-18.  It is easier to hit a target at a known distance with a laser sight.  *Id.* at 43:5-7.  This is especially true for aging shooters with diminishing eyesight.  *Id.* at 70:21 – 71:8.  As an instructor, Lajoy also uses lasers as a diagnostic tool.  *Id.* at 71:10-15.  There is also a large deterrent effect to a threat when using a laser.  *Id.* at 71:16 - 72:12.

58.     Lajoy knows of no other city that bans laser sights.  There is no reason in his mind why laser sights should be banned.  Lajoy Dep. at 73:17-18.  He is aware of no data from anywhere that the use of a laser sight by a law-abiding person causes a danger or harm to public safety.  *Id.* at 74:4-9.

59.     If you have a laser sight on your firearm and you are awoken by an intruder, you can get the laser on the target without having to use the sights in the dark.  Tapkowski Dep. at 69:17-23.  There are scenarios when a shooter is more comfortable with a laser sight, and where a laser sight may have a homeowner save her own life.  *Id.* at 102:11-21.  An intruder facing a laser sight may also run and thus remove the need for a self-defense shooting.  *Id.* at 103:2-8.

19

60.     Tapkowski sees no reason why someone who feels more comfortable using a laser sight should be barred from using them.  Tapkowski Dep. 105:7-15.

61.     Tony Kole is interested in purchasing and possessing laser sights in the City of Chicago.  Kole Dep. at 9:18-24.  Kole is an elevator mechanic, and frequently in Chicago (three days per week), Cook County, and the suburbs.  *Id.* at 10:18-24, 11:3-6.  Kole has also worked in the firearms industry, as a store owner in Norridge which was mostly online but also with a brick and mortar office.  *Id.* at 11:7-18.  Kole is also a certified NRA pistol instructor and Illinois concealed carry instructor.  *Id.* at 11:20-22.

62.     He owns between 15-20 firearms, and has one laser sight which is attached to one of the firearms but is interchangeable among most of the others.  Kole Dep. at 12:3-22.  He is looking to purchase another laser sight, and would like to do it in Chicago because he spends a lot of time there during the week.  *Id.* at 15:5-16.  Kole can get them on the Internet, but appreciates the instant gratification (*Id.* at 15:17 – 16:1), and if the one he has breaks he would like to just replace it right away (*Id.* at 16:7-17).  Plus he appreciates the tactile experience of getting them right away and in person.  *Id.* at 16:19-23.

63.     Kole is allowed to carry a firearm on the job unless the work location prohibits it.  Kole Dep. at 18:9-17.  He does so if able.  *Id.* at 18:22 – 19:1.  If allowed, he would have a laser sight on his concealed carry pistol to aid with self-defense.  *Id.* at 39:6-13.

64.     A laser sight is to help accuracy, and does not diminish skill with using iron sights, so using one does not degrade the fundamental skill of aiming and shooting without one.  Kole Dep. at 25:21 – 26:5.  A laser sight also allows one to maintain a point of aim on an attacker while maintaining situational awareness, such as body language, movement of others, *etc... Id.* at 26:13 – 27:8.  A laser sight allows one to overcome the loss of fine motor skills caused by stress, adrenaline, and an increased heart rate, and maintain control of the aim of the firearm.  *Id.* at 26:23 – 27:21.  It also aids with diminishing eyesight and in the dark.  *Id.* at 40:5-20, 41:14 – 42:12.

65.     If in a self-defense situation, Kole would feel more comfortable having a laser sight on his firearm in order to successfully defend himself.  Kole Dep. at 30:7-13.  This is true even though he has trained such that he could defend himself without one if necessary.  *Id.* at 31:8-10.  If you are in a self-defense situation, you want to have every tool available to defend yourself as safely, easily, and effortlessly as possible.  *Id.* at 33:15-19.  A laser sight makes a defender more effective.  *Id.* at 34:8-11.  It could also serve as a deterrent and end the situation with the attacker fleeing, which is preferable to shooting.  *Id.* at 43:2 – 44:5.

66.     Kole does not see a scenario where a law-abiding person with a properly-used laser sight is a danger to people or to public safety.  Kole Dep. at 44:13-20.

21

WHEREFORE, the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, requests this Honorable Court to deny Defendants' F.R.Civ.P. 56(a) Motion for Summary Judgment in its entirety, as well as any and all further relief as this Court deems just and proper.

Dated: August 21, 2019                          Respectfully submitted,


                                    By: _____/s/ David G. Sigale_____
                                           Attorney for Plaintiff


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

22

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

1.      On August 21, 2019, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

2.      Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                        /s/ David G. Sigale
                                Attorney for Plaintiffs



David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

23