IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a SECOND AMENDMENT ARMS, ROBERT M. ZIEMAN, SR., ICARRY, an unincorporated Association (and d/b/a of Shaun Kranish), SHAUN KRANISH, individually and d/b/a ICARRY, and TONY KOLE, | ) ) ) ) ) ) ) ) | Case No: 1:10-CV-4257 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Hon. Robert M. Dow, Jr. U.S. District Court Judge |
| CITY OF CHICAGO, a municipal corporation, RAHM EMANUEL, in his official capacity as Mayor of the City of Chicago, GARRY McCARTHY, Superintendent of Police of the City of Chicago, and SUSANA MENDOZA, City Clerk of the City of Chicago, | ) ) ) ) ) ) ) ) | Hon. Sheila M. Finnegan U.S. Magistrate Judge |
| Defendants. | ) ) | |

PLAINTIFFS' RESPONSE TO DEFENDANTS'
L.R.56.1(a)(3) STATEMENT OF UNDISPUTED FACTS

(TO BE FILED UNDER SEAL)

<u>**PLAINTIFFS' RESPONSE TO DEFENDANTS'**</u>
<u>**L.R.56.1(a)(3) STATEMENT OF UNDISPUTED FACTS**</u>

NOW COME the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, by and through undersigned counsel, and, for their Response to Defendant's F.R.Civ.P. 56.1(a)(3) Statement of Undisputed Facts, states as follows:

**I.    Parties**

1.    Plaintiff R. Joseph Franzese is a resident of Hainesville, Illinois, a town located approximately 40 miles outside of Chicago. Deposition of R. Joseph Franzese ("Franzese Dep.") (attached hereto as Ex. A) 6:13-19.

<u>**RESPONSE:**</u>        Admit.


2.    Plaintiff Second Amendment Arms ("SAA") is Franzese's "doing business as" company. Compl. ¶ 2. SAA operated from approximately 2008 or 2009 until sometime in 2011, 2012, or 2013, first in unincorporated Deerfield, Illinois, and then, in Lake Villa, Illinois. Plaintiffs' Answers to Defendants' Third Set of Interrogatories to Plaintiffs ("Pls.' Resp. to Interrog.") (attached hereto as Ex. B) No. 4; Franzese Dep. 16:10-18, 17:10-18:7. 62:1 3-20.

<u>**RESPONSE:**</u>        Admit.

2

3.      Plaintiff Tony Kole is a resident of Arlington Heights, Illinois. Deposition of Tony Kole ("Kole Dep.") (attached hereto as Ex. C) 4:10-13.

**RESPONSE:**      Admit.


4.      Defendant City is a municipal entity organized under the Constitution and laws of the State of Illinois. Compl. ¶ 5; Defendants' Answer to Plaintiffs' Fourth Amended Complaint ("Defs.' Answer"), Dkt. 190 ¶ 5.

**RESPONSE:**      Admit.


5.      The other Defendants are City officials purportedly sued in their official capacities. Defendant Lori Lightfoot is the City's Mayor. Mayor Lightfoot replaced former Mayor Rahm Emanuel, who was named as a defendant in his official capacity. Compi. ¶ 6. Defendant Eddie Johnson is the City's Superintendent of the Chicago Police Department. Superintendent Johnson replaced former Superintendent Garry McCarthy, who was named as a defendant in his official capacity. Id. ¶ 7. Defendant Anna Valencia is the Clerk of the City of Chicago. Clerk Valencia replaced former Clerk Susana Mendoza, who was named as a defendant in her official capacity. Id. ¶ 8.

**RESPONSE:**      Admit.

3

## II.    Jurisdiction and Venue

6.    Plaintiffs raise claims under the Second Amendment of the United States Constitution, and accordingly, this Court has subject-matter jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983.

**RESPONSE:**    Admit.


7.    The City of Chicago is located within the Northern District of Illinois of the United States District Court, and accordingly, venue is proper under 28 U.S.C. § 1391.

**RESPONSE:**    Admit.


## III.    Undisputed Material Facts

**Second Amendment Arms**

8.    On July 2, 2010, the City Council enacted an ordinance (the "2010 Ordinance") that, among other things, prohibited the sale or transfer of firearms within the City of Chicago, effective on July 12, 2010. *See* July 2, 2010 Journal of the Proceedings of the City Council (attached hereto as Ex. D) at 96235, 96265.

