Page 1

          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

SECOND AMENDMENT ARMS          )
(A D/B/A OF R. JOSEPH FRANZESE) )
R. JOSEPH FRANZESE, individually )
and d/b/a SECOND AMENDMENT ARMS, )
ROBERT M. ZIEMAN, SR., ICARRY an )
unincorporated Association (and )
d/b/a of Shaun Kranish) SHAUN   )No. 1:10-CV-4257
KRANISH, individually and d/b/a )
ICARRY, AND TONY KOLE,          )
                                )
            Plaintiffs,         )Hon. Robert M.
                                )Dow, Jr.
            - vs -              )U.S. District
                                )Court Judge
CITY OF CHICAGO, a municipal    )
corporation, RAHM EMANUEL, in his)
official capacity as Mayor of the)Hon. Sheila M.
City of Chicago, GARRY McCARTHY, )Finnegan
Superintendent of Police of the )U.S. Magistrate
City of Chicago, and SUSANA     )Judge
MENDOZA, City Clerk of the City )
of Chicago,                     )
                                )
                                )
            Defendants.         )

          The Discovery Deposition of

            ROMAN S. TAPKOWSKI,

taken in the above-entitled cause, before BERNA

DAVIS, a Certified Shorthand Reporter in the State

of Illinois, taken at City of Chicago, Department

of Law, Suite 1230, 30 North LaSalle Street,

Chicago, Illinois, 60602, on the 30th day of May,

A.D., 2018, commencing at approximately 1:04 p.m.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 6

1   **firearms?**

2        A    No.   I was a Chicago police officer for

3   32 years.   You don't do 32 years without being

4   accused of something.

5        **Q    So the cases where you were a party you**

6   **were, like, a defendant?**

7        A    Or someone else was.   Someone else there

8   I worked with.

9             MR. TRESNOWSKI:   Okay.   I'm not sure how

10  long it's been since you were last deposed, so

11  I'll just run over some quick ground rules.

12             I'll be asking you a series of

13  questions.   You're under oath just like you would

14  be at trial.   If you don't know the answer to a

15  question that's okay.   If you don't understand a

16  question I'm asking, let me know so that I can try

17  to rephrase it to help you understand it.

18             Try to answer orally to the

19  questions.   If you nod or shake your head the

20  court reporter won't be able to note that.

21             Also, for the court reporter's

22  sake, we should try not to interrupt or talk over

23  each other, to try to take turns speaking.

24             We can take a break at any time,

ROAMN S. TAPKOWSKI
May 30, 2018

Page 10

1      A    That's correct.

2      Q    And then Number 4 on the next page says

3    your name, your address, and says that you may be

4    testifying about your experience with firearms and

5    firearm education and training, experience working

6    with Franzese, and planned involvement with SAA,

7    and knowledge regarding laser sights.  Is that

8    correct?

9      A    That's correct.

10      Q    So I just want to ask you some

11    questions --

12      A    Sure.

13      Q    -- about those subjects.

14      A    Sure.

15      Q    Can you talk about your experience in

16    firearm education and training?

17      A    How far back do you want to go?

18      Q    Let's talk about, first of all, how long

19    have you been teaching firearm classes or training

20    classes?

21      A    Let's take that to the early '70s with

22    the Illinois National Guard.  I was a small arms

23    instructor for the 933rd MP Company.

24              Then we get back into training.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 11

1    And in probably 2006, when I taught security

2    related courses, including armed security at

3    Truman College.  And I was working at that time

4    for -- I'm trying to think of the name of Steve's

5    company.  It'll come to me.

6                    We worked there until 2008, when

7    Truman scrapped the security program, the entire

8    program.  So we found ourselves without work.

9    And, at the same time, the College of Lake County

10   reached out to us because they found themselves

11   without an instructor when their guy died.  So we

12   just moved lock, stock, and barrel over to the

13   College of Lake County.  And that's where I had

14   been teaching until last year.  Steve died a few

15   years ago.

