THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECOND AMENDMENT ARMS,               )
R. JOSEPH FRANZESE, individually     )
and d/b/a SECOND AMENDMENT           )        Case No. 10-cv-4257
ARMS, and TONY KOLE,                 )
                                     )        Judge Robert M. Dow, Jr.
            Plaintiffs,              )
                                     )
       v.                            )
                                     )
CITY OF CHICAGO,                     )
LORI LIGHTFOOT,                      )
CHARLES BECK,                        )
and ANNA VALENCIA,                   )
                                     )
            Defendants.              )

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are firearms owners and retailers who seek lost profits from a business they could not open because of a City of Chicago ordinance, later declared unconstitutional, and who challenge the constitutionality of a separate ordinance that bans the sale or possession of laser sights within the city. Currently before the Court is Defendants' motion for summary judgment and to exclude the testimony of Robert Southwick [251]. The motion [251] is granted in part (as to the exclusion of Southwick's proposed testimony) and denied without prejudice in part (as to summary judgment on Counts I and III). As explained below, each side is directed to file a supplemental brief on two underdeveloped issues (nominal damages and the laser sight ban) by March 31, 2020 and a supplemental reply brief by April 21, 2020.

**I.     Background**

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements, [254], [255], [260-2], [260-3], [261], [261-1], [261-2], and [261-3]. The following facts are

undisputed except where a disagreement between the parties is noted. The Court construes the facts in the light most favorable to the nonmoving party—Plaintiffs.

Plaintiff R. Joseph Franzese is a resident of Hainesville, Illinois, a town located approximately 40 miles outside of Chicago. [255-1] at 4. Franzese is a self-employed barber. [255-1] at 27. Plaintiff Second Amendment Arms ("SAA") is Franzese's "doing business as" company. [146] at ¶ 2. SAA operated from approximately 2008 or 2009 until sometime in 2011, 2012, or 2013, first in unincorporated Deerfield, Illinois, and then, in Lake Villa, Illinois. [255-2] at 5-6; [255-1] at 6-7, 17. Plaintiff Tony Kole is a resident of Arlington Heights, Illinois. [255-3] at 3.

Defendant City of Chicago is a municipal entity organized under the Constitution and laws of the State of Illinois. [146] at ¶ 5; [190] at ¶ 5. The other Defendants are City officials purportedly sued in their official capacities. Defendant Lori Lightfoot is the City's Mayor. Mayor Lightfoot replaced former Mayor Rahm Emanuel, who was named as a defendant in his official capacity. [146] at ¶ 6. Defendant Charles Beck is the City's interim Superintendent of the Chicago Police Department. Acting Superintendent Beck replaced former Superintended Eddie Johnson, who replaced former Superintendent Garry McCarthy, who was named as a defendant in his official capacity. See *id.* at ¶ 7. Defendant Anna Valencia is the Clerk of the City of Chicago. Clerk Valencia replaced former Clerk Susana Mendoza, who was named as a defendant in her official capacity. *Id.* at ¶ 8.

### A. Franzese's Operation of Second Amendment Arms Prior to 2010

Franzese began doing business as Second Amendment Arms in 2008 or 2009 by selling firearms out of a friend's home in unincorporated Deerfield, Illinois. [255-2] at 5-6; [255-1] at 6-7. When his friend moved sometime in late 2009, Franzese began selling firearms out of a 300-

square-foot space in his accountant's office in Lake Villa, Illinois. *Id.* at 6-7, 10. Franzese sold firearms and firearms accessories, but no ammunition or clothing. *Id.* at 8. He sold firearms, deposited the proceeds in his bank account, and filled out the paperwork required by federal law. [264-1] at 21. Franzese ceased operation of SAA at the Lake Villa location sometime in 2011, 2012, or 2013. [255-1] at 6-7, 17; [255-2] at 5-6. He did not employ any staff at the Lake Villa store, though he paid an accountant to keep the business's records and prepare its tax returns. [255-1] at 11; 15. He did not keep a written budget for the Lake Villa store. *Id.* at 15. Apart from a "couple little [advertising] events," Franzese relied largely on "word of mouth" or "peer-to-peer" communication to generate business for SAA. *Id.* at 24. Franzese estimates that SAA sold approximately 300 firearms in total from the Lake Villa store. [255-1] at 7-8. He possesses no documentation of SAA's sales and accounts or of the Lake Villa store's operation that would establish that SAA was a profitable business. *Id.* at 8-9. He could not provide an estimate of his Lake Villa business's annual profits. *Id.* at 14. Apart from tax returns reflecting aggregate amounts of sales revenue, Franzese possesses no documentation at all concerning the operation of the Lake Villa store. *Id.* at 9.

The SAA tax returns that Plaintiffs produced in this lawsuit were for the years 2011 and 2010 and the months of November and December of 2009. [255-6]; [255-1] at 26. Those tax returns indicate that Franzese's total taxable receipts in 2011 were less than $2,000 for the entire year; that for four of the months in 2010 he had no taxable receipts; and that there were only two months in 2010 in which he had taxable receipts over $1,000. [255-1] at 26-27.

## B. The 2010 Ordinance

On July 2, 2010, the City Council enacted an ordinance (the "2010 Ordinance") that, among other things, prohibited the sale or transfer of firearms within the City of Chicago, effective on

July 12, 2010. See [255-4] at 17. Approximately three-and-a-half years later, a court in the Northern District of Illinois concluded that certain provisions in the 2010 Ordinance effectively banning the sale and transfer of firearms were unconstitutional. *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 947 (N.D. Ill. Jan. 6, 2014) (regarding MCC § 8-20-100 and § 17-16-0201, which banned gun sales and transfers other than inheritance). This prompted yet another round of revisions from the City of Chicago, which issued a revised gun ordinance approximately six months later, in July 2014 (the "2014 Ordinance"). The 2014 Ordinance permits the sale of firearms subject to certain restrictions. See [255-5].

