IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECOND AMENDMENT ARMS, </br> R. JOSEPH FRANZESE, individually </br> and d/b/a SECOND AMENDMENT </br> ARMS, and TONY KOLE, </br></br> Plaintiffs, </br></br> v. </br></br> CITY OF CHICAGO, </br> LORI LIGHTFOOT, </br> EDDIE JOHNSON, </br> and ANNA VALENCIA, </br></br> Defendants. | ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. 10 C 4257 </br> ) </br> ) Judge Robert M. Dow, Jr. </br> ) </br> ) </br> ) </br> ) </br> ) |

**DEFENDANTS' SUPPLEMENTAL BRIEFING IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT PURSUANT TO COURT'S MARCH 10, 2020
<u>MEMORANDUM OPINION AND ORDER</u>**

Pursuant to the direction in the Court's March 12, 2020 Memorandum Opinion and Order ("Order"), Dkt. 278, Defendants submit this supplemental brief to address the following issues in support of their earlier motion and briefing on summary judgment: (1) whether Plaintiffs have a claim for nominal damages as against the City's prior ban on firearm stores; and (2) the applicable law governing Plaintiffs' challenge to the Laser Sight Ordinance, which bans the possession or sale of laser sight accessories, as well as the Court's consideration of evidence submitted by the parties on that claim. On the first issue, Plaintiffs have waived any claim for nominal damages and, in any event, such relief would not save their challenge to the prior ban on gun sales from being moot, since all other forms of relief as to that count have been dismissed, and nominal damages are essentially duplicative of the dismissed declaratory relief. On the second issue, the Seventh Circuit's decision in *Friedman v. Highland Park*, 784 F. 3d 406 (7th Cir. 2015), provides the legal framework for resolving Plaintiffs' challenge to the Laser Sight Ordinance. Like this case, *Friedman* addressed (and upheld) a ban on modern firearm technology that legislatures and the public reasonably view as dangerous to public safety. And the *Friedman* framework permits consideration of the newspaper articles submitted by Defendants in support of the Laser Sight Ordinance, even if the articles do not meet traditional standards of evidentiary admissibility; admissibility at trial is not a prerequisite for evidence that supports legislative judgments like those reflected in the ordinance. For these reasons, as more fully explained below, the Court should enter judgment for Defendants on Plaintiffs' gun store ban and Laser Sight Ordinance claims.

I. **The Court Should Not Allow Plaintiffs To Pursue Nominal Damages Because Plaintiffs Waived Any Such Claim, And Nominal Damages Would Not Save Plaintiffs' Gun Sale Claim From Mootness.**

　　A.　**Plaintiffs have waived a claim for nominal damages.**

Plaintiffs Second Amendment Arms ("SAA") and Franzese have never sought nominal damages at any point in the litigation, and therefore any claim for nominal damages based on the City's former ban on gun sales is waived. This case is ten-years old, and has been pleaded at least five times and subject to multiple rounds of dispositive motion briefing. At no point over the last decade did Plaintiffs request nominal damages. To be sure, at the tail end of dispositive briefing, Plaintiffs cited a case in their response to the City's motion for summary judgment in which the court discussed nominal damages. *See* Dkt. 274 at 5 (citing *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016)). But, even then, Plaintiffs did not affirmatively argue for nominal damages, whether based on *Six Star* or otherwise.

Nothing from the context of Plaintiffs' summary judgment response, or any of their prior briefing or pleading in this litigation, put the City on notice that Plaintiffs were seeking nominal damages. Plaintiffs' prayer for relief sought "actual monetary damages" that would "compensate" Plaintiffs for their alleged lost profits. Dkt. 146, at 10. A request for nominal damages cannot be read into this request because nominal damages are "not a small rather than a large damages award; functionally it is no damages award at all." *Moore v. Liszewski*, 838 F.3d 877, 879 (7th Cir. 2016). Similarly, Plaintiffs' generalized prayer for relief requesting "[a]ny other further relief as the Court deems just and appropriate," Dkt. 146 at 11, is insufficient to assert nominal damages. Courts do not typically read nominal damages into a generalized prayer for relief. Indeed, the Supreme Court has cautioned that attempts to avoid mootness based on a claim for nominal damages extracted "late in the day" from a general prayer for relief after all

2

other claims have been dismissed "[bears] close inspection." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997); *see also Fox v. Bd. of Trustees*, 42 F.3d 135, 141–42 (2d Cir. 1994) ("We are especially reluctant in these circumstances to read a damages claim into the Complaint's boilerplate prayer for 'such other relief as the Court deems just and proper,' or to conclude that the district court should have exercised its discretion to permit an amendment of the Complaint to seek nominal damages.").

