**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS,<br>R. JOSEPH FRANZESE, individually<br>and d/b/a SECOND AMENDMENT<br>ARMS, and TONY KOLE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO,<br>LORI LIGHTFOOT,<br>EDDIE JOHNSON,<br>and ANNA VALENCIA,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 10 C 4257<br><br>Judge Robert M. Dow, Jr. |

**DEFENDANTS' SUPPLEMENTAL BRIEF ADDRESSING *BRUEN***

Defendants ("City"), acting through their counsel, Corporation Counsel of the City of Chicago, hereby submit this supplemental brief as directed by the Court's June 27, 2022 Order, Dkt. 303. In that order, the Court directed the parties to address whether and how the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (U.S. June 23, 2022), affects the pending issues in this case. Those issues are (1) whether Plaintiffs are entitled to nominal damages on their challenge to the City's prior ban on gun stores, and (2) whether the City's ban on laser sight accessories is lawful under the Second Amendment.

As explained below, *Bruen* does not speak to the issue of nominal damages, meaning that the City's prior briefing on that issue fully addresses the analysis governing Plaintiffs' request for nominal damages. As to the City's ban on laser sight accessories, that law should be upheld under the legal framework adopted in *Bruen* because, at a minimum, laser sight accessories are not "arms" within the plain meaning of the Second Amendment's text.

## I.    Summary Of The *Bruen* Decision.

*Bruen* held that a New York state law governing the carrying of firearms in public violated the Second Amendment. The law generally prohibited residents from carrying handguns in public unless they had a license. *Bruen*, 142 S. Ct. at 2122. To receive a license, a person had to meet a discretionary "proper cause" standard, which required a showing that the person has "a special need for self-protection distinguishable from that of the general community." *Id.* This amounted to a requirement that an applicant present evidence of "particular threats, attacks or other extraordinary danger to personal safety;" it was not enough that the applicant lived or worked in an area noted for criminal activity. *Id.*

The Supreme Court held that the law violated the Second Amendment. In doing so, the Court articulated the following framework for analyzing the law: First, a court considers whether the Second Amendment's "plain text" covers the conduct at issue. *Bruen*, 142 S. Ct. at 2126; *see also id.* at 2129-30. If the text covers the conduct, "the Constitution presumptively protects that conduct." *Id.* At that point, the government must justify the regulation by demonstrating that the regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* Importantly, though, this second step is triggered only if the conduct is covered by the amendment's plain text. If textual coverage does not exist, then the inquiry ends there, and the law is upheld; the government need not show that a regulation is consistent with a historical regulatory tradition. *See id.* (explaining that presumptive constitutional protection and the ensuing historical tradition inquiry comes into play "[w]hen the conduct is covered by the amendment's text).

2

The Court then applied this approach to the New York public carry law at issue. As required by the first step of the analysis, the Court considered whether the conduct at issue – carrying firearms in public – is covered by the plain text of the Second Amendment. The Court concluded that it is. The Court explained that the right to "bear arms" refers to the right to "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Bruen*, 142 S. Ct. at 2134 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 584 (2008)). The Court further explained that "[t]his definition of 'bear'" is not limited to carrying firearms inside the home, but "naturally encompasses public carry." *Id.* Based on the amendment's "plain text," the Court concluded that the amendment "presumptively guarantees . . . a right to 'bear' arms in public for self-defense." *Id.* at 2135.

Because the plain text of the amendment covered the conduct at issue, the Court proceeded to the second step of the framework – whether New York had justified its proper cause requirement by showing that the requirement "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. Based on its survey of historical regulations, the Court observed that "the right to keep and bear arms in public has traditionally been subject to well-defined restrictions" including those "governing the intent for which one could carry arms" or "the manner of carry." *Id.* at 2138. But New York had not "demonstrate[d] a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" altogether, or a historical tradition "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* The Court therefore concluded that New York failed its "burden to identify an American tradition justifying New York's proper-cause requirement." *Id.*

3

II.     *Bruen* **Does Not Impact The Analysis On Nominal Damages.**

*Bruen* did not address the issue of remedies.  It addressed only the merits question of whether New York's law violated the Second Amendment.  After answering that question, the Court reversed the decision below, which had upheld New York's law, and remanded the case for further proceedings consistent with the Court's opinion.  142 S. Ct. at 2156.

