IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a SECOND AMENDMENT ARMS, and TONY KOLE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No: 1:10-CV-4257 |
| CITY OF CHICAGO, a municipal corporation, BRANDON JOHNSON, in his official capacity as Mayor of the City of Chicago, LARRY SNELLING, Superintendent of Police of the City of Chicago, and ANNA M. VALENCIA, City Clerk of the City of Chicago, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 12(B)(1) MOTION TO DISMISS COUNT I AND SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

NOW COME the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, by and through undersigned counsel, and for their Response to *Defendants' Rule 12(b)(1) Motion to Dismiss Count I and Supplementary Authority in Support of Their Motion for Summary Judgment* asserts the following:

I.    PLAINTIFF HAS STANDING TO CHALLENGE THE CITY'S 2010 GUN
      STORE, AND HAS HAD STANDING SINCE THE BEGINNING OF THIS
      LITIGATION.

Thirteen years after suit was filed over a constitutional violation which

occurred at that time, and after multiple denials of motions to dismiss and the

denial of two motions for summary judgment, and with none of the facts changing

between then and now, Defendants are seeking – without merit – to dismiss

Plaintiff's claim on standing grounds. Such a dilatory argument is as without merit

as it has been for the entire thirteen years.

It is undisputed that Plaintiff took steps towards his goal of opening firearm

stores in the City. Not enough to satisfy the Court as to lost profits, apparently, but

steps all the same. Mr. Franzese applied for a City license, applied for a federal

firearms license (FFL) with the BATFE ("ATF"), followed up incessantly, entered

into plans as to divisions of labor with his would-be associates/employees, all of

whom had extensive experience in the industry, and created a basic business plan.

Further, the Court has already addressed the issue of standing – and that

Plaintiff has it – when it ruled:

> a judgment that SAA was improperly precluded from opening a
> gun store at any commercial location in Chicago solely because
> of the gun store ban is substantially likely to redress its
> injuries— whatever their size.[fn]2

> [fn]2 That being said, the fact that SAA could not have opened a
> gun store at 415 West Armitage may significantly curtail any
> "lost profits" it could hope to recover from being the first gun
> store in Chicago. Indeed, it may be an insurmountable hurdle

> for Plaintiff to establish a viable, non-speculative damages theory. *But that goes to the merits, not standing.*

*See* Dkt. #219, dated August 29, 2017, at p.8 (italics added). And while this has come to pass - over Plaintiff's continuing objection - it is still not a standing issue. What *is* relevant is that in 2010 Plaintiff submitted a legitimate business license application for a gun store in the City, and he was denied for no reason other than the City had an unconstitutional Ordinance that violated Plaintiff's rights (*See* Dkt. # 215-7 (E-mail correspondence between City of Chicago and U.S. Department of Justice, dated January 31, 2011 (City Rule 34 Response Bate Stamp No. 000832-33))). This is "injury in fact," which is "fairly traceable to the [Defendants'] challenged conduct," and which is "likely to be redressed by a favorable judicial decision," *see Lujan*, 504 U.S. at 560-61, and has not changed from Minute One of this litigation to the present day.

This is why the Defendants' comparison to *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), is inapt. In *Carroll*, the plaintiff claimed that the State of Hawaii's law providing preferential treatment for state business loans to native Hawaiians violated the Fourteenth Amendment. *Carroll* was an equal protection race-based challenge with an "able and ready" standard of analysis (per *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)); that differs from the instant case, and held the plaintiff lacked standing because the plaintiff had only completed a partial business license application for a copy shop (after the lawsuit was filed), did not respond to inquiries from the

3

government for more information, had no work history, had not created even a basic business plan, had done no research about running a business, and appeared to know little about his chosen industry. *Carroll*, 342 F.3d at 941-42. The plaintiff admitted "that the only step taken in furtherance of his business was to speak with a sales clerk at Office Depot." *Carroll*, 342 F.3d at 941.

