# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

SECOND AMENDMENT ARMS, R.  )
JOSEPH FRANZESE, individually and )
d/b/a SECOND AMENDMENT ARMS, and )
TONY KOLE,        )
            )
    Plaintiffs,    )
            )
  v.         )  10 C 4257
            )
CITY OF CHICAGO, BRANDON   )
JOHNSON, LARRY SNELLING, and  )
ANNA M. VALENCIA,     )
            )
    Defendants.   )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiffs Second Amendment Arms ("SAA"), Joseph Franzese, and Tony Kole (together, "Plaintiffs") are firearms owners and retailers who sought damages for a business they could not open because of an ordinance ("2010 Ordinance") enacted by Defendant City of Chicago ("City"), later declared unconstitutional, and who challenge the constitutionality of a separate ordinance that bans the sale or possession of laser sights within Chicago ("Laser Sight Ordinance"). Before the Court are Defendants' motion for summary judgment, Dkt. # 251, and Defendants' motion to dismiss under

Federal Rule of Civil Procedure 12(b)(1) for lack of standing, Dkt. # 320.[1]  For the following reasons, Defendants' motion to dismiss is denied but their summary judgment motion is granted.

## BACKGROUND

Plaintiffs initiated this case in 2010, Dkt. # 1, and filed the operative fourth amended complaint ("FAC") in 2014, Dkt. # 146.  In 2019, Defendants moved for summary judgment on the two claims remaining in the case: Count I for damages stemming from the 2010 Ordinance, later deemed unconstitutional, and Count III challenging the constitutionality of the Laser Sight Ordinance banning the sale or possession of laser sights in Chicago.  Dkt. # 251.  The motion also sought to exclude the testimony of Robert Southwick, Plaintiffs' damages expert who offered testimony about lost profits.

On March 10, 2020, Judge Dow (the then-presiding judge in this case) granted Defendants' motion as to the exclusion of Southwick's testimony, and denied the motion without prejudice as to summary judgment on Counts I and III.  Dkt. # 278 ("2020 Order").  The 2020 Order excluded Southwick's report and opinions as

---

[1] "Defendants" refers collectively to Defendants City of Chicago, Brandon Johnson, Larry Snelling, and Anna M. Valencia.  Johnson is the City's Mayor, who replaced Mayor Lori Lightfoot, who replaced Mayor Rahm Emanuel, who was originally named as a defendant in his official capacity.  Dkt. # 146, ¶ 6.  Snelling is the Superintendent of Police of the City, who replaced interim Superintendent Charles Beck, who replaced Eddie Johnson, who replaced Superintendent Garry McCarthy, who was originally named as a defendant in his official capacity.  *Id.* ¶ 7.  Valencia is the Clerk of the City, who replaced Clerk Susana Mendoza, who was originally named as a defendant in her official capacity.  *Id.* ¶ 8.

inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). *Id*. at 26. "With Southwick's opinions excluded," the 2020 Order then turned to "whether summary judgment in Defendant[s'] favor may be warranted because Plaintiffs cannot establish any alleged lost profits with reasonable certainty as required by Illinois law." *Id*. The answer to that question was "yes."

The 2020 Order ruled that Franzese and SAA offered none of the evidence required to show lost profits, and instead relied on "mere speculation." *Id*. at 27 (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1368 (7th Cir. 1996)). It elaborated:

> [B]oth the successful launch of Franzese's business in Chicago and its profitability are too speculative to support an award of lost profits. Franzese did not in fact launch his business—admittedly at least in part due to Defendant's actions or inaction—or even do much [of] the work that was both within his power and necessary or helpful to starting the proposed business. . . . The undisputed facts show that Plaintiff was very far from opening the first proposed store, much less five new stores in eighteen months. Even setting aside the Chicago business license, whether or not Franzese could have even started his business—a necessary predicate to a business making a profit—is a matter of speculation.