**RESPONSE:**    Admit.


9.    On June 25, 2014, the City Council repealed the 2010 Ordinance and enacted a new ordinance (the "2014 Ordinance"), effective immediately upon enactment, that permits the sale of firearms subject to certain restrictions. *See* June

4

25, 2014 Journal of the Proceedings of the City Council (attached hereto as Ex. E) at 83727, 83760.

**RESPONSE:**       Admit.


10.       On July 2, 2010, Franzese submitted an application for SAA to sell firearms at 415 West Armitage Avenue, Floor 1, Chicago, Illinois 60614. The zoning classification for that property address did not and does not permit business or retail uses, either as of right or as a special use. See Dkt. 204-2 ¶¶ 10-12 Dkt. 215-10 ¶¶ 10-12. Franzese has not submitted any subsequent applications for business licenses to operate a gun store within the City of Chicago. Franzese Dep. 36:16-37:10.

**RESPONSE:**       Admit, though Plaintiff was never denied on the basis of zoning, and never actually received a written denial at all.  Had Plaintiff been informed of the zoning issue, he would have submitted a different address, though the application would still have been denied due to the 2010 Ordinance. *See* Declaration of R. Joseph Franzese, dated May 16, 2017; e-mail from Rose Kelly to Judith Bender dated January 31, 2011; correspondence from William Macy Aguiar to David G. Sigale.


11.       At the time Franzese submitted his application for a business license, he had never visited the property at 415 West Armitage, spoken with the property owner about leasing the property, or inquired with the property's management

5

service to see whether a retail operation would be permitted on site. Franzese Dep. 103:8-104:8, 104:19-21, 105:3-7. Franzese's lawyer at the time was the person who suggested to Franzese that he should use the 415 West Armitage address on his application. *Id.* at 102:6-10.

**RESPONSE:**　　　Admit, though Plaintiff was never denied on the basis of zoning, and never actually received a written denial at all.  Had Plaintiff been informed of the zoning issue, he would have submitted a different address, though the application would still have been denied due to the 2010 Ordinance. *See* Declaration of R. Joseph Franzese, dated May 16, 2017; e-mail from Rose Kelly to Judith Bender dated January 31, 2011; correspondence from William Macy Aguiar to David G. Sigale.

　　　12.　　　Franzese is a self-employed barber. Franzese Dep. 222:21.

**RESPONSE:**　　　Admit.

　　　13.　　　Franzese began doing business as Second Amendment Arms in 2008 or 2009 by selling firearms out of a friend's home in unincorporated Deerfield, Illinois. Pls.' Resp. to Interrog. No. 4; Franzese Dep. 15:23-16:1, 16:10-14, 18:20-19:1. When his friend moved sometime in late 2009, Franzese began selling firearms out of a space in his accountant's office in Lake Villa, Illinois. Franzese Dep. 16:15-18, 17:10-14, 31:19-32:12, 33:4-21. The total area of the office space in Lake Villa that was used for SAA was approximately 300 square feet. Id. at 34:13-15. Franzese

6

ceased operation of SAA at the Lake Villa location sometime in 2011, 2012, or 2013. *Id.* 17:10-18:7,62:13-20; Pls.' Resp. to Interrog. No. 4.

**RESPONSE:**       Admit.

14.       Franzese referred to the gun store he operated in Lake Villa as a "mom and pop" shop. Franzese Dep. 58:21. He did not employ any staff at the Lake Villa store. *Id.* at 36:10-12. He did not keep a written budget for the Lake Villa store. *Id.* at 52:10-53:1. Apart from a "couple little [advertising] events," Franzese relied largely on "word of mouth" or "peer-to-peer" communication to generate business for SAA. *Id.* at 155:22-157:12. His expenses at the Lake Villa location consisted of a $25 business permit, $100 per month in rent, and the costs of some furniture, a safe, a security door, and the construction of two walls in his office. Id. at 33:4-11.