16                    And experience in teaching, all

17   right.  Let's -- okay.

18                    I was an Illinois --

19       Q    Can I just ask what you're reading from?

20       A    Yeah.  That's my telephone, if you want

21   to see that.

22                    Okay.  This is in one of the

23   manuals.  I've written several manuals having to

24   do with basic security, armed security, private

ROAMN S. TAPKOWSKI
May 30, 2018

Page 12

1   investigation, concealed carry, and what have you.

2   In fact, I even wrote a Chicago Handgun Compliance

3   course.

4              And this is just from, like, the

5   third page in, because I like to let my students

6   know where I'm coming from so that they're not

7   wondering, you know, who the hell is this guy.  So

8   I let them know.  I was an Illinois law

9   enforcement training and standards instructor for

10  Use of Force and IDFPR, you know.  Okay.

11  Registered firearm instructor, and my number is on

12  here, 263 triple 0 379.  And I wrote the IDFPR

13  firearms course.  It's -- okay.  That was for

14  private security.

15             And I also wrote the Illinois

16  Concealed Carry course.  That one is entitled,

17  Handgun Fundamentals.  The number on that one is

18  CCC 13A0638.  And I am still a registered -- or,

19  actually, this is a certified instructor with

20  them.  And my number is CCT13B, like in boy, 091.

21  Also, I am -- I was a NRA certified law

22  enforcement handgun and shotgun instructor.  I

23  took that course in 2008.  And I'm currently an

24  NRA certified range safety officer, and I'm also a

ROAMN S. TAPKOWSKI
May 30, 2018

Page 13

1   range safety officer at the Conservation Club of

2   Kenosha County in Wisconsin, Bristole Ranges.

3                   So that kind of sums up what I

4   did or what have you.  And I can give you a copy

5   of that if you need it, not today but --

6        Q    **That would be great.**

7        A    -- somewhere down the road.

8        Q    **That would be great.**

9             MR. SIGALE:  Tell you what, if you

10  screen shot and you send it to me I can forward it

11  to them.

12            THE WITNESS:  That's wonderful.  You

13  know how to do that?

14            MR. McNULTY:  We can do that later.

15            MR. SIGALE:  After the dep we'll screen

16  shot, and you'll email it over to me and then I'll

17  get it to you guys.

18            THE WITNESS:  Okay.

19  BY MR. TRESNOWSKI:

20       Q    **When you say that you wrote a course --**

21       A    Yes.

22       Q    **-- what do you mean by that?**

23       A    Okay.  And we're looking at which type

24  of course?  We have several courses here.  So as

ROAMN S. TAPKOWSKI
May 30, 2018

Page 14

1   far as basic security --

2            MR. SIGALE:  Well, hold on.  Which

3   course are you talking about?

4            MR. TRESNOWSKI:  You know what, you

5   mentioned I think two courses that you had

6   written.

7            THE WITNESS:  We'll start with basic

8   security.  I'm sure you're not totally interested

9   in what goes on there.  Then there was a private

10  investigation course.  These two are the basics,

11  you know, the steppingstones to get to an armed

12  security course.

13                  And then the one that you would

14  be interested in is the armed security course,

15  which applies to both of the other two.  Either

16  side -- either one of those people, if they want

17  to carry a gun while they're working, they have to

18  take that course and get certified.  And I'm the

19  one that does that.

20      Q     And the requirement to take these

21  courses comes from State law?

22      A     Yeah, under the Private Detective Act.

23  It's a elongated thing.  It's private detective,

24  private security, locksmith, this, that, and the

ROAMN S. TAPKOWSKI
May 30, 2018

Page 17

1    **individual classes, but like, you know, a**

2    **concealed carry --**

3         A    Basic security --

4         **Q    -- course --**

5                        **Basic security is one?**

6         A    -- I taught.  I've also taught private

7    investigation.  I have taught armed security,

8    which is a 20-hour course, and then the concealed

9    carry course, which is a 16-hour course.  And then

10   I have also taught --

11                   And there's really no manual for

12   the tactical courses.  What I do with a tactical

13   course is, we're going to go out on the range,

14   we're going to see what you know, what you don't

15   know, and we're going to determine where you

16   belong then.  And we're going to slowly move up.