### C. Franzese's Proposed Chicago Firearms Retailer

On July 2, 2010, Franzese submitted an application for SAA to sell firearms at 415 West Armitage Avenue, Floor 1, Chicago, Illinois 60614.[1] He chose that location on the advice of his previous counsel and because there was a sign on the front of the building that said the location was commercial space. [255-1] at 20. The zoning classification for that property address did not and does not permit business or retail uses, either as of right or as a special use. See [204-2] ¶¶ 10-12; [215-10] ¶¶ 10-12. At the time Franzese submitted his application for a business license, he had never visited the property at 415 West Armitage, spoken with the property owner about leasing the property, or inquired with the property's management service to confirm whether a retail operation would be permitted on site. [255-1] at 20. While he was waiting for the City to respond to his business license application, he was still operating SAA at the Lake Villa location. [264-1] at 61.

Franzese planned to operate SAA's Chicago stores with Joe LaJoy and Roman Tapkowski. He intended LaJoy to be the Chief Operating Officer, and Tapkowski the Chief Training Officer.

---

[1] Franzese apparently applied for a Federal Firearms License ("FFL") from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as well. See [261-2] at 10.

[255-7]. LaJoy owns and manages LaJoy Precision in Fox Lake, Illinois, a gunsmithing and firearm manufacturing business and a firearm and archery instruction center. [255-1] at 6; [255-8] at 5. LaJoy's business provides training and sells firearms, ammunition, holsters, gun cleaning equipment, targets, gun cases, parts, accessories, optics, optic accessories, and other sporting goods. [263-6] at 6. LaJoy has been in the gunsmithing industry for 29 years, *id.* at 8, and he has worked in the retail firearms industry since he was 21 years old. *Id.* at 26. LaJoy is also a certified NRA instructor for the pistol, rifle, shotgun, personal protection, home and outdoor firearms safety. He is also a certified range safety officer. He was one of the first Illinois concealed carry instructors and is also certified to teach concealed carry courses in Utah, Florida, and Wisconsin. *Id.* at 27.

Tapkowski was a Chicago Policer Officer for 32 years. [255-9] at 4. He taught small arms in the Illinois National Guard in the 1970s. *Id.* at 5. He was then a firearms trainer from 2006 to 2017. *Id.* at 5. He has taught classes on basic security, private investigation, armed security, Illinois concealed carry, and tactical training. *Id.* He has also written several manuals on those topics, including a Chicago Handgun Compliance course, the private security firearms courses for the Illinois Department of Financial and Professional Regulation, and an Illinois concealed carry course. *Id.* Tapkowski is an Illinois concealed carry instructor, an NRA certified law enforcement handgun and shotgun instructor, an NRA certified range safety officer, and the range safety officer at the Conservation Club in Kenosha, Wisconsin. *Id.* Beginning in 2008 or 2009, Tapkowski and Franzese began discussing the possibility of Tapkowski teaching firearms training courses for SAA. *Id.* at 6.

In May 2011, ten months after applying for a Chicago business license for SAA and filing this lawsuit (and months after Franzese says he wanted to open SAA's first two Chicago stores),

Franzese completed a "business plan" for SAA. See [255-7]; [255-1] at 21. That plan lists LaJoy as SAA's chief operations officer and Tapkowski as SAA's chief training officer. [255-7] at 3. The plan lists the locations for SAA's stores as "Fullerton Ave., far North West City area, Goose Island and a South side retail business TBD due to the outcome of Lawsuit (SAA v. Chicago)." *Id.* The plan states that "[a]ll facets of working (out of the box) Firearms will be sold" at the stores. *Id.* at 4. Under the heading "Marketing," the plan states that "SAA will be focused on Males and Females 18-65 years of age, urban and Educated buyers with median income base of $35,000.00 to $120,000.00 yearly." *Id.* at 5. The plan also states that "an initial investment of [$] 2.5 million will be sufficient to acquire our Hub location, Armitage Ave., open and build out several satellite locations including the far North West City area, Goose Island and a South side retail business." *Id.* at 2. Franzese testified at his deposition that he would have acquired the $2.5 million initial investment for the Chicago stores through a loan from his personal bank. [255-1] at 22. He said that he believes his bank would loan him $2.5 million on the basis of his "good credit" and "[g]ood business plan." *Id.* He has never showed the business plan to any bank or other potential investor; he has never talked to any banks about financing a Chicago firearm business; and no bank has ever told Franzese that his business model would result in a profitable business. *Id.* Franzese has not looked into the cost of construction, insurance, or real estate in connection with opening a firearms store within the City of Chicago. *Id.* at 19. He acknowledges that his firearms operation in Chicago would require multiple employees and a payroll, but he has not calculated what SAA's weekly payroll would be. *Id.* at 23. He has not contacted any suppliers to discuss providing inventory for a firearms store in the City of Chicago; has not entered into contracts to purchase

inventory for any Chicago stores; and has not engaged in any negotiations with firearms vendors to provide inventory for any Chicago stores. *Id.* at 22-23.[2]

Franzese says that he would have pursued a "general aggressive [marketing] strategy" for SAA, but he did not create a specific plan for how he would implement that general strategy in practice. [255-1] at 18. Apart from the address on Armitage Avenue listed on SAA's initial application for a City business license, Plaintiffs have not identified any specific addresses for the stores Franzese says SAA would open. [255-1] at 12. Franzese is also not sure where he would live if he were to operate firearms stores in Chicago. *Id.* at 16. Both LaJoy and Tapkowski testified during their depositions that they had never seen SAA's business plan. [255-8] at 6; [255-9] at 10.

Franzese never received a written denial of his Chicago business license application. On one of his follow-up phone calls to the City, in approximately October 2011, a woman told Franzese that his license was denied because the City does not allow gun stores. [215-3] at 2-3. It is not clear whether the City notified Franzese in writing about the denial. [215-9] at 2-3. After Franzese's application for an FFL had been pending for eighteen months, ATF denied it, apparently because Franzese did not have a Chicago business license or address. [255-1] 5.