If Plaintiffs were genuinely seeking nominal damages in this case, they would have raised the issue earlier in the litigation. At the latest, they should have raised nominal damages when the Court made clear – more than 4 years ago – that the only aspect of Count I that survived dismissal was its claim for compensatory damages. The Court ruled as follows: "Plaintiff Second Amendment Arms may proceed on its claim for monetary damages based on the alleged loss of business that it suffered as a result of zoning restrictions in the 2010 Ordinance . . . Plaintiffs' remaining claims under Count I are dismissed." Dkt. 182 at 28. If Plaintiffs believed that there remained a claim for nominal damages despite the Court's express dismissal of all aspects of Count I other than compensatory damages, they should have brought that to the Court's and the City's attention at that time. Plaintiffs may not wait until all other forms of relief are eliminated and, only then, assert nominal damages to try to keep a claim alive. This delay and deliberate strategic choice by Plaintiffs counsels in favor of waiver of any claim to nominal damages. *See Ollie v. Atchison*, 753 F. App'x 406, 408 (7th Cir. 2019) (upholding dismissal of plaintiff's complaint when the plaintiff did not request nominal damages until after dismissal of the other forms of relief).

**B.     Even if properly asserted, a claim for nominal damages cannot save Count I from dismissal as moot.**

Plaintiffs' failure to ever seek nominal damages makes sense here because nominal damages would provide no meaningful relief to Plaintiffs in this case and would not save Count I from being moot. For a federal court to exercise jurisdiction, a "live controversy must exist at all stages of review. Federal courts therefore lack jurisdiction over moot cases, cases in which one of the parties lacks a personal stake in the suit's outcome." *Equal Employment Opportunity Comm'n v. Flambeau, Inc.*, 846 F.3d 941, 946 (7th Cir. 2017) (citations omitted) (quotation marks omitted). That is the situation here. The City's 2014 repeal of the ordinance prohibiting firearm sales rendered moot any injunctive or declaratory relief as to Count I. *See Markadonatos v. Village of Woodridge*, 760 F.3d 545, 546 (7th Cir. 2014) (noting that "the ordinance has been repealed and the repeal moots the plaintiff's request for declaratory and injunctive relief"). And compensatory damages are no longer on the table, either, given the Court's ruling as to Plaintiffs' lack of competent evidence of lost profits. Dkt. 278 at 29.

Under the circumstances presented here, the pursuit of a single dollar in nominal damages is not enough to find that there remains a "live controversy" or a "personal stake" sufficient to avoid mootness. "A basic principle of standing is that a person is not entitled to litigate in a federal court unless he can show a reasonable probability of obtaining a tangible benefit from winning." *Diaz v. Duckworth*, 143 F.3d 345, 347 (7th Cir. 1998). But nominal damages would not provide Plaintiffs with a tangible benefit. The Eleventh Circuit addressed a similar scenario in *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs*, *Georgia*, 868 F.3d 1248 (11th Cir. 2017). In *Flanigan*, the court held that after the city repealed a challenged ordinance, rendering injunctive and declaratory relief moot, a single remaining claim for nominal damages

4

was not sufficient to save the case from mootness because "there is nothing of any practical effect left for us to grant [plaintiffs]. Because the availability of such a practical remedy is a prerequisite of Article III jurisdiction, we must conclude that the prayer for nominal damages will not sustain this case." *Id*. at 1264.

Importantly, the court observed that "nominal damages—a trivial sum awarded for symbolic, rather than compensatory, purposes—may be closely analogized to that of declaratory judgments." *Id.* at 1268. A nominal damages claim is therefore essentially moot for the same reason that a declaratory judgment claim is moot after a statute is repealed; in both cases, there is no live grievance. *Id.; see also Morrison v. Board of Education*, 521 F.3d 602, 611 (6th Cir. 2008) (explaining that awarding nominal damages where a legal regime is no longer in place "would have *no* effect on the parties' legal rights") (emphasis in original); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1268 (10th Cir. 2004) (McConnell, J., concurring) ("Where . . . the challenged past conduct did not give rise to a compensable injury and there is no realistic possibility of a recurrence, nominal damages have no more legal effect than would injunctive or declaratory relief in the same case."); *Freedom From Religion Found., Inc. v. Franklin Cty., Ind.*, 133 F.Supp.3d 1154, 1160 (S.D. Ind. 2015) ("By allowing FFRF to proceed to determine the constitutionality of a policy that has been voluntarily amended to cease illegal conduct, in hope of receiving $1.00, vindicates no rights and is not a task of the federal courts."); *Freedom From Religion Found., Inc. v. City of Green Bay*, 581 F.Supp.2d 1019, 1033 (E.D.Wis. 2008) ("Because an award of nominal damages is virtually indistinguishable from a declaratory judgment which, like Plaintiffs' claim for injunctive relief, I have already found nonjusticiable, I conclude that the Plaintiffs' nominal damages request does not prevent dismissal.").