Accordingly, this Court may rely on the City's prior briefing regarding the availability of nominal damages on Plaintiffs' claim challenging the City's prior ban on gun stores.  As shown in that briefing, Plaintiffs are not entitled to nominal damages because they waived any claim for nominal damages, and prudential concerns counsel against awarding nominal damages at this stage of the case.  *See* Dkt. 291, at 2-3, 6-8.  *See also* Dkt. 302.

III.    *Bruen* **Does Not Alter The Result As To The City's Ban On Laser Sight Accessories.**

In the City's prior summary judgment briefing, the City demonstrated why its ban on laser sight accessories is valid under the Second Amendment.  That result is consistent with the *Bruen* framework.  To be sure, the *Bruen* framework differs from the framework used by the Seventh Circuit in *Friedman v. Highland Park*, 784 F.3d 406 (7th Cir. 2015), and discussed in the City's prior briefing.  But the first step of the *Bruen* framework – whether the conduct at issue is covered by the Second Amendment's plain text – mirrors the first step of the City's argument in the prior briefing, which showed that laser sight accessories are not "arms" under the meaning of that word in the Second Amendment.  Because laser sight accessories are not covered by the amendment's plain text, the *Bruen* inquiry ends, and the City is not required to justify its laser sight ban as being consistent with historical regulations.

If, however, it were necessary to address the historical inquiry, *Bruen* recognized a historical tradition of regulating weapons that are dangerous and unusual, or that spread fear and

4

terror – descriptions that encompass laser sight accessories.  At the least, the City should be allowed additional time to develop the record on this element of the *Bruen* framework, for it was not a dispositive feature under prior caselaw and therefore not addressed in the City's prior briefing.

### A.    Laser sight accessories are not "arms" under the Second Amendment.

The City's prior briefing addressed the laser sight issue under a two-step framework, where the City addressed, first, whether laser sight accessories fall within the scope of the Second Amendment as "arms," and then, second (assuming that laser sight accessories are "arms"), whether the City's ban satisfied the applicable form of scrutiny (which was the form set forth in *Friedman*).  *See* Dkt. 291, at 8.  The first step in the City's prior briefing mirrors the first step of the *Bruen* analysis, and thus is fully applicable here.  *Bruen*, 142 S. Ct. at 2126-27 (explaining that "[s]tep one of the predominant framework" used by lower courts, which considered whether a regulation falls within the "historical meaning" and "original scope" of the Second Amendment, "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

The City's prior briefing demonstrated that laser sights are not "arms" within the meaning of the plain text of the Second Amendment, but are, rather, mere firearm accessories.  For this reason, they are categorically outside the scope of the Second Amendment.  *See generally* Dkt. 256, at 27-28; Dkt. 269, at 10-12.[1]  The Second Amendment protects "the right of

---

[1] Although the City demonstrates that laser sight accessories are not "arms" within the plain text of the Second Amendment, it is Plaintiffs who should bear the burden of showing that laser sight accessories fall within the amendment's text.  In *Bruen*, there apparently was no dispute that the conduct at issue was covered by the text.  *See* 142 S. Ct. at 2134.  But requiring this burden of the challenger is consistent with the approach taken under the First Amendment.  *See Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2421-22 (2022) (explaining that in a free exercise challenge, a plaintiff has an initial burden to show, for example, "that a government entity has burdened his sincere religious practice pursuant to a policy that is

the people to keep and bear *Arms*." (Emphasis added). And as explained by the Supreme Court in *Heller*, the plain textual meaning of "arms" in founding-era dictionaries was "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581. While the term "Arms" in the Second Amendment is not limited "only [to] those arms in existence in the 18th century" and extends to "modern instruments," the term nonetheless encompasses only those instruments "that constitute bearable *arms*" – a meaning that is "fixed according to its historical understanding." *Bruen*, 142 S. Ct. at 2132 (citations omitted) (emphasis added).[2]