In contrast, Franzese may not have had enough information to support a lost-profit claim for a new business, but he was worlds beyond the plaintiff in *Carroll*, and certainly enough to ensure standing, which the Court did not doubt for the first thirteen years of this litigation. Franzese testified that he did not proceed further with the financing and real estate issues because the City denied him a business license, which in turn meant his FFL application was also eventually denied. Without those licenses, he could not obtain inventory or contact distributors, vendors, or outside ranges. To compare to *Carroll*, for example, the plaintiff's lack of effort to get a business loan did not affect his ability to apply for a business license (which he also did not do), and there were no federal licenses required for a copy shop. Had Plaintiff been granted a City business license, received the FFL, and failed to open because of a lack of business acumen, that would have been on him. That he was unconstitutionally denied even the opportunity is on the City, as determined four years later in *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (Second Amendment "right must also include the right to acquire a firearm").

Defendants also cite to *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337 (11th Cir. 2019), but *that* case cites to *A Helping Hand, LLC v. Baltimore Cty.*, 515 F.3d 356, 358-62 (4th Cir. 2008), where the plaintiff had standing when it "(1) was in the business of operating methadone clinics, (2) located a particular clinic location and signed a lease, (3) consulted with local officials about founding its clinic, (4) applied for the required federal and state certifications and permits, (5) submitted detailed plans about the requested clinic site to county officials, and (6) associated with specific prospective patients who joined as plaintiffs to the lawsuit)."

Plaintiffs' actions are not entirely linear with *Helping Hand*, but Plaintiff got underway on many of these items before the City slammed the door shut – Plaintiff was knowledgeable about the industry, applied for federal and local licenses, followed up with federal and local officials about licensure, looked for an initial location (even though he was misled that does not change the analysis, *see* Opinion of August 29, 2017 at p.7 (Dkt. #219) (denying summary judgment as to Count I)), started coordinating with experienced staff about job descriptions, and started putting together a business plan. The law does not require one to be a candidate for Shark Tank to have Article III standing.

This is why Defendants' entire argument and cited line of cases about a plaintiff's failure to apply for a license (Motion at p.8) is completely inapposite, because it is undisputed that Plaintiff did apply for a license. Therefore, based on the above-demonstrated efforts, Plaintiff easily exceeds the "someday" speculation

5

discussed in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 (2013) or *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

Further, despite the Court's prior ruling about lost profits, Defendant's "injury in fact" argument only works if nominal damages are not allowed. However, as Plaintiff has briefed twice already (Dkt. ## 292 (dated July 16, 2020), 300 (dated August 27, 2020), nominal damages are allowed, not least of which because the Supreme Court and the Seventh Circuit have both stated that they do. *See New York State Rifle & Pistol Ass'n. v. City of New York*, 140 S. Ct. 1525, 1535 (2020) (Alito, J., dissenting); *see also Carey v. Piphus*, 435 U.S. 247, (1978); *Memphis Community School Dist. v. Stachura*, 477 U.S. 299 (1986); *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795 (7th Cir. 2016); *Moore v. Liszewski*, 838 F.3d 877, 879 (7th Cir. 2016) (nominal damage rule is "entrenched" in Seventh Circuit).

Defendant continues to claim that Plaintiff has waived such a claim, but Plaintiff has also repeatedly briefed why that is not true (Dkt. #292 at p.3; Dkt. #300 at pp.2-3). Plaintiffs' pending Complaint requests actual damages to compensate for the lost business due to the deprivations of their civil rights, as well as "such other and further relief as this Court may deem just and proper in the premises." *See* p.10-11 of Fourth Amended Complaint (Dkt. # 146). Further, at the outset Plaintiffs requested "general, compensatory, and punitive damages as the proofs will show at trial (*See* p.25 of Dkt. # 1). Plaintiffs' pending Complaint thus covers both possibilities, and, in fact, Plaintiffs have sought such a remedy since the initial filing of this suit.