*Id*. Plaintiffs argued that Defendants prevented them from taking certain actions required to start the business, e.g., SAA was unable to get a Federal Firearms License ("FFL") without a business license from the City, which Defendants refused to issue, and "there was no point in working to start the business [] as long as the ordinance prevented him from obtaining a business license." *Id*. at 28–29. The 2020 Order rejected Plaintiffs' argument:

3

> Plaintiffs have a point here with regard to the FFL, because having a business license appears to be a requirement of obtaining an FFL. And if activities requiring an FFL were the only ones Plaintiffs had not completed or attempted, the analysis might be different. But even giving Franzese and [SAA] the benefit of the doubt regarding FFL-dependent activities, Plaintiffs did so little of the work required to open and begin operating a business that the business's mere existence remains wildly speculative.

*Id*. at 29. And having excluded Southwick's lost profits calculations, "Plaintiffs' briefing point[ed] the Court to no other calculations of their alleged lost profits . . . . even [if] Franzese had opened his business, and even if it were profitable, no reasonable inference of its lost profits can be drawn 'as distinct from relying on hope and a guess.'" *Id*. (quoting *Parvati Corp. v. City of Oak Forest*, 709 F.3d 678, 685 (7th Cir. 2013)).

In Judge Dow's view, the only other *potential* path for Plaintiffs to succeed was nominal damages. *Id*. ("If Defendants have violated Plaintiffs' Second Amendment rights, but Plaintiffs cannot marshal sufficiently reliable evidence to show any lost profits with reasonable certainty as required by Illinois law, Plaintiffs still might be able to technically prevail on the merits with an entitlement to nominal damages."). Even though Plaintiffs may have "allude[d] to" the possibility of nominal damages with a citation to a Seventh Circuit opinion affirming an award of nominal damages, the 2020 Order noted that the point was "seriously underdeveloped." *Id*. at 29–30. Judge Dow thus ordered supplemental briefing on the possibility of nominal damages. *Id*. at 30–31. He ordered supplemental briefing as to the Laser Sight Ordinance as well,

expressing that all involved "would be better served by a more robust explanation of the parties' positions and the applicable law." *Id*. at 30.

Several rounds of briefing followed. The parties submitted the briefing ordered in the 2020 Order in July and August of 2020. Dkt. # 291; Dkt. # 292; Dkt. # 299 Dkt. # 300. On June 27, 2020, Judge Dow ordered additional briefing in light of the Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Dkt. # 303. Those briefs were filed in August of 2020. Dkt. # 309; Dkt. # 313. The case was reassigned to this Court on October 11, 2022, Dkt. # 314, and after a status hearing with the parties, we ordered additional briefing on several issues, Dkt. # 318. Specifically, we asked Defendants to file an opening brief addressing the Seventh Circuit's ruling in *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023), "any outstanding arguments concerning nominal damages and the [Laser Sight Ordinance] for the Court to consider," as well as Defendants' contention that Plaintiffs lacked standing. Dkt. # 318. Defendants filed that brief, in the form of their motion to dismiss for lack of jurisdiction under Rule 12(b)(1), in January of 2024. Dkt. # 320; Dkt. # 321. Plaintiffs responded in February. Dkt. # 326.

At long last, we address the remaining issues in this case. For purposes of this opinion, we presume familiarity with the 2020 Order. Because the parties submitted their statements of fact pursuant to Local Rule 56.1 in connection with their original summary judgment briefing, and they have not submitted additional statements of fact, the 2020 Order's recitation of the undisputed facts is adopted in full and incorporated

by reference herein. *See* 2020 Order, at 1–9. We also reference a few additional undisputed facts not included in the 2020 Order. In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). We will reference particular facts where relevant and include below some background facts pertinent to our opinion on the Laser Sight Ordinance.

Plaintiff Tony Kole has worked in the firearms industry as the owner of a retail firearms store in Norridge, Illinois. Kole is a certified NRA pistol instructor and Illinois concealed carry instructor. Kole is interested in purchasing and possessing laser-sight devices within the City of Chicago. When turned on, a laser-sighting device emits a laser that appears as a colored dot on a target when the firearm is aimed at the target. A firearm may be sold with a laser sight already integrated, or a laser sight may be attached to a firearm. Kole is allowed to carry a firearm on the job unless the work location prohibits it, and he does so if able. If allowed, he would have a laser sight on his concealed carry pistol to aid with self-defense.