**RESPONSE:**       Admit, except that his accountant did the books and the tax returns.  Franzese Dep. at 53:2-7.

15.       Franzese estimates that SAA sold approximately 300 guns in total from the Lake Villa store. Franzese Dep. 21:23-22:1, 49:18-20. He possesses no documentation of SAA's sales and accounts or of the Lake Villa store's operation that would establish that SAA was a profitable business. *Id.* at 25:7-12; 26:4-9. He could not provide an approximation of his Lake Villa business's annual profits. *Id.* at 49:14-17. Apart from tax returns reflecting aggregate amounts of sales revenue,

7

Franzese possesses no documentation at all concerning the operation of the Lake

Villa store. *Id.* at 26:10-13.

**RESPONSE:**     Admit.


16.     ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████     Franzese Dep. 219:12-20, 221:5-222:3.

**RESPONSE:**     Admit that the tax documents indicate that.


17.     Franzese maintains that SAA would have opened five gun stores in

Chicago between 2010 and 2014 if he had been permitted to do so under City law.

Franzese Dep. 10:23-11:6.

**RESPONSE:**     Admit.


18.     In May 2011. Franzese completed a document he refers to as a

"business plan" for SAA. *See* SAA Business Plan (attached hereto as Ex. G);

Franzese Dep. 115:23-116:5. ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████

██████████████████████████████

█████████████████████████

███████████████████████████████

███████████████████████████████

████████████ *Id.* at 5.

**RESPONSE:**      Admit.


19. ███████████████████████████

██████████████████████████████

███████████████████████████████

███████████████████

**RESPONSE:**      Admit.


20. ██████████████████████████

███████████████████████████████

██████████████████████████████

████████████████████ He has never showed

the business plan to any bank or other potential investor, *id.* at 141:11-15, he has

never talked to any banks about financing a Chicago firearm business, *id.* at 141:18-

21, and no bank has ever told Franzese that his business model would result in a profitable business, *id.* at 212:14-18.

**RESPONSE:**    Admit.

21.    Franzese has not looked into the cost of construction, insurance, or real estate in connection with opening a gun store within the City of Chicago. *Id.* 100:8-20. He acknowledges that his gun operation in Chicago would require multiple employees and a payroll, but he has not calculated what SAA's weekly payroll would be. *Id.* at 147:2-148:1. And he has not contacted any suppliers to discuss providing inventory for a store in the City of Chicago has not entered into contracts to purchase inventory for any Chicago stores; and has not engaged in any negotiations with gun vendors to provide inventory for any Chicago stores. *Id.* at 146:5-18.

**RESPONSE:**    Admit, though Franzese cannot discuss or purchase inventory without an FFL, which he cannot get without a Chicago business license. And there was no point to Franzese looking into insurance or real estate or staffing while the Chicago ordinance prohibited him from 2010-2014 to obtaining a business license or opening a store. *See* 2010 Ordinance, e-mail from Rose Kelly to Judith Bender.

22.    Franzese says that he would have pursued a "general aggressive [marketing] strategy" for SAA, but he did not create a specific plan for how he would implement that general strategy in practice. Franzese Dep. 74:11-24.

**RESPONSE:**        Admit, though there was no point to Franzese looking into aggressive marketing strategies while the Chicago ordinance prohibited him from 2010-2014 to obtaining a business license or opening a store. *See* 2010 Ordinance, e-mail from Rose Kelly to Judith Bender.

23.    Apart from the address on Armitage Avenue listed on SAA's initial application for a City business license, Plaintiffs have not identified any specific addresses for the five stores Franzese says SAA would open. Franzese Dep. 38:7-9. Franzese is also not sure where he would live if he were to operate gun stores in Chicago. *Id.* at 59:23-60:11.