17                   And by the time I'm through with

18   that, then you should be able to move on to the

19   next phase which is, one of our major guys going

20   out there with (indecipherable).  One that was

21   involved with GTR and another one -- I can't think

22   of the other names right now.  But those are the

23   people that pick up on these people to take them

24   to further training.  If they don't have enough

ROAMN S. TAPKOWSKI
May 30, 2018

Page 26

1    was 299.

2        Q    And for all these classes it's easier to

3    go through the college to attract a large number

4    of students; correct?

5        A    Yes.  It was much easier.  We could get

6    larger groups, plus we have large classrooms

7    there.  The audiovisual system, the firearms

8    training simulator.  There's a lot of good things

9    there.

10       Q    Just to complete this, how much would

11   you charge for your tactical courses, tactical

12   training courses?

13       A    Generally those are by the day -- the

14   dates that you're attending.  It was put together

15   as a -- about a 22-piece program that people were

16   taught two sections of it per time at the range.

17   So we would go into the range for a two-hour

18   session.  And the first hour they're going to

19   be -- well, we run them through certain safety

20   things to make sure that they're competent enough

21   to get out on the range.  And then we take them

22   the first hour on one particular issue that we're

23   going to deal with, then we switch up and the next

24   issue in the next hour.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 27

```
 1                    So we're going to deal with two
 2    different things, drawing from a concealed
 3    position, what are you going to do in a close-up
 4    position such as, you know, touching your target.
 5    So that you're this far away from a person
 6    (demonstrating) and drawing your firearm and
 7    doing -- all different kinds of things; the
 8    flashlight drills.
 9                    The laser, I didn't incorporate
10    the laser drill there, but if anybody brought a
11    laser we'd certainly work with it.  And those went
12    roughly $60 a session, and one session would be
13    two hours.  So it would be $60, but you're going
14    to be doing that 11 times, you know, so.
15        Q    You could do it 11 times or you could
16    just do one session if that's what you wanted;
17    correct?  Or was it normal for someone to sign
18    up --
19        A    You have 22 different things that are
20    happening, you know, that you could learn.  And we
21    were going to package together two each so that
22    you're not bored, you're not doing the same thing
23    for two hours.  I got them out there doing one
24    thing.  We could do a refresher at any time, you
```

ROAMN S. TAPKOWSKI
May 30, 2018

Page 47

1    he took my private detective course, and he took

2    my armed security course, and I believe he took my

3    concealed carry course.

4        **Q    How long have you known him?**

5        A    Well, I started teaching in Truman at --

6    in 2008, so it was somewhere after that that I met

7    him -- or the CLC, not Truman.  Truman was 2006.

8        **Q    And when did Mr. Franzese first talk to**

9    **you about opening a gun store in Chicago?**

10       A    I don't know.  2008, 2009, something.

11   He mentioned it when -- after one of the classes.

12       **Q    How many conversations have you had with**

13   **him about his gun store in Chicago?**

14       A    A handful, less than 10.

15       **Q    Less than 10.**

16                   **Did he ask you if you wanted to**

17   **participate in the store?**

18       A    He asked me if I would teach classes for

19   his entity.