**D.      Alleged Lost Profits**

Franzese, during his deposition, said that he would have opened three stores in the year 2010 and estimated that each of those three stores would have earned $150,000 in profit for that year. [255-1] at 13. In response to an interrogatory, Plaintiffs projected that SAA would earn $20,000 to $30,000 per week in gross revenues for the first six months of business in 2010, $40,000 per week in gross revenues for the following six months, and over $29 million in total gross revenues through the end of 2015. [255-2] at 6-7.

---

[2] Franzese asserts that he could not discuss or purchase inventory without an FFL, which he says he cannot obtain without a business license from the City. [261] at 10.

Plaintiffs hired Robert Southwick to opinion on the amount of lost profits SAA would have earned if it had been in operation from 2010 to 2014. [255-11] at 4. Southwick opined that Franzese lost $1,211,622 in profits from 2010 to 2014 for not being allowed to open his planned five stores of Second Amendment Arms in the City of Chicago. *Id.* at 11, 16. In calculating this amount, Southwick used existing data sources for operating statistics for firearm retailers across the United States, including data on hunting, target shooting participation, and sales of firearms and accessories purchased for protection purposes, and he employed standard statistical analysis to complete his calculations. [256-1] at 5-6. There were no assumptions provided by counsel. *Id.* at 7.

### E.   Laser Sights

Tony Kole is an elevator mechanic who frequently travels around Chicago, Cook County, and the City's suburbs. [268-3] at 3-4. Kole has also worked in the firearms industry as the owner of a retail firearms store in Norridge, Illinois. *Id.* at 4. Kole is a certified NRA pistol instructor and Illinois concealed carry instructor. *Id.* Kole is interested in purchasing and possessing laser-sight devices within the City of Chicago. [255-3] at 4. When turned on, a laser-sighting device emits a laser that appears as a colored dot on a target when the firearm is aimed at the target. [255-9] at 8-9. A firearm may be sold with a laser sight already integrated, or a laser sight may be attached to a firearm. [255-3] at 5. Kole is allowed to carry a firearm on the job unless the work location prohibits it. [268-3] at 8. He does so if able. *Id.* at 8-9. If allowed, he would have a laser sight on his concealed carry pistol to aid with self-defense. *Id.* at 17.

On March 10, 1999, the City Council passed an ordinance prohibiting the sale, purchase, and possession of "laser sight accessories," which the ordinance defined as "laser sighting device[s] which [are] either integrated into a firearm or capable of being attached to a firearm"

(the "Laser Sight Ordinance"). [254-13] at 5. The Laser Sight Ordinance contained the following finding: "WHEREAS, The City of Chicago finds that the public health and safety of its citizens, most particularly its police officers, are being endangered by the use of laser sights[.]" *Id.* at 4.

On July 9, 2010, the first complaint in this case was filed. There were various motions to dismiss and amendments to the complaint, culminating in the Fourth Amended Complaint [146]. Defendants again moved to dismiss [155], and the Court granted the motion in part and denied it in part. See [182]. Later, the parties agreed that Count IV was moot and it was dismissed. See [193]. Defendants have moved for summary judgment on Count I, now limited to a claim for monetary damages based on alleged loss of business as a result of the 2010 Ordinance, and Count III, a claim that the Laser Sight Ordinance violates the Second Amendment (but only to the extent that it seeks injunctive relief).

## II.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014) (quoting *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008)).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  See *Celotex Corp.*, 477 U.S. at 323.  "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'"  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)); see also *Anderson*, 477 U.S. at 250.  In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party.  *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

Franzese and Second Amendment Arms claim lost profits from the firearms stores Franzese was unable to open and operate for the period of 2011 through 2014.  In support of the claim, Plaintiffs offer proposed expert testimony from Robert Southwick, which asserts that

Second Amendment Arms would have made between approximately $668,000 and $1.2 million in profits during the relevant period. Defendants argue that any lost profits are too speculative to be awarded and are prohibited by the "new business" rule. Defendants also move to exclude Southwick's testimony for being similarly speculative and failing to meet reliability requirements of Federal Rule of Evidence 702 and *Daubert*. Because Southwick's testimony is significant to the lost profits issue as a whole, the Court will first address Defendants' motion to exclude Southwick's testimony.

### A.       Expert Testimony of Robert Southwick

Defendants ask the Court to exclude evidence from Plaintiffs' proffered expert, Robert Southwick, arguing that it is unreliable and therefore inadmissible under *Daubert* and Federal Rule of Evidence 702. "When acting on a motion for summary judgment the judge considers only evidence that would be admissible at trial," *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 849 (7th Cir. 1992), though the evidence need not be in a form that would be admissible at trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994); see also *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002) (noting that inadmissible evidence "cannot create a factual issue"). Thus in order to determine whether the Court can consider Southwick's testimony or report in resolving the lost profits issue, the Court must determine whether that proposed expert evidence would be admissible at trial.

### 1.       Background

Robert Southwick received a B.S. in Economics from the University of Florida in 1988 and studied topics including sample biases, sampling errors, confidence intervals, margins of error, and progression analysis. *Id.* at 5-6. After working in the sport fishing industry as an economist, he started Southwick Associates in 1990. *Id.* at 6-7. Southwick owns and manages Southwick

Associates in Fernandina Beach, Florida. [264-2] at 2. The company performs market research and economic research specializing in outdoor activities, primarily hunting, target shooting, sport fishing, boating, and similar activities. *Id.* at 2-3 Southwick has conducted lost profits analyses in the past, usually in breach of contract matters or in instances of land encroachment that caused loss of business. In this case, Plaintiffs retained Southwick to opine as to the amount of profits that SAA would have earned if the business had been able to operate in Chicago from 2010-2014. [256-1] at 5. Southwick opined that SAA suffered between $668,018 and $1,211,622 in lost profits. [255-11] at 11, 16.