As these cases demonstrate, a claim for nominal damages here is functionally no different

than a claim for declaratory judgment, and, as such, is moot with the repeal of the offending ordinance. There is no longer a live controversy and no personal stake, and thus no basis for consuming the resources of the busy federal courts. *See Morrison*, 521 F.3d at 611("Allowing [the case] to proceed to determine the constitutionality of an abandoned policy—in the hope of awarding the plaintiff a single dollar—vindicates no interest and trivializes the important business of the federal courts.").

The opinion in *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795 (7th Cir. 2016), is not to the contrary. That case had no occasion to address whether an 11th-hour assertion of nominal damages could save an otherwise moot claim. Instead, nominal damages were asserted alongside a claim for compensatory damages, and both forms of damages were litigated all the way through trial. It was that overall package of damages that "save[d] the case from mootness." *Id.* at 799. Here, in contrast, Plaintiffs no longer have a viable compensatory damages claim to save a nominal damages claim. Further, the claim of nominal damages in *Six Star* was not a throw away, but was integral to how the plaintiffs presented their case. The plaintiffs were two companies (owned by the same person) who claimed that a Milwaukee ordinance unconstitutionally interfered with the ability of each to operate a nude entertainment club. At trial, the common owner of both plaintiffs admitted that he would have opened only one of the two clubs if the ordinance had not existed, and he thus requested that the jury award compensatory damages (lost profits) for the company he would have opened and nominal damages for the other, which is what the jury ultimately awarded. *Id.* at 801. Here, though, Plaintiffs have never asserted that they would have opened anything less than the full compliment of stores that underlaid their claim for lost profits.

Prudential considerations further weigh against keeping Count I alive for the sole purpose

6

of litigating nominal damages. *See Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 149 (7th Cir. 2011) ("Mootness doctrine is also premised on constitutional requirements and prudential considerations."). Nominal damages could be awarded only if the Court first ruled that, on the merits, the City's prior ban on gun stores violated the Second Amendment. But ruling on that complicated issue of constitutional law, six years after the Ordinance was repealed, would be an inefficient use of the parties' and the Court's resources, all to – at most – eventually award Plaintiffs one dollar. The City would thus be severely prejudiced. Indeed, the City moved for summary judgment on Count I on the basis that Plaintiffs utterly failed to establish any injury as a result of the City's ordinance. The City correctly did not view it as necessary to address the merits of whether the Ordinance was constitutional in its motion for summary judgment, because regardless of constitutionality, Plaintiffs could not succeed on the only relief that was still alive at that time: compensatory damages. If the Court were to now allow Plaintiffs to proceed with a nominal damages claim that they never previously requested, litigating the merits of Count I would likely entail at least an additional round of summary judgment briefing and factual submissions – if not also require discovery to be reopened – all of which will come at great cost in time and additional resources to the City and the Court. All of that work would be to litigate a claim that, at the end of the day, would not affect any rights or relations between the parties. This is different than the situation in *Six Star*, where the plaintiff who received nominal damages maintained a real personal stake in the outcome of the lawsuit throughout its duration, including through trial, because compensatory damages were still viable (and were in fact awarded). *See* 821 F.3d at 801.

      Had Plaintiffs earlier raised nominal damages, the City and the Court could have properly and efficiently addressed that aspect of the case, and potentially resolved the entirety of

7

Count I at once. Plaintiff should not be allowed to reap the benefit of sleeping on nominal damages until all other roads were closed to them. Plaintiffs chose to pursue only compensatory damages, and lost. Prudential concerns weigh in favor of holding Plaintiffs to the consequence of this decision.

For these reasons, the Court should not allow Plaintiffs to proceed on a nominal damages claim and should dismiss Count I in full.