A laser sight accessory does not fall within the plain textual meaning of "Arm" because it is not itself a "weapon of offence" or "armour of defence." A laser sight itself cannot be used to inflict offensive injury, nor can it be used as defensive armor. In this regard, laser sight accessories are like firearm silencers, devices that courts have held do not constitute "arms" under the Second Amendment because they are accessories rather than weapons themselves. *See United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')"); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019) ("[A] silencer is not an 'arm' or a 'weapon' because it is not inherently useful 'in case of confrontation' as a '[w]eapon of offence' or an 'armour of

_____

not 'neutral' or 'generally applicable,'" and then, if such a showing is made, the Court will find a First Amendment violation unless the government can satisfy the applicable standard of scrutiny). And courts have analogized the First Amendment to the Second Amendment. *See, e.g.*, *Bruen*, 142 S. Ct. at 2156; *Heller* 554 U.S. at 635; *Ezell v. City of Chicago*, 651 F.3d 684, 706-07 (7th Cir. 2011). Plaintiffs have not shown that laser sight accessories fall within the plain text of the Second Amendment. Nor could they, as is clear from the City's discussion in this brief and in its prior summary judgment briefing.

[2] That the term "Arms" as used in the Second Amendment does not include weapon accessories is also supported by the text of a founding-era military statute, which referred separately to, and thus distinguished between, "arms," "ammunition," and "accoutrements." *See Heller*, 554 U.S. at 650 (Stevens, J., dissenting) (quoting from an Act ... for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § III, p. 2).

6

defence.' A silencer is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose.").

The record in this case, moreover, confirms that laser sights are accessories rather than arms. As Plaintiff Tony Kole himself testified, a laser sight is "an accessory . . . not a fundamental part of the design of the firearm." Dkt. 254, ¶ 33. A laser sight is not necessary for a firearm to function. *Id.* Laser sights are often separate devices that are attached to already-operable firearms, and even firearms that have laser sights integrated into the device will still function if the laser sight component is removed or stops working. *Id.* As Plaintiff Kole testified, if the laser sight accessory attached to one of his firearms happened to be broken, he would "absolutely" still be able to defend himself if necessary. *Id.* While a laser sight accessory does not meet the textual definition of "arm" in its own right, these admissions preclude Plaintiffs from arguing that laser sight accessories are "arms" rather than accessories, because "statements in [p]laintiffs' deposition constitute binding admissions under oath, and those admissions are inescapable." *Butler v. E. Lake Mgmt. Grp., Inc.*, No. 10-CV-6652, 2014 WL 273650, at *2 (N.D. Ill. Jan. 24, 2014) (Dow, J.).

Plaintiffs are not helped by arguing that colonial-era firearms contained iron sights. Dkt. 260-1, at 25, 27. Whether older firearms had that particular *feature* does not speak to whether that feature – to say nothing of modern laser sight accessories – is an "Arm" within the particular meaning of the Second Amendment. Plaintiffs' effort to analogize iron sights to laser sight accessories, moreover, is foreclosed by Plaintiff Kole's testimonial admission expressly distinguishing between a laser sight (an accessory) and an iron sight (a fundamental feature of a firearm). *See* Dkt. 254, ¶ 33 (A laser sight is "an accessory. So it's not a fundamental part of the design of the firearm and that fundamental design is the iron sights.").

For these reasons, laser sight accessories, like firearms silencers, do not fall within the Second Amendment's plain text. The analysis therefore stops at the first step of the *Bruen* framework, and there is no need to consider whether the City's ban is consistent with a historical regulatory tradition. *See supra*, at 2 (historical tradition prong is triggered "[w]hen" the Second amendment's text covers an individual's conduct).

**B.     The second step of the *Bruen* test permits banning laser sight accessories.**

If, however, laser sight accessories are deemed to be "arms" under the Second Amendment, that would not end the inquiry. *Bruen* makes clear that the analysis would proceed to the second step, where the City can justify its ban by showing that it is consistent with the Nation's historical tradition of firearms regulation.