Since judgment has not entered, Plaintiffs are not only at least entitled to nominal damages pursuant to F.R. Civ. P. 54(c), but will amend their Complaint *instanter* to explicitly state a request for relief of nominal damages should the Court require, even though F.R. Civ. P. 54(c) does not require it (*See Illinois Physician's Union v. Miller*, 675 F.2d 151, 158 (7th Cir. 1982) ("the court may grant 'the relief to which the party in whose favor … (judgment) … is rendered is entitled, even if the party has not demanded such a relief in his pleadings'")). *See also Avitia v. Metropolitan Club*, 49 F.3d 1219, 1226 (7th Cir. 1995).

At a minimum the Defendants should be liable for violating Plaintiffs' constitutional rights. They have established that their request for a business license was wrongfully denied because the Defendants unconstitutionally did not allow firearms dealers within the City limits, and that Plaintiffs could not obtain an FFL without the license. This is not argument; the Court has already all but decided such in *Firearms Retailers*. Plaintiffs should be compensated for the Defendants' wrongful actions, even if nominal damages are the only available remedy. The Motion to Dismiss Count I should be denied.

## II. *BEVIS* IS IRRELEVANT TO ANALYZING THE LASER SIGHT BAN, AND DOES NOT CHANGE THAT THE LASER SIGHT BAN IS UNCONSTITUTIONAL.

### Laser sights are "arms."

In addition to the arguments presented in Dkt. # 274, pp. 24-29, Dkt. #292, pp. 6-14, Dkt. #300, pp. 11-15, and Dkt. #313, pp. 6-9, Plaintiffs assert the following:

In the citations to the record noted above, Plaintiffs demonstrated how the Seventh Circuit cases of *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), which concerned assault weapon bans, are not applicable here. *Wilson* made very clear that its analysis applied specifically to assault weapons. *Wilson*, 937 F.3d at 1035. *Wilson* also held that "We do not establish here a comprehensive approach to Second Amendment challenges, and we leave for other cases further development and refinement of standards in this emerging area of the law." *Id.* at 1036-37.

Defendants now attempt to fit a third assault weapon case, *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023)[1] into this one. But *Bevis* is as inapt to the present situation as *Friedman* and *Wilson* are.

The most the City can take away from *Bevis* is that assault weapons (the Court's discussion was actually limited to the AR-15) and large capacity magazines are close enough to military weapons that they do not qualify as "arms" protected by the Second Amendment. *Id.* at 1195. *Bevis*, like *Friedman* and *Wilson*, does not concern laser sights or any other type of sights, which are not mentioned at all in the PICA assault weapon law and have no impact on whether a firearm meets the definition of an assault weapon. "Specifically, the Act covers firearms, [large

---

[1] *Bevis*, which actually consisted of six consolidated cases from the Northern and Southern Districts of Illinois, is currently the subject of numerous Petitions for *writ of certiorari* at the United States Supreme Court (*see, e.g.*, *Harrel v. Raoul*, 23-877) while the cases are simultaneously pending after remand in the District Court (*see, e.g.*, *Barnett v. Raoul*, 3:23 CV 209 (S.D. Ill.)).

capacity] magazines, and an endorsement process for registration." *Bevis*, 85 F.4th at 1207 (Brennan, J., dissenting).

The text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Heller* the Supreme Court definitively construed the word "arms" in the Amendment to mean "[w]eapons of offence, or armour of defence," *Heller*, 554 U.S. at 581 (quoting Johnson, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)), or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," id. (quoting 1 A New and Complete Law Dictionary).

"Arms" are not limited specifically to firearms as Defendants describe them. "[E]ven though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28. *See, e.g., Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*) (stun guns are "arms" under Second Amendment); *see also People v. Webb*, 2019 IL 122951 (same); *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) (Hawaii statute banning butterfly knives violated Second Amendment).