All standard firearms have iron sights. A firearm will still function if its laser sight component is broken or removed. Kole testified that a laser sight is "an accessory. So it's not a fundamental part of the design of the firearm and that fundamental design is the iron sights." Dkt. # 255-3, at 32:6–10. If his laser sight were to fail, he would "have something to revert to." *Id*. at 32:10–12. If the laser sight on his firearm were broken, he would "absolutely" still be able to defend himself if necessary. *Id*. at 31:3–

6

8.   Tapkowski, a former police officer with years of experience teaching firearm training, testified that it is "just as easy to use your [iron] sights" as it is to use a laser sight and that he teaches his students that it is better to learn how to fire a gun "the right way," i.e., using the iron sight instead of relying on a laser sight.  Dkt. # 255-9, at 68:24–69:9.

On March 10, 1999, the City Council passed the Laser Sight Ordinance prohibiting the sale, purchase, and possession of "laser sight accessories," which the ordinance defined as "laser sighting device[s] which [are] either integrated into a firearm or capable of being attached to a firearm." Dkt. # 254-13, at 5.  The Laser Sight Ordinance contained the following finding: "WHEREAS, The City of Chicago finds that the public health and safety of its citizens, most particularly its police officers, are being endangered by the use of laser sights[.]" *Id*. at 4.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial."  *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018).  The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the

light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

Before reaching the merits of Defendants' motions, we note that the interplay between Defendants' motion to dismiss and the remaining issues to be decided on summary judgement presents somewhat of a "chicken or the egg" complexity. In order to rule on the merits of Count I, which involves the question of whether Plaintiffs have waived a claim to nominal damages, we need jurisdiction. But, as Plaintiffs recognize, Defendants' standing argument "only works if nominal damages are not allowed." Dkt. # 326, at 6. Because jurisdiction is a threshold question, we believe we must address the motion to dismiss first. For the following reasons, Defendants' motion to dismiss is denied but their motion for summary judgment is granted.

### I. Defendants' Motion to Dismiss

Defendants seek dismissal of Count I, challenging the 2010 Ordinance, under Rule 12(b)(1) for lack of jurisdiction. Dkt. # 320; Dkt. # 322. They argue SAA has no standing because it suffered no concrete, non-speculative injury caused by the 2010 Ordinance.

8

Standing requires that a plaintiff has suffered, or is likely to suffer, an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing, a complaint must plausibly allege "an invasion of a legally protected interest," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560), that "(1) is concrete and particularized, (2) was or will be caused by the defendant, and (3) likely will be remedied by a favorable judgment[,]" *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (cleaned up). The injury must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. The plaintiff has the burden to establish its standing. *Spokeo*, 578 U.S. at 338.

Defendants assert that the standing requirements "must be proved 'with the manner and degree of evidence required at the successive stages of the litigation,' and courts have 'an independent obligation to assure that standing exists' at each stage." Dkt. # 322, at 6 (citations omitted). Furthermore, "at the summary judgment stage, SAA's 'burden increases,' and it 'can no longer rest on . . . 'mere allegations'' to establish standing." *Id*. (citations omitted).

We disagree with Defendants that Plaintiffs lack standing for Count I. It is undisputed that Franzese filed an application for a City business license on behalf of SAA, and that the license was denied because the City did not allow gun stores pursuant to the 2010 Ordinance. 2020 Order, at 7. Franzese's FFL application was also denied because he did not have a City business license. *Id*. Defendants largely ignore that fact throughout their briefing, instead focusing on whether Plaintiffs could have gotten a

gun business up and running. But that relates to Plaintiffs' lost profits theory of damages, whereas, *theoretically*, Plaintiffs could have suffered a nominal injury *if* the denial of their licenses was unconstitutional. This is where the aforementioned complexity comes into play. While we *do not* find that Plaintiffs have a viable nominal damages claim that they have not waived and can pursue, for the *purposes of standing only*, we find that if Plaintiffs' license was unconstitutionally denied under the 2010 Order, that *could* establish an injury, even if nominal, caused by the 2010 Ordinance and addressable by a favorable ruling. *See* Dkt. # 219, at 8 n.2 ("Indeed, it may be an insurmountable hurdle for Plaintiff[s] to establish a viable [] damages theory. But that goes to the merits, not standing.").