**RESPONSE:**        Admit, though there was no point to Franzese looking into real estate for multiple locations while the Chicago ordinance prohibited him from 2010-2014 to obtaining a business license or opening a store. *See* 2010 Ordinance, e-mail from Rose Kelly to Judith Bender

24.    Both LaJoy and Tapkowski testified during their depositions that they had never seen SAA's business plan. Deposition of Joseph LaJoy ("LaJoy Dep.") (attached hereto as Ex. H) 23:20-24); Deposition of Roman Tapkowski ("Tapkowski Dep.") (attached hereto as Ex. I) 88:5-14. LaJoy does not recall any specific conversations with Franzese about how the SAA stores would be operated. LaJoy Dep. 12:14-13:22. LaJoy understood that he would run the gunsmithing operation at SAA, *id.* at 24:9-13, but he has never created a budget for that operation and

11

could only speculate about how many employees he would hire or what he would
pay them, *id.* at 26:13-27:4. LaJoy operates his own gunsmithing business in the
suburban Chicago area, *id.* at 16:21-17:1. 17:7-8. The business has no employees,
and LaJoy admits that he has been operating the business "in the red," *id.* at 17:9-
10, 92:11-18.

**RESPONSE:**        Deny.  Lajoy ordered the NSSF marketing report at Franzese's
request, and talked of inventory and multiple locations.  Lajoy Dep. at 12:21 –
14:11.   Lajoy said he would hire 2-3 employees per location, and pay around
$15.00/hour based on experience.  *Id.* at 26:13-19.  Further, Lajoy is only operating
in the red since all the money gets reinvested back into the business.  *Id.* at 46:14-
16.


        25.    Tapkowski understood that Franzese wanted him to teach classes for
SAA, Tapkowski Dep. 47:16-19. but Tapkowski never had conversations with
Franzese about how many hours he would work, how much he would be paid, or
which courses would be offered. *Id.* at 48:11-18, 49:10-15. And he "couldn't even
begin to guess" how many students SAA's stores would have attracted for the
classes they intended to offer. *Id.* at 54:19-23.

**RESPONSE:**        Admit the first sentence, though there was no point to Franzese
looking into classes, marketing, or staffing while the Chicago ordinance prohibited
him from 2010-2014 from obtaining a business license or opening a store.  *See* 2010
Ordinance, e-mail from Rose Kelly to Judith Bender.  Further, there were no

12

discussions because the choice would be Tapkowski's, though he knew Franzese

wanted concealed carry and security-related courses.  Tapkowski Dep. at 49:10-21.

 

26.     Over the course of this lawsuit, Plaintiffs have claimed varying

amounts of profits that SAA would have earned from the period between 2010 and

2015. Franzese, during his deposition, said that he would have opened three stores

in the year 2010 and estimated that each of those three stores would have earned

$150,000 in profit for that year. Franzese Dep. 45:3-6. In response to an

interrogatory, Plaintiffs projected that SAA would earn $20,000 to $30,000 per week

in gross revenues for the first six months of business in 2010, $40,000 per week in

gross revenues for the following six months, and over $29 million in total gross

revenues through the end of 2015. Pls.' Resp. to Interrog. No. 6. Plaintiffs' now-

withdrawn damages expert in this case, Miles Hall, projected that SAA would have

made over $37 million in profits from 2011 to 2014. Expert Report of Miles Hall

(attached hereto as Ex. J) at 3. Plaintiffs' most recent damages expert, Robert

Southwick, estimates profits of $668,018 from 2011 to 2014 based on one projection

approach, and profits of $1,211,662 over that time period based on a different

projection approach. Expert Report of Robert Southwick (attached hereto as Ex. K)

at 10, 14.

**RESPONSE:**     Franzese testified he would rely on the experts for his lost profit

calculations.  Franzese Dep. at 81:5-12, 82:8-13, 95:14-18.  Plaintiffs admit that they

initially disclosed an expert witness on the issue of Plaintiff's lost profit damages

(Hall), and then immediately withdrew him as an expert once flaws in his methodologies and conclusions came to light. Defendants are well aware that Plaintiff is not relying on, or claiming the amounts offered in, that expert's conclusion. With leave of this Court, Plaintiff disclosed a second expert (Southwick) on whose methodologies and conclusions Plaintiff is relying, and whose conclusions are unchallenged by any other witness in this matter. Southwick discussed in his report and deposition, two separate analytic models, and then explained why the second model, on which he ultimately stood, provided the better analysis. *See* Southwick Report at p.15; Southwick Dep. 79:11 – 80:5. Again, Southwick's conclusion is unchallenged by any other witness.