20       **Q    Do you have any notes from your**

21   **conversations with him --**

22       A    No.

23       **Q    -- regarding the Chicago gun store?**

24       A    No.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 48

1      Q    Did you ever email with him about the
2  gun store in Chicago?
3      A    No.
4      Q    You told him you were interested in
5  participating in the Chicago store?
6      A    Yes, I did.
7      Q    Were you planning on working there
8  full-time once the store was up and running?
9      A    Well, they had to get the store up and
10  running.
11      Q    So you never got into conversations
12  about how many hours a week you would work there;
13  correct?
14      A    No.  We never got that far.
15      Q    And how much did you expect to be paid
16  for your work with the gun store in Chicago?
17      A    I didn't really put an expectation on
18  it.
19      Q    Would you have started working there
20  without an agreement about how much you would be
21  paid?
22      A    Sure.
23      Q    Have you ever started working at a job
24  without an agreement about how much you would be

ROAMN S. TAPKOWSKI
May 30, 2018

Page 49

1   **paid?**

2      A    To tell you the truth, I don't know --

3              Yeah.  I did once.  In high

4   school I was working as a busboy for Columbia

5   Yacht Club.  And the manager asked me to come in

6   and take care of the Yacht Club for him for a

7   weekend because nobody was going to be there and

8   the place was going to be closed.  And I didn't

9   make an agreement with him.  I should have.

10      **Q    Did you have any conversations with**

11  **Mr. Franzese about which courses would be offered**

12  **at the store in Chicago?**

13      A    No.  It's my understanding that the

14   choice of curriculum would be mine of what we were

15   going to put on it.

16      **Q    But you didn't?**

17      A    Well, I know he wanted to offer

18   concealed carry and he was interested in any of

19   the security related courses.  But we couldn't

20   proceed with any of that until he had some kind of

21   authorization to do this, until he had a location.

22             I'm not going to just, yes, at

23   what we're going to do.  Let's take a look and see

24   how it's starting out.  And once we had -- we were

ROAMN S. TAPKOWSKI
May 30, 2018

Page 50

1   moving in that direction I told him I would be

2   happy to sit down and talk to him at any time.  I

3   could go on a moment's notice.  I have these

4   courses written, I have PowerPoints, I have books.

5   I have everything that's necessary to make this

6   thing run.  I can be up and running tomorrow.  I

7   can be teaching classes tomorrow.  So that part

8   didn't bother me as long as he had someplace for

9   me to go and teach.

10      **Q     Did you ever discuss any specific**

11  **locations for the store with Mr. Franzese?**

12      A     The only location I tried to steer him

13  into is the Union Stock Yards, because that's

14  about as close to city center as you can get with

15  a large amount of land, and plenty of vacant

16  buildings, and plenty of parking.  Everything he

17  needed was there.

18      **Q     So apart from the general area of the**

19  **Union Stock Yards, you never discussed any**

20  **specific addresses --**

21      A     No.

22      **Q     -- or properties with Mr. Franzese?**

23      A     No.

24      **Q     By the end of the first year of the**

L.A. Court Reporters, L.L.C.
312-419-9292

ROAMN S. TAPKOWSKI
May 30, 2018

Page 51

1    **Chicago gun store's operation, how much revenue**

2    **would you expect to be taking in as a company from**

3    **classes on a weekly basis?**

4            MR. SIGALE:  Object as to foundation and

5    speculation.

6                    But to the extent you can

7    answer.

8            THE WITNESS:  It would depend on the

9    classes.  They were moving much better when

10   concealed carry first started.  And some of my

11   classes -- and that's one class -- I would

12   generate $6,000.  So if I'm doing two classes

13   we're talking 12,000 and if there is three classes

14   we're talking 18,000 a week.

15   BY MR. TRESNOWSKI:

16       **Q    Per week?**

17       A    Sure.  I wouldn't teach all three, not

18   all of it.  I would work with another instructor.

19   There are some physical limitations here, you

20   know, like lunch or dinner, and a nap maybe at my

21   age.

22       **Q    You were basing that estimate off of**

23   **concealed carry classes?**

24       A    Right.  That is off of concealed carry

ROAMN S. TAPKOWSKI
May 30, 2018

Page 52

 1    classes.  The security classes would be smaller.