a. <u>Assumptions</u>

All of Southwick's work relied on three "key assumptions." [255-11] at 5. First, Southwick assumed that SAA would have opened five stores in Chicago within eighteen months: the first store in January 2011, a second store in April 2011, a third store in July 2011, a fourth store in January 2012, and a fifth store in June 2012. *Id.* The basis for these assumptions about the store opening timeline is Franzese's statement during his deposition that we "would have an aggressive opening of three stores in the initial year, yes." *Id.* at 5 n.1. Southwick admitted that he did not investigate whether this assumption was a reasonable one. [264-2] at 8-9. He accepted this assumption based on his belief "that SAA had significant capital behind them." *Id.* at 9. But without significant startup capital, he admitted, the assumption "probably would not have been reasonable and [his team] probably would have taken a different approach." *Id.* The second key assumption was that each SAA store would be profitable within its first year and would reach "full profitability" after one year. [255-11] at 5. During the first year, Southwick assumed that each store would earn 50% of the profits that it would earn in the following years. *Id.* His assumption that stores' profits in the first year would be 50% of their peak profits was not "based on any data

12

or method," but was simply what seemed "most reasonable to [his team], given a *lack of data* on other businesses in the same situation." [256-1] at 22 (emphasis added). Third, Southwick assumed that SAA would have been profitable and that its sales and profits would have been "average, compared to other regional firearms retailers." [255-11] at 4. This assumption comes not from any facts or data Southwick reviewed, but from the *lack* of detail in SAA's business plan or otherwise "showing how SAA's product offerings, display/merchandising, service, marketing and business management practices would have permitted above average retail performance." [255-11] at 6; [256-1] at 22. Essentially, Southwick assumed average performance based on a lack of information that indicated higher- or lower-than-average performance. Southwick did not consider, and is not aware of, the rate of failure for start-up retail firearm stores within their first four years of operation. *Id.* at 9-10.

b. <u>Southwick's Two Approaches to Calculating Lost Profits</u>

Southwick used two approaches to calculate the amount of profits for the five SAA stores that he assumed would open and earn "average" profits. Approach 1 relied on data from the 2018 Shooting Sports Industry Financial Benchmarking Report a national survey of firearms retails conducted by the National Shooting Sports Foundation (the "NSSF Report"). [265]. The report contained demographic and financial data—including 2017 net sales, cost of goods sold (as a percentage of net sales), and operating expenses (as a percentage of net sales)—for the 82 stores that responded to the survey. Southwick identified the demographic categories that he believed best fit the five stores SAA intended to open: (1) retailers whose facility is between 1,000 and 5,000 square feet, (2) Midwestern retailers, (3) retailers in communities with a population greater than 100,000, and (4) brick and mortar stores that do not offer a shooting range. [255-11] at 7. For each of those categories, Southwick calculated the average net sales, cost of goods sold, and

operating expenses. That also allowed him to calculate an average net profit margin for each category. Southwick then used the average net sales, cost of goods sold, and operating expenses of each of the four demographic categories to generate "average" data for each of SAA's hypothetical stores. Because he did not know "the relative importance of each demographic factor"—that is, store size, region, community size, and store type—"in determining a firearm retailer's net profit," Southwick gave each factor "equal weight" in calculating the average figures. *Id*. at 8 From there, Southwick calculated the net pre-tax profit per year for each hypothetical SAA store by subtracting the cost of goods and operating expenses from net sales (adjusted for inflation), and he discounted the net profit for the first twelve months of each store's operation by 50%. [256-1] at 8-9. That yielded a lost profits estimate of $688,018.

Southwick did not calculate a confidence interval for his estimation of lost profits. At his deposition, he testified that he did not "tak[e] the time to do the actual calculation" but guessed it was of "plus or minus 5 percent[,] 90 percent of the time." [256-1] at 16. Additionally, Southwick testified that the size of the survey sample would affect the degree of confidence of his estimates, but he did not know how much the four demographic categories overlapped, and therefore the ultimate size of the sample he relied on. *Id.*

Approach 2 used the same percentages for cost of goods sold and operating expenses as Approach 1 but employed a different method for estimating net sales.[3] Southwick estimated the number of target shooters and rifle hunters likely to be customers in the "local market"—a 40 mile radius—of the zip code where SAA's hypothetical "hub" store would have ben, 60614.[4] See [255-

---

[3] Southwick admits that any errors in the estimates of the costs and expenses in Approach 1 would be carried over into Approach 2 and undermine its conclusions. [254-2] at 22-23.

[4] Southwick does not state why this zip code was chosen [see [256] at 13 n.4]; however, that is the zip code of the Armitage location for which Plaintiff submitted an application to sell firearms.

11] at 12. Southwick used a software program (ArcGis Business Analyst) to estimate the probability that a given consumer would visit a store located in zip code 60614. From the *Consumer Segmentation Analysis of the U.S. Commercial Firearms & Accessories Market Report*,[5] Southwick estimated the number of consumers in the local market who would purchase a firearm for protection purposes but not for target shooting or hunting. That number plus the estimate of likely customers for target shooting and rifle hunting purposes yielded an estimate of total potential customers. Southwick then multiplied the number of potential customers by the national average annual spending on firearms. [255-2] at 12. Southwick used the ArcGis software (specifically a model called the Huff Model) to estimate what portion of the firearms consumers in the local market would have patronized SAA's hypothetical hub store as opposed to the 36 other firearms in the local market. *Id*. at 13. That yielded a total net sales figure for the hub store. From there, Southwick calculated the net pre-tax profit per year by subtracting the cost of goods and operating expenses from net sales (adjusted for inflation), and he discounted the net profit for the first twelve months of the store's operation by 50%. Using the same figures for net sales, cost of goods sold, and operations expenses, and with the same discount for the first twelve months, he repeated the net profit calculation for the four other hypothetical SAA stores. That yielded a total lost profits estimate of $1,211,662. *Id.* at 15.