## II. THE LASER SIGHT ORDINANCE IS CONSTITUTIONAL.

The Court also directed the parties to address the legal framework that governs Plaintiffs' challenge to the City's prohibition on the possession or sale of laser sights (the "Laser Sight Ordinance"), as well as whether and how the Court should consider newspaper articles submitted by the City in support of that ordinance. The City addresses these questions below.

### A. *Friedman* provides the governing framework for addressing the merits of Plaintiffs' challenge to the laser sight restriction.

Initially, Plaintiffs' challenge to the Laser Sight Ordinance can be rejected at the outset, without applying any form of constitutional scrutiny, because laser sights are not "arms" but mere firearm accessories, and are therefore categorically outside the scope of the Second Amendment. *See* Dkt 256 at 27-28; Dkt 269 at 10-12. But if the Court were to conclude that laser sights are an "arm," then the form of scrutiny that applies is that developed by the Seventh Circuit in *Friedman*.

*Friedman* addressed a Second Amendment challenge to a local ban on high capacity magazines and assault weapons. To resolve the claim, *Friedman* adopted an analysis with two core inquiries. The first is whether the banned weapon was "common at the time of ratification," or has "some reasonable relationship to the preservation or efficiency of a well regulated

8

militia." 784 F. 3d at 410. The second is whether "law-abiding citizens retain adequate means of self-defense" in the absence of the banned weapon. *Id.* This framework recognizes that the Second Amendment "does not imperil every law regulating firearms" and that "categorical limits on the kinds of weapons that can be possessed are proper." *Id.* (citations omitted).

The Seventh Circuit's later decision in *Wilson v. Cook County*, 937 F. 3d 1028 (7th Cir. 2019), which, like *Friedman*, also addressed a ban on high capacity magazines and assault weapons, confirmed *Friedman*'s approach and explained how the approach was rooted in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *See* 937 F.3d at 1035-36. And, importantly, *Wilson* explained that *Friedman* also "fits comfortably under the umbrella of" the Seventh Circuit's earlier decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). 937 F.3d at 1036.[1] The *Ezell* framework is a general one that amounts to a sliding scale approach: where an activity is protected by the Second Amendment, the court asks "whether the strength of the government's reasons justifies the restriction of rights at issue," with the rigor of this inquiry "depend[ing] on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.* at 1036.

*Wilson* explained that *Ezell* was an early effort to develop a framework and establish "threshold" inquiries that would govern in "some" cases. *Id.* at 1036. By the time of *Friedman*, however, a number of other circuits had addressed bans on assault weapons, and the Seventh Circuit was thus "able to draw on upon the experience of those circuits" to develop a more refined approach for assessing the firearms ban before it: the Seventh Circuit thus "pretermit[ed] discussion of more general principles concerning level of scrutiny and focus[ed] on the

---

[1] Indeed, Wilson expressly rejected the arguments that *Friedman* "was wrongly decided" and "cannot be reconciled with *Heller* or *Ezell*." 937 F. 3d at 1035.

9

'concrete' inquiries that had informed those courts' analysis of whether the bans violated the Second Amendment." *Id.* at 1036 (citing *Friedman*, 784 F. 3d at 410). *Friedman*, "therefore, did not 'shun[ ]' *Ezell*, but merely represents the application and extension of its principles to the specific context of a ban on assault weapons and large-capacity magazines." *Id.* at 1036.

The *Friedman* analysis has thus been endorsed by two different panels of the Seventh Circuit. And, here, the Court should resolve Plaintiffs' challenge by posing *Friedman*'s "concrete" inquires, rather than the more general sliding scale approach of *Ezell*. *Friedman* is the more apt precedent in this case not only because it is the more recent and more refined, but also because it addressed bans on items constituting modern firearm technology – large capacity magazines and assault weapons – that render conventional firearms more dangerous. A laser sight accessory is of a piece with these – it is a technology developed long after the Second Amendment's ratification that can enhance the lethality of a firearm. *Ezell*, in contrast, applied its approach to a ban on an activity – shooting firearms at ranges – rather than a firearm or firearm accessory.