*Bruen*'s conclusions about historical public carry laws are supportive of the City's laser sight ban. The Court explained that, even if there was not a historical tradition of prohibiting public carry altogether, the historical evidence "does demonstrate that *the manner* of public carry was subject to reasonable regulation," 142 S. Ct. at 2150 (emphasis in original). As support, the Court discussed colonial statutes that "codified the existing common-law offense of bearing arms to terrorize the people," and laws that "prohibited the carrying of 'dangerous and unusual weapons." *Id.* at 2143. *See also Heller*, 554 U.S. at 627 (discussing "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'"). The Court explained that the "familiar thread" running through such laws is that they "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." 142 S. Ct. at 2145.

Banning laser sight accessories is consistent with these historical prohibitions on dangerous and unusual weapons, or carrying weapons in a way that spreads fear or terror. The technology of the laser sight—the ability to visibly point and project a laser dot on a target and

fire—enhances the dangerousness of firearms and the fear they generate among the public. The record is replete with evidence showing that the City Council could properly conclude as much. Laser sights allow "novice" criminals to be turned into "marksmen," *see* Dkt. 254, ¶ 31, and after a laser sight was used to kill a Chicago police officer, the City enacted its ban for the express purpose of alleviating the concern that "the [the City's] citizens, most particularly its police officers, [were] being endangered by the use of laser sights." *Id.* ¶¶ 28-30. And in the two decades since the ordinance's enactment, laser sights have remained at the fore of public consciousness, with numerous articles reporting on shooters using laser-sight devices in high-profile mass shootings; these shootings include the 2019 shooting in Aurora, Illinois, the 2018 shooting during a video game tournament in Jacksonville, and the 2009 Fort Hood shooting. *See id.* ¶ 35. News reports also suggest that gang members use guns equipped with laser sights to carry out gang-related attacks. *See, e.g.*, *id.* ¶ 36. In *Friedman*, the Seventh Circuit took seriously the fear and terror that particular weapons instill because of their tendency to be used in salient episodes of violence like mass shootings and the shootings of law enforcement officers. 784 F.3d at 412. Like the assault weapons at issue in *Friedman*, the use of laser sight accessories enhances "the perceived risk from a mass shooting," and prohibiting their use has the "substantial benefit" of "mak[ing] the public feel safer as a result." *Id.*

Another aspect of *Bruen* supports the City's laser sight ban. The Court explained that when inquiring into historical prohibitions that are analogous to modern regulations, courts should consider the extent to which the modern regulation burdens a person's right to self-defense. *See Bruen*, 142 S. Ct. at 2133. Here, any burden on self-defense is minimal. The City's ban on laser sight accessories does not restrict who may carry firearms, what kinds of firearms may be carried, or where they may be carried. It prevents only one particular

mechanism for aiming the firearm. Firearms without laser sights can still be aimed effectively. Indeed, Plaintiffs' own witness testified that non-laser-sighted firearms are amply sufficient for self-defense. *See* Dkt. 256, at 29-30; Dkt. 269, at 13. As held by the Seventh Circuit in *Friedman* and *Wilson v. Cook County*, 937 F. 3d 1028 (7th Cir. 2019), moreover, conventional long guns and pistols are adequate for self-defense.

These features of *Bruen's* historical analysis should suffice, but if more were needed, the City respectfully requests additional time to investigate and develop a record as to historical analogues to the laser sight ban. Examining that historical tradition could involve canvassing statutes from scores of colonial and state jurisdictions over hundreds of years. Such inquiry was not addressed in prior briefing by the City because it is not part of the *Friedman* framework, nor otherwise dispositive. And in the wake of *Bruen*, which issued a little over a month ago, the City has not yet had sufficient time to investigate the historical materials as they may bear on analogues to the City's ban on laser sight accessories.

## CONCLUSION

For the foregoing reasons, *Bruen* does not address nominal damages, and it does not provide a basis for invalidating the City's ban on laser sight accessories. The Court should therefore grant Defendants' motion for summary judgment (Dkt. 251) and grant judgment to Defendants on Counts I and III.

Date:    August 8, 2022                    Respectfully submitted,

The City of Chicago

By:      <u>Andrew Worseck</u>

Andrew Worseck
Thomas P. McNulty
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-7129/ 742-0307
Attorneys for Defendants