As previously briefed, firearm sights have been used for hundreds of years, and a laser sight is simply a modern iteration of that. Banning something which is simply a modern iteration of something that has necessarily been a part of safe

firearm usage for hundreds of years, *i.e.* firearm sights (*See, e.g., United States v. Jones*, 132 S. Ct. 945 (2012)), cannot be upheld under *Bruen*.

Sights are necessary to accurately use the firearm. The assertion that laser sights, or any firearm sights, are not arms is meritless. The ban is aimed at restricting the ability of residents to use arms with the increased aim they can have when equipped with a laser sight. A firearm equipped with a laser sight is no less of a protected "arm" than a firearm without one. It should make no difference for Second Amendment analysis that the firearm can physically be pointed and shot without the laser sight permanently affixed to it.

The Defendants claim that laser sights are not useful for self-defense and so they are not protected parts of firearms. But that is wrong both in theory and application. The Defendants are wrong in theory because there is no rule that a part of a firearm is only protected by the Second Amendment if it can be shown to be sufficiently important for self-defense. Rather, the Supreme Court has rejected that proposition and warned courts that they should not be in the business of making that sort of judgment. The Defendants' argument is wrong in practice because laser sights, like regular sights, are useful for self-defense or for any other type of lawful use of a firearm. Without them, and the ability to aim the firearm to maximum ability at the target, firearms present an increased danger to the user and the public.

Of course, a laser sight or any sight, by itself, is not capable of expelling a projectile, but no part of a firearm is. Yet regulation of an ammunition magazine, a

10

rifle barrel, a trigger, or yes, a set of sights, would necessarily regulate the firearm itself. This logic is why magazines have been determined to be arms, *see Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*, 910 F.3d 106, 116 (3d Cir. 2018), as has ammunition. *See Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them" because "eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose" of self-defense). If, as the Defendant's cited case *United States v. Saleem*, 659 F. Supp. 3d 683, 697 (W.D.N.C. 2023) notes, cleaning supplies and range training are protected because they are both "critical to the use and effectiveness of a firearm as a bearable weapon," *id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)), then a laser sight which allows the user to *accurately aim the firearm*, surely falls into the same category. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring).

If the Second Amendment is to mean anything, then an "arm" must include not just complete firearms but also component parts that function with the firearm. And any ban on a component part of a firearm should not be understood merely as a ban on that part, but a ban on firearms that function with that part. Defendants may claim otherwise, but the effect of the ban is not that Chicagoans cannot own laser sights, but rather that they cannot own a firearm with the ability to aim through the use of a laser sight. This is why the court in one of Defendants' other

cited cases distinguished between components that "'cast at or strike another,' or 'contain, feed, or project ammunition,' or those that 'serve any intrinsic self-defense purpose'" and those that did not. *United States v. Hasson*, 2019 U.S. Dist. LEXIS 160498, \*11. Regardless of how the *Hasson* court felt about silencers, the ability to use sights to aim clearly serve an "intrinsic self-defense purpose."

The Defendants cherry-picked one statement from Tony Kole's deposition as if it is a dispositive admission. But the fact that Kole, who is very experienced with firearms and their use, *could* aim his firearm without a laser sight does not take away from its "intrinsic self-defense purpose. That one could fire a gun without ever visiting a firing range for training does not reduce the value of doing so, or its Second Amendment protection. In any event, the Supreme Court made clear in *Bruen* it is not the job of the courts to determine whether an arm that a government wishes to ban is useful enough for self-defense to preclude said government from doing so. 597 U.S. at 19-20.

However, to recap from Plaintiffs' original Summary Judgment Response, Dkt. # 274-77, four witnesses testified about the value of laser sights for self-defense. Dkt. # 276, SUF 55-66.

Specifically, Joseph LaJoy testified that he "installs laser sights as part of his gunsmithing work," for "target acquisition, and [it] helps to make sure the gun is sighted and on target. It is easier to hit a target at a known distance with a laser sight. This is especially true for aging shooters with diminishing eyesight. As an

12

instructor, Lajoy also uses lasers as a diagnostic tool. There is also a large deterrent effect to a threat when using a laser." Dkt. # 276, SUF 57 (deposition cites omitted).