Defendants' motion to dismiss is accordingly denied.

## II.     Defendants' Motion for Summary Judgment

The Court has two remaining issues to decide with respect to Defendants' motion for summary judgment (Dkt. # 251): (1) whether Plaintiffs can pursue nominal damages in connection with the 2010 Ordinance (Count I); and (2) whether the Laser Sight Ordinance is constitutional (Count III). For the following reasons, Defendants' motion is granted as to both Count I and Count III.

### a.  Count I: Nominal Damages and the 2010 Ordinance

As recounted above, the 2020 Order granted summary judgment in Defendants' favor on Plaintiffs' lost profits damages theory. Despite Plaintiffs never having mentioned nominal damages before, Judge Dow then queried whether nominal

10

damages was a path remaining to Plaintiffs and asked the parties for additional briefing on that point. 2020 Order, at 29–30. He did so because "Plaintiffs allude[d] to this possibility with a citation to *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016) (affirming award of nominal damages to strip club operator whose First Amendment rights were violated by city's lack of clear licensing standards)." *Id*.

Defendants argue that Plaintiffs have waived any claim for nominal damages by never previously raising it in this case. Dkt. # 291, at 2 (arguing Plaintiffs "have never sought nominal damages at any point" in the more than ten years of litigating this case, despite the case having "been pleaded at least five times and subject to multiple rounds of dispositive motion briefing."). Plaintiffs counter that their generalized requests for damages covered nominal damages and that the Court "may" grant nominal damages even if Plaintiffs did not ask for them. For the following reasons, we agree with Defendants that Plaintiffs have waived nominal damages as a form of relief and thus grant summary judgment in Defendants' favor on Count I.

As to Count I, the FAC requests: (1) injunctive relief; (2) declaratory relief; (3) monetary damages; (4) attorney's fees and costs; (5) costs of suit; and (6) "[a]ny other further relief as the Court deems just and appropriate." Dkt. # 146, at 10–11. There is no mention of nominal damages in the FAC, nor do Plaintiffs appear to have asserted such a theory throughout this litigation. Plaintiffs' argument that they have been seeking nominal damages since the outset of this case therefore strains credulity. Even now, Plaintiffs do not purport to have explicitly sought nominal damages until

11

they cited *Six Star* in their response to Defendants' motion for summary judgment. Dkt. # 300, at 3 ("Defendants are neither surprised nor prejudiced by Plaintiffs' request [for nominal damages], as even the explicit citation to *Six Star* [] was made a year ago.") (citations omitted); *id.* at 8 ("Plaintiffs have been referencing nominal damages specifically [] for more than a year.").

First, any possible claim for nominal damages was arguably dismissed long ago in the Court's order on Defendants' motion to dismiss the FAC, which ruled that SAA could "proceed on its claim for monetary damages" based on lost profits *only*, and that "Plaintiffs' remaining claims under Count I are dismissed." Dkt. # 182, at 28; *see Shahi v. U.S. Dep't of State*, 572 F. Supp. 3d 470, 481 (N.D. Ill. 2021) ("Nominal damages are money damages"). If Plaintiffs had a problem with that order, *issued in 2015*, they should have raised it with the Court then.

And we disagree that Plaintiffs' citation to *Six Star*, with no affirmative argument for nominal damages and, in fact, *no mention whatsoever of nominal damages*, constitutes a request for nominal damages. A "claim for nominal damages, extracted late in the day from [a] general prayer for relief and asserted to avoid otherwise certain mootness, [bears] close inspection." *Arizonans for Official English v. Arizona*, 520 U.S. 42, 71 (1997) (citing *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 141–42 (2d Cir. 1994) (*Fox* "reject[ed] claim for nominal damages proffered to save case from mootness years after litigation began where [the] defendants could have asserted qualified immunity had plaintiffs' complaint specifically requested monetary relief").