**Laser Sights**

27.    Tony Kole is interested in purchasing and possessing laser-sight accessories within the City of Chicago. Kole Dep. 9:8-24.

**RESPONSE:**        Admit.

28.    The Chicago Tribune reported on January 11, 1999 that Chicago Police Officer John C. Knight was shot and killed by a gang member who used a handgun equipped with a laser scope. *See* John Chase, "Man Charged with Murder in Cop's Death," Chicago Tribune, Jan. 11, 1999, available at

http://www.chicagotribune.com/news/ct-xpm- 1 999-01-11-9901130074- story.html

(attached hereto as Ex. L) at 1.[1]

**RESPONSE:**     Admit.  Further, even assuming the article is accurate, Plaintiffs object to its relevance pursuant to *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D.Ill. 2014).  Plaintiffs also object to the characterization that even if the article is accurate, that Plaintiffs would commit such wrongdoing, or would otherwise engage in wrongdoing while operating a lawful business or engaging in lawful Second Amendment activity.


29.     On March 10, 1999, the City Council passed an ordinance prohibiting the sale, purchase, and possession of "laser sight accessories," which the ordinance defined as "laser sighting device[s] which [are] either integrated into a firearm or capable of being attached to a firearm." March 10, 1999 Journal of the Proceedings of the City Council ("Laser Sight Ordinance") (attached hereto as Ex. M) at 91067- 91068, 91071.

**RESPONSE:**     Admit.

---

[1] The Court may take judicial notice of the newspaper articles Defendants cite. *See, e.g.*, *Specht v. Google Inc.*, 758 F. Supp. 2d 570, 586 (N.D. Ill. 2010), *judgment entered*, No. 09 C 2572, 2011 WL 4737179 (N.D. Ill. Oct. 6, 2011), and *aff'd* 747 F.3d 929 (7th Cir. 2014).

30. The Laser Sight Ordinance contained the following finding: "WHEREAS, The City of Chicago finds that the public health and safety of its citizens, most particularly its police officers, are being endangered by the use of laser sights[.]" Laser Sight Ordinance at 91067.

**RESPONSE:**     Admit.

31. On April 8, 1996, the Chicago Tribune reported that Chicago-area gangs were going "high tech" by using laser-sight accessories on firearms. Lori Lessner, "Gangs Go High Tech by Using Laser Gun Sights," Chicago Tribune, Apr. 8, 1996, available at http://www.chicagotribune.com/news/ct-xpm-1996-04-08-9604080181-story.html (attached hereto as Ex. N) at 1. The article reported that laser sights were "one of the latest additions to the criminal arsenal," and that a laser sight "attaches to a gun and can turn a novice into a marksman." *Id.*

**RESPONSE:**     Admit, though in the article Master Sgt. Marc Maton of the Elgin-based North Central Narcotics Task Force stated that without a laser sight: "Generally, it's just point, pull and pray." Further, even assuming the article is accurate, Plaintiffs object to its relevance pursuant to *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D.Ill. 2014). Plaintiffs also object to the characterization that even if the article is accurate, that Plaintiffs would commit such wrongdoing, or would otherwise engage

16

in wrongdoing while operating a lawful business or engaging in lawful Second Amendment activity.

32.     A firearm may be sold with a laser sight already integrated, or a laser sight may be attached to a firearm by means, for example, of a firearm's "accessory rail." Kole Dep. 14:811. When turned on. a laser-sighting device emits a laser that creates a colored dot so that when the firearm is aimed at the target, the dot appears on the target. Tapkowski Dep. 65:9-66:4.

**RESPONSE:**        Admit.

33.     All standard firearms have iron sights. Kole Dep. 26:13-16. A firearm will still function if its laser-sight component is broken or removed. Franzese Dep. 232:11-19. Kole explained that a laser sight is "an accessory. So it's not a fundamental part of the design of the firearm and that fundamental design is the iron sights." Kole Dep. 32:6-10. If his laser were to fail, Kole says he would "have something to revert to." *Id.* at 32:10-12. If the laser sight on his firearm were broken, Kole says he would "absolutely" still be able to defend himself if necessary. Id. at 31:3-8.