 2        **Q    And concealed carry did not become**

 3    **authorized in Illinois until 2013; is that**

 4    **correct?**

 5        A    2013, right.

 6        **Q    So you wouldn't be offering concealed**

 7    **carry class in 2010 or 2011?**

 8        A    No.  2010 would be probably -- it

 9    wouldn't be concealed carry classes, you would

10    probably be dealing with any of the security

11    classes and a basic firearms class.  And something

12    like that, it would probably go for 100 or 100 and

13    a quarter for a class like that.  Because you're

14    talking about roughly a five-hour class, and

15    you're running pretty much along the lines of the

16    NRA basic pistol class, although I took that class

17    and rewrote it.  So I've got it the way that I

18    like it.

19        **Q    So I was talking about the first year of**

20    **operation for the gun store in the city, so we're**

21    **talking maybe earlier 2010.  So let's assume that**

22    **concealed carry isn't on the books, because it**

23    **wasn't.**

24        A    Right.  It wasn't concealed carry in

ROAMN S. TAPKOWSKI
May 30, 2018

Page 53

1   those days, but in those days people were taking

2   the basic course.  And I remember the numbers

3   being anywhere from 10 people to about 15 or so

4   per class.  And so what's that?  That's -- you're

5   looking at 1,200 at 10 people, and about $1,800

6   for 15.

7        Q    **$1,800?**

8        A    Is my math good here?

9        Q    **So you are $1,800 for 15 people?**

10       A    So if you round that down to about 12

11  people, 13 people, you come up with a $1,500

12  number.

13       Q    **And you said three classes.  So 15 times**

14  **3, that's 4,500.**

15       A    That could have been.  It could have

16  worked that way if you generate enough people.

17  Again, it's like herding cats.  You've got people

18  that want it in the evening, you've got people

19  that want it on the weekend.  But the weekend

20  people want it with a Friday finishing Sunday,

21  while others want it without the Friday finishing

22  on Sunday.  So, you know, you try to get enough

23  people together in each class to make that

24  worthwhile.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 60

1   That would be nice to do.

2               So, you know, once we're good to

3   go, I can be in there and, you know, I can start

4   teaching tomorrow.  Let me get in there and get my

5   gear set up, you know.  If you don't have a

6   screen, I have one.  If you don't have a projector

7   I have one.  I have a computer.  I have all this

8   stuff.  We can operate -- you know, we can get

9   started tomorrow.

10      **Q    Before you started you would want to**

11  **have a conversation about which courses you would**

12  **be offering; correct?**

13      A    Right.  I think that the most money

14  would probably be from concealed carry courses.

15  Concealed carry and armed security --

16               Armed security, yeah.  That one

17  and private investigation, those are the three top

18  money makers.

19      **Q    And before you start you would also want**

20  **to make sure you have the necessary equipment for**

21  **your classes; correct?**

22      A    Sure.  It would be nice to have a range,

23  a place to actually shoot, you know.  Something

24  that's -- we're not worried about any rounds

ROAMN S. TAPKOWSKI
May 30, 2018

Page 69

1        A     Because it's just as easy to use your

2    sights.  A lot of people don't like sights, they

3    want to do this the easy way.  And I don't want

4    them to do it the easy way, do it the right way.

5    This is what you should be doing.  Then if you

6    want to go easier with lasers it might be a little

7    bit easier to do.  But right now I would like you

8    to hold the sights correctly, do it the right way,

9    you know.

10                    There are tips and tricks that

11   come with this stuff.  And, you know, I've got an

12   assortment of them to give these people.

13       **Q     So why do people use lasers if it's just**

14   **as easy to use your sights?**

15       A     Because it's neat on TV.  Darkness would

16   be another thing.  If you're -- you wake up and

17   you're disoriented in your house, or you just come

18   up from a sound sleep, there is something moving

19   around in your house, you go for your gun.  You

20   get to your bedroom door and you're seeing

21   something, you can put that laser on something and

22   know you're going to hit them without seeing the

23   sights.  You may not even be able to see your

24   sights, you know.  How dark is it in your house?