Approach 2 assumed that each SAA store would have the same net sales as the others, for each year of operation, and that opening subsequent SAA stores in Chicago would not cannibalize the sales of earlier stores. Southwick justifies this assumption by arguing that Chicago had "the potential for significant pent-up demand from consumers not willing to travel outside the city," *id.* at 14, but he cites no sources for the existence of this pent up demand and does not quantify such

---

[5] This report appears to be previous work by Southwick Associates. See [255-11] at 19.

demand or explain how much would be necessary to prevent cannibalization of sales by newer stores.  [264-3] at 62.

        2.     *Rule 702 and the* Daubert *Standard*

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony.  See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009).  Rule 702 requires that the district judge act as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Daubert*, 509 U.S. at 589.

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; see also *Ortiz v. City of Chi.,* 656 F.3d 523, 526 (7th Cir. 2011).  "The non-exclusive list of *Daubert* reliability factors for scientific evidence includes whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field."  *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert,* 509 U.S. at 593–94 ).  "The goal

of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

"Under Federal Rule of Evidence 702 and *Daubert,* the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R.,* 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007)). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 141-43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony). Defendants do not challenge Southwick's qualifications, see [256] at 28, fn. 7, and the Court can resolve the question of admissibility on other grounds, so it will move straight to the reliability of Southwick's methodology.

### 3.     *Reliability of the Methodology*

The Court must ensure that a proposed expert's methodology is "scientifically valid," *Daubert*, 509 U.S. at 592–93, and that his conclusions are "based on sufficient facts or data," Fed. R. Evid. 702(b). The test of reliability is flexible, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when

17

it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); *see also Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis omitted) (citing *Jenkins,* 487 F.3d at 489)); *Lewis*, 561 F.3d at 704–05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation." (citation omitted)).

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, as the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another," and while "[t]rained experts commonly extrapolate from existing data[,] * * * nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). In short, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Where that link is missing, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146.

Additionally, a district court is required to exclude "subjective belief or unsupported speculation" by considering "whether the testimony has been subjected to the scientific method."

18

*Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (citing *Wintz*, 110 F.3d at 512). An expert's opinion is inadmissible if it "*assumes* as truth the very issue that [the plaintiff] needs to *prove* in order to recover." *Clark*, 192 F.3d at 757.

> a.  Speculative and Unreasonable Assumptions

The Seventh Circuit has affirmed exclusion of a purported expert on lost profits when the expert report was based on implausibly optimistic assumptions. *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998). Southwick's opinions are based on assumptions so unrealistic that his methodology cannot meet the reliability requirements of Rule 702 and *Daubert*. Southwick's key assumptions, as stated in his report and on which his analysis relies, are that (1) SAA would have opened five stores in Chicago within its first eighteen months of existence as a Chicago business; (2) each store would be profitable within the first year of its operation; and (3) following their first year, the stores' profits would have been "average" compared to firearm retail stores located outside of Chicago. [255-11] at 6. Southwick offers, and the record contains, little or no basis factual for these assumptions. Rather, the facts in front of the Court (and available when Southwick was conducting his analysis) undermine these assumptions. For example, the assumption that SAA would have opened five stores in eighteen months was premised on SAA having capital to open the proposed stores. [256-1] at 6. Southwick admitted that he did not investigate whether this assumption was reasonable. [264-2] at 8-9. Southwick testified that if SAA lacked startup capital, his assumption "probably would not have been reasonable and [his team] probably would have taken a different approach." *Id.* at 7. But Franzese testified, and Plaintiffs do not dispute, that he had not obtained *any* capital for financing the opening of the first store, much less for additional stores. [255-1] at 22. By Southwick's own testimony, the first assumption of his analysis, on which all other assumptions and conclusions rely, is factually incorrect

and unreasonable. Because it is unreasonable, it is unreliable and should be excluded. *Target Mkt. Pub.*, 136 F.3d at 1144.

> b. <u>Assuming Profitability</u>

Second, Southwick assumes the very thing he must prove: profitability. An expert's opinion is inadmissible if it "*assumes* as truth the very issue that [the plaintiff] needs to *prove* in order to recover." *Clark*, 192 F.3d at 757. Here, the record provides little factual foundation for assuming SAA's profitability—or even its existence. Southwick points to Franzese's and LaJoy's experience in the firearms industry as support for his assumption, but he admits that he does not know whether LaJoy, the intended Chief Operating Officer, has ever run a profitable retail firearms business. [256-1] at 11. Furthermore, Southwick did not know or incorporate into his analysis the rate of failure for new firearms retail stores, [256-1] at 9-10; as a result, there is no evidence in the record, or way for Southwick to determine, that it was reasonable to assume that SAA's stores would open and be immediately profitable. As far as Southwick was concerned, the source of his second foundational assumption was somewhere between optimism and speculation, neither of which is a reliable basis for an expert's methodology. See *Clark*, 192 F.3d at 757; *MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 658 (7th Cir. 2000) (calculating lost profits based on market data "assumes a success not guaranteed to any new business"); *Act II Jewelry, LLC v. Wooten*, 318 F. Supp. 3d 1073, 1086 (N.D. Ill. 2018) (excluding expert evidence of lost profits based in part on market data because expert assumed, rather than analyzed and proved, that the business would be profitable).