As the City has already explained at length in its prior briefs, its ban on laser sight accessories easily satisfies review under *Friedman*. First, a laser sight is not something that was commonly possessed in 1791 (the date of the Second Amendment's ratification). Nor is it analogous to iron sights that may have been on muskets at the time, for a laser sight projects a target onto the subject, whereas an iron sight projects no target and requires the shooter to manually align the gun with the intended target using his or her line of vision. *See* Dkt. 256 at 29; Dkt. 269 at 13-14. Further, a laser sight is not necessary for the preservation or efficiency of a well-regulated militia; militias have existed for hundreds of years without laser sights. *See* Dkt. 256 at 29. Last, even if laser sights are beneficial for self defense, Chicagoans are left with

ample other means for self-defense. They can still use conventional long guns and pistols, which, as *Friedman* and *Wilson* hold, are adequate for self defense. Indeed, because Chicago is a part of Cook County, *Wilson*'s holding that these options are adequate as to Cook County residents necessarily means that those options suffice for Chicago residents, too. And Plaintiffs' own witnesses attested to the adequacy of non-laser-sighted firearms. *See* Dkt. 256 at 29-30; Dkt. 269 at 13. For these reasons, none of the *Friedman* inquiries come out in Plaintiffs' favor, and the City's Laser Sight Ordinance is therefore valid.

And if more were needed, there is another factor that supports the City's restriction under *Friedman*: Banning laser sights advances important governmental interests by increasing the public's sense of safety, given the numerous public reports of laser sights being used in mass shootings and gang violence, and the salience that these shootings can have in the public consciousness. *See* Dkt. 256 at 30-31; Dkt. 269, at 12. A ban that "may increase the public's sense of safety" by reducing "perceived risk" is a "substantial benefit" weighing in favor of its validity, even if there is no empirical evidence showing that the ban in fact reduces gun violence. *Friedman*, 784 F. 3d at 412. The regulation of laser sight accessories is thus a matter properly "left to the legislative process." *Id.* at 412. *See also Wilson*, 937 F. 3d at 1036.

Finally, even if the *Ezell* framework were to apply here, the City's ordinance would pass muster. Laser sights are not protected by the Second Amendment, and even if they were, the City's ordinance places – at most – a modest burden on the ability to use a firearm for self defense, and is supported by the City's legitimate interests discussed above and in the City's prior briefing. Dkt. 256 at 30-31; Dkt. 269 at 14-15.

**B.   The Court should consider news articles reporting the use of laser sights in mass shootings and shootings of law enforcement officers as relevant evidence in support of the laser sight prohibition.**

The Court directed the parties to address whether the Court can and should consider newspaper articles submitted with the parties' summary judgment materials, including whether and for what purpose the Court should consider newspaper articles submitted by the City that were published after the Laser Sight Ordinance was enacted. *See* Dkt. 278 at 30-31. Defendants submitted six news articles regarding mass shootings or shootings of law enforcement officers that involved firearms equipped with laser sights, two of which predated the enactment of the Laser Sight Ordinance. *See* Dkt. 254 at ¶¶ 28, 31, 35-36. As explained more fully below, these articles should be considered as relevant support for the ordinance.

Initially, Plaintiffs admitted the accuracy of Defendants' assertions of undisputed fact based on each of the articles. *See* Dkt. 275, ¶¶ 28, 31, 35-36. Plaintiffs objected to the articles not on hearsay grounds, but instead on relevance. For purposes of this case, then, there is no dispute as a factual matter that laser sights have been used to harm the public and law enforcement as recounted in the articles.

Plaintiffs' relevance objection, moreover, is ill-founded. As explained above, *Friedman* concluded that the government has a "substantial" interest in making the public feel safer by restricting access to devices perceived to be dangerous to the public. *See also Wilson*, 937 F.3d at 1033. Here, the articles support that proposition: They establish that laser-sighted firearms are perceived as more dangerous than regular firearms, as the City Council expressly found. *See* Dkt. 256 at 15; Dkt. 254 at ¶ 30.[2] As news articles reporting violent shootings, they establish the

---

[2] *Friedman* explains that "[w]hat should matter to the 'danger' question is how deadly a single weapon of one kind is compared with a single weapon of a different kind." 784 F. 3d at 409. Here, the City Council has reasonably determined that a firearm with a laser sight is more dangerous than a firearm without one.

12

salience of this danger in the public consciousness. The articles therefore support the proposition that prohibiting laser sights improves the public's sense of safety. *See Friedman*, 784 F.3d at 412 (emphasizing significance of mass shootings as driving perceived risk of assault weapons).