Further, Plaintiff Tony Kole testified that if allowed, he would have a laser sight on his concealed carry pistol to aid with self-defense. *See* Dkt. # 276, SUF 63.

Kole also testified that:

"A laser sight is to help accuracy, and does not diminish skill with using iron sights, so using one does not degrade the fundamental skill of aiming and shooting without one. A laser sight also allows one to maintain a point of aim on an attacker while maintaining situational awareness, such as body language, movement of others, *etc...* A laser sight allows one to overcome the loss of fine motor skills caused by stress, adrenaline, and an increased heart rate, and maintain control of the aim of the firearm. It also aids with diminishing eyesight and in the dark." Dkt. # 276, SUF 64 (deposition cites omitted).

"If in a self-defense situation, Kole would feel more comfortable having a laser sight on his firearm in order to successfully defend himself. This is true even though he has trained such that he could defend himself without one if necessary. If you are in a self-defense situation, you want to have every tool available to defend yourself as safely, easily, and effortlessly as possible. A laser sight makes a defender more effective. It could also serve as a deterrent and end the situation with the attacker fleeing, which is preferable to shooting." Dkt. # 276, SUF 65 (deposition cites omitted).

### Defendants cannot historically justify the laser sight ban.

As previously noted in earlier briefings, since a sight – by virtue of its function and usage with a firearm – constitutes an "arm," under *Bruen* the Defendants then have the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24.

The City cannot meet this burden, because it has not and cannot identify well-established and representative historical analogues to show that the prohibition is consistent with a historical tradition of firearms regulation. And while "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Bruen*, 597 U.S. at 30 (quoting *Drummond v. Robinson*, 9 F. 4th 217, 226 (3d Cir., 2021), such an admonition is irrelevant here, because the Defendants have offered no analogues, witnesses or evidence on the topic at all.

As noted, all the Defendants have offered is a few inadmissible and random newspaper stories over the last few decades that involved a shooting where the shooter had a laser sight. In addition to being hearsay with no actual facts or supported data, they are simply fear-mongering, and inviting the means-end scrutiny no longer allowed under *Bruen*, while evidencing absolutely nothing about laser sights. Defendants are clearly trying to note the existence of a shooting by a

criminal somewhere and sometime in America, and that the firearm used had a laser sight, but that is the sort of conclusory, unsupported, and unduly prejudicial statement prohibited by the FRE, and *Bruen*, and which this Court should reject. In contrast, Plaintiffs have demonstrated that they help law-abiding persons use their firearms more safely, and how there are already laws designed to prevent laser sights from being used during illegal activity.

Plaintiffs have shown that firearm sights are long-standing, and it was Defendants' burden under *Bruen* to show that the ban met constitutional scrutiny. In the end, the Defendants' failure to provide any - much less any proper - historical analogues to support the laser sight prohibition means their motion for summary judgment must again be denied.

## CONCLUSION

WHEREFORE, the Plaintiffs, SECOND AMENDMENT ARMS (a d/b/a of R. Joseph Franzese), R. JOSEPH FRANZESE, individually and d/b/a Second Amendment Arms, and TONY KOLE, requests this Honorable Court to deny Defendant's F.R. Civ. P. 56(a) Motion for Summary Judgment in its entirety, and to grant Plaintiffs any and all further relief as this Court deems just and proper.

Dated: February 21, 2024                    Respectfully submitted,


By:        /s/ David G. Sigale
           Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com

## <u>CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING</u>

The undersigned certifies that:

      1.      On February 21, 2024, the foregoing document was electronically filed with the District Court Clerk via CM/ECF filing system;

      2.      Pursuant to F.R. Civ. P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.


                                  /s/ David G. Sigale
                                    Attorney for Plaintiffs


David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
55 West 22nd Street, Suite 230
Lombard, IL 60148
630.452.4547
dsigale@sigalelaw.com