12

As Plaintiffs explain, they had been operating under the understanding that nominal damages were not at issue in this case, and they would have defended the case differently had nominal damages been at play. And a grant of nominal damages would first require a ruling that the 2010 Ordinance was unconstitutional,[2] which has not been at issue since the Court dismissed all aspects of Count I except compensatory damages. And it would require *even more* summary judgment briefing, if not a reopening of discovery. *See* Dkt. # 299, at 4–5.

Plaintiffs' arguments that nominal damages are "an accepted and commonplace remedy for constitutional violations," and/or that the Court "may" award nominal damages even where a plaintiff did not request them in the complaint, are not persuasive. *See* Dkt. 292, at 2. No one denies that nominal damages would have been a viable damages theory had Plaintiffs pursued them. And while Plaintiffs cite several cases indicating that a court *can* award relief not sought in a complaint, Dkt. # 300, at 3, none of these cases say we must do so. Especially where, as here, Plaintiffs pursued other damages theories throughout this litigation but gave no indication they were pursuing nominal damages, and where we find that an eleventh-hour request for nominal damages would upend years of litigation in this long-pending case.

Plaintiffs' citation to *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 140 S. Ct. 1525, 1526–27 (2020), does not help them. The opinion did not address the viability

---

[2] Judge Chang's ruling on the 2010 Ordinance in *Ill. Assoc. of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014), is not binding on this Court.

of nominal damages. Rather, where the plaintiffs sought only injunctive and declaratory relief, and the law at issue was repealed while the case was pending in the Supreme Court, the Supreme Court remanded the case so the district court could consider whether the plaintiffs could seek damages *at all* for the repealed law. The issue being addressed was what happens when a case "become[s] moot on appeal" and specifically, "where the mootness is attributable to a change in the legal framework governing the case, and where the plaintiff may have some residual claim under the new framework that was understandably not asserted previously[.]" *Id.* The situation at bar is quite different. Plaintiffs have sought damages from the beginning (just not nominal damages), the 2010 Ordinance was repealed in 2014, and Plaintiffs have had a full opportunity to develop their damages case throughout this litigation, including fact and expert discovery and summary judgment briefing. Plaintiffs chose to pursue compensatory damages and lost. Nothing in *N.Y. State Rifle* alters our opinion as to waiver of nominal damages.[3]

Finally, we disagree with Plaintiffs' assertion that their generalized request for "[a]ny other further relief as the Court deems just and appropriate" inherently included nominal damages. In *Ollie v. Atchison*, the Seventh Circuit held that even where

---

[3] Nor does Plaintiffs' citation to Justice Alito's non-binding dissent change the analysis, since he expressed that "prejudice is the critical factor in determining whether to permit a late request for a form of relief not expressly demanded in a complaint," the majority did not identify how a request for damages would prejudice the defendant at that juncture, and "there is no suggestion that the City would have litigated the case any differently if it had been on express notice that petitioners were seeking" damages. *N.Y. State Rifle*, 140 S. Ct. at 1538 n.9 (Alito, J., dissenting). As discussed *supra*, that is not the situation here.

14

nominal damages were permitted under the applicable statute, the plaintiff "did not request this relief in his amended complaint [], and therefore *it was never before the district court*." 753 F. App'x 406, 408 (7th Cir. 2019) (emphasis added). In that case, the operative complaint also did not request nominal damages but included a request for "such other and further relief as this court may deem just and proper." *Ollie v. Atchison*, No. 3:15-cv-01313-SMY-RJD, Dkt. # 37, at 10 (S.D. Ill. 2016). The appropriate result of Plaintiffs' failure to raise the possibility of nominal damages throughout this case is a finding of waiver.

For the foregoing reasons, we find that Plaintiffs waived any claim for nominal damages. Because that was the only potential path remaining to Plaintiffs after the 2020 Order, summary judgment is granted in Defendants' favor on Count I.