**RESPONSE:**        Admit, though Kole testified that proper use of a laser sight is an aid to self-defense and would endanger people or the public in any way.  Kole Dep. at 39:1-13, 44:13-20.

17

34.    Tapkowski is a former police officer with years of experience teaching firearm training. Tapkowski Dep. 6:2-3: 10:18-1 3:2. It is his opinion that it is "just as easy to use your [iron] sights" as it is to use a laser sight, *id.* at 68:24-69:2, and he teaches his students that it is better to learn how to fire a gun "the right way," using iron sights, than to rely on a laser sight, *Id.* at 69:2-9.

**RESPONSE:**    Admit, though Tapkowski also stated he saw no reason for them to be banned, as used lawfully they are not a danger to the public.  Tapkowski Dep. at 105:7-15.


35.    Since the enactment of the Laser Sight Ordinance in 1999, multiple news articles concerning mass-shooting tragedies—including the recent 2019 shooting in Aurora, Illinois, the 2018 shooting during a video game tournament in Jacksonville, and the 2009 Fort Hood shooting—have reported that the shooters used firearms equipped with laser sights to carry out their attacks. *See* Chuck Goudie & Christine Tressel, "Aurora Shooter Gary Martin Ignored Gun Card Revocation", ABC 7 Chicago, Feb. 18. 2019, available at https://abc7chicago.com/aurorashooter-ary-martin-hmored-gun-card-revocation-/5144404/  (attached hereto as Ex. 0) at 3; Marco della Cava & Kevin Johnson, "Jacksonville Killer Stalked Victims with 2 Handguns, Laser Sight," USA Today, Aug. 27, 2018, available at https://www.usatoday.com/story/news/2018/08/27/jacksonville-killer-stalked-victims-2- handguns-laser-sight/1113893002/  (attached hereto as Ex. P) at 1; Brian Todd,

18

"Attorney: Court Hearing for Fort Hood Suspect to be Held in Hospital," CNN, Nov. 20, 2009, available at

www.cnn.com/2009/CRIME/11/20/fort.hood.hearing/index.html# (attached hereto as Ex. Q) at 1.

**RESPONSE:** Admit. However, even assuming the articles are accurate, Plaintiffs object to their relevance pursuant to *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D.Ill. 2014). Plaintiffs also object to the characterization that even if the articles are accurate, that Plaintiffs would commit such wrongdoing, or would otherwise engage in wrongdoing while operating a lawful business or engaging in lawful Second Amendment activity.

36. On October 23, 2018. the Chicago Tribune reported that two individuals were shot—and one of them, a two-year-old boy, was killed—by a gang member firing a gun equipped with a laser sight. Megan Crepeau, "Prosecutor: 2-Year-Old Boy Killed After Gang Leader Gives Order to Shoot: 'Bust, Bust, Bust'," Chicago Tribune, Oct. 23, 2018, available at

http://www.chicagotribune.com/news/breaking/ct-met-arrest-boy-killed-20181022-story.html (attached hereto as Ex. R) at 1-2, 4.

**RESPONSE:** Admit. However, even assuming the article is accurate, Plaintiffs object to its relevance pursuant to *District of Columbia v. Heller*, 554 U.S.

19

570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) and *Illinois Association of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D.Ill. 2014). Plaintiffs also object to the characterization that even if the article is accurate, that Plaintiffs would commit such wrongdoing, or would otherwise engage in wrongdoing while operating a lawful business or engaging in lawful Second Amendment activity.

WHEREFORE, the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, requests this Honorable Court to deny the Defendants' F.R.Civ.P. 56(a) Motion for Summary Judgment in its entirety, as well as any and all further relief as this Court deems just and proper.

Dated: August 21, 2019                     Respectfully submitted,


                              By: _____ /s/ David G. Sigale _____
                                        Attorney for Plaintiff


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

    1.    On August 21, 2019, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

    2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                         /s/ David G. Sigale
                                         Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

## CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING

The undersigned certifies that:

     1.    On October 11, 2019, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

     2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CMJECF participants in this matter.


                     /s/ David G. Sigale
                     Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
799 Roosevelt Road, Suite 207
Glen Ellyn, IL 60137
630.452.4547
dsigale@sigalelaw.com

1