ROAMN S. TAPKOWSKI
May 30, 2018

Page 81

1    to a class.  And there were two of us teaching

2    that class.

3         **Q    And how many classes were being offered**

4    **per week?**

5         A    There was only one per week.  That's all

6    that was offered.  And there were two of us

7    teaching them, like I said.

8         **Q    So if there were more classes, do you**

9    **think you'd be able to get 15 --**

10        A    It's possible --

11        **Q    -- per class?**

12        A    -- because there was another instructor

13   going on at that time.  At the time we were there

14   he was teaching an NRA course.  And I don't know

15   which NRA course he was teaching, but he was

16   teaching in another part of the store.

17                    We had classrooms on one end,

18   there were classrooms on the other end.  So they

19   had different things going on on different days.

20        **Q    So would it be reasonable to project**

21   **that there would be 45 students signed up for**

22   **classes -- signed up four classes per week at this**

23   **store you would open in Chicago?**

24        A    I would think that it would be somewhere

ROAMN S. TAPKOWSKI
May 30, 2018

Page 82

1    between 30 and 45.

2        Q    **Somewhere between 30 and 45.**

3        A    That that would be reasonable.  You're

4    dealing with a whole week here.

5        Q    **Yeah.  So for a month, then, we're**

6    **talking about 120 to 180 individual students**

7    **signing up per month for classes?**

8        A    That's possible.

9        Q    **Does that seem likely, like a likely**

10   **number?**

11       A    I don't know.  It depends.  You know,

12   we're talking a multiyear thing here.  Back

13   between 2010, around that time, we would be

14   dealing with a five-hour class with range time.

15   And then at 2013 when concealed carry kicked in,

16   you would have the same number, that 15.  But that

17   15 could easily stretch up to 20 or 25 people for

18   a concealed carry class, because the demand was

19   that high at that time.  And that slowly waned,

20   but it took over a year for that to come down.

21                    And I remember when I first

22   started doing this, and in my classes I had -- it

23   was an effort to keep my classes under 20 people.

24   I didn't want more than 20 people.  I didn't want

ROAMN S. TAPKOWSKI
May 30, 2018

Page 87

1    PPA on the calendar.  That's them.

2        **Q    I'm sorry.  And what was the time frame**

3    **when you were there?**

4        A    I don't know, just before concealed

5    carry started.  So I was with him probably for two

6    or three years before that, two and a half years

7    maybe.

8        **Q    Prior to?**

9        A    Prior to concealed carry.

10       **Q    Concealed carry?**

11       A    I saw things I didn't like and I wanted

12   to step away from there before concealed carry

13   started.

14       **Q    If Mr. Franzese opened up his gun store**

15   **in Chicago today, would you still be interested in**

16   **participating?**

17       A    Yes.

18       **Q    You haven't had recent conversations**

19   **about the --**

20       A    No.  No.  The last conversation I had

21   with Joe was I'm telling him, when you get things

22   to the point that you're ready to start let me

23   know.

24            MR. TRESNOWSKI:  I think I just have one

ROAMN S. TAPKOWSKI
May 30, 2018

Page 90

1    unfamiliar with the industry.

2        **Q     So you're not authorized to teach this**

3    **so-called 40-hour --**

4        A     Yes, I am.

5        **Q     -- State cert --**

6                    **Oh, you are?**

7        A     Yes.  In fact, mine is probably one of

8    the only 40-hour State, if not the only 40-hour

9    State course, to be certified because they made me

10   do it that way.  Where everybody else could submit

11   a 20 and get approved, they wouldn't let me do

12   that.  They made me submit a 40.  So they approved

13   the 40.  That's what I have.