> c. <u>Failure to Use Reliable Comparators</u>

Finally, the calculation of profits is flawed to the point of inadmissibility. In calculating lost future profits or lost business, the measure of damages is guided by analysis of "comparable

businesses *in the area.*"  *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n. 7 (7th Cir. 1979) (emphasis added); *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 634 (7th Cir. 2007) (lost profits based on comparison to another business were not speculative "where the plaintiff operated an established business *at an identical location* during the same time period as a party for whom profit information is available") (emphasis added); see also *Lehrman v. Gulf Oil*, 500 F.2d 659, 667 (5th Cir. 1974) ("[T]he business used as a standard must be as nearly identical to the plaintiff's as possible.").  Absent the requisite showing of comparability, a model that predicts either the presence or absence of future profits is impermissibly speculative and conjectural.  *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005), citing *Home Placement Svc., Inc. v. The Providence Journal Co.,* 819 F.2d 1199, 1209 (1st Cir. 1987).  Exact correlation is not necessary, but the samples must be fair congeners; if they are not, the comparison is manifestly unreliable.  *Id.*

Southwick did not use any particular store or stores as a comparator.  Nor did he use any comparators to a firearms store in Chicago within the obvious meaning of "in the area"—he did not analyze stores near Chicago but outside city limits, stores in northern Illinois, or even stores in nearby southern Wisconsin or northwestern Indiana, despite identifying 36 other retailers within 40 miles of Chicago and assuming in Approach 2 that those stores would have competed with SAA's hypothetical stores.  See [255-11] at 13, figure 3.  Instead, drawing from a single industry report, he calculated the average profits of successful firearms retailers across the entire Midwest region.  [256-1] at 11.  The record does not contain justifications for this choice.  The entire Midwest is not "an identical location," *TAS Distrib. Co.*, 491 F.3d at 634, or even a similar area, to the proposed locations (vague as they are) of the Second Amendment Arms stores, making the

method of Southwick's calculation "impermissibly speculative." *Loeffel Steel*, 387 F. Supp. 2d at 812.

Even if it were appropriate to compare stores across the entire region, the remainder of Southwick's method is suspect. The industry report lists four categories "demographic data," of stores that Southwick relied on: retail square footage, community size, type of business, and region. See [255-11] at 9. Southwick chose the traits that he believed Second Amendment Arms' hypothetical stores would have had and used the financial data the corresponded to those traits to calculate a measure of lost profits. The first problem with this method is that three of the demographic categories, and therefore three-quarters of the inputs into the "average" profits calculation, incorporate national data, not just data from the Midwest. This fact moves Southwick's "average" figures even further from a reasonable comparison in the area of SAA's hypothetical stores.

Furthermore, Southwick could not say which demographic factors played a larger or smaller role in determining net profit. *Id*. at 7. So he simply gave each one equal weight. *Id.* Not knowing the "relative importance of each demographic factor in determining a firearms retailer's net profit" means that Southwick did not know if one factor was entirely responsible for the retailers' net profit, or if any factor was entirely irrelevant to the retailers' net profit.[6] Calculations based on factors that may or may not be relevant, or are relevant in varying but unknown degrees, are speculative and not reliable enough for *Daubert* and Rule 702 purposes. Furthermore, without knowing which factors are relevant to a store's profit, the data associated with each of these factors

---

[6] Furthermore, the Court is not persuaded that the limited choices within each of these demographic categories allows reasonable comparisons. For example, the "community size" category has only two options: populations less than 100,000 people, and populations greater than 100,000 people. Plaintiffs have not explained why all communities with more than 100,000 residents should be grouped together, or why a town of 100,001 is reliably comparable to Chicago, a city of more than 2.7 million people.

is linked to Southwick's conclusion of profitability by little more than his say-so. *Gen. Elec.*, 522 U.S. at 146 (district court is not required to admit opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert"). Because that essential link is missing here, there is too great an analytical gap between the data and the opinion, and Southwick's conclusions are not reliable enough to be admissible. *Id*; *Mamah*, 332 F.3d at 478.

### 4.    *Sufficiency of Facts and Data*

Rule 702's reliability element also requires the district judge to determine that the expert considered sufficient data to employ the methodology. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). For example, if an expert seeks to testify about an average gross sales price but is going to base the testimony on sales to only a single customer, a court would appropriately exclude the testimony because a single observation does not provide a sufficient basis for calculating an average. See *Wasson v. Peabody Coal Co.,* 542 F.3d 1172, 1176 (7th Cir. 2008) (affirming exclusion of testimony on these facts); see also *Gen. Elec.*, 522 U.S. at 143–47 (affirming exclusion of expert testimony where expert did not provide basis for claim that studies of cancer incidence in mice supported testimony as to cancer incidence in humans). The facts and data underlying Southwick's opinions do not meet Rule 702's requirements.

First, Southwick essentially admitted that he was missing key data and based his assumptions on a *lack* of facts, rather than on reliable ones. His assumption that SAA's profits in the first year would be 50% of their peak profits was not "based on any data or method," but was what seemed "most reasonable to [his team], given a *lack of data* on other businesses in the same situation." [256-1] at 22 (emphasis added). Southwick also assumed that SAA's profits would have been average compared to other regional retailers, but this was not based on any information he had about SAA or its planned operations. Instead, he merely assumed SAA's stores would be

average because "no details were available showing how SAA's product offerings, display/merchandising, service, marketing and business management practices would have permitted above average retail performance." [255-11] at 6; [256-1] at 32-35. The starting points of Southwick's analysis and foundations for his conclusions are not "sufficient facts or data" as required by Fed. R. Evid. 702(b), but the absence of key facts and data.

Second, Southwick had neither data from firearms retailers that failed nor the failure rate of firearms retailers. [256-1] at 9-10. It does not appear that his primary data source, the NSSF industry report, contained such data, and if it did, neither party pointed the Court toward it. See [265-1]. The lack of data on failed stores introduces a survivorship bias into Southwick's calculations; the analysis considers only the firearms retailers that made it to profitability and overlooks those that were not profitable and failed. Southwick's response—that he ignored failed stores because he was confident that Franzese would open and operate a store successfully, see [265-1] at 12-13—is another instance of assuming the very thing that he was supposed to prove. Without data of failed stores to consider, or at least the failure rate of new firearms retailers, Southwick could not have considered any alternative to a scenario in which Second Amendment Arms was a successful business. Ignoring the failure rate for new firearms retailers is both a problem for the methodology, as discussed above, and evidence that Southwick did not rely on sufficient facts or data to come to a reliable conclusion.