The articles are appropriate support for these points in this case; they need not meet traditional standards of evidentiary admissibility, given the deference afforded the legislature on questions of this sort. As the Seventh Circuit has explained, "Heller did not suggest that [a regulation] would be effective only if the statute's benefits are first established by admissible evidence," and there is no requirement of "proof, satisfactory to a court," that a firearm regulation is "vital to the public safety." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2009) (en banc). And in *Friedman*, the Seventh Circuit bemoaned "[t]he problems that would be created by treating such empirical issues as for the judiciary rather than the legislature," such as "the possibility that different judges might reach dramatically different conclusions about the relative risks" of different firearms "and their constitutional significance." *Friedman*, 784 F.3d at 409. The City Council's conclusion as to the public benefits resulting from restricting laser sights is the kind of "legislative fact" on which courts defer to the legislature. *See Frank v. Walker*, 768 F.3d 744, 750 (7th Cir. 2014) (explaining that as to matters of legislative fact, such as "whether a photo ID requirement promotes public confidence in the electoral system . . . courts accept the findings of legislatures"). Even under traditional standards of judicial notice, the Court may take notice of news articles and the fact that they can have an impact on the public, just as Judge Leinenweber did in *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 586 (N.D. Ill. 2010), *judgment entered*, No. 09 C 2572, 2011 WL 4737179 (N.D. Ill. Oct. 6, 2011, and *aff'd*., 747 F. 3d 929 (7th Cir. 2014).

In the Order, the Court expressed uncertainty about why Defendants believe the news

13

articles cited in their summary judgment briefs are admissible, but object to Plaintiffs' submission of newspaper articles. Dkt. 278 at 31, n.8. As explained above, Defendants' articles are used to illuminate and support the legislative bases for banning a dangerous firearm accessory, and the articles are appropriate evidence on that point under the standards that govern judicial review of legislative judgments concerning the firearm dangers posed here. Plaintiffs' news articles, however, are used for a different purpose. Plaintiffs use one article as proof that "in 2015, when someone else tried to open a gun store in Chicago, it was blocked by the local Alderman. [citation omitted]. *This occurrence* has deterred [plaintiff] Franzese from attempting to open at least until this litigation is concluded." Dkt. 276 at ¶ 33 (emphasis added). Accordingly, this article is offered for the truth of a particular historical fact asserted in the document – *i.e.*, that an alderman had blocked someone else who tried to open a gun shop – and is therefore inadmissible hearsay. Fed. R. Evid. 801.

Similarly, Plaintiffs use two other website articles as proof that "[t]he firearms business has increased greatly since 2008." Dkt. 276 at ¶29. These articles are cited for the truth of the matters asserted in those articles (*i.e.,* that the firearms industry grew since 2008), and are thus inadmissible hearsay. In fact, they are double hearsay, because they are out-of-court statements by web columnists commenting upon purported reports by the National Shooting Sports Foundation ("NSSF"). The other two web pages cited by Plaintiffs (in their response brief) regarding the history and development of scope technology in the firearms industry (Dkt. 274 at 25), suffer from the same defect – they are used as proof of the matters asserted.

Finally, Defendants' articles that post-date the Laser Sight Ordinance are properly considered here. For one, they go to whether it remains reasonable for the City Council to maintain its laser sight restriction on the books. The articles are evidence that, even today, there

14

persists a public perception that laser sights are dangerous, and, thus, that restricting their use enhances the public's sense of safety. Moreover, the post-enactment articles may be used to support the Ordinance's enactment in 1999. The Seventh Circuit has often sustained firearm restrictions based on materials that were not part of the legislative record and were not created until after a statute was enacted. *See United States v. Yancey*, 621 F.3d 681, 683-87 (7th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693-94 (7th Cir. 2010); *Skoien*, 614 F.3d at 643-44. For instance, in the course of upholding a 1996 ban on firearms possession by domestic violence misdemeanants, *Skoien* cited studies from 1997, 1999, 2001-2005, and 2009; at the same time, it did not at all ask whether the enacting legislature had any data or evidence before it. *See Skoien*, 614 F.3d at 643-44. For all these reasons, the post-ordinance news articles remain relevant to the disposition of Defendants' motion for summary judgment.

## CONCLUSION

The Court should grant Defendants' motion for summary judgment (Dkt. 251) and grant judgment to Defendants on Counts I and III.

Date: July 16, 2020                                Respectfully submitted,


                                        MARK A. FLESSNER
                                      Corporation Counsel of the City of Chicago

                                      By:   /s/ Thomas P. McNulty

Andrew Worseck
Thomas P. McNulty
Peter H. Cavanaugh
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 742-0307 / 744-4216
Attorneys for Defendants

15