### b. Count III: Whether the Laser Sight Ordinance is Constitutional

Count III challenges the constitutionality of the Laser Sight Ordinance under the Second Amendment. The Second Amendment recognizes an individual's right to "keep and bear Arms." U.S. Const., Amdt. 2. But, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). The Supreme Court set out a two-part test to determine whether a law runs afoul of the Second Amendment in *Bruen*, 142 S. Ct. 2111.[4] First, the trial court must decide whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at

---

[4] Though the parties' earlier summary judgment briefing debated which legal standard to apply, they now agree that *Bruen* supplies the proper analysis. The Court therefore primarily relies on the parties post-*Bruen* briefs but considers their previous briefs as well.

2129–30. If so, then "the Constitution presumptively protects that conduct." *Id*. at 2130. The analysis then moves to the second step, which calls on the "government [to] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*.

The first step of the *Bruen* test is a threshold question—if the law at issue does not deal with "Arms for purposes of the Second Amendment," then "the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic process." *Bevis*, 85 F.4th at 1192. Only if the items at issue "are properly characterized as Arms" does the court proceed to *Bruen*'s second step. *Id*. A plaintiff has the burden at *Bruen* step one. *Id*. at 1194. Here, Plaintiffs must therefore show that laser sights are "Arms" protected by the Second Amendment.

"Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Id*. at 1192. The Supreme Court noted in *Heller* that founding-era dictionaries defined arms as "weapons of offence, or armour of defence" and "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581–82 (cleaned up). "Arms" does not apply "only to those arms in existence in the 18th century." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). Rather, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id*.

16

Defendants contend that Plaintiffs' challenge to the Laser Sight Ordinance fails at the first *Bruen* step because "laser sights are not 'arms' within the meaning of the plain text of the Second Amendment, but are, rather, mere firearm accessories." Dkt. # 309, at 5. Because a laser sight itself cannot be used to inflict offensive injury or used as defensive armor, it is not a "weapon of offence" or "armour of defence." *Id.* at 6. Defendants argue that laser sights are akin to firearm silencers, which courts have consistently held do not constitute "Arms" under the Second Amendment because they are "accessories rather than weapons themselves." *Id.* Furthermore, the undisputed evidence (based on Plaintiffs' own admissions) shows, among other things, that a laser sight is an "accessory . . . not a fundamental part of the design of the firearm" and that firearm owners can "absolutely" still defend themselves without a laser sight. *Id.* Defendants also cite cases holding that "laws that regulate the use of firearm accessories or attachments do not generally implicate the Second Amendment." Dkt. # 322, at 12 (quoting *Miller v. Garland*, 2023 WL 3692841, at *10 (E.D. Va. 2023)).

We agree with Defendants that laser sights are not "Arms" protected by the Second Amendment and are rather firearm accessories. The following facts are undisputed: (1) a firearm will still function if its laser sight component is broken or removed; (2) a laser sight is "an accessory. So it's not a fundamental part of the design of the firearm and that fundamental design is the iron sights[;]" (3) if the laser sight were broken, a gun user would "absolutely" still be able to defend himself if necessary; and (4) all standard firearms have iron sights, which are "just as easy" to use as laser

17

sights. Cases finding that gun silencers and stabilizing braces are firearm accessories are particularly instructive here, and we find their reasoning persuasive and applicable as to laser sights.

In *Miller*, the court found that a stabilizing brace was not a protected "Arm" because it "cannot cause harm on its own, is not useful independent of its attachment to a firearm, and a firearm remains an effective weapon without a brace." *Miller*, 2023 WL 3692841, at *10.

In *United States v. Cox*, the court found that "even if silencers are commonly used by law-abiding citizens for lawful purposes," they are not the "type of instrument protected by the Second Amendment[.]" 906 F.3d 1170, 1186 (10th Cir. 2018). Rather, a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment." *Id*.; *see also United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. 2019), *aff'd* 26 F.4th 610 (4th Cir. 2022) ("As Defendant's own expert testified, a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm. A silencer is not a weapon in and of itself, but simply a 'firearm accessory,' and therefore not a 'bearable arm' protected by the Second Amendment.") (cleaned up).