14       **Q     I see.  It says here the LEO training**

15   **will be offered.  I take that to mean law**

16   **enforcement --**

17       A     Law enforcement --

18       **Q     -- officer training?**

19       A     Yes.

20       **Q     Is that something that you provide?**

21       A     I was a -- an NRA law enforcement

22   firearms training officer in shotgun and handgun.

23       **Q     In shotgun and handgun?**

24       A     Right.

ROAMN S. TAPKOWSKI
May 30, 2018

Page 97

1   **Permit?**

2        A      I remember that we needed a Chicago

3   firearms something training.  I remember that.

4   And I remember something about the permit allowing

5   you to have one gun in the house.

6        **Q      Okay.  So --**

7        A      I remember something like that.

8        **Q      -- I want you to assume, for purposes of**

9   **this question, that prior to the Supreme Court's**

10  **decision in McDonald versus City of Chicago, that**

11  **people were not allowed to have handguns in their**

12  **home with very limited exception.  Okay?**

13       A      Okay.

14       **Q      I want you to further assume, for**

15  **purposes of my question, that following the**

16  **Supreme Court's decision in 2010 in McDonald**

17  **versus City of Chicago that the city rewrote their**

18  **handgun ordinance to allow people to have handguns**

19  **in their home.  Okay?**

20       A      Right.

21       **Q      I want you to further assume, for**

22  **purposes of my question, that the City of Chicago**

23  **conditioned such home handgun possession on the**

24  **acquisition of something called a Chicago Firearms**

ROAMN S. TAPKOWSKI
May 30, 2018

Page 98

1    **Permit, which required the permit holder to have**

2    **firearms training which included both classroom**

3    **and range training.**

4                    **Does anything --**

5                    **Those assumptions, does any of**

6    **that ring a bell?  Does that sound familiar to**

7    **you?**

8        A    Yeah.  You're talking about Chicago

9    Handgun Compliance Training --

10            MR. TRESNOWSKI:  Object to the form.

11            MR. SIGALE:  Okay.  You can still answer

12   it if you understand my question.

13   BY MR. SIGALE:

14       **Q    Did any of those statements that I just**

15   **made to you, do they sound familiar to you?  Did**

16   **you know those things?**

17       A    Yes, I did.  Chicago Handgun Compliance

18   Training, I wrote a manual for that and we

19   worked -- Steve and I were teaching that.

20       **Q    So is it fair to say that the number of**

21   **Chicago residents who were taking this firearms**

22   **training say went up dramatically from the number**

23   **0 in 2010 after the Supreme Court decision and**

24   **after the Chicago Firearms Permit became**

ROAMN S. TAPKOWSKI
May 30, 2018

Page 99

1    **mandatory?**

2         A    I believe our awareness of people --

3    Chicago people taking firearms training increased

4    at that time.  Because the training that we were

5    offering, Steve and myself, was not just in

6    Chicago.  We were working with -- also with the

7    College of Lake County.  And people from Chicago

8    specifically requested, hey, can we get this?  And

9    we told them, absolutely, you know.  What we are

10   offering falls into this.  If you look at the two

11   trainings they're virtually identical.  And if you

12   want the compliance certificate we can give you

13   one, but you gotta tell us you're from Chicago and

14   you need this.  And that amount went up.

15        **Q    So is it fair to say that the supreme**

16   **Court decision in 2010, coupled with the Chicago**

17   **Firearms Permit Ordinance shortly thereafter,**

18   **created an entirely new market of Chicago**

19   **residents who needed firearms training?**

20        A    I would say yes.

21        **Q    And given all the testimony, is it fair**

22   **to say that had Second Amendment Arms been allowed**

23   **to open in the City of Chicago during that time,**

24   **that that training for this brand new market is**

ROAMN S. TAPKOWSKI
May 30, 2018

Page 100

1    something that you would have been willing to

2    provide through Second Amendment Arms?