Furthermore, Southwick admitted other problems with his data. When discussing his calculation of average profits at his deposition, Southwick acknowledged that the size of the survey sample of stores in the industry report would affect the degree of confidence in his estimates. [256-1] at 16. But he did not know the extent of the overlap in the four categories of demographic data from which he calculated average firearm retailer profits. For example, he did not know how many

24

Midwestern stores are also in communities larger than 100,000 people, or how many communities larger than 100,000 also had brick and mortar stores between 1,000 and 5,000 square feet. As a result, he admitted that he did not know the ultimate size of the sample on which he relied for his estimates. *Id.* He also did not know how many, if any, stores share the demographic traits that he gave to the hypothetical Second Amendment Arms stores—urban, midsize, brick-and-mortar store without a range, located in the Midwest. *Id.* at 16-17. So even if the entire Midwest region were the appropriate area for comparison, Southwick lacked both the data to determine whether any close comparator stores actually exist and the data to compare them to SAA's hypothetical stores and calculate lost profits. Plaintiffs have failed to meet their burden of showing that Southwick's opinions were based on sufficient facts or data as required by Federal Rule of Evidence 702(b).

### 5. Helpfulness to the Jury

Finally, the touchstone of admissibility under Rule 702 is helpfulness to the jury. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) *amended on unrelated grounds,* 957 F.2d 301 (7th Cir. 1992). Not every opinion from an expert is necessarily helpful. As discussed above, Southwick assumed that all five Chicago stores would be profitable within a year of opening, *i.e.*, he assumed the issue that he was required to prove. Such an opinion is not admissible because it is not helpful to the jury. *Clark*, 192 F.3d at 757 ("an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed"); *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 721 (N.D. Ill. 2001) ("Kaplan's analysis assumed that the existing strain relief mechanism was defective. However, the precise issue in this case was whether the existing strain relief clamp was defective and if Kaplan's testimony is based on the assumption that it was, then he will obviously not aid the jury

in determining the issue involved in this case."). Southwick's opinions fail the helpfulness requirement of *Daubert* and Rule 702 as well and are therefore inadmissible.

In sum, Southwick's report and opinions do not meet the requirements of *Daubert* and Rule 702. His method is not reliable, largely because it is based on speculation and assumptions that are either unrealistically optimistic or contradicted by the factual record. He lacked sufficient and sufficiently reliable facts and data to arrive at admissible conclusions. And his testimony, because it assumes the very issue it is supposed to prove, would not be helpful to the jury. Under *Daubert* and Rule 702, Southwick's opinions and report are not admissible evidence, and the Court will not consider them in ruling on the motion for summary judgment. *Gustovich*, 972 F.2d at 849 ("When acting on a motion for summary judgment the judge considers only evidence that would be admissible at trial.")

### B.     Plaintiffs' Claim for Lost Profits and the New Business Rule

With Southwick's opinions excluded, the Court turns to whether summary judgment in Defendant's favor may be warranted because Plaintiffs cannot establish any alleged lost profits with reasonable certainty as required by Illinois law. "[A]s a general rule, expected profits of a new commercial business are considered too uncertain, specific and remote to permit recovery. This maxim is generally known as the 'new business rule.'" *TAS Distrib. Co.*, 491 F.3d at 633 (citations omitted). "The rule is based on the correct observation that it is more difficult to establish loss objectively when a business is strangled in its cradle, for then there is no history of profit and loss from which to extrapolate lost future profit." *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013). The new business rule is not a hard-and-fast rule, and it may be overcome by sufficient evidence. See *TAS Distrib.*, 491 F.3d at 633 (recognizing exceptions to the new business rule). New businesses have successfully established lost profits by using historical data

from similar franchise operations in similar locations, see *Wilbern v. Culver Franchising Sys.*, 2015 WL 5722825 at *3 (N.D. Ill. Sep. 29, 2015); by using profits made by previous owners in the same business, see *Fishman v. Estate of Wirtz*, 807 F.2d 520, 555-58 (7th Cir. 1986); and by establishing a profit history based on competitors' sales of the same product, see *Milex Products, Inc. v. Alra Labs. Inc.*, 237 Ill.App.3d 177 (1992).

Franzese and Second Amendment Arms offer none of this evidence; rather, they assert that they would have opened five new firearms retail stores in Chicago within eighteen months, all of which would have been profitable. Though plaintiffs get some leeway in proof as to the *amount* of damages in a lost profits case, "at some point too many inferences become mere speculation" and damages must be precluded. *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1368 (7th Cir. 1996) (quoting *Roebuck v. Drexel Univ.,* 852 F.2d 715, 736 (3d Cir. 1988))*; see also MindGames, Inc.,* 218 F.3d at 658 ("a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate"). And Plaintiffs have cited no cases supporting the proposition that the Court must assume that the business would have come into being and would have been profitable.

Even drawing all reasonable inferences in Plaintiff's favor, both the successful launch of Franzese's business in Chicago and its profitability are too speculative to support an award of lost profits. Franzese did not in fact launch his business—admittedly at least in part due to Defendant's actions or inaction—or even do much the work that was both within his power and necessary or helpful to starting the proposed business. He did not create a business plan until ten months after applying for a business license, and ten months after filing this suit, and several months after he said his first two Chicago stores would have opened. See [255-7]; [255-1] at 21. The "plan" did not include information on marketing, staffing the stores, inventory, or merchandising. [255-7];

see also [255-11] at 6, (noting lack of detail on "SAA's product offerings, display/merchandising, service, marketing, and business management practices").  Franzese believed that he needed $2.5 million in startup capital, but had not secured *any* funding, or even discussed financing with a lender or investor.  [2551-] at 22.  Of the five proposed stores, Franzese owned or leased zero physical locations for the stores.  For three of them, Franzese identified only a proposed neighborhood.  He did provide an address—415 West Armitage Avenue—for the first store in the business license application.  But that location is not zoned for retail businesses, see [204-2] ¶¶ 10-12; [215-10] ¶¶ 10-12, and at the time he submitted the application, Franzese had never visited 415 West Armitage, spoken with the owner about leasing the property, or inquired with the property's management service to confirm whether a retail operation would be permitted on site. [255-1] at 20.  Nor had Plaintiff looked into the cost of construction, insurance, or real estate in connection with opening retail firearms stores in Chicago.  [255-1] at 19.  The undisputed facts show that Plaintiff was very far from opening the first proposed store, much less five new stores in eighteen months.  Even setting aside the Chicago business license, whether or not Franzese could have even started his business—a necessary predicate to a business making a profit—is a matter of speculation.