In *United States v. Saleem*, the court agreed with *Hasson* and found that "silencers, because they are not independently operable and do not serve any central self-defense purpose, are not firearms within the meaning of the Second Amendment

but are instead firearm accessories that fall outside its protection." 659 F. Supp. 3d 683, 697 (W.D.N.C. 2023). The court was not persuaded by the argument that "even if silencers are not 'arms,' they nevertheless qualify for Second Amendment protection because they are reasonably necessary accoutrements that render a firearm useful and functional." *Id*. Unlike "[c]leaning equipment, bullets, and materials that provide a firearm with protection from the elements [which] are all necessary to render a firearm functional, [] silencers serve no such core purpose." *Id*. Unlike silencers, "[t]hese accoutrements are thus critical to the use and effectiveness of a firearm as a bearable weapon, allowing them to serve their purpose of weapons of self defense such that restrictions may run afoul of the Second Amendment." *Id*. The court concluded:

> A firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm. Thus, silencers are neither arms nor reasonably necessary accoutrements within the purview of the Second Amendment, and the [regulation] of silencers do not run afoul of its protections.

*Id*. at 698.; *see also United States v. Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. 2023) ("as a firearm accessory, silencers are not weapons and therefore cannot be 'bearable arms' protected by the Second Amendment.").

The court in *United States v. Berger* summarized the relevant case law well:

> [C]ourts are drawing a line for Second Amendment protection based on whether the particular firearm component is necessary or integral to a firearm's operation. If the component is necessary or integral, such as ammunition, it qualifies as a bearable "Arm" under the plain text of the Second Amendment. If the firearm component is not necessary or integral to the operation of a firearm, it does not fall within the Second Amendment's plain text.

2024 WL 449247, at *16 (E.D. Pa. 2024) (cleaned up) (collecting cases). We agree with this approach and follow it here.

Plaintiffs fail to meet their burden to show that laser sights are "Arms." Plaintiffs acknowledge that *Bruen* "altered the analysis as to Second Amendment challenges" and first argue that "laser sights are not assault weapons," Dkt. # 313, at 2, 6, answering a question not before the Court. They cite *United States v. Jones*, 132 S. Ct. 945 (2012), and argue that "laser sights are protected by the Second Amendment, as a modern version of something that has been a part of safe firearm usage for hundreds of years, *i.e.*, firearm sights." *Id*. at 7. We disagree that *Jones*, a case about Fourth Amendment searches and seizures and GPS tracking, stands for that sweeping proposition. Plaintiffs also assert that laser sights "may be a modern iteration of something that has been a firearm component for centuries, but they do not make firearms more dangerous" and they "improve aim and can even deescalate a situation before firing the weapon is even necessary." *Id*. at 6–7. None of this shows that laser sights are necessary or integral to the operation of a firearm.

Plaintiffs' other arguments are unpersuasive or miss the mark. They contend that Defendants' comparison of laser sights to silencers, and their discussion of cases dealing with silencers, is "unavailing." *Id*. But all they offer in support is a conclusory statement that a laser sight has "a discernible lawful purpose and is often built into the firearm itself." *Id*. Plaintiffs do not even attempt to engage with the reasoning of the

cases finding silencers were not protected by the Second Amendment, i.e., that silencers are not necessary or integral to the operation of a firearm. Plaintiffs then draw an inapt comparison and assert that a "trigger, by itself, is also not an 'arm' or weapon.' It is the trigger's use as *part* of a bearable arm that renders it protected under the Second Amendment." *Id*. (emphasis in original). Plaintiffs conclude that if Defendants "banned triggers, and argued they were not [] protected arms, such a ban would immediately be struck down." *Id*. at 7–8. Besides being illogical, this false comparison fails to explain how a trigger (without which a firearm cannot function) is analogous to a laser sight. Rather, a trigger is more akin to ammunition, without which "a firearm is nothing more than a paper weight and is no more of a bearable arm than a baseball bat." *See Saleem*, 659 F. Supp. 3d at 697. But a "firearm can be used safely and effectively without" a laser sight, even if it "has benefits for the user." *See id.* at 698.