3         A    Yes.

4         Q    And is it fair to say that you

5    individually or you through some other instructors

6    that you had mentioned earlier or that you would

7    have supervised or coordinated with, Second

8    Amendment Arms would have been willing to

9    accommodate as many Chicago residents as Second

10   Amendment Arms could handle --

11        A    Yes.

12        Q    -- to teach this class and get the

13   training and certification for a Chicago Firearms

14   Permit?

15        A    Yes.

16        Q    Is there currently a going rate for CCL

17   instructors?

18                  I know what the class costs.

19   But if you -- someone just asked you, hey, can you

20   come teach my class, I'll pay you X dollars per

21   hour, is there a going rate for what X is?

22        A    I don't know if there is an hourly rate.

23   In general it's done per class.  But I understand

24   where you can have some issues with that with a

ROAMN S. TAPKOWSKI
May 30, 2018

Page 102

1      Q    Okay.  So, in other words, if Second
2  Amendment Arms opened and you were running the
3  training and had to bring in extra instructors,
4  presumably Second Amendment Arms would be able to
5  figure out a rate with them; right?
6      A    Yes.
7      Q    Okay.  The last thing I wanted to ask
8  you about was laser sights.  Counsel asked you a
9  lot of questions about, you know, this
10  hypothetical, this going wrong and that going
11  wrong and that going wrong.  But it's also
12  perfectly reasonable that when -- that someone
13  might feel more comfortable shooting if they had a
14  laser sight; correct?
15      A    Yes.  I believe that.
16      Q    And it's also reasonable that there are
17  scenarios where the battery works as intended, and
18  in a home intrusion scenario that laser sight
19  might be the extra edge to save the homeowner's
20  life?
21      A    That's possible.  Yes.
22      Q    And especially if someone has training
23  from someone like yourself and that training kicks
24  in at the right time; right?

ROAMN S. TAPKOWSKI
May 30, 2018

Page 103

1      A    Correct.

2      Q    And it's also reasonable that the home

3  intruder sees a laser dot on their chest and gets

4  the heck out of there?

5      A    That's possible.  Yes.

6      Q    Thus sparing the homeowner from having

7  to shoot the firearm at all?

8      A    Yeah.  That would be what would happen.

9      Q    And if the person, say in the home, is

10  the only person in the situation with a firearm

11  with a laser, then what you were talking about,

12  well, whose dot is whose, doesn't apply at all;

13  right?

14     A    That's right.  There would be no

15  confusion at that point if there is one laser

16  light.

17     Q    Okay.  And even if you would prefer that

18  they -- strike that.

19                  Even if you prefer using regular

20  sights yourself and not a laser, even if someone

21  else might prefer the added feature of a laser

22  sight, and the -- somehow in a scenario where

23  there's lots of people, I guess, with lots of

24  laser dots all aimed at the same general chest,

ROAMN S. TAPKOWSKI
May 30, 2018

Page 105

1    though?  He survived three to the head with a 22.

2    So, I mean, three bigger calibers.  I mean, just

3    like with the laser sight, I would lean towards

4    the training that I've had rather than rely on a

5    mechanical object.  Can we call it a mechanical

6    thing?

7         **Q    But someone who feels -- has it**

8    **calibrated and the batteries working and feels**

9    **more comfortable in that situ -- feels more**

10   **comfortable having it in such a situation, you**

11   **don't see -- do you see any reason why that person**

12   **should be banned from having that tool in the**

13   **event that they might really need it?**

14        A    No.  It's a personal preference the way

15   I'm seeing it.

16             MR. SIGALE:  I don't have anything else.

17             MR. TRESNOWSKI:  I just have a few more.

18   I don't know what time we're at.

19             MR. SIGALE:  Three minutes.

20             MR. TRESNOWSKI:  Well, feel free to

21   interrupt when you need to.

22             MR. SIGALE:  If we need to take a break

23   for a few minutes then we'll take a break and

24   we'll come back and...