Franzese and Second Amendment Arms argue that Defendants prevented them from taking certain actions required to start the business.  For example, Second Amendment Arms could not get Federal Firearms License without a business license from the City of Chicago, which Defendants refused to issue.  Without an FFL, Franzese asserts, he could not purchase inventory from firearms suppliers or discuss terms with them.  [261-1] at 10.  More generally, he argues that there was no point in working to start the business—*e.g.* looking into insurance or creating a marketing strategy—as long as the ordinance prevented him from obtaining a business license, so

28

his failure to do more to get the business off the ground should not count against him in the lost profits analysis. Plaintiffs have a point here with regard to the FFL, because having a business license appears to be a requirement of obtaining an FFL. And if activities requiring an FFL were the only ones Plaintiffs had not completed or attempted, the analysis might be different. But even giving Franzese and Second Amendment Arms the benefit of the doubt regarding FFL-dependent activities, Plaintiffs did so little of the work required to open and begin operating a business that the business's mere existence remains wildly speculative.

Moreover, even if the facts showed that the existence of Franzese's proposed stores was not speculative, the measure of their profits would be. As discussed above, calculations of lost profits by Plaintiff's proposed expert are not admissible under FRE 702, so the Court will not consider them. Plaintiffs' briefing points the Court to no other calculations of their alleged lost profits, though it does mention Plaintiffs' attempt to estimate damages in the answer to Defendants' interrogatories. That answer, however, estimates only gross revenues ($29,420,000) between 2011 and 2015, not net profits, and provides no factual support for the assertion. The undisputed evidence before the Court demonstrates that if even Franzese had opened his business, and even if it were profitable, no reasonable inference of its lost profits can be drawn "as distinct from relying on hope and a guess." *Parvati*, 709 F.3d at 685. (7th Cir.2013).

This leaves open one other possibility: nominal damages. If Defendants have violated Plaintiffs' Second Amendment rights, but Plaintiffs cannot marshal sufficiently reliable evidence to show any lost profits with reasonable certainty as required by Illinois law, Plaintiffs still might be able to technically prevail on the merits with an entitlement to nominal damages. Plaintiffs allude to this possibility with a citation to *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016) (affirming award of nominal damages to strip club operator whose First

Amendment rights were violated by city's lack of clear licensing standards). However, because this point is seriously underdeveloped, and Defendant's reply brief does not address it at all, the Court requests supplemental briefing as set out below.

### C.     Laser Sight Ban

Plaintiffs also challenge the Chicago ordinance that bans laser sights. For a number of reasons, the Court orders additional briefing on this issue as well.

The briefing on the laser sight ban is limited compared to the briefing on lost profits, and given the gravity of the issue, the Court believes everyone—the parties, the Court, and the individuals whose rights are at stake—would be better served by a more robust explanation of the parties' positions and the applicable law. Additionally, the applicable law shifted mid-briefing. The briefing focuses on whether *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), or *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 407 (7th Cir. 2015), controls the analysis in this case, but partway through the briefing schedule, the Seventh Circuit decided *Wilson v. Cook Cty.*, 937 F.3d 1028 (7th Cir. 2019). *Wilson* may add clarity to the relationship between *Ezell* and *Friedman* and what Seventh Circuit precedent applies in this case, and both parties should have an opportunity to address *Wilson* and flesh out their positions on the laser sight ban.

Beyond the legal complexity noted above, the record on this issue is somewhat thin, and the Court has questions about the admissibility of the proffered evidence. Defendants submitted several newspaper articles (see, *e.g.*, [255-12], [255-15 through 18]), and Plaintiffs submitted no exhibits on the topic but included in their brief two links to websites,[7] see [261] at 32, and additional links to newspaper articles in their Statement of Additional Undisputed Material Facts, see *e.g.*, [261-2] at 10. The Court directs counsel to address whether the Court can and should

---

[7] The second of which the Court was not able to open or view.

consider these types of evidence, including whether and for what purposes the Court should consider newspaper articles published after the Laser Sight Ordinance was passed.[8]

To sum up, in view of the discussion above, the Court sets the following schedule for supplemental briefing on (1) nominal damages and (2) the laser sight ban:  each side shall file a brief of no more than 15 pages no later than March 31, 2020; each side shall file a reply brief of no more than 15 pages no later than April 21, 2020.  The parties need not rehash the factual background that is contained in the prior briefing and are encouraged to focus that section of their briefs on the most relevant facts for the remaining issues.  If, however, there is additional factual material in the record that it the Court may appropriately consider at summary judgment, the parties may direct the Court to such material.

## IV.    Conclusion

For the reasons explained above, the motion to exclude Robert Southwick's testimony is granted.  However, the motion for summary judgment is denied without prejudice and subject to further briefing as to both Counts I and III.  Each side is directed to file a supplemental brief on the nominal damages and laser sight ban issues by March 30, 2020 and a supplemental reply brief by April 20, 2020.


Dated:  March 10, 2020

_____
Robert M. Dow, Jr.
United States District Judge

---

[8] The Court is unsure, for example, why Defendants believe the newspaper articles cited in their briefs are admissible evidence, but object that the newspaper articles cited in Plaintiffs' Statement of Additional Undisputed Material Facts are inadmissible hearsay.  See, *e.g.,* [270] at 10-11.