Plaintiffs also argue that the "definition [of arms] covers modern instruments that facilitate armed self-defense." Dkt. # 326, at 9. They then cite cases that found that stun guns and butterfly knives were "arms" under the Second Amendment. Plaintiffs offer no explanation, however, of how a laser sight (attached to a firearm to assist with accuracy) is comparable to stun guns or knives which are themselves weapons.

The remainder of Plaintiffs' brief belies their position that laser sights are arms by expressly and impliedly admitting that laser sights are mere accessories. *See id.* at 10–13. Plaintiffs state that a "firearm can physically be pointed and shot without the laser sight permanently affixed to it," *id*. at 10, and cite deposition testimony

21

purportedly showing "the value of laser sights for self-defense, *id*. at 12–13. This includes, for example, that a laser sight "*helps* to make sure the gun is sighted and on target," it "is *easier* to hit a target at a known distance with a laser sight," a laser sight would "*aid* with self-defense," a laser sight "is to *help* accuracy," and Plaintiff Kole "would feel more comfortable" with a laser sight. *Id*. (emphasis added). All of this shows that laser sights are neither firearms themselves nor necessary to the operation of a firearm, and are merely unprotected firearm accessories. *See United States v. Lightner*, 2024 WL 2882237, at *2 (M.D. Fla. 2024) (rejecting argument that silencers "enhance accuracy" and thus "better facilitat[e] armed self-defense" because "the potential utility of a firearm silencer does not transform it into a bearable arm."); *Hasson*, 2019 WL 4573424, at *5 ("Here, there is no evidence that silencers are 'so critical' to firearm ownership that firearms cannot be used effectively without them. Although silencers may improve the usage of a firearm, they are not necessary, and they are therefore not protected by the Second Amendment."). We reject Plaintiffs' argument that laser sights are "necessary to [the] exercise" of Second Amendment rights. Dkt. # 326, at 11 (citation omitted); *see Berger*, 2024 WL 449247, at *17 ("Adopting the defendants' interpretation of the term 'necessary' would require the Court to redefine it from referring to something that is 'essential,' to instead refer to something that is akin to 'helpful,' 'useful,' or 'advantageous.' The Court declines to adopt such a tortured interpretation of 'necessary.'").

Plaintiffs' citation to *Jackson v. City & Cnty. of San Francisco*, 746 F. 3d 953,

22

967 (9th Cir. 2014), belies their position as well. Plaintiffs cite this case for its holding that ammunition was an "arm" because "eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose" of self-defense. Dkt. # 326, at 11. But as just discussed, Plaintiffs' own arguments (as well as the record evidence) make it clear that the absence of a laser *does not* "make it impossible to use firearms" for self-defense. Nor does *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), help Plaintiffs, since they have failed to put forth evidence that laser sights are "necessary" to the effective or safe use of firearms.

In sum, the undisputed facts show that "a firearm remains an effective weapon without a [laser sight] attached" and thus a laser sight "is not a weapon protected by the Second Amendment." *See Hasson*, 2019 WL 4573424, at *5. Rather, "it is merely an accessory which is unnecessary to the essential operation of a firearm." *See Berger*, 2024 WL 449247, at *17. Kole himself testified that a laser sight is not a firearm and is rather an accessory without which he would "absolutely" be able to defend himself. Because Plaintiffs failed to carry their burden to show that a laser sight is an "Arm" protected by the Second Amendment, Count III challenging the Laser Sight Ordinance fails at *Bruen* step one, which ends the analysis. Summary judgment is granted in Defendants' favor as to Count III.

## <u>CONCLUSION</u>

Defendants' motion to dismiss [320] is denied.  Defendants' motion for summary judgment [251] is granted as to Counts I and III.  Civil case terminated.

It is so ordered.

_____

Charles P. Kocoras

United States District Judge

Date: July 22, 2024